POMERANTZ LLP
Gustavo F. Bruckner
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com

*Attorney for Plaintiff*

- additional counsel on signature page -

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CLAUDIO COUTINHO, Individually and On Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | <u>CLASS ACTION COMPLAINT</u> |
| v. | <u>JURY TRIAL DEMANDED</u> |
| BRASKEM S.A., ROBERTO LOPES PONTES SIMÕES, FERNANDO MUSA, and PEDRO VAN LANGENDONCK TEIXEIRA DE FREITAS, | |
| Defendants. | |

Plaintiff Claudio Coutinho ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge

1

as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Braskem S.A. ("Braskem" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Braskem securities between May 6, 2016, and July 8, 2020, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Braskem is headquartered in Camaçari, Bahia.  The Company is purportedly the largest producer of thermoplastic resins in the Americas, based on

the annual production capacity of the Company's twenty-nine plants in Brazil, six plants in the U.S., two plants in Germany, and four plants in Mexico, as of December 31, 2019.  The Company's segments include, among others, its Vinyls Unit, which involved salt mining operations in Alagoas, Brazil.

3.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.   Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Braskem's salt mining operations were unsafe and presented a significant danger to surrounding areas, including nearly two thousand properties; (ii) the foregoing foreseeably increased the risk that Braskem would be subjected to remedial liabilities, including, but not limited to, increased governmental and/or regulatory oversight or enforcement, significant monetary and reputational damage, and/or the permanent closure of one or more of its salt mining operations; (iii) accordingly, earnings generated from Braskem's salt mining operations were unsustainable; (iv) Braskem downplayed the true scope and severity of the Company's liability with respect to its salt mining operations; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

4.      On April 2, 2019, media sources and, later, Braskem, disclosed that the Company had been sued by local authorities in connection with a geological event

it had purportedly caused in the state of Alagoas, Brazil.  Specifically, Braskem

disclosed, in relevant part, that the Company "ha[d] become aware, through the

media, of a lawsuit filed against it by the Public Prosecutor's Office and the Public

Defender's Office, both of the State of Alagoas."  The Company disclosed that the

lawsuits were "requesting the freezing of amounts and assets in a total of

approximately R$6.7 billion to guarantee any potential damages owed to the general

public affected by the geological phenomenon which occurred in districts near the

rock salt extraction area in Maceió."

5.     On this news, Braskem's American Depositary Share ("ADS") price

fell $1.60 per share over two trading days, or 5.98%, to close at $25.14 per share on

April 3, 2020.

6.     Then, on January 3, 2020, Braskem disclosed that it had executed an

agreement related to the aforementioned geological event that subjected the

Company to further liabilities.  Specifically, the Company disclosed that on January

3, 2020, it had executed an agreement with the Alagoas State Public Defender's

Office ("DPE"), the Federal Prosecution Office ("MPF"), the Alagoas State

Prosecution Office ("MPE"), and the Federal Public Defender's Office ("DPU") "to

support the relocation and indemnification of residents of the areas at risk located in

the districts of Mutange, Bom Parto, Pinheiro and Bebedouro of Maceió, Alagoas,

as established in the agreement, which will be submitted to judicial ratification."

4

Among other conditions, the Company advised that preliminarily estimates for the relocation established in the agreement involve approximately 17,000 people, with estimates to be recognized as provisions at approximately R[1]$1.7 billion for the implementation of the relocation, and R$1 billion to close the Company's salt wells.

7.      Finally, on July 9, 2020, during pre-market hours, Braskem disclosed that authorities in northeastern Brazil had advised the Company that the geological damage from its salt mining operations was more widespread than initial estimates. Specifically, among other things, 1,918 properties needed to be evacuated because of the geological event associated with Braskem's mining operations, and Braskem estimated that moving the residents would cost the Company an additional R$850 million in possible payments to those residents, with another additional R$750 million in expenses to "definitively" shut down Braskem's salt mining operations.

8.      On this news, Braskem's ADS price fell $0.59 per share, or 6.20%, to close at $8.93 per share on July 9, 2020.

9.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] All references to "R$" are to Brazil's official currency, the Brazilian "real" or "reais" (plural).

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

11.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

12.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements entered and the subsequent damages took place in this Judicial District.  Pursuant to Braskem's most recent annual report on Form 20-F, as of December 31, 2019, there were a total number of 345,049,672 of the Company's Class A Preferred Shares issued, each represented by ADSs.  Braskem's Class A Preferred Shares, each represented by ADSs, trade on the New York Stock Exchange ("NYSE").  Accordingly, there are presumably hundreds, if not thousands, of investors in Braskem's Class A Preferred Shares, each represented by ADSs, located within the U.S., some of whom undoubtedly reside in the State of New Jersey.

13.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

14.     Plaintiff, as set forth in the attached Certification, acquired Braskem securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Braskem is organized under the laws of the Federative Republic of Brazil, with principal executive offices located at Rua Lemos Monteiro, 120 – 24° andar, Butantã – São Paulo, SP – CEP 05501-050 – Brazil.  Braskem securities trade in an efficient market on the NYSE under the ticker symbol "BAK."

16.     Defendant Roberto Lopes Pontes Simões ("Simões") has served as Braskem's Chief Executive Officer ("CEO") since January 1, 2020.

17.     Defendant Fernando Musa ("Musa") served as Braskem's CEO from before the start of the Class Period until January 1, 2020.

18.     Defendant Pedro van Langendonck Teixeira de Freitas ("Freitas") has served as Braskem's Chief Financial Officer at all relevant times.

19.     Defendants Simões, Musa, and Freitas are sometimes referred to herein as the "Individual Defendants."

20.     The Individual Defendants possessed the power and authority to control the contents of Braskem's SEC filings, press releases, and other market communications.   The Individual Defendants were provided with copies of Braskem's SEC filings and press releases alleged herein to be misleading prior to or

7

shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Braskem, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

21. Braskem and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## Background

22. Braskem is headquartered in Camaçari, Bahia. The Company is purportedly the largest producer of thermoplastic resins in the Americas, based on the annual production capacity of the Company's twenty-nine plants in Brazil, six plants in the U.S., two plants in Germany, and four plants in Mexico, as of December 31, 2019. The Company's segments include, among others, its Vinyls Unit, which involved salt mining operations in Alagoas, Brazil.

## Materially False and Misleading Statements Issued During the Class Period

23.     The Class Period begins on May 6, 2016.  On May 5, 2016, during after-market hours, Braskem filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2015 (the "2015 20-F").  The 2015 20-F reported that Braskem's "Vinyls Unit generated net sales revenue of R$2,780.1 million in 2015, or 5.0% of [the Company's] net sales revenue of all reportable segments."

24.     With respect to Braskem's salt mining operations, the 2015 20-F stated, in relevant part, that the Company "used approximately 848,885 tons of salt during 2015," which "accounted for 0.5% of [the Company's] Vinyls Unit's total cost of sales in 2015"; that Braskem "ha[s] exclusive salt exploration rights at a salt mine located near [its] Alagoas plant"; that Braskem "estimate[s] that the salt reserves of this mine are sufficient to allow [the Company] to produce chlorine at expected rates of production for approximately 35 to 45 years"; and that Braskem "enjoy[s] significant cost advantages when compared to certain of [its] competitors due to the low extraction costs of rock salt (particularly compared to sea salt), and low transportation costs due to the proximity of the salt mine to [the Company's] production facility."

25.     The 2015 20-F also contained generic, boilerplate representations regarding potential hazards caused by Braskem's operations, stating, in relevant part,

that Braskem's "operations are subject to hazards, such as fires, explosions and other accidents, associated with the manufacture of petrochemicals and the storage and transportation of feedstock and petrochemical products"; that "[t]hese hazards can cause personal injury and loss of life, severe damage to or destruction of property and equipment and environmental damage"; that "[a] sufficiently large accident at one of [Braskem's] plants or storage facilities could force [the Company] to suspend [its] operations temporarily and result in significant remediation costs and lost net sales revenue"; that, "[a]lthough [Braskem] maintain[s] insurance coverage for losses due to fire damage and for losses of income resulting from shutdowns due to fire, explosion or electrical damage, those insurance proceeds may not be available on a timely basis and may be insufficient to cover all losses"; and that the foregoing "could have a material adverse effect on [Braskem's] financial performance." Plainly, these risk warnings were generic, catch-all provisions that were not tailored to Braskem's actual known risks related to its dangerous salt mining operations.

26.     Additionally, the 2015 20-F contained generic, boilerplate representations regarding risks related to "natural" disasters, stating, in relevant part, that "[s]ome of [Braskem's] facilities are located in places that could be affected by natural disasters, such as floods, earthquakes, hurricanes, tornados and other natural disasters"; that the foregoing "could disrupt [Braskem's] operations or the operations of [its] customers and could damage or destroy infrastructure necessary to transport

10

[its] products as part of the supply chain"; and that "[s]uch events could require maintenance shutdowns, delay shipments of existing inventory or result in costly repairs, replacements or other costs, all of which could have a material adverse effect on [Braskem's] financial performance." Plainly, these risk warnings, too, were generic, catch-all provisions that were not tailored to Braskem's actual known risks related to its dangerous salt mining operations.

27.     Appended as Exhibit 99.01 to the 2015 20-F was Braskem's Item 16H. Mine Safety Disclosure, which stated, in relevant part:

> We operate a salt mine located in our Alagoas complex . . . . This mine uses a system of wells for salt extraction and does not expose any workers to the interior of the mine. Because the mine is located in Brazil, it is not subject to the Mine Safety and Health Administration, or MSHA, regulation under the Federal Mine Safety and Health Act of 1977, or the Mine Act.
>
> During the 2015 fiscal year, none of our mining operations received written notice from MSHA of (i) a violation under section 104 of the Mine Act or unwarrantable failure of the mine operator to comply with section 104(d) of the Mine Act; (ii) a flagrant violation under section 110(b)(2) of the Mine Act; (iii) an imminent danger order under section 107(a) of the Mine Act; (iv) a proposed assessment under the Mining Act or (v) a pattern of violations of mandatory health or safety standards that are of such nature as could have significantly and substantially contributed to the cause and effect of our mine health or safety hazards under section 104(e) of the Mine Act or the potential to have such a pattern.
>
> For the 2015 fiscal year, we experienced no mining-related fatalities nor were we involved in any pending legal action before the Federal Mine Safety and Health Review Commission involving our mine.

28.     Appended as Exhibit 13.01 to the 2015 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Musa and Freitas certified that the 2015 20-F "fully complies with the requirements of section 13(a) or 15(d) of the [Exchange Act] and information contained in the [2015] 20-F fairly presents, in all material respects, the financial condition and results of operations of the Company."

29.     On September 25, 2017, Braskem filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2016 (the "2016 20-F").  The 2016 20-F reported that Braskem's "Vinyls Unit generated net sales revenue of R$3,016.4 million in 2016, or 5.1% of [the Company's] net sales revenue of all reportable segments."

30.     The 2016 20-F also contained substantively the same statements as referenced in ¶¶ 24-26, *supra*.

31.     Appended as Exhibit 99.01 to the 2016 20-F was substantively the same mine safety disclosure as referenced in ¶ 27, *supra*.

32.     Appended as Exhibit 13.01 to the 2016 20-F were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by Defendants Musa and Freitas.

33.     The statements referenced in ¶¶ 23-32, *supra*, were materially false and misleading because Defendants made false and/or misleading statements, as well as

failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Braskem's salt mining operations were unsafe and presented a significant danger to surrounding areas, including nearly two thousand properties; (ii) the foregoing foreseeably increased the risk that Braskem would be subjected to remedial liabilities, including, but not limited to, increased governmental and/or regulatory oversight or enforcement, significant monetary and reputational damage, and/or the permanent closure of one or more of its salt mining operations; (iii) accordingly, earnings generated from Braskem's salt mining operations were unsustainable; (iv) Braskem downplayed the true scope and severity of the Company's liability with respect to its salt mining operations; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

34.    On April 2, 2019, media sources and, later, Braskem, disclosed that the Company had been sued by local authorities in connection with a geological event it had purportedly caused in the state of Alagoas, Brazil (the "April 2019 Press Release").  Specifically, Braskem disclosed, in relevant part:

> BRASKEM . . . hereby announces to its shareholders and the market in general that it has become aware, through the media, of a lawsuit filed against it by the Public Prosecutor's Office and the Public Defender's Office, both of the State of Alagoas, requesting the freezing of amounts

13

and assets in a total of approximately R$6.7 billion to guarantee any potential damages owed to the general public affected by the geological phenomenon which occurred in districts near the rock salt extraction area in Maceió.

35.    On this news, Braskem's ADS price fell $1.60 per share over two trading days, or 5.98%, to close at $25.14 per share on April 3, 2020.  Despite this decline in Braskem's ADS price, the Company's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding the true scope and severity of the Company's liability with respect to the geological event caused by its salt mining operations.

36.    For example, the April 2019 Press Release also assured investors, in relevant part, that "the Company informs that it was not served in the referred lawsuit, but will evaluate and take the pertinent measures within the applicable legal deadlines and keep the market informed of any relevant developments on the matter"; that "[r]egarding the phenomenon occurred in the Pinheiro neighborhood, the Company reiterates that it has been collaborating with the authorities to identify the causes"; that "the technical analysis of the competent bodies are still in progress and that, to date, it cannot be affirmed that Braskem's activities are the cause of the events observed in the neighborhood"; and that "Braskem reaffirms its commitment to the population of Alagoas and to responsible business practices, and will continue contributing to identify and implement solutions."

37.    On October 8, 2019, Braskem filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 20-F").  The 2017 20-F reported that Braskem's "Vinyls Unit generated net sales revenue of R\$3,066.9 million in 2017, or 5.0% of our net sales revenue of all reportable segments."

38.    The 2017 20-F also contained substantively the same statements as referenced in ¶¶ 24-26, *supra*.

39.    With respect to potential hazards posed by Braskem's operations, the 2017 20-F also contained, albeit belatedly, additional risk warnings related to the Company's salt mining operations, which simultaneously downplayed Braskem's wrongdoing and potential liability with respect to its salt mining operations. Specifically, the 2017 20-F stated, in relevant part, that "[t]he operation of [Braskem's] salt mining activities in the state of Alagoas, Brazil, which is a raw material necessary for production of certain products in [Braskem's] Vinyls Unit, is also subject to similar risks and hazards"; that "any significant incident relating to [Braskem's] salt mining activities may also result in material adverse environmental and social impacts"; that, "[f]or instance, in certain neighborhoods of the city of Maceió that are located near the geological area of [Braskem's] salt mine, there have been recent allegations that the ground gave way as a result of the activities carried out by [Braskem] at this mine"; and that this "allegedly may have affected certain

nearby private and public properties." Plainly, the foregoing risk warnings were generic, catch-all provisions that were not tailored to Braskem's actual known risks regarding the true scope and severity of the Company's liability with respect to its salt mining operations.

40. The 2017 20-F further downplayed Braskem's potential legal responsibility, as well as liability, for the geological event associated with the Company's salt mining operations, through a discussion of Braskem's ongoing court proceedings, stating, in relevant part:

> On April 4, 2019, in response to a request of the Alagoas State Attorney's Office . . . and [DPE] . . . seeking to freeze our assets in an amount of up to R$6.7 billion to secure funds allegedly required to ensure remediation and compensation for environmental, property and personal damages potentially resulting from this incident, a lower-court judge of the Alagoas state court ordered the freezing of R$100 million in our bank accounts. In addition, the Alagoas state court of appeals . . . ordered the suspension of the distribution of dividends for the fiscal year 2018 that had been proposed in the amount of R$2.7 billion, or, alternatively, the freezing of assets in the same amount of the proposed dividend distribution. This decision was subsequently reversed by a decision of the Superior Court of Justice . . . which authorized the distribution of dividends upon posting of a judicial bond in the same amount. The Alagoas State Attorney's Office and [DPE] amended their claim to exclude the request for indemnification for the alleged environmental damages and reduce the amount of assets to be frozen to R$3.7 billion, which according to their allegations would be equivalent to the alleged damages caused to the residents of the districts affected by the geological event. Immediately thereafter, on June 26, 2019, the presiding judge of the Alagoas state court of appeals . . . issued a decision ordering an amount of R$3.7 billion to be frozen. This decision was also subsequently reversed by the Superior Court of Justice (STJ), which ordered the frozen amount of R$3.7 billion to be returned to our bank accounts after posting another judicial bond in an equivalent

amount. On July 25, 2019, we were informed of another civil lawsuit filed against us by the Labor Prosecutor's Office of the State of Alagoas, or MPT-AL, requesting injunctive relief to freeze the amount of R$2.5 billion to guarantee payment of any potential damages that workers affected by the geological event may suffer. In that lawsuit, MPT-AL further requested the payment of compensation to workers for pain and suffering. The trial court has not yet ruled on the plaintiff's injunction relief request. On August 19, 2019, we became aware of the filing of another civil lawsuit by the [MPF] against us and other parties, requesting the following injunctive reliefs: (i) the set-up of a fund of R$3.1 billion for the benefit of social and environmental programs and emergency measures to be carried out, and the maintenance in said fund of working capital in the amount of at least R$2.0 billion or, after a financial schedule is approved for such fund, an amount equivalent to 100% of the expenses projected for the subsequent 12 months; (ii) the posting of bonds in the amount of R$20.5 billion; (iii) prohibition on us to encumber or dispose of any of our fixed assets and to distribute profits, in the form of dividends, interest on shareholders' equity or any other form; (iv) freezing of any profits not yet distributed; and (v) suspension of receipt of government financings from BNDES (a federal development bank) and government incentives, as well as acceleration of existing indebtedness with BNDES. We are taking all relevant measures to defend against these lawsuits. As of the date of this annual report, the plaintiff's requests for injunctive relief have not yet been ruled upon.

41.     In this same vein, the 2017 20-F represented, in relevant part, that a report prepared by an entity of the Brazilian Energy and Mining Ministry indicated the occurrence of "destabilization of caverns resulting from sodium chloride, or salt, extraction . . . created a dynamic situation that reactivated pre-existing geological structures and deformations in the districts of Pinheiro, Mutange and Bebedouro"; that "instability in the Pinheiro district . . . was aggravated by the erosive effects caused by an increase in the infiltration of stormwater runoff in pre-existing fractures

in extremely erodible soil and accelerated due to the lack of an effective stormwater runoff drainage network and of adequate basic sanitation, among other factors"; that because of "the developments from the publication of [the report] . . . on May 9, 2019, [Braskem] suspended all salt extraction"; that, "consequently, the operations of the chlor-alkali and dichloroethane plants located in the district of Pontal da Barra in Maceió, state of Alagoas . . . also reduc[ed] production"; that, consequently, "Braskem put in plance [*sic*] a non integrated business model"; that "the Company will import (i) caustic soda to supply the Brazilian market using its logistics structure and terminals along the Brazilian coast, (ii) EDC to continue to operate its PVC plants in Alagoas and Bahia, and (iii) sea salt to supply the Chlorine Soda plant of Bahia"; that Braskem has "been continuously cooperating with relevant authorities and the local community"; that, "[i]f authorities conclude that the activities at [Braskem's] salt mine caused such incidents, [the Company] may be held responsible for any adverse environmental and social impacts attributable to it"; and that Braskem "may face difficulties in obtaining or maintaining operating licenses and may suffer damage to [its] reputation following the occurrence of any such event."  Plainly, these risk warnings, too, were generic, catch-all provisions that were not tailored to Braskem's actual known risks regarding the true scope and severity of the Company's liability with respect to its salt mining operations.

18

42.     Appended as Exhibit 99.01 to the 2017 20-F was substantively the same mine safety disclosure as referenced in ¶ 27, *supra*, which additionally represented, in relevant part, that "Braskem's mining operations in the State of Alagoas hold an environmental license issued by the state's environmental protection agency valid through 2022 and are grounded in mining law formalized by the Mining Concession awarded by the Federal Government"; that, "[i]n view of the summarized report issued by the . . . agency of the Ministry of Mines and Energy, on May 8, 2019, the salt extraction wells that were the object of the environmental licenses had their activities suspended by the state's environmental agency"; and that "the National Mining Agency (the regulatory and oversight agency for mining activities) ordered the cessation of mining activities on May 9, 2019."

43.     Appended as Exhibit 13.01 to the 2017 20-F were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by Defendants Musa and Freitas.

44.     On October 17, 2019, Braskem filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 20-F").  The 2018 20-F reported that Braskem's "Vinyls Unit generated net sales revenue of R$3,167.4 million in 2018, or 4.4% of [the Company's] net sales revenue of all reportable segments."

45.     The 2018 20-F also contained substantively the same statements as referenced in ¶¶ 24-26 and 39-41, *supra*.

46.     Appended as Exhibit 99.01 to the 2018 20-F was substantively the same mine safety disclosure as referenced in ¶ 27, *supra*, containing the additional representations as referenced in ¶ 42, *supra*.

47.     Appended as Exhibit 13.01 to the 2018 20-F were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by Defendants Musa and Freitas.

48.     Then, on January 3, 2020, Braskem disclosed that it had executed an agreement related to the geological event associated with its salt mining operations that subjected the Company to further liabilities.   Specifically, the Company disclosed, in relevant part:

> Braskem S.A. . . . hereby informs that it executed, on January 3, 2020, an agreement with the [DPE], [MPF], [MPE] and [DPU] to support the relocation and indemnification of residents of the areas at risk located in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro of Maceió, Alagoas, as established in the agreement, which will be submitted to judicial ratification. The Company preliminarily estimates that the support for relocation established in the agreement and on areas announced previously by the Company involve approximately 17,000 people ("Financial Compensation and Support for Relocation Program").
>
> In this regard, and to the best of its knowledge, the Company estimates the amounts to be recognized as provisions at approximately (i) R$1.7 billion for the implementation of the Financial Compensation and Support for Relocation Program; and (ii) R$1 billion for the actions

required to close its salt wells. Said provisions will be disbursed over the coming years and may be changed based on new developments.

Furthermore, the DPE, MPF, MPE and DPU agreed (i) to release the approximately R$3.7 billion in cash of the Company that previously had been frozen, of which R$1.7 billion will be transferred to a bank account of Braskem specifically for funding the Financial Compensation and Support for Relocation Program that must maintain at minimum working capital of R$100 million, subject to verification by an external auditor; and (ii) to the substitution of the surety bonds already presented by Braskem to the Courts in the approximate amount of R$6.4 billion by two new surety bonds in the approximate amount of R$3 billion, to guarantee the Public-Interest Civil Action filed by the DPE and by the MPE and the Public-Interest Civil Action filed by the MPF.

49.    Despite this disclosure, Braskem's securities continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding the true scope and severity of the Company's liability with respect to the geological event caused by its salt mining operations.

50.    For example, on June 15, 2020, Braskem filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operating results for the quarter and year ended December 31, 2019 (the "2019 20-F"). The 2019 20-F reported that Braskem's "Vinyls Unit generated net revenue of R$2,692.8 million in 2019, or 4.2% of [the Company's] net revenue of all reportable segments, including inter-segment sales."

51.     With respect to Braskem's salt mining operations, the 2019 20-F stated, in relevant part, that the Company "used 212,000 tons of salt during 2019," which "accounted for 1% of [the Company's] Vinyls Unit's total cost of products sold in 2019"; that "salt mining operations at [Braskem's] mine were halted in May 2019"; that, "[a]s a result, [Braskem's] business is also subject to stringent environmental and other regulations"; that "[p]roduction of caustic soda and ethylene dichloride at [Braskem's] chlor-alkali facility located in the state of Alagoas was also interrupted due to the lack of salt"; that, "[b]ecause of the interruption, [Braskem] needed to import 139,000 tons of caustic soda to supply [its] customers and 295,000 tons of EDC to supply [its] PVC facilities located in the state of Alagoas and in the Northeastern Complex"; that, "[s]eeking to resume [Braskem's] chlor-alkali operations, [the Company] launched a project to modify the feedstock base of [its] chlor-alkali plants by acquiring sea salt from third parties in Brazil or abroad"; that "[t]he product will be stocked, dissolved in water to make brine and then treated and sent for processing"; and that "[t]he estimated cost of the project is R$59.3 million, of which R$21.2 million was already disbursed in 2019."

52.     The 2019 20-F also contained substantively the same statements as referenced in ¶¶ 25-26, *supra*.

53.     With respect to risks regarding Braskem's salt mining activities, as well as related remedial measures, the 2019 20-F contained generic, boilerplate

representations, stating, in relevant part, that "[m]ining operations at [Braskem's] salt mine in Alagoas were halted in May 2019"; that "[e]ven though the risk of a sinkhole formation is unlikely, it cannot be fully disregarded"; that "[a] safety area covering 15 of the 35 wells at the site of [Braskem's] salt mine was designated, and the entirety of the mining area has been monitored"; that, "[i]n October 2019, a conceptual project was launched to start backfilling some wells that have lost their salt, which is a condition for sinkhole formation"; that Braskem "expect[s] that these wells will be stabilized as soon as possible, starting in 2020"; that "these actions are part of a large operation that, following reasonable engineering efforts, may take a few years to be completed"; that "[o]ther caverns that are comparatively more stable will be closely monitored"; and that, "[b]ased on the results of monitoring routines and additional studies relating to numerical simulations, which provide data to monitor the stability of the caverns, there could arise the need for further stabilization and backfilling." Plainly, these risk warnings were generic, catch-all provisions that were not tailored to Braskem's actual known risks regarding the true scope and severity of the Company's liability with respect to its salt mining operations.

54. Additionally, with respect to Braskem's foreseeable liability for the geological event associated with its salt mining operations, the 2019 20-F stated, in relevant part, that "[o]n January 3, 2020, [Braskem] entered into an agreement with the [DPE], [MPF], [MPE] and [DPU] to support the relocation of, and

indemnification to, residents in the areas at risk"; that Braskem "estimate[s] that the support for relocation set forth in the agreement and in surrounding areas will involve approximately 4,500 buildings and 17,000 people during the next two years"; that, "[o]n December 31, 2019, based on" various legal assessments, financial assessments, existing information, and discussions with authorities, Braskem "recorded a provision of R$3,383.1 million, of which R$1,450.5 million is under current liabilities and R$1,932.6 million is under non-current liabilities"; that "the provision may be adjusted over time to reflect new developments"; that, "[o]n February 17, 2020, [Braskem] entered into a settlement agreement with the Labor Prosecutor's Office . . . in the amount of R$40.0 million," under which Braskem "agreed to implement a program for business recovery and promotion of educational activities"; and that, under "the settlement agreement, the Labor Prosecutor's Office agreed to withdraw the lawsuit it had filed against [Braskem], including the request to freeze [Braskem's] funds made in connection with such lawsuit."

55.    Appended as Exhibit 99.01 to the 2019 20-F was substantively the same mine safety disclosure as referenced in ¶ 27, *supra*, containing the additional representations as referenced in ¶ 42, *supra*.

56.    Appended as Exhibit 13.01 to the 2018 20-F were substantively the same SOX certifications as referenced in ¶ 28, *supra*, signed by Defendants Simões and Freitas.

57.     The statements referenced in ¶¶ 36-48 and 50-56, *supra*, were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Braskem's salt mining operations were unsafe and presented a significant danger to surrounding areas, including nearly two thousand properties; (ii) the foregoing foreseeably increased the risk that Braskem would be subjected to remedial liabilities, including, but not limited to, increased governmental and/or regulatory oversight and enforcement, significant monetary and reputational damage, and/or the permanent closure of one or more of its salt mining operations; (iii) accordingly, earnings generated from Braskem's salt mining operations were unsustainable; (iv) Braskem downplayed the true scope and severity of the Company's liability with respect to its salt mining operations; and (v) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

58.     On July 9, 2020, during pre-market hours, and less than a month since Braskem filed the 2019 20-F, the Company disclosed that authorities in northeastern Brazil had advised the Company that the geological damage from its salt mining operations was more widespread than initial estimates.  Specifically, among other

things, 1,918 properties needed to be evacuated because of the geological event associated with Braskem's mining operations, and Braskem estimated that moving the residents would cost the Company an additional R$850 million in possible payments to those residents, with another additional R$750 million in expenses to "definitively" shut down Braskem's salt mining operations.  Specifically, Braskem disclosed, in relevant part:

> BRASKEM S.A. . . . hereby informs its shareholders and the market that, in the context of the geological event in Alagoas, it received a letter from the Alagoas State Public Defender's Office, the Federal Prosecution Office, the Alagoas State Prosecution Office and the Federal Public Defender's Office ("Authorities") informing of the updating of the Map of Sectors of Damage and Priority Action Lines by the Civil Defense of Maceió, which included 1,918 properties to be vacated in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in Maceió, Alagoas.
>
> To ensure the safety of the residents in the region, Braskem is negotiating with the Authorities to define possible measures to be adopted by mutual agreement, although it is not automatically obligated to assist in the vacation of these new areas pursuant to the Agreement signed with the Authorities and announced by the Company on January 3, 2020.
>
> In light of the existing information, ongoing dialogue with authorities, the Company estimates R$850 million in possible assistance measures for residents of the new areas and R$750 million in additional expenses expected from the measures to definitively shutdown the salt mining activities in Maceió, the operation management and the relocation of properties included after technical analysis, among others.
>
> In addition, with regard to the public-interest civil action filed by the Federal Prosecution Office involving the social and environmental damages, the Company informs that it is still in dialogues with the

authorities and will keep the market information of material developments in the process.

59.    On this news, Braskem's ADS price fell $0.59 per share, or 6.20%, to close at $8.93 per share on July 9, 2020.

60.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Braskem securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Braskem securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed

Class.   Record owners and other members of the Class may be identified from records maintained by Braskem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Braskem;

- whether the Individual Defendants caused Braskem to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Braskem securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

67.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Braskem securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Braskem securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

68.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

70.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a

fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Braskem securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Braskem securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Braskem securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Braskem's finances and business prospects.

74.    By virtue of their positions at Braskem, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

75.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Braskem, the Individual Defendants had knowledge of the details of Braskem's internal affairs.

76.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Braskem.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Braskem's businesses, operations, future

financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Braskem securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Braskem's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Braskem securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

77.    During the Class Period, Braskem securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Braskem securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Braskem securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The

market price of Braskem securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

78.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

80.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.     During the Class Period, the Individual Defendants participated in the operation and management of Braskem, and conducted and participated, directly and indirectly, in the conduct of Braskem's business affairs.   Because of their senior positions, they knew the adverse non-public information about Braskem's misstatement of income and expenses and false financial statements.

34

82.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Braskem's financial condition and results of operations, and to correct promptly any public statements issued by Braskem which had become materially false or misleading.

83.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Braskem disseminated in the marketplace during the Class Period concerning Braskem's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Braskem to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Braskem within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Braskem securities.

84.    Each of the Individual Defendants, therefore, acted as a controlling person of Braskem.  By reason of their senior management positions and/or being directors of Braskem, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Braskem to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised

control over the general operations of Braskem and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

85.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Braskem.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.

Dated:  August 25, 2020

Respectfully submitted,

POMERANTZ LLP

<u>*/s/ Gustavo F. Bruckner*</u>
Gustavo F. Bruckner
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
gfbruckner@pomlaw.com
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
(*pro hac vice* application forthcoming)
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

THE SCHALL LAW FIRM
Brian Schall
(*pro hac vice* application forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, California 90067
Telephone: (310) 301-3335
brian@schallfirm.com

*Attorneys for Plaintiff*

**CERTIFICATION PURSUANT**
**TO FEDERAL SECURITIES LAWS**

1.      I, Claudio Coutinho, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Braskem S.A. ("Braskem" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Braskem securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Braskem securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      To the best of my current knowledge, the attached sheet lists all of my transactions in Braskem securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


**Executed** _____8/21/2020_____
                      **(Date)**


                                    DocuSigned by:

                                    *Claudio Coutinho*
                                    57A18B6CECA640A...
                                    _____
                                              **(Signature)**


                                    Claudio Coutinho
                                    _____
                                         **(Type or Print Name)**

**Braskem S.A. (BAK)**                                                    **Coutinho, Claudio**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/4/2019 | 800 | $25.4400 |
| Purchase | 4/16/2019 | 1,000 | $24.7100 |
| Purchase | 5/7/2019 | 1,100 | $22.1600 |