**SCHNADER HARRISON
SEGAL & LEWIS, LLP**
Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Telephone: (856) 482-5222
Email:  lrodriguez@schnader.com

*Additional Counsel on Signature Page*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| MATSUKAWA CO., LLC, and RAINER SENN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRASKEM S.A., *et al.*<br><br>Defendants. | Case No. 2:20-cv-11366-CCC-ESK<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Lead Plaintiff Matsukawa Co. Ltd. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by

00618788;V1

Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC")
filings, documents from Brazilian governmental agencies, wire and press releases
published by and regarding Braskem S.A. ("Braskem" or the "Company"), analysts'
reports and advisories about the Company, and information readily obtainable on the
Internet.  Plaintiff believes that substantial additional evidentiary support will exist
for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting
of all persons and entities other than Defendants that purchased or otherwise
acquired Braskem American Depositary Shares (ADSs) between March 21, 2019
and July 8, 2020, both dates inclusive (the "Class Period").  Plaintiff seeks to recover
damages caused by Defendants' violations of the federal securities laws under
Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange
Act") and Rule 10b-5 promulgated thereunder.

2.     This case concerns Defendants' misstatements and omissions of
material fact concerning the Company's role in, and extent of liability for damages
from, ground subsidence at Braskem's salt mine in Alagoas, Brazil, which forced
many residents of adjacent areas to vacate their homes and businesses.

3.     Braskem is purportedly the largest producer of thermoplastic resins in
the Americas, based on the annual production capacity of twenty-nine plants in

Brazil, six plants in the U.S., two plants in Germany, and four plants in Mexico. Braskem's segments include its Vinyls Unit. Salt is a raw material necessary for production of certain products in the Vinyls Unit. Braskem's salt mine was located beneath the city of Maceio, the capital of Alagoas, Brazil (the "Mine").

4.     Companies that choose to engage in mining activity in Brazil expose themselves to a high degree of financial risk because Brazilian law imposes strict civil liability with regards to environmental damage. Under the National Environmental Policy Act ("NEPA"), Article 14, a company "must repair or otherwise compensate for damage caused to the environment and to third parties by its activity *regardless of fault*," with the two required elements being only the harm itself and some causal link between the harm and the company's activities.

5.     Environmental civil liability in Brazil is "assessed on an objective standard and can be joint" (Article 14, §1, Law 6.938/1981), meaning that a company's liability will not be decreased due to the possible existence of other contributing factors.

6.     Between June 2016 and December 2018, Braskem's mining activity caused the ground around the Mine to subside by as much as 40 centimeters – up to 100 times faster than average. This subsidence made ground stability precarious and set the stage for the ground to give way below neighborhoods in Maceio.

7.     On February 15, 2018, after heavy rains, a fissure of approximately 283

meters appeared in the ground in the Pinheiro neighborhood of Maceio, Alagoas.

8.      On March 3, 2018, there was again heavy rainfall, and there was a small earthquake measuring 2.4 on the Richter scale (the "Earthquake").  The Earthquake was felt by residents of the Pinheiro, Mutange, Bebedouro and Farol neighborhoods. The Earthquake accelerated ground subsidence and worsened cracks and fissures in streets, buildings and structures in a large portion of Pinheiro.

9.      On May 17, 2018, a government inquiry began into whether Braskem's salt mining operations in the area were related to the ground subsidence.

10.     As part of the government inquiry, the Geological Survey of Brazil (the "CPRM") began investigating the causes of the ground subsidence adjacent to the Mine.

11.     On March 21, 2019, Brazil's Federal Senate met with Braskem representatives to discuss, among other things, the CPRM's investigation.    At this meeting, the CPRM presented evidence showing that there were rapid changes in ground stability near the Alagoas mine from June 2016 through December 2018. Specifically, the ground near the Mine moved as much as 40 centimeters over the course of just those two and a half years – 100 times faster than the usual subsidence rate.  *See* ¶45.[1]  The CPRM provided evidence showing that Braskem's activities at

---

[1] Unless otherwise noted, all paragraph references are to this Amended Complaint.

the Mine were responsible for the ground subsidence that was observed between June 2016 and December 2018.

12.     On the same day, March 21, 2019 (the first day of the Class Period), Braskem misleadingly represented in a press release that the CPRM was "conducting studies to help in the determination of the causes of the event that affects the district of Pinheiro."   The Company did not disclose that the CPRM had just presented evidence at the meeting determining that Braskem's mining activities caused the subsidence and collapses in Maceio.   Defendants continued to make misrepresentations and omissions of material fact about Braskem's role in the ground subsidence at the Mine, its cooperation with Brazilian authorities, and the Company's financial exposure from the ground subsidence, through the end of the Class Period.

13.     On April 2, 2019, media sources, as well as Braskem, disclosed that the Company had been sued by local authorities over the extensive damage caused by the ground subsidence.   Braskem stated that the lawsuits aimed to freeze R$6.7 billion in Braskem assets.[2]   The market, thus, learned more about Braskem's exposure to the disaster – which the Company still misleadingly downplayed – but still did not learn that the CPRM found that Braskem had caused the ground subsidence at the Mine.

---

[2] Approximately five Brazilian reais equal one United States dollar.

14.     On this news, Braskem's ADSs fell $1.60 per share over two trading days, or approximately 6%, to close at $25.14 per share on April 3, 2019.

15.     Braskem repeatedly tried to cover up its role in the ground subsidence – including by submitting misleading information to Brazilian authorities.  On May 14, 2019, CPRM technicians stated that Braskem had sent them inaccurate information relating to the Company's mining activity.  *See* ¶73.  Similarly, the CPRM found that Braskem had been aware of data indicating faults in the salt mining area ***but did not reveal them to the Federal Justice Ministry***.  *See* ¶77.  In addition, in September 2019, Maceio's City Council found that Braskem had provided misleading information.  *See* ¶85.  Braskem's repeated attempts to cover up the Company's role in the ground subsidence near the Mine form an unmistakable pattern.

16.     On November 14, 2019, Braskem announced that it was permanently closing the Mine.  *See* ¶90.

17.     On November 21, 2019, Defendant Musa, the Company's CEO, resigned.

18.     On January 3, 2020, Braskem announced that it would pay R$2.7 billion, or over $500,000,000, to settle certain claims relating to its role in damages stemming from the ground subsidence.  Specifically, Braskem executed an agreement with the Alagoas State Public Defender's Office ("DPE"), the Federal

Prosecution Office ("MPF"), the Alagoas State Prosecution Office ("MPE"), and the Federal Public Defender's Office ("DPU") to support the relocation and indemnification of residents of the areas at risk located in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro of Maceió, Alagoas.  Braskem estimated that 17,000 people would have to be relocated, with approximately R$1.7 billion to implement relocation and R$1 billion to close Braskem's salt wells.

19.     These amounts were material to Braskem.  Braskem's total net revenues for 2019 were R$9.6 billion.   Thus, the R$2.7 billion remediation costs in the agreement amounted to more than 25% of the Company's 2019 revenues.  Indeed, Braskem ultimately had to pay over R$10 billion in connection with the Alagoas disaster – more than the Company's entire net revenues for 2019.  *See* ¶¶107, 136.

20.     However, Defendants still did not accurately disclose the full scope of the Company's liability – nor did Braskem disclose that the R$2.7 billion figure ***was only a starting point***, not a final estimate.

21.     On the last day of the Class Period, July 9, 2020, Braskem disclosed that it would pay much more damages in connection with the ground subsidence than earlier stated.  Specifically, during pre-market hours, the Company announced that it would be paying ***60% more*** than the $2.7 billion previously disclosed.  Braskem would pay an additional R$850 million in possible payments to residents and another R$750 million in expenses to "definitively" shut down Braskem's salt

mining operations – or total additional costs of R\$1.6 billion (approximately \$325,000,000).

22.     On this news, Braskem's ADS price fell from a July 8, 2020 closing of \$9.52 to close on July 9, 2020 at \$8.93, a drop of over 6%. Analysts were surprised by the announcement.   For example, on July 9, 2020, J.P. Morgan wrote that "Braskem announced an additional R\$1.6bn in provisions for the environmental issues in Alagoas. *The announcement was not expected by investors, in our view*."

23.     As a result of Defendants' misstatements and omissions, Plaintiff and other Class members have suffered tens of millions of dollars in damages.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

26.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as the alleged misstatements and omissions affected, and damages took place, in this Judicial District. Pursuant to Braskem's annual report on Form 20-F, as of December 31, 2019, there were a total number of 345,049,672 of the Company's Class A Preferred

Shares issued, each represented by ADSs. Braskem's Class A Preferred Shares, each represented by ADSs, trade on the New York Stock Exchange ("NYSE"). Accordingly, there are presumably hundreds, if not thousands, of investors in Braskem's ADSs, each represented by ADSs, located within the U.S., some of whom undoubtedly reside in the State of New Jersey.

27.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

28.    Lead Plaintiff Matsukawa Co., Ltd., as set forth in the certification attached to its motion for appointment as lead plaintiff, purchased Braskem ADSs at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.[3]

29.    Defendant Braskem is organized under the laws of the Federative Republic of Brazil, with principal executive offices located at Rua Lemos Monteiro, 120 – 24° andar, Butantã – São Paulo, SP – CEP 05501-050 – Brazil. Braskem ADSs trade on the NYSE under the ticker symbol "BAK."

---

[3] Matsukawa Co. Ltd. was formerly Matsukawa Co. LLC.  Co-Lead Plaintiff Rainer Senn is not included because he purchased Braskem ADSs before the applicable Class Period.

30.     Defendant Roberto Lopes Pontes Simões ("Simões") has served as Braskem's Chief Executive Officer ("CEO") since January 1, 2020.

31.     Defendant Fernando Musa ("Musa") served as Braskem's CEO from before the start of the Class Period until January 1, 2020.

32.     Defendant Pedro van Langendonck Teixeira de Freitas ("Freitas") has served as Braskem's Chief Financial Officer at all relevant times.

33.     Defendants Simões, Musa, and Freitas are sometimes referred to herein as the "Individual Defendants."

34.     The Individual Defendants possessed the power and authority to control the contents of Braskem's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Braskem's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Braskem, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the statements being made were then materially false and misleading. The Individual Defendants are liable for the misstatements and omissions pleaded herein.

35.     Braskem and the Individual Defendants are collectively referred to

herein as "Defendants."

36.    Non-party Alvaro Cesar Oliveira de Almeida ("Almeida") served as Braskem's Industrial Director of Vinyls at all relevant times.

37.    Non-party Marcelo de Oliveira Cerqueira ("Cerqueira") served as Braskem's Executive Vice President, Brazil Manufacturing and Global Industrial Operations at all relevant times.

38.    Non-party Milton Pimentel Pradines Filho ("Pradines") served as Braskem's Institutional Relations Manager at all relevant times.

39.    Non-party Alexandre de Castro ("Castro") served as Braskem's Business Director of Chlor Alkali and Vinyls until March 2020.

## SUBSTANTIVE ALLEGATIONS

**Background**

40.    Braskem is headquartered in Camaçari, Bahia. The Company is purportedly the largest producer of thermoplastic resins in the Americas, based on the annual production capacity of twenty-nine plants in Brazil, six plants in the U.S., two plants in Germany, and four plants in Mexico.

41.    The Company's five business segments include its Vinyls Unit, which includes the production and sale of PVC and caustic soda. The Vinyls Unit accounted for net revenue of R$2.6 billion of Braskem's consolidated net revenue as of December 31, 2019.

**Under Brazil's Tough Environmental Laws, Companies**
**Are Strictly Liable If They Played *Any* Role in Causing Damages**

42.     Companies that choose to engage in mining activity in Brazil are subject to a high degree of financial risk because Brazilian law imposes strict civil liability with regards to environmental damage. Under NEPA's Article 14, a company "must repair or otherwise compensate for damage caused to the environment and to third parties by its activity regardless of fault," with the two required elements being only the harm itself and a causal link between the harm and the operator's activities.

43.     In addition, "environmental civil liability is assessed on an objective standard and can be joint" (Article 14, §1, Law 6.938/1981), meaning that Braskem's liability for the damage in Maceio would not be decreased due to the possible existence of other contributing factors. *See also* Brazilian Civil Code (Law No. 10,406/2002) Article 927 ("There will be an obligation to repair the damage, independent of fault, in the cases specified in the law, or when the activity as normally conducted by the perpetrator of the damage implies, by its nature, risk to the rights of another").

**Braskem's Alagoas Salt Mine**

44.     Salt is a raw material necessary for the production of certain products made by Braskem's Vinyls Unit, such as chlorine and caustic soda. Braskem's salt-mining operation is located beneath the city of Maceio, the capital of Alagoas, a city

with a population of over one million people.  Braskem's operation consists of 35 salt-mining wells.

**From June 2016 to December 2018, the Ground
Around the Mine Subsided Up To 100 Times Faster Than Usual**

45.      Between June 2016 to December 2018, the ground adjacent to the Mine subsided as much as 40 centimeters over the course of just two and a half years.  This rate of ground subsidence is very unusual.  A government technical expert, Dr. Thales Sampaio of the CPRM, stated during a March 21, 2019 meeting that the normal rate of subsidence is only 3 millimeters – ***up to 100 times smaller than at the Mine***:

MR. PRESIDENT (Rodrigo Cunha)

So, Thales, if you could expand on that…Including, when you mentioned the sinking in your presentation, this 188 mm subsidence, which even in some places reached about 40 cm, the speed it's occurring at, this sinking, you mentioned here about that being a warning. But I don't know what normal is. If 188 mm is serious, what's normal today? I know that there is some natural sinking of the ground…

MR. THALES QUEIROZ SAMPAIO (Off microphone)

***Three millimeters***.

MR. PRESIDENT (Rodrigo Cunha)

Three millimeters. So we're talking here about how many times more? I'm also not a mathematician, but that's 50 times more, 60 times more than what is natural. That is, something beyond the norm, something that is not natural is occurring.  (Emphasis added).[4]

---

[4] Meeting Minutes, Federal Senate, Commission for Transparency, Governance,

**Heavy Rains Accelerate Ground Subsidence, Exposing**
**Fissures and Surface Deformities in the Ground Near the Mine**

46.     On February 15, 2018, after heavy rains, residents of the city of Maceio, Alagoas noticed that large cracks and fissures began to appear in streets, buildings and structures in a large portion of the Pinheiro neighborhood, including a fissure of approximately 283 meters that appeared in the ground in Pinheiro.

**The March 2018 Earthquake**

47.     On March 3, 2018, there was again heavy rainfall, and a small earthquake measuring 2.4 on the Richter scale was felt by residents of the Pinheiro, Mutange, Bebedouro and Farol neighborhoods.  The Earthquake exacerbated the damages in Pinheiro.[5]

48.     On May 17, 2018, the MPF began a civil inquiry into whether Braskem's salt mining operations in the area were related to the events in Pinheiro and its surrounding areas, as well as the resulting damage to roads and structures. May 13, 2019 ACP at 5.

**The Crisis and Investigations Into Braskem Continue**

49.     On December 5, 2018, local authorities in the city of Maceio declared a state of emergency in the Pinheiro neighborhood that was affected by the ground

---

Inspection and Control and Consumer Protection, March 21, 2019 at 23-24.

[5] *See* Public Civil Action with Request for Injunction, Case No. 0803662-52.2019.4.05.8000, May 13, 2019 ("May 13, 2019 ACP") at 3.

subsidence and collapse. This state of emergency was also declared by federal authorities on December 28, 2018.  May 13, 2019 ACP at 3.

50.    In January of 2019, prosecutors recommended that Braskem halt salt mining at the Mine until the conclusion of studies by the CPRM, National Mining Agency ("ANM"), and Civil Defense Commission on the cause of ground movement in the region.

**Braskem Is Confronted With Evidence That From June 2016 To December 2018, the Ground Above the Mine Subsided Up To 40 Centimeters**

51.    On March 21, 2019, a public meeting was held by the Federal Senate to discuss the situation in Pinheiro.  Braskem was represented at this meeting by the Company's business director, Castro, and its Industrial Director of Vinyls, Almeida. The CPRM and ANM were also present.

52.    At this meeting, the CPRM presented various satellite data, including studies showing that the cracks and fissures were not limited to Pinheiro but were also present in Mutange and Bebedouro, and that the area with the most ground movement correlated with Braskem's salt mining activity.

53.    The CPRM also provided evidence at the meeting that from June 2016 to December 2018, there was a rapid change in ground stability:

> [I]n the interferometry presentation, which Dr. Thales made, we saw that, in that film that he showed, from June 2016 to December 2018, we have quickly gone from the green stage to the yellow one to the red one. I say quickly because this happened in three years. We are used to talking about our

history in billions of years, right, Dr. Thales? And here we are seeing phenomena that are occurring in a matter of hours.[6]

54.     The data presented by Dr. Thales Sampaio of the CPRM showed that the ground had moved as much as 40 centimeters over the course of just those two and a half years.  *See* Federal Senate Minutes at 8 ("***we have had subsidence of close to 40 cm in that area, and that area is within the Braskem [mining] area***, these two little points that I'm showing.") (Emphasis added).

55.     At the meeting, Dr. Thales Sampaio of the CPRM stated that the normal rate of subsidence is only 3 millimeters – up to 100 times smaller than at the Mine.  *See* ¶45.

56.     On the same day, Braskem announced that it had attended the public hearing in the Brazilian Senate.  Braskem misleadingly represented that "[t]he company is providing support to public authorities - such as the Civil Defense, the National Mining Agency, the Geological Survey of Brazil and the Ministry of Mines and Energy - and conducting studies to help in the determination of the causes of the event that affects the district of Pinheiro."

## Alagoas Authorities Sue Braskem And Demand That the Company Freeze

---

[6] Meeting Minutes, Federal Senate, Commission for Transparency, Governance, Inspection and Control and Consumer Protection, March 21, 2019 ("Federal Senate Minutes") at 14.

**R$6.7 Billion in Assets; Braskem Stock Falls and the Company Loses Tens of Millions in Market Capitalization**

57.     On April 2, 2019, Alagoas state authorities filed a request for injunctive relief and the blocking of R$6.7 billion in Braskem assets.  This R$6.7 billion was to be held in a judicial account to cover "social rent costs, indemnity repairs, environmental repairs, construction works, stabilization of affected areas, expert reports (including building inspections), collective moral damage for very serious violations of security rules, among other expenses arising and related to the effects of mining in the neighborhood and surroundings, that is, the damage resulting from the exploitation of rock salt deposits in the subsoil and/or aquifers."[7]

58.     Braskem disclosed that it had been sued by local authorities on the same day.

59.     Significantly, in a joint interview announcing the request for injunctive relief filed that morning, state attorney Ricardo Melro noted that there was "sufficient evidence that there is a causal connection between the mining activity and the damage that is occurring."[8]

---

[7] Davi Soares, *MP and Public Defense request freezing of R$6.7 billion from Braskem for damage in Maceio*, Diario do Poder, April 2, 2019, available at https://diariodopoder.com.br/brasil-e-regioes/mp-e-defensoria-pedem-bloqueio-de-r-67-bilhoes-da-braskem-por-danos-em-maceio ("Diario do Poder article April 2, 2019").

[8] Dulce Melo, *Public Ministry and Public Defense request freezing of Braskem assets in amount of R$6,709,440,000*, MP-AL News, April 2, 2019, available at

60.    The judge agreed to freeze R\$6.7 billion of Braskem's assets to cover any potential damages and compensation to the population.

61.    On April 3, 2019, Braskem signed a technical cooperation agreement with Brazilian authorities in which the Company agreed to fund measures to mitigate the effects of the events in Maceió and prevent further damage.[9]

62.    On April 15, 2019, Braskem disclosed that the Appellate Judge of the 3rd Civil Court of the City of Maceió, Alagoas, in connection with the appeal filed by the Public Prosecutor's Office and by the Public Defender's Office, ordered the suspension of the consideration and vote by Braskem shareholders regarding the distribution of dividends to be made on April 16, 2019, until the merits of the appeal had been examined.

**The CPRM Releases A Report Confirming What It Showed at the March 2019 Meeting – Starting in 2016 the Mine Caused Ground Subsidence Nearby**

63.    On May 8, 2019, the CPRM released its report on the results of its extensive studies on the cause of the ground subsidence in Maceio.  The CPRM considered various hypotheses for what caused the subsidence, including

---

https://www.mpal.mp.br/ministerio-publico-e-defensoria-publica-pedem-indisponibilidade-de-bens-da-braskem-no-valor-de-r-6-709-440-00000/.

[9] *Federal, Labor and State Public Ministries mediate agreement between Braskem and Maceió City Hall*, MPF Press Release, April 8, 2019, available at http://www.mpf.mp.br/al/sala-de-imprensa/noticias-al/ministerios-publicos-federal-do-trabalho-e-estadual-mediam-acordo-entre-braskem-e-prefeitura-de-maceio-al.

geotechnical characteristics of the region's terrain, and the extraction of subterranean water from local aquifers, among others.

64.     The CPRM report cited satellite data showing that the area adjacent to the Mine had been undergoing a continuous process of subsidence since at least 2016.   The report stated that this subsidence triggered the cracks and fissures observed in the area:

> There is an unstable area (red), ***in a process of continuous subsidence (since 2016, or earlier***) next to a stable area (green). In the transition between the two areas (yellow) there is breakage.[10]

The CPRM Summary Report went on:

> Destabilization is occurring in the rock salt extraction cavities, causing halokinesis (movement of the salt) and creating a dynamic situation that is reactivating preexisting geological structures, subsidence, and rupture deformations on the surface in part of the Pinheiro, Mutange, and Bebedouro neighborhoods.

CPRM Summary Report at 37.  *See also* S&P Global, July 9, 2020 ("in March 2018 [] neighborhoods in Maceio, the capital city of the Brazilian state of Alagoas, experienced a mild earthquake. The Brazil Geological Survey investigated that as well as fissures and other geological damage that had appeared, ***and in May 2019 released a report that said Braskem's salt mining operation in Maceio was responsible***").

---

[10] Studies on the Ground Instability in the Pinheiro, Mutange and Bebedouro Districts of Maceio (AL) – Summary Report of Results No. 1, May 8, 2019 ("CPRM Summary Report") at 8-9.  (Emphasis added.)

65.     The CPRM also studied data for deactivated Braskem mines and noted that these cavities were destabilized since the structures were no longer maintained at a certain volume, which could lead to landslide. CPRM Summary Report at 26. One particular mine, Number 7, had been deactivated in 1987, and comparison of sonar data from that time and from 2019 showed that due to ground shifting, the mine was now 200 meters closer to the surface.  CPRM Summary Report at 29.

66.     On May 9, 2019, Defendant Musa conceded the CPRM's findings in an investor conference call:

> On the impact of Alagoas, the Maceio issues, we are still in the planning phase of the shutdown. And this is – once we have more clarity on the process and the timing, we'll have more clarity.  [. . .]  We have been doing several studies with different types of methodologies. So in our seismic satellite-based imagery, et cetera, and those results have been shared with CPRM, which is the equivalent of the US geological agency in the US. In parallel, CPRM has been doing its own independent evaluation, and this is the report that they published yesterday, the first report on their work, ***that has a conclusion that there are connections between our operations and what's happening in the neighborhood nearby.***

67.     On the same day, Braskem announced that it would be "suspending salt extraction and, consequently, the operations of the chlor-alkali and dichloroethane plants located in the district of Pontal da Barra in Maceió, Alagoas."

68.     On May 13, 2019, the MPF filed a case against Braskem demanding that sonar studies of Braskem's salt-mining wells be completed and that suitable

technical measures be taken in halting salt mining in the area.[11]

69.     A May 14, 2019 analyst report from Deutsche Bank disclosed that a potential acquirer (Lyondell) of Braskem did not understand Braskem's liability associated with the ground subsidence at the Mine: "According to a local Brazilian press report, Lyondell's potential acquisition of Braskem is on hold until the issues involving Braskem's salt mine in Maceio, Alagoas state are 'completely understood.'"

70.     Lyondell ultimately terminated the acquisition process.

**Braskem is Delisted After it Fails to File Two Annual Reports on Time**

71.     On May 13, 2019, Braskem announced that its ADSs were to be delisted from the NYSE because the Company had failed to file its well-overdue 2017 Annual Report with the SEC.

72.     Braskem's ADSs began trading on the OTC market on May 15, 2019.

**The CPRM Reports That Braskem Sent It Misleading Information**

73.     On May 14, 2019, in advance of a scheduled meeting with the Special Commission of Inquiry of the City Council of Maceio ("CEI"), the Environmental Institute of Alagoas ("IMA") and Braskem two days later, CPRM technicians stated that Braskem had sent them inaccurate information relating to the Company's

---

[11] Public Civil Action with Request for Injunction, Case No. 0803662-52.2019.4.05.8000, May 13, 2019 at 2.

mining activity.  The President of the CEI, Francisco Sales, stated that if it was proven that Braskem used false data to defend itself from accusations, then the City Council could seek to have those responsible arrested. Sales stated:

> We are going to ask CPRM for more details about what data was hidden, what was sent incorrectly, and how this could have compromised the study of such a serious problem, which affects thousands of families. In light of this issue, yes we can carefully evaluate the request to arrest the Braskem directors.[12]

74.    Fellow councilman José Márcio Filho added that "if Braskem used false information to continue causing harm to the city of Maceió and thousands of families in Pinheiro, Mutange, and Bebedouro, we cannot rule out indictment of the directors of the company and the arrest request." Diario do Poder Article May 14, 2019.

75.    On May 28, 2019, an ordinance was issued by National Secretary of Civil Defense and Protection recognizing a state of public calamity in the areas of Maceio (Pinheiro, Bebedouro and Mutange) affected by the landslides and collapses.

**The CPRM "Definitively" Finds That Braskem's Alagoas Mine Caused the Ground Instability – And that Braskem Tried to Cover Up Its Role In It**

76.    On June 3, 2019, Braskem held a meeting with the MPF and CPRM in Alagoas.  Among the attendees were eight technicians and four attorneys from Braskem.  After the June 3, 2019 meeting, Braskem issues a series of questions to

---

[12] *Councilors to confront Braskem with CPRM and IMA data on sinking*, Diario do Poder, May 14, 2019, available at https://diariodopoder.com.br/brasil-e-regioes/vereadores-confrontarao-com-a-braskem-os-dados-da-cprm-e-ima-sobre-afundamento ("Diario do Poder Article May 14, 2019").

the CPRM.  On June 17, 2019, the CPRM responded to those questions.

77.    The CPRM noted that during the June 3, 2019 meeting, Braskem had

been aware of data indicating faults in the salt mining area – ***but did not reveal them***

***to the Federal Justice Ministry***:

> In addition to the foregoing, even before the presentation of the CPRM report
> in May 2019, Braskem had already interpreted faults in the salt mining area.
> In the presentation called "BRASKEM INFORMATION" in April 2019, on
> slide 16, the data from boreholes indicated the existence of a fault between
> boreholes M08 and M22, and another between boreholes M31 and M28 (Fig.
> 14). In the same presentation (slide 19), the data from the boreholes
> suggested the occurrence of faults between boreholes M32 and M09, M09
> and M12, and M22 and M23 (Fig. 15). The "Da Silva Creek Fault" was also
> identified, with 240º Az (Fig. 16) with the same direction as faults interpreted
> by gravimetry. Considering then the existence of faults in the salt mining
> area included in the abovementioned presentation, ***it is surprising that the***
> ***interpretations based on data from the boreholes for the presentation to***
> ***the Federal Justice Ministry in Alagoas on 06/03/2019 did not contain***
> ***indications of faults in the mining area (slides 16 and 17 in the BRASKEM***
> ***presentation called "MPF/CPRM MEETING" on 06/03/2019***).[13]

78.    The CPRM also noted that one of the slides presented by Braskem in a

May 2019 meeting with the MPF had "exaggerated the horizontal scale in relation

to the vertical scale, generating a deformed geological model":

> To verify whether the geological model (without faults) presented by
> Braskem at the MPF meeting in Alagoas (slide 15 of the "MPF/CPRM
> MEETING" presentation on 06/03/2019) would be compatible with the
> gravimetric data, direct modeling was conducted, inserting geological
> section 3 (Fig. 18) as a connection, which coincides with a part of the
> modeled gravimetric profile. To make the geological model more realistic
> for the assessment of the mass in the region, cavities filled with brine (d=1.20

---

[13] CPRM's Responses to Braskem's Questions, June 17, 2019 ("CPRM Response")
at 17.

g/cm3) in the salt layer were added. Although the geological section (Fig. 19) didn't include a salt layer associated with borehole M-2, a cavity was inserted into it as well, since the geological section in figure 2 (slide 18 of the Braskem presentation at the Federal Senate) indicates the existence of a cavity and the report "Geological Re-study and Re-evaluation of the Salt Reserves" (Sal Gema Mineração Ltda., 1989) shows a thick layer of salt at this location.

***The result, presented in figure 20, shows that the model calculated based on the geological information from Braskem's section 3 (Fig. 19) shows a large mismatch in relation to the observed gravimetric data.*** Considering these obtained results, we can state that the interpretations of the profiles of the boreholes presented by Braskem on slide 15 of the "MPF/CPRM MEETING" presentation on 06/03/2019 do not manage to show all of the complexity of the geological-tectonic framework of the mining area.

CPRM Response at 20-22 (emphasis added).

79.     Beyond noting that Braskem had provided the CPRM with incomplete and misleading information, the agency's conclusion that Braskem was responsible for the ground subsidence at the Mine was unequivocal:

The results already obtained, however, especially because of their integration with several others as has already been mentioned, previously explained, ***is indicative that the cause of the sinking phenomenon is related to Braskem's caverns***. CPRM Response at 28.

80.     The CPRM Response also emphasized that dozens of professionals in four different groups agreed that Braskem had caused the ground subsidence:

The CPRM study is definitive as to the triggering cause (causal link) of the phenomenon occurring in the neighborhoods of Pinheiro, Mutange, and Bebedouro.

It is important to remember that nine causes were raised to be investigated as to the possibility that they represented the triggering cause of the

phenomenon initially observed in Pinheiro. These were gathered into four groups. Dozens of professionals dedicated themselves to the investigation of each of them to evaluate the possibility that it represented the triggering cause. ***They ALL concluded that the studies point only to the destabilization of the rock salt extraction cavities as the triggering cause***. (Capitalization emphasis in original). *Id*. at 38.

### The Fallout for Braskem Continues

81.     On June 24, 2019, Braskem met in Brasilia with residents of the affected areas.

82.     On June 26, 2019, the Alagoas state justice department authorized the release of R$15m from Braskem towards funding social housing for 2,500 affected families.

83.     On July 26, 2019, R$3.7 billion of Braskem's assets were frozen.

84.     On August 23, 2019, UBS issued a report on Braskem.  That report discussed the material harm done to the Company's Vinyls Business:

Q: Will the salt mine environmental problem affect profitability in the vinyl business?

Yes, we believe the environmental problem will have several impacts on the company's vinyl business:

1) As a non-integrated player that imports caustic soda and EDC, Braskem's vinyl spreads will be <35% in 2019E and 28% in 2020E; and 2) on 26 July, R$3.7bn of the company's funds were frozen due to the Alagoa [sic] lawsuit, and a further R$2.5bn may be frozen at the request of the labour ministry.

### Another Agency Finds Braskem Purposefully
### Obfuscated the Causes of the Ground Subsidence

85.     On September 24, 2019, the City Council of Maceio's Commission of

Inquiry (CEI) released a report containing conclusions and findings of its

investigation, which included hearings with Braskem and the CPRM:

> Asked about the reason why CPRM arrived at the cause of the tremors and
> if Braskem had omitted information, Mr. Thales [CPRM] responded that it
> is difficult to respond due to the fact of not having had access to the
> documentation; asked if false information had been passed, Mr. Thales said
> it had not, ***but that imprecise information had been passed***, due to the fact
> that Braskem always sent information that was photocopied, ***lacked more
> detailed information*** and that created a lot of work, ***and [which] showed
> Braskem that there were faults in the Pinheiro neighborhood and the
> region. Mr. Thales reported that BRASKEM bought interferometry images
> and that Braskem did not pass on information about subsidence***.
>                                                                ***
>
> ***In light of these facts, this report, with approval of the full commission,
> concludes that there is evidence of illegal acts in the execution of mineral
> extraction by the company BRASKEM and in the processing of releasing
> the licenses for this effort***.[14]

86.     The CEI found that evidence of fraud on the part of Braskem executives

was compelling and should be forwarded to state and federal police:

> Forward this report along with the entire investigative process, within
> 20 days of the completion of this C.E.I. to:
>
> 1) Justice Ministry of the State of Alagoas – MPE-AL.  For civil and
> criminal indictment of the responsible directors from Braskem S/A
> involved: Mr. Álvaro César O. de Almeida – Braskem [Industrial]
> Director, Mr. Milton Pradines – Manager of Institutional Relations for
> Braskem S/A and Mr. Marcelo Serqueira [sic] – Vice President of
> Braskem S/A, ***for [] attempt[ing] to interfere in investigations, and []***

---

[14] Official Gazette No. 5805 - Maceio City Hall, September 24, 2019 ("CEI
Report") at 28, 29.

*use [] economic power to interfere in the case and coerce the State.*

> 2) Federal Justice Ministry of Alagoas – MPF-AL, For investigative action in light of the reported context, whatever is within the Federal realm. For civil and criminal indictment of involved directors responsible: Mr. Fernando Musa – President of Braskem S/A, Mr. Álvaro César O. de Almeida – [Industrial] Director, Mr. Milton Pradines – Manager of Institutional Relations of Braskem S/A, and Mr. Marcelo Serqueira [sic] – Vice President of Braskem S/A, [for] possible fraud occurring when the company assumes fault for irregularly and irresponsibly exploiting the subsoil of the city of Maceió,…

CEI report at 29.

87.    Two criminal investigations were opened in Brazil following the CEI Report.  These files have not been made public.

**Braskem Relists on the NYSE**

88.    After finally filing its 2017 and 2018 20-Fs on October 8 and 17, 2019 respectively, Braskem announced on October 21, 2019 that it was relisting on the NYSE.

**The CPRM Again Confirms, This Time to the Chamber of Deputies, That the Mine Caused the Ground Subsidence in Maceió**

89.    In a November 7, 2019 hearing before the Chamber of Deputies (the lower house of Brazil's National Congress), Dr. Thales Sampaio of the CPRM described how Braskem's own study showed that the Company's activities at the Mine caused the ground subsidence:

> [A] recurring question from us at technical meetings with Braskem was: "Gentlemen, are there any problems with pipes, any problems with breaking, any problems with warping in the pipes?". The answer, throughout the year of 2018, let's just say, until April 2019, was: "No, there is no warping, there

is none of that in the pipes." Very well, Braskem did this, with its equipment. *This slide is from Braskem, it is a Power Point presentation— Source: Information Pinheiro April 2019 - Braskem. It showed the gyroscope showing that the pipes were at a standstill. See that the pipes are bent: this in this direction, here in this direction, here in this direction, here in this direction, here in this direction. […] Pipelines are bending towards the zone of greatest subsidence….*

The phenomenon that is happening in the neighborhoods of Pinheiro, Mutange, Bebedouro and, probably, in the Bom Parto neighborhood is the result of the destabilization of the salt mining cavities, which caused halokinesis. Some of these cavities are completely outside the salt layer. […] [W]e clearly see that our thesis is completely consistent with the destabilization of these cavities. […] *Therefore, we affirm, as the Brazil Geological Survey, that subsidence is caused by the destabilization of mining pits. We have no doubt about that.*[15]

**Braskem Permanently Closes the Mine**

90.     On November 14, 2019, Braskem announced that it had submitted to the National Mining Agency (ANM) the measures to permanently end salt extraction activities in Maceió with the closure of its wells.  The plan provided for the creation of a protected area but did not provide an estimate of financial impacts.

**Braskem's CEO Resigns**

91.     On November 21, 2019, Defendant Musa, Braskem's CEO, resigned.

92.     On November 22, 2019, Braskem announced that Defendant Simoes

---

[15] Meeting Minutes, Chamber of Deputies, External Commission to monitor the damage caused by the sinking of the soil in the neighborhoods Pinheiro, Bebedouro, Mutange and Bom Parto, in the city of Maceió-AL, as well as dealing with effective actions related to the situation of the residents of the respective neighborhoods, November 7, 2019 ("Chamber of Deputies Minutes") at 13, 18.

would replace Defendant Musa as CEO:

> HOUSTON (ICIS)--Brazilian polyolefins producer Braskem named the current chairman of the board, Roberto Simoes, as the company's new CEO, replacing Fernando Musa, according to a regulatory filing.

> Musa will remain CEO through 31 December to help Simoes transition to the new role, Braskem said. Simoes's appointment will become effective on 1 January.

93.   The article discussed the numerous problems at Braskem on Musa's watch:

> During his tenure, the company's salt mine in Maceio, Alagoas state was found to be causing subsidence in the nearby neighbourhoods of Pinheiro, Bebedouro and Mutange, exposing the company to hundreds of millions of dollars in potential liabilities.

> A state regulator said Braskem's mine was responsible for the subsidence and the subsequent damage that it caused to homes and buildings in the neighbourhoods.

> In response, Braskem closed the salt mine, causing it to also shut down a chlor-alkali unit and a downstream plant that produced ethylene dichloride (EDC).

> During Musa's tenure, Braskem also failed to file its 2017 and 2018 annual reports in time with the US Securities and Exchange Commission (SEC). As a result, the company's US listed shares were removed from the New York Stock Exchange (NYSE).

> The company had since filed its annual reports, and its shares have resumed trading on the NYSE.

> During this time, LyondellBasell was considering acquiring Braskem. It had started talks with the contractor Odebrecht, which owns a majority stake in the company.

LyondellBasell would ultimately terminate these talks.

94.     A news report stated that Musa's resignation was due to pressure from Braskem's parent, Petrobras, who was unhappy with Musa's handling of the Alagoas Mine disaster. A November 22, 2019 article in http://exame.com/negocios/presidente-da-braskem-deixa-o-cargo-em-melo-a-criticas-da-petrobras, entitled "Braskem President Leaves Office Amid Criticism From Petrobras", provided as follows:

> The executive will be replaced by the chairman of Braskem's board of directors, Roberto Simões, who has been with the company since 1994. Musa's departure does not really take place until December. Until then, the company is going through a transition period for Simões to take over.
>
> The announcement was made in a relevant fact on the evening of Thursday 21. ***Musa, who has been in the presidency since 2016, had received criticism from Petrobras, Braskem's second largest shareholder behind the parent company Odebrecht, and who would have asked the company to leave the executive***.
>
> ***Petrobras' dissatisfaction was related to the crisis with a rock salt mine, the raw material used in the production of plastics, in Alagoas***.

**Braskem Agrees to Pay R$2.7 Billion to Cover the Costs of Its Malfeasance**

95.     On December 30, 2019, the Company signed an agreement (the "Agreement") with the MPF, DPU, MPE and DPE to fund a Financial Relocation and Compensation Support Program.  That agreement, which required Braskem to set aside at least R$2.7 billion towards this purpose, made it crystal clear that the agreement's settlement amount provided a floor – not a ceiling:

The amount initially deposited in the indicated bank account represents the financial starting point, ***and it may not in any way be considered as a ceiling for payment of the obligations in these TERMS OF AGREEMENT***.[16]

96.     On January 3, 2020, Braskem announced the Agreement – but did not

reveal that the R$2.7 billion settlement amount was only a minimum initial payment

– not a complete estimate:

> Braskem S.A. ("Braskem" or "Company"), in compliance with CVM Instruction 358/02 and in connection with the Material Fact notice dated November 14, 2019, hereby informs that it executed, on January 3, 2020, an agreement with the Alagoas State Public Defender's Office (DPE), the Federal Prosecution Office (MPF), the Alagoas State Prosecution Office (MPE) and the Federal Public Defender's Office (DPU) to support the relocation and indemnification of residents of the areas at risk located in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro of Maceió, Alagoas, as established in the agreement, which will be submitted to judicial ratification. The Company preliminarily estimates that the support for relocation established in the agreement and on areas announced previously by the Company involve approximately 17,000 people ("Financial Compensation and Support for Relocation Program").
>
> ***In this regard, and to the best of its knowledge, the Company estimates the amounts to be recognized as provisions at approximately (i) R$1.7 billion for the implementation of the Financial Compensation and Support for Relocation Program; and (ii) R$1 billion for the actions required to close its salt wells. Said provisions will be disbursed over the coming years and may be changed based on new developments***.
>
> Furthermore, the DPE, MPF, MPE and DPU agreed (i) to release the approximately R$3.7 billion in cash of the Company that previously had been frozen, of which R$1.7 billion will be transferred to a bank account of Braskem specifically for funding the Financial Compensation and Support for Relocation Program that must maintain at minimum working capital of R$100 million, subject to verification by an external auditor; and (ii) to the

---

[16] Terms of Agreement for Support in Vacating Risk Areas, Case Nos. 0803836-61.2019.4.05.8000, 0806577-74.2019.4.05.80001, dated December 30, 2019 at 8.

substitution of the surety bonds already presented by Braskem to the Courts in the approximate amount of R$6.4 billion by two new surety bonds in the approximate amount of R$3 billion, to guarantee the Public-Interest Civil Action filed by the DPE and by the MPE and the Public-Interest Civil Action filed by the MPF.

97.     Nonetheless, the market was relieved that Braskem's liabilities concerning the Mine were apparently only R$2.7 billion.  Thus, Braskem's ADSs rose from a January 3, 2020 closing price of $15.67 to close on January 4, 2020 at $16.29.

98.     Indeed, a J.P. Morgan report dated January 3, 2020 categorized the announcement as positive:

> The amount is lower than the R$3.8bn we had in our model, and we did not expect a solution in the short-term. [. . .] What happened? Earlier today, BAK announced that it has reached an agreement with the Public Defender's Office of Alagoas (DPE), the Federal Prosecution Office (MPF), the State Prosecution Office of Alagoas (MPE) and the Federal Public Defender's Office (DPU), related to the environmental issues it faced with its salt mines in Alagoas. As part of the agreement, BAK will provision R$1.7bn related to the compensation and relocation of -17k people in risk areas in Maceio: Mutange, Bom Parto, Pinheiro and Bebedouro. Another-R$1.0bn will be provisioned related to potential costs related to the closure of its salt mines in Maceio. The amounts provisioned should be disbursed in the coming years. Also, as part of the agreement, the R$3.7bn that had been frozen by the courts were unfrozen, with R$1.7bn transferred to an account related to the compensation and relocation of the families. And R$6.4bn of surety bonds will be replaced by two new surety bonds totaling R$3.0bn. ***Why is it positive? We see the announcement as positive as it mitigates one of investors' key concerns with the case***.  (Emphasis added).

99.     A later *Reuters* article dated March 2, 2020 noted that the R$2.7 billion figure was only a starting point:

[I]n January the company announced a deal with prosecutors to provide 1.7 billion reais ($387.4 million) over two years to relocate and compensate 17,000 residents, though it did not admit blame for the damage. Its Brazil-listed shares shot up on investor hopes the accord would draw a line under a multi-billion-dollar question mark.

However seven state and federal prosecutors involved in the case told Reuters that the 1.7 billion reais - a cost estimate by Braskem - *was a minimum initial payment and that the company may have to pay more out*. [Emphasis added].

"That's a floor, not a ceiling," said Ricardo Melro, head of the Alagoas public defender's office, the most explicit public indication from officials that Braskem's compensation and relocation costs could exceed the figure flagged in January.

Melro said he believed the company would end up paying about 2.3 billion reais, about a third more.

In response to Reuters queries, Braskem representatives said they were confident in their estimate. The company has an extra 2 billion reais available in the unlikely event costs run over, they added.

Federal prosecutor Niedja Kaspary, however, said Braskem would also likely be required to compensate 23,000 other residents in adjacent neighborhoods as a result of a 6.7 billion reais federal lawsuit launched against the company last year.

Unlike the 17,000 people, those residents are not deemed in imminent danger, but authorities warn their homes could be vulnerable in coming years.

**Braskem Belatedly Admits that the Remediation Costs Would Be 60% Higher Than Previously Disclosed**

100.    On July 9, 2020, during pre-market hours, the Company disclosed that

its liabilities were far worse than earlier disclosed. Specifically, among other things,

1,918 properties needed to be evacuated, and Braskem estimated that moving the

residents would cost the Company an additional R$850 million in possible payments to those residents, with another additional R$750 million in expenses to "definitively" shut down Braskem's salt mining operations. In other words, Braskem disclosed another $300,000,000 in liabilities – **60% higher** than the R$2.7 billion previously announced.

101. On this news, Braskem's ADS price fell $0.59 per share, or 6.20%, to close at $8.93 per share on July 9, 2020.

102. Analysts were surprised by the announcement. For example, on July 9, 2020, J.P. Morgan wrote:

> Braskem announced an additional R$1.6bn in provisions for the environmental issues in Alagoas. ***The announcement was not expected by investors, in our view***. Braskem had already provisioned R$3.4 billion in the 4Q19, and ended 1Q20 with R$3.l billion of provisions in its balance sheet. We welcome Braskem's attitude on proactively addressing the issues in the area. However, today's announcement could lead investors to question if further provisions and costs related to the environmental issues in the state will take place in the future.

**Braskem Announces *Another* R$3.3
Billion – Half-A-Billion Dollars – In Remediation Costs**

103. On September 15, 2020, Braskem announced that it expected an ***additional*** R$3.3 billion ($622 million) in costs to implement compensation and relocation measures stemming from geological damage from its former salt mining operation in the Brazilian state of Alagoas.

104. Analysts were again surprised. A report by Itaú BBA stated:

Braskem had provisioned BRL 3.2 billion for reparations related to the Alagoas geological incident at the end of 2020. In July, after an amendment to the agreement with authorities, an additional BRL 1.6 billion was provisioned in 2020, increasing the total provisioned amount to BRL 4.6 billion (with BRL 2.6 billion booked as a short-term liability). The additional provision of BRL 3.3 billion announced yesterday takes the amount to BRL 7.9 billion, of which we estimate BRL 2.9 billion will be booked as a short-term liability.

105.   Similarly, a September 15, 2020 J.P. Morgan report provided:

[T]he magnitude of expected expenses is a negative surprise - as of 2Q20, BAK had provisions of R$4.6bn related to Alagoas, and our understanding was that, given most families in the area had already been relocated, any additional provisions would be marginal. In addition, potential fines/expenses related to the environmental impacts still have not been finalized. […] [W]hen will it end?"

**Braskem Announces Further Settlements of R$1.2 Billion**

106.   On December 30, 2020, Braskem announced an agreement to extinguish the Public Civil Actions that were brought by Brazilian authorities.  These were the April 2019 case focused on compensation and other arrangements for affected residents and the August 2019 case focused on socio-environmental matters.  Braskem estimated additional costs from these two agreements at R$1.2 billion (beyond the R$7.6 billion already agreed to by 3Q2020).  The Company also stated that it was in discussions with the ANM relating to costs of measures to halt mining activity in Maceio and estimated that such measures could be an additional R$3 billion.

**Braskem's Total Liabilities Top R$10 Billion**

107.   On February 1, 2021, analyst Scotiabank issued a report summarizing the Alagoas saga – and noted that Braskem lost an acquisition opportunity due to its poor handling of the Company's liabilities stemming from ground subsidence at the Mine:

> The End Is Near for the Alagoas Saga, which Should Lead To a Re-Rating and/or a Transaction…
>
> While there were several reasons why Lyondell walked away from its acquisition of Braskem, the most prominent reason, in our view, was due to the inability for provisions relating to Alagoas to be even approximately estimated. If liabilities of a company can't be estimated, how do you know what the equity is worth? In fact, we believe this is one of the reasons why Petrobras and/or Odebrecht haven't yet completed their respective sales of Braskem, and why the stock hasn't completed its re-rating. Accordingly, as line of sight toward sizing up Alagoas provisions becomes more clear, which it did today, it should go without saying that the probability of a transaction unfolding and/or a shareholder re-rating of the stock increases.
>
> Simply put, this is one of the main reasons why we rate BAK a Sector Outperform.
>
> FOUR LIABILITIES REMAIN UNCERTAIN
>
> 1.  Potential public and individual lawsuits for relocation and compensation. Although the company has settled claims against it from the Government of Brazil, individuals that were not a part of the settlement have filed standalone claims. The company is hoping to finalize these outstanding claims throughout 2021. We think the materiality of these claims is very low.
>
> 2.  An environmental study for the social and environmental Public-Interest Civil Action (PCA). The study is expected to provide final verification on the environmental impact of BAK's salt extraction activities in Alagoas and is on track to be complete in the second half of 2021.
>
> 3.  Entrants into social and environmental settlement. The final amount of the settlement is subject to the number of parties that enter into the

agreement. The settlement is [estimated] at R$1.588.

4.      National Mining Agency (ANM) Letter. As a reminder, the ANM requesting further closure and backfilling of salt wells remains suspended pending a final evaluation of BAK's technical arguments. The estimated additional cost is R$3.08.

• There is about R$8.88 of remaining provisions outstanding, as R$1.28 has already been paid of the *R$10B settled across different legal claims*. (Emphasis added).

**Materially False and Misleading Statements Issued During the Class Period**

108.   The Class Period begins on March 21, 2019.  On that date, Braskem

announced that it had attended a meeting that day in the Brazilian Senate:

Maceió, March 21, 2019 - Executives of Braskem attended the public hearing held by the Transparency, Governance, Supervision and Control and Consumer Defense Committee (CTFC) of the Senate, this Thursday (21), with the objective of debating the situation of the district of Pinheiro, in Maceió. The public hearing was chaired by Senator Rodrigo Cunha (PSDB-AL).

As done in other occasions, the representatives of the company explained the procedures adopted in mining activities - following international standards - and made clarifications on the safety control of their operations.

*The company is providing support to public authorities - such as the Civil Defense, the National Mining Agency, the Geological Survey of Brazil [CPRM] and the Ministry of Mines and Energy - and conducting studies to help in the determination of the causes of the event that affects the district of Pinheiro*.

109.   These statements were materially false and misleading because

Braskem did not disclose that the CPRM provided detailed evidence at the March

21, 2019 meeting showing that Braskem caused the ground subsidence at the Mine,

which in turn caused tremendous damages to nearby residents. *See* ¶¶45, 51-56, 76-80.

110.    After the news on March 21, 2019, Braskem ADSs fell from a March 20, 2019 closing price of $28.33 to close at $27.66 on March 21, 2019.   Braskem ADSs remained artificially inflated because Braskem did not disclose the full truth about the CPRM's findings or the Company's liabilities stemming from its role in the ground subsidence at the Mine.

111.    Braskem disclosed in an April 3, 2019 filing with the SEC, signed by Defendant Freitas, that the Public Prosecutor's office had sued the Company:

> BRASKEM . . . hereby announces to its shareholders and the market in general that it has become aware, through the media, of a lawsuit filed against it by the Public Prosecutor's Office and the Public Defender's Office, both of the State of Alagoas, requesting the freezing of amounts and assets in a total of approximately R$6.7 billion to guarantee any potential damages owed to the general public affected by the geological phenomenon which occurred in districts near the rock salt extraction area in Maceió.…

> Regarding the phenomenon occurred in the Pinheiro neighborhood, the Company reiterates that it has been collaborating with the authorities to identify the causes… ***The technical analysis of the competent bodies are still in progress and that, to date, it cannot be affirmed that Braskem's activities are the cause of the events observed in the neighborhood***…

112.    These statements were materially false and misleading because Braskem did not disclose that the CPRM provided detailed evidence at the March 21, 2019 meeting showing that Braskem caused the ground subsidence at the Mine, which in turn caused tremendous damages to nearby residents. *See* ¶¶45, 51-56, 76-

80.

113.   After the April 2, 2019 news, Braskem's ADS price fell $1.60 per share over two trading days, or almost 6%, to close at $25.14 per share on April 3, 2020.

114.   Despite this decline in Braskem's ADS price, the Company's ADSs continued to trade at artificially inflated prices throughout the remainder of the Class Period because of Defendants' continued misrepresentations and omissions regarding the true scope and severity of the Company's liability with respect to the ground subsidence at the Mine.

115.   On May 9, 2019, Braskem held a conference call with analysts.  On that call, Defendant Musa, Braskem's CEO, addressed the CPRM Summary Report:

> We have been doing several studies with different types of methodologies. So in our seismic satellite-based imagery, et cetera, and *those results have been shared with CPRM*, which is the equivalent of the US geological agency in the US. In parallel, CPRM has been doing its own independent evaluation, and this is the report that they published yesterday, *the first report on their work, that has a conclusion that there are connections between our operations and what's happening in the neighborhood nearby*.  What I mentioned is that we are evaluating those reports by CPRM. They are doing different studies with different service providers and their own analysis. And we're looking to understand the data and compare it to our own data as we look at it.

116.   These statements were materially false and misleading because (i) Braskem did not disclose that the CPRM provided detailed evidence at the March 21, 2019 meeting showing that Braskem caused the ground subsidence at the Mine, which in turn caused tremendous damages to nearby residents (*see* ¶¶45, 51-56, 76-

80); and (ii) Braskem was not just "sharing" results with the CPRM – it was providing the agency with misleading information. *See* ¶¶73-74.

117.   Braskem ADSs fell more than 7% on this day in response to the May 9, 2019 news, falling from a May 8, 2019 closing price of $22.13 to $20.56 on May 9, 2019.

118.   On October 8, 2019, Braskem filed the Company's 2017 annual report on Form 20-F with the SEC, which was signed by Defendants Musa and Freitas, reporting the Company's financial and operating results for the quarter and year ended December 31, 2017 (the "2017 20-F").

119.   The 2017 20-F represented that "[w]e estimate that the salt reserves of this [Alagoas] mine are sufficient to allow us to produce chlorine at expected rates of production for approximately 35 to 45 years."

120.   This statement was materially false and misleading because producing chlorine at these rates was unsustainable due to the inherently unsafe situation caused by ground subsidence at and near the Mine.  Indeed, Braskem had announced on May 9, 2019 that it was suspending operations at the Mine.  *See* ¶67.  Defendants knew or recklessly disregarded that, in light of the CPRM's findings (*see* ¶¶45, 51-56, 76-80), such suspension would be permanent – as it became in November 2019. *See* ¶90.

121.   The 2017 20-F also provided as follows:

The operation of our salt mining activities in the state of Alagoas, Brazil, which is a raw material necessary for production of certain products in our Vinyls Unit, is also subject to similar risks and hazards, and any significant incident relating to our salt mining activities may also result in material adverse environmental and social impacts.   For instance, in certain neighborhoods of the city of Maceió that are located near the geological area of our salt mine, ***there have been recent allegations that the ground gave way as a result of the activities carried out by us at this mine, which allegedly may have affected certain nearby private and public properties***….

122.   These statements were materially false and misleading because the CPRM presented far more than mere "allegations" – the CPRM provided detailed evidence supporting its findings about Braskem's role in ground subsidence, none of which was disclosed.  *See* ¶¶45, 51-56, 76-80.

123.   Just nine days later, on October 17, 2019, Braskem filed an annual report on Form 20-F with the SEC, signed by Defendants Musa and Freitas, reporting the Company's financial and operating results for the quarter and year ended December 31, 2018 (the "2018 20-F").

124.   The 2018 20-F represented that "[w]e estimate that the salt reserves of this mine are sufficient to allow us to produce chlorine at expected rates of production for 35 to 45 years."

125.   This statement was materially false and misleading because producing chlorine at these rates was unsustainable due to the inherently unsafe situation caused by ground subsidence at and near the Mine.  Indeed, Braskem had announced on May 9, 2019 that it was suspending operations at the Mine.  *See* ¶67.  Defendants

knew or recklessly disregarded that, in light of the CPRM's findings (*see* ¶¶45, 51-56, 76-80), such suspension would be permanent – as it became in November 2019. *See* ¶90.

126.   On January 3, 2020, Braskem disclosed in a 6-K filing with the SEC, which was signed by Defendant Freitas, that it had executed an agreement subjecting the Company to further liabilities of over \$2.7 billion, or over \$500,000,000. Specifically, the Company disclosed, in relevant part:

> [T]he Company estimates the amounts to be recognized as provisions at approximately (i) R\$1.7 billion for the implementation of the Financial Compensation and Support for Relocation Program; and (ii) R\$1 billion for the actions required to close its salt wells. Said provisions will be disbursed over the coming years and may be changed based on new developments. Furthermore, the DPE, MPF, MPE and DPU agreed (i) to release the approximately R\$3.7 billion in cash of the Company that previously had been frozen, of which R\$1.7 billion will be transferred to a bank account of Braskem specifically for funding the Financial Compensation and Support for Relocation Program that must maintain at minimum working capital of R\$100 million, subject to verification by an external auditor; and (ii) to the substitution of the surety bonds already presented by Braskem to the Courts in the approximate amount of R\$6.4 billion by two new surety bonds in the approximate amount of R\$3 billion, to guarantee the Public-Interest Civil Action filed by the DPE and by the MPE and the Public-Interest Civil Action filed by the MPF.

127.   These statements were materially false and misleading because Defendants downplayed the true scope and severity of the Company's liability. Defendants knew the R\$2.7 billion figure was a minimum starting payment, not a final estimate, and knew that Brazilian's laws held companies strictly liable.  *See* ¶¶42-43, 95.  Defendants' characterization of a starting point as a complete estimate

was materially false and misleading.

128.   Nonetheless, Braskem stock rose 4.33% after the January 3, 2020 news because the market believed the Company's misleading R$2.7 billion liability figure. Braskem's ADS also rose another 7% in the following three days.

129.   On June 12, 2020, Braskem filed its 2019 annual report on Form 20-F, which was signed by Defendant Simoes.  That report reiterated the $R2.7 billion liability estimate:

> On January 3, 2020, we entered into an agreement with the Alagoas State Public Defender's Office (Defensoria Pública do Estado de Alagoas), the Federal Prosecutor's Office (Ministério Público Federal), the State of Alagoas Prosecutor's Office (Ministério Público do Estado de Alagoas) and the Federal Public Defender's Office (Defensoria Pública da União) to support the relocation of, and indemnification to, residents in the areas at risk located in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in the city of Maceió, in the state of Alagoas, as set forth in the agreement, which was ratified by the Federal Judge of the 3rd District Court in the state of Alagoas. We estimate that the support for relocation set forth in the agreement and in surrounding areas will involve approximately 17,000 people. We also estimate that the following amounts will be provisioned in connection with the agreement: (i) R$1.7 billion for the implementation of the Financial Compensation and Support for Relocation Program; and (ii) R$1.0 billion for the actions required to close certain salt wells previously operated by us. The provisions will be disbursed in the coming years and may be changed based on new developments.

130.   These statements were materially false and misleading because Braskem downplayed the true scope and severity of the Company's liability. Defendants knew the R$2.7 billion figure was a minimum starting payment, not a final estimate.  *See* ¶95.  Defendants' characterization of a starting point as a total

estimate was materially false and misleading.

**Braskem Reveals That Its Exposure Was 60% More Than Earlier Disclosed**

131. On July 9, 2020, during pre-market hours, and less than a month since Braskem filed the 2019 20-F, the Company disclosed in a 6-K filing signed by Defendant Freitas that its liabilities from the ground subsidence were far worse than disclosed three weeks before:

> BRASKEM S.A….received a letter from the Alagoas State Public Defender's Office, the Federal Prosecution Office, the Alagoas State Prosecution Office and the Federal Public Defender's Office ("Authorities") informing of the updating of the Map of Sectors of Damage and Priority Action Lines by the Civil Defense of Maceió, which included 1,918 properties to be vacated in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in Maceió, Alagoas. To ensure the safety of the residents in the region, Braskem is negotiating with the Authorities to define possible measures to be adopted by mutual agreement, although it is not automatically obligated to assist in the vacation of these new areas pursuant to the Agreement signed with the Authorities and announced by the Company on January 3, 2020. In light of the existing information, ongoing dialogue with authorities, the Company estimates R$850 million in possible assistance measures for residents of the new areas and R$750 million in additional expenses expected from the measures to definitively shutdown the salt mining activities in Maceió, the operation management and the relocation of properties included after technical analysis, among others. In addition, with regard to the public-interest civil action filed by the Federal Prosecution Office involving the social and environmental damages, the Company informs that it is still in dialogues with the authorities and will keep the market information of material developments in the process.

132. On this news, Braskem's ADS price fell $0.59 per share, or 6.20%, to close at $8.93 per share on July 9, 2020.

133. Analysts were surprised by the announcement. For example, on July 9,

2020, J.P. Morgan stated:

> Braskem announced an additional R$1.6bn in provisions for the environmental issues in Alagoas. ***The announcement was not expected by investors, in our view***. Braskem had already provisioned R$3.4bn in 4Q19, and ended 1Q20 with R$3.lbn of provisions in its balance sheet. We welcome Braskem's attitude on proactively addressing the issues in the area. However, today's announcement could lead investors to question if further provisions and costs related to the environmental issues in the state will take place in the future.

## ADDITIONAL SCIENTER ALLEGATIONS

134.   As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company or in their own name during the Class Period were materially false and misleading when made.

135.   Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.

### The Ground Subsidence at the Mine Caused Material Harm to the Company

136.   The amounts in the settlement agreements were material to Braskem. Braskem's total net revenues for 2019 were R$9.6 billion.  Thus, the R$2.7 billion in the December 2019 R$2.7 billion settlement agreement alone amounted to more than 25% of the Company's R$9.6 billion in 2019 net revenues.  *See* ¶16, 95. Braskem's total settlements relating to ground subsidence at the Mine amounted to over R$10 billion (*see* ¶107) – or almost $2 billion – which was more than the

Company's R$96 billion in 2019 net revenues.[17]

**Braskem Repeatedly Presented Misleading Data, Concealed Adverse Data, And Covered Up Its Role in the Ground Subsidence**

137.    On May 14, 2019, in advance of a scheduled meeting with the CEI, the IMA and Braskem two days later, CPRM technicians stated that Braskem had sent them inaccurate information relating to the Company's mining activity. *See* ¶73.

138.    In a June 3, 2019 meeting with the MPF and the CPRM, the CPRM noted that Braskem had been aware of data indicating faults in the salt mining area – but did not reveal them to the Federal Justice Ministry. *See* ¶77.

139.    The CPRM also noted that one of the slides presented by Braskem in a May 2019 meeting with the MPF had "exaggerated the horizontal scale in relation to the vertical scale, generating a deformed geological model". *See* ¶78.   This exaggeration obfuscated the ground subsidence problems at the Mine.

140.    On September 24, 2019, the CEI stated that Braskem had "passed" "imprecise information" and that it "always sent information that was photocopied, lacked more detailed information and that created a lot of work, and [which] showed Braskem that there were faults in the Pinheiro neighborhood and the region. Mr. Thales reported that BRASKEM bought interferometry images and that Braskem

---

[17] *See* https://www.nasdaq.com/articles/brazils-braskem-estimates-%241.85-billion-in-provisions-due-to-alagoas-disaster-2021-02-01 ("Brazil's Braskem SA BRKM5.SA will record approximately 10.1 billion reais ($1.85 billion) in provisions related to an ongoing environmental disaster in the state of Alagoas").

did not pass on information about subsidence." *See* ¶85.

141. Providing inaccurate information supports an inference that Defendants tried to cover up Braskem's role in the ground subsidence.

## Criminal and Civil Investigations Into Braskem

142. The CEI recommended that Almeida, Pradines, and Cerqueira be criminally indicted "for [] attempt[ing] to interfere in investigations, and [] use [] economic power to interfere in the case and coerce the State." *See* ¶86.

143. The Federal Justice Ministry of Alagoas recommended civil and criminal indictment for Musa, Almeida, Pradines, and Cerqueira for possible fraud relating to ground subsidence at the Mine. *See* ¶87.

144. Two criminal inquiries were initiated after the CEI's recommendations. Performance: "'Caso Pinheiro' Task Force Creates Precedents in Preventive Action of Human and Environmental Tragedies", Federal Justice Ministry, State of Alagoas at 3. *See* ¶87.

145. These criminal and civil inquiries further support an inference that Defendants acted knowingly or with severe recklessness.

## The Scienter of Almeida, Cerqueira, Pradines and Castro Can Be Imputed to Braskem

146. Almeida was Braskem's Industrial Director of Vinyls. Cerqueira was Braskem's Executive Vice President, Brazil Manufacturing and Global Industrial Operations. Pradines was Braskem's Institutional Relations Manager. Castro was

Braskem's Business Director of Chlor Alkali and Vinyls until March 2020.

147.  Almeida and Castro were present at the March 2019 meeting with the CPRM.  *See* ¶51.

148.  Almeida, Cerqueira and Pradines were recommended for civil and criminal indictment.  *See* ¶86.

**Defendants Knew or Recklessly Disregarded That Brazil Would Hold Braskem Strictly Liable for Damages at the Mine Even if the Company Was Only a Partial Cause**

149.  Brazilian law holds companies strictly liable for damage with regards to environmental damage.  Under NEPA, Article 14, a company "must repair or otherwise compensate for damage caused to the environment and to third parties by its activity regardless of fault," with the two required elements being only the harm itself and some causal link between the harm and the company's activities.

150.  Environmental civil liability in Brazil is "assessed on an objective standard and can be joint" (Article 14, §1, Law 6.938/1981), meaning that a company's liability will not be decreased due to the possible existence of other contributing factors.

151.  Defendants' knowledge that Brazil's environmental laws would hold Braskem strictly liable further supports an inference that they knew or recklessly disregarded that their statements about Braskem's liabilities stemming from ground subsidence at the Mine were misleading.

**Resignation of CEO Musa and Business Director of Vinyls Castro**

152.   The Company's CEO, Defendant Musa, resigned on November 21, 2019.

153.   A news report linked Musa's resignation with his handling of issues relating to ground subsidence at the Mine.   *See* ¶94.

154.   In March 2020, Braskem's Director of Chlor Alkali and Vinyls, Alexandre de Castro, left the Company.

155.   Castro was present at the March 2019 meeting with the CPRM.   *See* ¶51.

156.   These resignations support an inference that Defendant Musa and Castro knew Braskem's alleged misstatements and omissions were misleading.

## LOSS CAUSATION/ECONOMIC LOSS

157.   During the Class Period, as detailed herein, Defendants engaged in a course of conduct that artificially inflated the price of Braskem ADSs and operated as a fraud or deceit on Class Period purchasers of Braskem ADSs by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Braskem ADSs fell as the prior artificial inflation came out.

158.   As a result of its purchases of Braskem ADSs during the Class Period,

Plaintiff and the other Class members suffered economic loss, i.e., damages, under the federal securities laws. Defendants' false and misleading statements caused Braskem ADSs to trade at artificially inflated levels throughout the Class Period.

159.   By failing to disclose to investors the adverse facts detailed herein, Defendants presented a misleading picture of Braskem's business and operations. When the truth about the Company was revealed to the market, the price of Braskem ADSs declined. These declines removed the inflation from the price of Braskem ADSs, causing real economic loss to investors who had purchased Braskem ADSs during the Class Period.

160.   The declines in the price of Braskem ADSs after the corrective disclosures on April 2, 2019, May 9, 2019, and July 9, 2020 were a direct result of Defendants' fraudulent misrepresentations being revealed to investors and the market.

161.   The declines in the price of Braskem ADSs were also the result of the materialization of the concealed risks relating to the subsidence of the ground around the Mine between June 2016 and December 2018; and the concealed risks relating to the extent of the Company's liabilities from the ground subsidence around the Mine.

162.   Defendants' materially false and misleading statements relate to the Company's role in the ground subsidence at the Mine; the CPRM's findings about

the Company's role in such subsidence; the sustainability of revenues stemming from the Mine; and the scope of the Company's financial liabilities from the ground subsidence at the Mine.

163.   The first corrective disclosure was on April 2, 2019.  On that date, Braskem disclosed that it was being sued for its role in the tremendous damages suffered by residents stemming from ground subsidence near the Mine.

164.   This disclosure began to reveal Braskem's role in the ground subsidence at the Mine and caused part of the concealed investment risks relating to Braskem to be revealed.

165.   After this disclosure, Braskem's ADSs fell more than 6% over a two day period as a consequence.

166.   The second corrective disclosure was on May 9, 2019.  On that date, Braskem's CEO Musa revealed that the CPRM found Braskem caused the ground subsidence at the Mine.

167.   This disclosure revealed more of Braskem's role in the ground subsidence at the Mine and caused more of the concealed investment risks relating to Braskem to be revealed.

168.   After this disclosure, Braskem's ADSs fell more than 7% as a consequence.

169.   The final corrective disclosure on July 9, 2020.  On that date, Braskem

revealed that it would pay 60% more – a total of R$4.3 billion rather than R$2.7 billion – than earlier disclosed.

170.   This disclosure revealed the truth about Braskem's liabilities in connection with ground subsidence at the Mine and caused the remainder of the concealed investment risks relating to Braskem to be revealed.

171.   After this disclosure, Braskem's ADSs fell 6.2% on that date, and almost 8% over three days.

172.   The timing and magnitude of the price declines in Braskem's ADSs stock negate any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, i.e., damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of Braskem ADSs and the subsequent significant decline in the value of Braskem ADSs when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

173.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Braskem ADSs during the Class Period (the

"Class"), and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

174.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Braskem ADSs were actively traded on the NYSE and OTC. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Braskem or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

175.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

176.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those

of the Class.

177.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

  a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

  b. whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of Braskem;

  c. whether the prices of Braskem securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

  d. whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

178.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

179.   Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

    a.  Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

    b.  the omissions and misrepresentations were material;

    c.  Braskem ADSs are traded in an efficient market;

    d.  the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

    e.  the Company traded on the NYSE and OTC and was covered by multiple analysts;

    f.  the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADSs; and

    g.  Plaintiff and members of the Class purchased, acquired and/or sold Braskem ADSs between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

180.   Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

181.   Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I
### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

182.   Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

183.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

184.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of ADSs. Such scheme was intended to,

and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Braskem ADSs; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Braskem ADSs at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

185.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Braskem ADSs. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Braskem's role in ground subsidence at the Mine, as well as the Company's financial liabilities from the damages caused by such subsidence.

186.  By virtue of their positions at Braskem, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth

in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

187.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Braskem, the Individual Defendants had knowledge of the details of Braskem's internal affairs.

188.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Braskem. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Braskem's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Braskem ADSs was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Braskem's business and financial

condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Braskem ADSs at artificially inflated prices and relied upon the price of the ADSs, the integrity of the market for the ADSs and/or upon statements disseminated by Defendants, and were damaged thereby.

189.   During the Class Period, Braskem ADSs were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Braskem ADSs at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said ADSs, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Braskem ADSs was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Braskem ADSs declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

190.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

191.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's ADSs during the Class Period, upon the disclosure that the Company had been disseminating misleading information to the investing public.

## COUNT II
### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

192.   Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

193.   During the Class Period, the Individual Defendants participated in the operation and management of Braskem, and conducted and participated, directly and indirectly, in the conduct of Braskem's business affairs. Because of their senior positions, they knew the adverse non-public information about Braskem's misstatement of income and expenses and false financial statements.

194.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Braskem's financial condition and results of operations, and to correct promptly any public statements issued by Braskem which had become materially false or misleading.

195.   Because of their positions of control and authority as senior officers,

the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Braskem disseminated in the marketplace during the Class Period concerning Braskem's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Braskem to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Braskem within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Braskem ADSs.

196.   Each of the Individual Defendants, therefore, acted as a controlling person of Braskem. By reason of their senior management positions and/or being directors of Braskem, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Braskem to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Braskem and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

197.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Braskem.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  April 28, 2021

Respectfully submitted,

**SCHNADER HARRISON
SEGAL & LEWIS, LLP**

By: /s/ Lisa J. Rodriguez
_____

Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Telephone: (856) 482-5222
Email:  lrodriguez@schnader.com

*Local Counsel for Plaintiff and the
Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Michael S. Bigin (pro hac vice)
Joseph R. Seidman, Jr.
Lisa Sriken
10 East 40th Street
New York, New York 10016
Tel.: (212) 779-1414
Fax: (212) 779-3218
bigin@bernlieb.com
seidman@bernlieb.com
lsriken@bernlieb.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Matthew M. Guiney (application for
admission forthcoming)
Kevin Cooper
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
guiney@whafh.com
cooper@whafh.com

*Co-Lead Counsel for Plaintiff and the Proposed Class*