# EXHIBIT 7

As filed with the Securities and Exchange Commission on June 15, 2020

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

## FORM 20-F

☐ **REGISTRATION STATEMENT PURSUANT TO SECTION 12(b) OR
12(g) OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
FOR THE FISCAL YEAR ENDED DECEMBER 31, 2019**

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

OR

☐ **SHELL COMPANY REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 001-14862

# BRASKEM S.A.
**(Exact Name of Registrant as Specified in its Charter)**

| | |
|---|---|
| **N/A** | **The Federative Republic of Brazil** |
| (Translation of Registrant's Name into English) | (Jurisdiction of Incorporation or Organization) |

**Rua Lemos Monteiro, 120 - 24° andar
Butantã - São Paulo, SP - CEP 05501-050 - Brazil**
(Address of Principal Executive Offices)
Pedro van Langendonck Teixeira de Freitas
Braskem S.A.
Rua Lemos Monteiro, 120 - 24° andar
Butantã - São Paulo, SP - CEP 05501-050 - Brazil
Telephone: + 55 11 3576-9000
Fax: + 55 11 3576-9532
(Name, Telephone, E-mail and/or Facsimile number and Address of Company Contact Person)

**Securities registered or to be registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Trading Symbol | Name of Each Exchange on which Registered |
|---|---|---|
| Preferred Shares, Class A, without par value per share, each represented by American Depositary Shares | BAK | New York Stock Exchange |

**Securities registered or to be registered pursuant to Section 12(g) of the Act: None**

**Securities for which there is a reporting obligation pursuant to Section 15(d) of the Act:**

6.450% Notes due 2024, issued by Braskem Finance Limited

**The total number of issued shares of each class of stock of Braskem S.A. as of December 31, 2019 was:**

451,668,652 Common Shares, without par value

345,049,672 Preferred Shares, Class A, without par value

500,230 Preferred Shares, Class B, without par value

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☒ No ☐

If this report is an annual or transition report, indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, or an emerging growth company. See definition of "large accelerated filer," "accelerated filer," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☒          Accelerated filer ☐          Non-accelerated filer ☐          Emerging growth company ☐

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 13(a) of the Exchange Act.

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

Indicate by check mark which basis of accounting the registrant has used to prepare the financial statements included in this filing:

U.S. GAAP ☐          International Financial Reporting Standards as issued by the International Accounting Standards Board ☒          Other ☐

If "Other" has been checked in response to the previous question, indicate by check mark which financial statement item the registrant has elected to follow. ☐ Item 17 ☐ Item 18

If this is an annual report, indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

**TABLE OF CONTENTS**

|  |  |  | **Page** |
|---|---|---|---|
| PRESENTATION OF FINANCIAL AND OTHER INFORMATION |  |  | ii |
| CAUTIONARY STATEMENT WITH RESPECT TO FORWARD-LOOKING STATEMENTS |  |  | x |
| PART I |  |  | 1 |
|  | Item 1. | Identity of Directors, Senior Management and Advisers | 1 |
|  | Item 2. | Offer Statistics and Expected Timetable | 1 |
|  | Item 3. | Key Information | 1 |
|  | Item 4. | Information on the Company | 43 |
|  | Item 4A. | Unresolved Staff Comments | 75 |
|  | Item 5. | Operating And Financial Review and Prospects | 75 |
|  | Item 6. | Directors, Senior Management and Employees | 127 |
|  | Item 7. | Major Shareholders and Related Party Transactions | 144 |
|  | Item 8. | Financial Information | 152 |
|  | Item 9. | The Offer and Listing | 166 |
|  | Item 10. | Additional Information | 167 |
|  | Item 11. | Quantitative and Qualitative Disclosures About Market Risk | 182 |
|  | Item 12. | Description of Securities Other than Equity Securities | 185 |
| PART II |  |  | 186 |
|  | Item 13. | Defaults, Dividend Arrearages and Delinquencies | 186 |
|  | Item 14. | Material Modifications to the Rights of Security Holders and Use of Proceeds | 186 |
|  | Item 15. | Controls and Procedures | 187 |
|  | Item 16A. | Audit Committee Financial Expert | 190 |
|  | Item 16B. | Code of Ethics | 190 |
|  | Item 16C. | Principal Accountant Fees and Services | 190 |
|  | Item 16D. | Exemptions From the Listing Standards for Audit Committees | 191 |
|  | Item 16E. | Purchases of Equity Securities by the Issuer and Affiliated Purchasers | 191 |
|  | Item 16F. | Change in Registrant's Certifying Accountant | 192 |
|  | Item 16G. | Corporate Governance | 192 |
|  | Item 16H. | Mine Safety Disclosure | 194 |
| PART III |  |  | 195 |
|  | Item 17. | Financial Statements | 195 |
|  | Item 18. | Financial Statements | 195 |
|  | Item 19. | Exhibits | 195 |

**EXPLANATORY NOTE**

Braskem S.A., or the Company, is filing this annual report on Form 20-F for the year ended December 31, 2019 pursuant to the U.S. Securities and Exchange Commission, or the SEC, Order under Section 36 of the Securities Exchange Act of 1934 Modifying Exemptions from the Reporting and Proxy Delivery Requirements for Public Companies of March 25, 2020 (Release No. 34-88465).

As set forth in the Company's Form 6-K furnished to the SEC on April 30, 2020, the Company was unable to file its annual report on Form 20-F for the year ended December 31, 2019, which was originally due on April 30, 2020, due to the circumstances related to the novel coronavirus (COVID-19) pandemic. In particular, the novel coronavirus (COVID-19) pandemic has caused displacement of staff and certain other resources of the Company in order to comply with government-imposed restrictions and "stay-at-home" orders. Because of this, the Company was unable to complete certain procedures and analyses on its internal processes and controls in connection with its financial statements for the year ended December 31, 2019 prepared under PCAOB standards. This, in turn, delayed the Company's ability to prepare and complete its annual report on a timely basis.

## PRESENTATION OF FINANCIAL AND OTHER INFORMATION

All references herein to "*real*," "*reais*" or "R$" are to the Brazilian *real*, the official currency of the Federative Republic of Brazil, or Brazil. All references to "U.S. dollars," "dollars" or "US$" are to U.S. dollars, the official currency of the United States. All references to "CHF" are to Swiss francs, the official currency of Switzerland.

All references herein to (1) "we," "us," "the Company" or "our Company" are references to Braskem S.A., its consolidated subsidiaries and jointly controlled entities, and (2) "Braskem" are references solely to Braskem S.A. All references herein to "Braskem Europe" are to Braskem Europe GmbH and its consolidated subsidiaries, including Braskem America, Inc., or Braskem America.

### Financial Statements

We maintain our books and records in *reais*. Our consolidated financial statements as of December 31, 2019 and 2018 and for the three years ended December 31, 2019 have been audited, as stated in the report appearing therein, and are included in this annual report. These financial statements and related notes included elsewhere in this annual report are collectively referred to as our audited consolidated financial statements herein and throughout this annual report.

We have prepared our audited consolidated financial statements included in this annual report in accordance with International Financial Reporting Standards, as issued by the International Accounting Standards Board, or IFRS.

### Market Share and Other Information

We make statements in this annual report about our market share in the petrochemical industry in Brazil and our production capacity relative to that of other petrochemical producers in Brazil, other countries in Latin America, the United States and the world. We have made these statements on the basis of information obtained from third-party sources that we believe are reliable. We have calculated our Brazilian market share with respect to specific products by dividing our domestic net sales volumes of these products by the total Brazilian domestic consumption of these products. We derive information regarding the production capacity of other companies in the Brazilian petrochemical industry and the estimated total Brazilian domestic consumption of petrochemical products principally from reports published by the Brazilian Chemical Industry Association (*Associação Brasileira da Indústria Química*), or ABIQUIM. We derive information regarding the production capacity of other companies in the global petrochemical industry, international market prices for petrochemical products and per capita consumption in certain geographic regions, principally from reports published by IHS, Inc., or IHS. We derive information relating to Brazilian imports and exports from the *ComexStat (http://comexstat.mdic.gov.br)*, produced by the Brazilian Ministry of the Economy (*Ministério da Economia*). We also include information and statistics regarding economic growth in emerging economies obtained from the International Monetary Fund, or IMF, and statistics regarding gross domestic product, or GDP, growth in Brazil, the United States, Europe and Mexico obtained from independent public sources such as the Brazilian Institute of Geography and Statistics (*Instituto Brasileiro de Geografia e Estatística*), or the IBGE; the U.S. Department of Commerce; the statistical office of the European Union, or Eurostat; and the Mexican Institute of Statistics and Geography (*Instituto Nacional de Estadística y Geografía*).

We have no reason to believe that the information described above is inaccurate in any material respect. However, we have not independently verified the production capacity, market share, market size or similar data provided by third parties or derived from industry or general publications.

We provide information regarding domestic apparent consumption of some of our products based on information available from the Brazilian government, the Institute of Applied Economic Research (*Instituto de Pesquisa Econômica Aplicada*) and ABIQUIM. Domestic apparent consumption is equal to domestic production plus imports minus exports. Domestic apparent consumption for any period may differ from actual consumption because this measure does not give effect to variations of inventory levels in the petrochemical supply chain.

ii

**Certain Industry Terms**

*Glossary of Selected Terms in the Petrochemical Industry and in the Context of Our Business*

| Term | Meaning | Main uses | In the context of our business |
|---|---|---|---|
| Aliphatics | Aliphatics are open-chain hydrocarbons that contain no stable rings connecting their atoms, in contrast to aromatics. | Used as fuels, solvents and as basic chemicals in the petrochemical industry. | We produce aliphatics, such as ethylene and propylene, in our Chemicals Unit. |
| Aromatics | Aromatics are cyclic hydrocarbons with stable bonds connecting their carbon atoms. | Used as fuel additives, solvents, and basic chemicals in the petrochemical industry. | We produce aromatics, such as benzene, toluene and xylenes, as co-products in our Chemicals Unit. |
| Benzene | An aromatic hydrocarbon. It is a natural constituent of crude oil. | Used primarily for the manufacture of chemicals with more complex structure, such as ethylbenzene and cumene. | We produce benzene as a by-product in our Chemicals Unit. |
| BTX products | A mixture of benzene, toluene and the three xylene isomers (ortho, meta and para), all of which are aromatic hydrocarbons. | Used as fuel additives, solvents, and basic chemicals in the petrochemical industry. | We produce benzene, toluene and xylenes as BTX by-products in our Chemicals Unit. |
| Butadiene | An organic compound and a colorless gas. | Used industrially as a monomer in the production of synthetic rubber. | We produce butadiene as a by-product in our Chemicals Unit. |
| Butene | A colorless gas present in crude oil. | Used as a monomer in the production of polymers, as well as a petrochemical intermediate. | We use butene for the production of HDPE and LLDPE in our Polyolefins Unit. Butene is supplied by our Chemicals Unit. |
| Caustic soda | Caustic soda, or sodium hydroxide, is an inorganic compound. A colorless crystalline solid, caustic soda is toxic, corrosive and highly soluble in water. | Used in the manufacture of pulp and paper, textiles, drinking water, soaps and detergents, and as a drain cleaner. | We produce caustic soda in our Vinyls Unit. Caustic soda is a by-product of chlorine production required to produce PVC. |
| Chlor-alkali | Electrolysis process used in the manufacture of chlorine, hydrogen and sodium hydroxide (caustic soda). | Main industrial process for the production of caustic soda. | We operate chlor-alkali plants in Brazil. |

iii

| Term | Meaning | Main uses | In the context of our business |
|---|---|---|---|
| Chlorine | Chlorine is a chemical element (Cl), a toxic, greenish yellow gas at room temperature. It has a pungent suffocating odor. | Used in the production of paper products, antiseptics, plastics, dyes, textiles, medicines, insecticides, solvents and to treat swimming pools. | We use salt to produce chlorine in our Vinyls Unit. |
| Condensate | Condensate, or natural gas condensate, is a low-density mixture of hydrocarbon liquids that are present as gaseous components in the raw natural gas. | Condensate is used as an input for petrochemical plants, burned for heat and cooking, and blended into vehicle fuel. | We use condensate as a raw material in our Chemicals Unit. |
| Cumene | An organic compound based on an aromatic hydrocarbon with an aliphatic substitution, cumene is a colorless liquid constituent of crude oil and refined fuels. | Used for the production of phenol and acetone. | We produce cumene as a by-product in our Chemicals Unit. |
| Dicyclopentadiene | Dicyclopentadiene, or DCPD, is a yellow liquid with an acrid odor. | Used in polyester resins, inks, adhesives and paint. | We produce DCPD in our Chemicals Unit. |
| Ethane | A type of natural gas liquid (NGL), ethane is a colorless, odorless gas in standard temperature and pressure, extracted from natural gas in liquid form. | Used as a feedstock for ethylene production. | Ethane is one of the main raw materials that we use to produce ethylene in our Chemicals Unit. |
| Ethanol | A simple alcohol, produced by the fermentation of sugars by yeasts or via petrochemical processes. | Used as a fuel for vehicles, as a disinfectant and as a chemical intermediate. | We use ethanol as a raw material to produce green polyethylene in our Chemical Unit located in Triunfo, Brazil. |
| Ethyl tertiary-butyl ether | Ethyl tertiary-butyl ether, or ETBE, is a colorless liquid manufactured by the acid etherification of isobutylene with ethanol. | Used commonly as an additive in the production of gasoline. | We produce ETBE in our Chemicals Unit. |

iv

| Term | Meaning | Main uses | In the context of our business |
|---|---|---|---|
| Ethylene | A hydrocarbon, colorless gas and the most widely used organic compound in the chemical industry. Produced mainly via steam cracking of raw materials such as naphtha and NGLs. | Used mainly for the production of polyolefins, primarily polyethylene, the most used thermoplastic resin in the world. | We produce ethylene in our Chemicals Unit, as a main product of the steam cracking of raw materials. |
| EVA | Ethylene-vinyl acetate, or EVA, is a co-polymer of ethylene and vinyl acetate. | Used to produce rubber-like materials, with applications in adhesives, packaging, molding, and and membranes for electronic devices. | We produce EVA in our Polyolefins Unit. |
| Gasoline | A flammable liquid obtained by refining crude oil. | Used primarily as a fuel in combustion engines. | We produce gasoline as a by-product in our Chemicals Unit. |
| HDPE | High-density polyethylene, or HDPE, is a thermoplastic resin produced by the polymerization of ethylene. | Used in a variety of industries, to produce plastic bottles, toys, chemical containers, pipe systems, and other plastic products. | We produce HDPE in our Polyolefins Unit. |
| Hexene | An aliphatic, hexane is a clear, colorless liquid with a petroleum-like odor. | Used as a solvent, paint thinner, and chemical reaction medium. Also used as a co-monomer for the production of HDPE. | We use hexene in our Mexico Unit as a raw material to produce HDPE. |
| Hydrocarbon resins | Also called petroleum resins, they are produced from the polymerization of aromatic hydrocarbons. | Generally used together with other kinds of resins, in the paint, ink, adhesive and rubber industry. | We produce hydrocarbon resins in our Chemicals Unit. |
| Hydrogen | A chemical element, hydrogen is a colorless, odorless gas. | Used to make ammonia in the production of fertilizers and as an intermediate chemical in the production of plastics and pharmaceuticals. | We produce hydrogen in our Vinyls Unit. |
| Hydrogenated solvents | Odorless, colorless solvents treated with hydrogen. | Used in the manufacture of paints. | We produce hydrogenated solvents in our Chemicals Unit. |
| Isoprene | A common organic compound that is a component of natural rubber. Also a by-product of oil refining. | Used to produce synthetic rubber. | We produce isoprene in our Chemicals Unit. |

v

| Term | Meaning | Main uses | In the context of our business |
|---|---|---|---|
| LDPE | Low-density polyethylene, or LDPE, is a thermoplastic resin made from the polymerization of ethylene. | Used for manufacturing containers, dispensing bottles, wash bottles, tubing, plastic bags and molded laboratory equipment. | We produce LDPE in our Polyolefins Unit. |
| Liquefied petroleum gas (LPG) | Liquefied petroleum gas, or LPG, is a mixture of propane and butane, which are two natural gas liquids. | Used in fuel heating appliances, cooking equipment, vehicle fuel, aerosol propellant, and as a refrigerant. | We produce LPG in our Chemicals Unit. |
| LLDPE | Linear low-density polyethylene, or LLDPE, is a linear polymer made by the copolymerization of ethylene with longer-chain olefins. | Used in plastic bags and sheets, plastic wrap, stretch wrap, pouches, toys, covers, lids, pipes, buckets and containers, covering of cables and flexible tubing, among others. | We produce LLDPE in our Polyolefins Unit. |
| Methanol | Methanol is the simplest alcohol, a liquid produced industrially by hydrogenation of carbon monoxide. | Used as a precursor to other commodity chemicals, including formaldehyde, acetic acid and MTBE. | We use methanol as a raw material to produce MTBE in our Chemicals Unit. |
| Methyl tertiary-butyl ether (MTBE) | An intermediate hydrocarbon liquid stream derived mainly from the refining of crude oil | Used almost exclusively as a fuel additive in gasoline to raise the oxygen content. | We produce MTBE in our Chemicals Unit. |
| Naphtha | An intermediate hydrocarbon liquid stream derived mainly from the refining of crude oil. | Used as a solvent, fuel additive and as a raw material in the petrochemical industry. | We use naphtha as a raw material for the production of petrochemical products in our Chemicals Unit. |
| Natural gas | A naturally occurring hydrocarbon gas mixture, consisting primarily of methane. | Used as a source of energy for heating, cooking and electricity generation, as a fuel for vehicles and as a chemical feedstock. | We use natural gas for electricity generation in our production processes. |
| Natural gas liquids (NGL) | A mixture of hydrocarbon components of natural gas, primarily ethane, propane and butane, which are separated from the raw natural gas in the form of liquids. | Used as raw materials in the petrochemical industry, as fuel and in applications for heating and cooking. | We use NGLs such as ethane and propane as raw materials at our plants in Rio de Janeiro and Mexico. |
| N-hexane | A hydrocarbon, obtained by refining crude oil. | Used mixed with other solvents, to extract vegetable oils from crops, and as a cleaning agent in the printing, textile, furniture, and shoemaking industries. | We use n-hexane in our Polyolefins Unit as a raw material in the production of HDPE and LLDPE. |
| Nonene | A hydrocarbon, nonene is a colorless liquid with an odor reminiscent of gasoline. | Used as a plasticizer to make rigid plastics flexible, and to produce chemical intermediates. | We produce nonene in our Chemicals Unit. |
| Olefins | Unsaturated hydrocarbons that contain at least one carbon-carbon double bond, such as ethylene, propylene and butene. Obtained from steam cracking of raw materials. | Used as chemical intermediates for the production of other chemicals and resins. | We produce olefins in our Chemicals Unit. |
| Para-xylene | An aromatic hydrocarbon, para-xylene is produced mainly in refineries and during the steam cracking of naphtha. | Used as a chemical feedstock in the production of polymers, especially PET. | We produce para-xylene as a by-product in our Chemicals Unit. |
| PDH | Propane dehydrogenation, or PDH, is an on-purpose technology used for conversion of propane into propylene. | Industrial process for the production of propylene. | We use propylene from PDH units as a raw material in our plants in the United States. |
| Piperylene | A volatile, flammable hydrocarbon in liquid form, obtained as a by-product of ethylene production. | Used as a monomer in the manufacture of plastics, adhesives and resins. | We produce piperylene in our Chemicals Unit. |

| | | | |
|---|---|---|---|
| Polyethylene (PE) | PE is the most common type of thermoplastic resin. It is lightweight and durable, and is obtained from the polymerization of ethylene. | PE has a large number of applications, such as: packaging, consumer goods, fibers, textiles, pipes, automotive, wiring, cables, construction, among others. | We produce PE in our Polyolefins Unit. |
| Polyisobutylene (PIB) | PIB is a gas-permeable synthetic rubber produced by the polymerization of isobutylene with isoprene. | Used as a fuel and lubricant additive, in explosives, as the base for chewing gum, and to improve the environmental stress-cracking resistance of polyethylene. | We produce PIB in our Chemicals Unit. |

vi

| Term | Meaning | Main uses | In the context of our business |
|---|---|---|---|
| Polyolefins | Macromolecules formed by the polymerization of olefin monomer units. The most common are polypropylene (PP) and polyethylene (PE). | Used in a broad range of consumer and industrial applications. | We produce polyolefins in our Polyolefins Unit. |
| Polypropylene (PP) | PP is a thermoplastic resin and the second most widely produced commodity plastic, after PE. Obtained by the polymerization of propylene, PP is generally harder and more heat resistant than PE. | Widely used in the automotive and furniture industry, in consumer goods, for packaging and labeling, and in other industrial applications. | We produce PP in our Polyolefins Unit. |
| Polyvinyl chloride (PVC) | PVC is the world's third-most widely produced synthetic plastic polymer, after PE and PP, obtained by the polymerization of vinyl chloride monomer (VCM), a monomer generally made of ethylene and chlorine. | Used mainly in infrastructure and construction for pipes and profile applications, such as doors and windows, and also in plumbing, electrical cables, flooring, and as a replacement for rubber. | We produce PVC in our Vinyls Unit. |
| Propane | A type of natural gas liquid (NGL), propane is a gas in standard temperature and pressure, and is extracted from natural gas in liquid form. | Commonly used together with butane in heating and cooking applications, and also as a raw material in the petrochemical industry. | We use propane together with ethane as a raw materials to produce petrochemical products in our Chemicals Unit. |
| Propylene | A hydrocarbon, propylene is a colorless gas, and the second most widely used olefin in the chemical industry, after ethylene. It can be obtained as a co-product of steam cracking or refining, and from on-purpose production. | Used mainly to produce polypropylene resins and a wide variety of other chemicals, such as propylene oxide and acrylonitrile. | We produce propylene in our Chemicals Unit as a by-product of steam cracking. Propylene is also the main raw material that we use to produce polypropylene in our Polyolefins and United States and Europe Units. |

vii

| Term | Meaning | Main uses | In the context of our business |
|---|---|---|---|
| Refinery off gas | Gas that is produced as a by-product of the refining of crude oil. It is a mixture of methane, ethane, hydrogen and other gases. | Used as a feedstock in the petrochemical industry. | We use refinery off gas as a raw material in our Chemicals Unit to produce ethylene. |
| Salt | Salt is a mineral composed primarily of sodium chloride. | Used in a wide variety of industries, mainly in the chlor-alkali process to produce caustic soda and chlorine, and as a food additive. | We use salt to produce chlorine and caustic soda in our Vinyls unit. |
| Sodium hypochlorite | Sodium hypochlorite is a chlorine compound. | Used as a disinfectant or a bleaching agent and to produce other chemicals. | We produce sodium hypochlorite in our Vinyls Unit. |
| Tetramer | Tetramer, or propylene tetramer, is an olefin. | Used as a plasticizer, surfactant, lubricating oil additive and polymerization agent. | We produce propylene tetramer in our Chemicals Unit. |
| Thermoplastic resins | Raw, unshaped polymers, such as PE, PP and PVC. | Used in the plastic industry and other industries. | We produce thermoplastic resins in our Chemicals Unit. |
| Toluene | An aromatic hydrocarbon. | Used predominantly as an industrial feedstock and a solvent. | We produce toluene in our Chemicals Unit. |
| UHMWPE | Ultra-high molecular weight polyethylene, or UHMWPE, is a special type of thermoplastic polyethylene. | Used in industrial applications that require durability, low friction, and chemical resistance, including wear strips, chain guides, and marine dock fender pads, among others. | We produce UHMWPE in our United States and Europe Units. |
| Vinyls | Vinyls, or vinyl polymers, are a group of polymers derived from vinyl monomers. The most common type of vinyl is PVC. | Used in the plastic industry and other industries. | We produce vinyls in our Vinyls Unit. |

*Certain Other Selected Terms Used in This Annual Report*

As used in this annual report:

- "first generation products" means basic petrochemical products such as ethylene and propylene produced from naphtha, natural gas, and ethane. The basic petrochemical products are used as feedstocks for the production of second generation products. We also sell certain first generation products to our customers;

- "second generation products" means thermoplastics resins, such as PE, PP and PVC;

- "third generation" means plastics converters;

- "third generation products" means finished plastic products produced by molding thermoplastic resins into end-use applications;

- "annual production capacity" means the annual nominal capacity for a particular facility, calculated based on operations during the 24 hours of the day for an entire year;

- "kton" means a kiloton, which is equal to 1,000 tons, or 2,204,622.62 pounds;

- "ton" means a metric ton, which is equal to 1,000 kilograms or 2,204.62 pounds.

**Rounding**

We have made rounding adjustments to some of the amounts included in this annual report. As a result, numerical figures shown as totals in some tables may not be arithmetic aggregations of the amounts that precede them.

**Currency Conversion**

Solely for the convenience of the reader, we have translated certain amounts included in "Item 3. Key Information- Selected Financial and Other Information" and elsewhere in this annual report from *reais* into U.S. dollars using the selling rate as reported by the Brazilian Central Bank as of May 29, 2020 of R$5.4263 to US$1.00. These translations should not be considered representations that any such amounts have been, could have been or could be converted into U.S. dollars at that or at any other exchange rate.

ix

**CAUTIONARY STATEMENT WITH RESPECT TO FORWARD-LOOKING STATEMENTS**

This annual report contains forward-looking statements. Some of the matters discussed concerning our business operations and financial performance include forward-looking statements within the meaning of the U.S. Securities Act of 1933, as amended, or the Securities Act, or the U.S. Securities Exchange Act of 1934, as amended, or the Exchange Act.

Statements that are predictive in nature, that depend upon or refer to future events or conditions or that include words such as "aim," "anticipate," "believe," "can," "continue," "estimate," "expect," "intend," "likely," "may," "might," "plan," "potential," "project," "seek," "should," "target," "would," or the opposite of these terms or other similar expressions are forward-looking statements. Although we believe that these forward-looking statements are based upon reasonable assumptions, these statements are subject to several risks and uncertainties and are made in light of information currently available to us.

Our forward-looking statements may be influenced by numerous factors, including the following:

- the adverse effect of global health crises, such as the novel coronavirus (COVID-19) pandemic and others, on our Brazilian and international sales and operations, demand for our petrochemical products, our manufacturing facilities, price of raw materials, logistics for our products and raw materials, and supply chains;

- general economic, political and business conditions in the markets or jurisdictions in which we operate, including demand and prices for petrochemical products;

- interest rate fluctuations, inflation and exchange rate movements of the *real* in relation to the U.S. dollar and other currencies;

- the cyclical nature of the global petrochemical industry;

- competition in the global petrochemical industry;

- prices of naphtha, ethane, propane, propylene and other raw materials and the terms and conditions of the supply agreements related thereto;

- international prices of petrochemical products;

- actions taken by our major shareholders;

- inherent risks related to any change of our corporate control;

- our ability to implement our financing strategy and to obtain financing on satisfactory terms;

- our progress in integrating the operations of companies or assets that we may acquire in the future, so as to achieve the anticipated benefits of these acquisitions;

- changes in laws and regulations, including, among others, laws and regulations affecting tax and environmental matters and import tariffs in other markets or jurisdictions in which we operate or to which we export our products;

- future changes in Brazilian, Mexican, American and European policies and related actions undertaken by those governments;

- a deterioration in the world economy that could negatively impact demand for petrochemicals;

- decisions rendered in major pending or future tax, labor, environmental and other legal proceedings; and

- other factors identified or discussed under "Item 3. Key Information-Risk Factors."

x

Our forward-looking statements are not a guarantee of future performance, and our actual results or other developments may differ materially from the expectations expressed in the forward-looking statements. As for forward-looking statements that relate to future financial results and other projections, actual results will be different due to the inherent uncertainty of estimates, forecasts and projections. Because of these uncertainties, potential investors should not rely on these forward-looking statements.

Forward-looking statements speak only as of the date they are made, and we do not undertake any obligation to update them in light of new information or future developments or to release publicly any revisions to these statements in order to reflect later events or circumstances or to reflect the occurrence of unanticipated events.

xi

**PART I**

**ITEM 1. IDENTITY OF DIRECTORS, SENIOR MANAGEMENT AND ADVISERS**

Not applicable.

**ITEM 2. OFFER STATISTICS AND EXPECTED TIMETABLE**

Not applicable.

**ITEM 3. KEY INFORMATION**

**Selected Financial and Other Information**

The following selected information should be read in conjunction with "Presentation of Financial and Other Information," "Item 5. Operating and Financial Review and Prospects" and our audited consolidated financial statements and the related notes thereto, which are included in this annual report.

The selected financial data as of December 31, 2019 and 2018 and for the three years ended December 31, 2019 have been derived from our audited consolidated financial statements, prepared in accordance with IFRS, and included in this annual report.

In 2019, except for the changes that occurred following the adoption of the new accounting standards described in "Item 5. Operating and Financial Review and Prospects Changes in key accounting policies" below, accounting practices were applied prospectively in the preparation of our financial statements, except for IFRS 16 described in "Section 4. Information on the Company-Changes in key accounting policies."

In the year ended December 31, 2019, the Company changed the classification of the profit sharing expenses in order to report the effects of these expenses by function. The Company also reclassified the profit sharing expenses in the year ended December 31, 2018 from "Other expenses" (R$375.4 million in 2018) to "cost of goods sold" (R$145.4 million in 2018), "selling and distribution expenses" (R$50.3 million in 2018), "general and administrative expenses" (R$160.2 million in 2018) and "research and development" (R$19.4 million in 2018).

We have included information with respect to the dividends and/or interest attributable to shareholders' equity paid to holders of our common shares and preferred shares since January 1, 2017 in *reais* and in U.S. dollars translated from *reais* at the commercial market selling rate in effect as of the payment date under the caption "Item 8. Financial Information-Dividends and Dividend Policy-Payment of Dividends."

1

| | **For the Year Ended December 31,** | | | | | |
|---|---|---|---|---|---|---|
| | **2019** | **2019** | **2018** | **2017** | **2016** | **2015** |
| | | | **Restated** | | | |
| | *(in millions of US$, except per share data and as indicated)* | | *(in millions of reais, except per share data and as indicated)* | | | |
| **Statement of Profit or Loss Data:** | | | | | | |
| Net revenue | 9,642.6 | 52,323.5 | 57,999.9 | 49,260.6 | 47,664.0 | 46,880.0 |
| Cost of products sold | (8,455.0) | (45,879.1) | (46,576.6) | (36,177.4) | (34,985.6) | (36,697.8) |
| **Gross profit** | **1,187.6** | **6,444.4** | **11,423.3** | **13,083.2** | **12,678.4** | **10,182.2** |
| **Income (expenses):** | | | | | | |
| Selling and distribution | (328.7) | (1,783.5) | (1,689.2) | (1,459.6) | (1,403.7) | (1,077.3) |
| (Loss) reversals for impairment of trade accounts receivable | (1.3) | (7.1) | 87.0 | | | |
| General and administrative | (409.9) | (2,224.2) | (1,793.2) | (1,434.3) | (1,285.6) | (1,095.4) |
| Research and development | (45.7) | (247.7) | (219.2) | (167.5) | (162.0) | (169.6) |
| Results from equity investments | 1.8 | 10.2 | (0.9) | 40.0 | 30.1 | 2.2 |
| Other operating income (expenses), net[1] | (375.7) | (2,038.5) | 472.5 | (854.9) | (3,906.0) | (952.3) |
| **Operating profit** | **28.3** | **153.6** | **8,280.2** | **9,206.9** | **5,951.2** | **6,889.8** |
| **Financial results:** | | | | | | |
| Financial expenses | (715.5) | (3,882.8) | (3,007.6) | (3,747.2) | (3,571.0) | (3,163.4) |
| Financial income | 156.7 | 850.6 | 589.1 | 603.6 | 690.1 | 584.9 |
| Exchange rate variations, net | (317.8) | (1,724.5) | (2,257.0) | (798.7) | (3,210.4) | 102.9 |
| Financial expenses, net | (876.6) | (4,756.7) | (4,675.5) | (3,942.3) | (6,091.3) | (2,475.6) |
| **(Loss) Profit before income tax and social contribution** | **(848.3)** | **(4,603.1)** | **3,604.8** | **5,264.6** | **(140.1)** | **4,414.2** |
| Current and deferred income tax and social contribution | 361.7 | 1,962.7 | (736.6) | (1,357.7) | (616.0) | (1,660.4) |
| **(Loss) Profit for the year of continued operations** | **(486.6)** | **(2,640.4)** | **2,868.2** | **3,906.9** | **(756.1)** | **2,753.8** |
| Results from discontinued operations | 0.0 | 0.0 | 0.0 | 8.9 | 26.9 | 6.4 |
| **(Loss) Profit for the year** | **(486.6)** | **(2,640.4)** | **2,868.2** | **3,915.8** | **(729.2)** | **2,760.2** |
| Net income attributable to shareholders of the company | (468.3) | (2,541.0) | 2,827.7 | 3,865.4 | (411.5) | 3,001.7 |
| Net income attributable to non-controlling interest in subsidiaries | (18.3) | (99.4) | 40.5 | 50.3 | (317.7) | (241.5) |
| | **(468.6)** | **(2,640.4)** | **2,868.2** | **3,915.8** | **(729.2)** | **2,760.2** |
| **(Loss) Profit per share:** | | | | | | |
| **Basic:** | | | | | | |
| Common shares | (0.5883) | (3.1922) | 3.5543 | 4.8479 | (0.5511) | 3.7651 |
| Preferred class "A" shares | (0.5883) | (3.1922) | 3.5543 | 4.8479 | (0.5511) | 3.7651 |
| Preferred class "B" shares | (0.5883) | (3.1922) | 0.5910 | 0.6069 | 0.0000 | 0.6065 |
| Diluted: | | | | | | |
| Common shares | (0.5883) | (3.1922) | 3.5543 | 4.8590 | (0.5511) | 3.7651 |
| Preferred class "A" shares | (0.5883) | (3.1922) | 3.5543 | 4.8590 | (0.5511) | 3.7651 |
| Preferred class "B" shares | (0.5883) | (3.1922) | 0.5910 | 0.6069 | 0.0000 | 0.6065 |
| ADS[2] | (1.1766) | (6.3845) | 7.1086 | 9.7180 | (1.1021) | 7.5302 |

(1) In the year ended December 31, 2019, the Company changed the classification of the profit sharing expenses in order to report the effects of these expenses by function. The Company also reclassified the profit sharing expenses in the year ended December 31, 2018 from "Other expenses" (R$375.4 million in 2018) to "cost of goods sold" (R$145.4 million in 2018), "selling and distribution expenses" (R$50.3 million in 2018), "general and administrative expenses" (R$160.2 million in 2018) and "research and development" (R$19.4 million in 2018).

(2) For each of the years presented, each ADS represented two of our class A preferred shares.

2

| | For the Year Ended December 31, | | | | | |
|---|---|---|---|---|---|---|
| | 2019 | 2019 | 2018 | 2017 | 2016 | 2015 |
| | *(in millions of US$, except per share data and as indicated)* | | | *(in millions of* reais*, except per share data and as indicated)* | | |
| **Statement of Financial Position Data:** | | | | | | |
| Cash, cash equivalents and financial investments[1] | 1,564.9 | 8,491.4 | 7,905.3 | 6,077.8 | 7,892.3 | 7,458.2 |
| Short-term trade accounts receivable | 421.2 | 2,285.8 | 3,075.2 | 3,281.2 | 1,634.1 | 2,755.7 |
| Inventories[2] | 1,405.2 | 7,625.1 | 8,486.6 | 6,640.0 | 5,299.5 | 6,243.7 |
| Property, plant and equipment, net | 5,955.3 | 32,315.2 | 31,759.9 | 29,761.6 | 29,336.7 | 34,100.3 |
| Total assets | 12,555.3 | 68,129.0 | 58,807.5 | 52,731.8 | 51,821.9 | 60,626.9 |
| Short-term borrowings | 142.8 | 774.9 | 737.4 | 1,184.8 | 2,594.5 | 1,970.0 |
| Long-term borrowings | 5,204.7 | 28,242.1 | 24,160.7 | 22,176.6 | 20,736.6 | 25,380.5 |
| Share capital | 1,482.3 | 8,043.2 | 8,043.2 | 8,043.2 | 8,043.2 | 8,043.2 |
| Shareholders' equity (including non- controlling interest) | 727.0 | 3,944.7 | 5,654.7 | 5,472.8 | 1,720.7 | 945.5 |
| **Other Financial and Operating Information:** | | | | | | |
| Statement of Cash Flow Data: | | | | | | |
| Net cash provided by (used in): | | | | | | |
| Operating activities | 417.5 | 2,265.3 | 9,250.4 | 2,461.6 | 4,457.9 | 7,091.7 |
| Investing activities | (491.4) | (2,666.4) | (2,488.3) | (2,406.4) | (2,552.5) | (3,334.2) |
| Financing activities | 301.4 | 1,636.8 | (4,603.4) | (2,988.5) | (2,757.3) | (97.5) |
| Other Information: | | | | | | |
| Capital expenditures: | | | | | | |
| Property, plant and equipment | (494.4) | (2,682.5) | (2,706.3) | (2,273.2) | (2,586.5) | (3,337.9) |

(1)   Includes current financial investments.

(2)   Includes non-current advances to suppliers.

## Exchange Rates

The current laws and regulations governing the Brazilian foreign exchange system allow the purchase and sale of foreign currency and the international transfer of *reais* by any person or legal entity, regardless of the amount, subject to certain regulatory procedures. Since 1999, the Central Bank has allowed the U.S. dollar-*real* exchange rate to float freely, and, since then, the U.S. dollar-*real* exchange rate has fluctuated considerably.

In the past, the Central Bank has intervened occasionally to control unstable movements in foreign exchange rates. We cannot predict whether the Central Bank or the Brazilian government will continue to permit the *real* to float freely or will intervene in the exchange rate market through the return of a currency band system or otherwise. The *real* may depreciate or appreciate against the U.S. dollar substantially. Furthermore, Brazilian law provides that, whenever there is a serious imbalance in Brazil's balance of payments or there are serious reasons to foresee a serious imbalance, temporary restrictions may be imposed on remittances of foreign capital abroad. We cannot assure you that such measures will not be taken by the Brazilian government in the future. See "-Risk Factors-Risks Relating to Brazil-Brazilian government exchange control policies could increase the cost of servicing our foreign currency-denominated debt, adversely affect our ability to make payments under our foreign currency-denominated debt obligations and impair our liquidity" and "-Risk Factors-Risks Relating to Our Equity and Debt Securities-If holders of the ADSs exchange them for class A preferred shares, they may risk temporarily losing, or being limited in, the ability to remit foreign currency abroad and certain Brazilian tax advantages."

3

**Risk Factors**

*Risks Relating to Us and the Petrochemical Industry*

***Global or regional health pandemics or epidemics, including that related to the novel coronavirus (COVID-19), may adversely affect our business, financial condition and results of operations.***

Our business, financial condition and results of operations may be adversely affected by the novel coronavirus (COVID-19) pandemic, which was reported to have surfaced in China in December 2019 and spread to the rest of the world, or by other pandemics or epidemics of similar nature. In 2020, the novel coronavirus (COVID-19) pandemic has significantly impacted economic activity and markets around the world, and its severity, magnitude and duration are highly uncertain, rapidly changing and difficult to predict. At this time, our management cannot fully predict with certainty the effects that the novel coronavirus (COVID-19) pandemic will have on our business, financial condition and results of operations and whether these effects will be material to us. The spread of the novel coronavirus (COVID-19) has caused us to modify certain of our business practices, and we may take further actions as required by government authorities or that we determine are in the best interests of our employees, customers, partners and suppliers. Based on our preliminary operating data for May 2020 and the publicly reported expected impact on certain industries that are customers to our products (such as automotive and construction), we believe the novel coronavirus (COVID-19) has affected our business in numerous ways, including, but not limited to, reduction of our production, sales volume and net revenue, increase of some of our costs, and decrease of our gross margin.

We are closely monitoring the impact of the novel coronavirus (COVID-19) pandemic on all aspects of our business and geographies, including how it may impact our customers, team members, suppliers, business partners and distribution channels. We are at this time unable to fully predict the impact that the novel coronavirus (COVID-19) pandemic will have on our financial position and results of operations due to numerous uncertainties that we are unable to predict or control, such as the severity of the virus, the duration of the outbreak, governmental, business or other actions, which could include limitations on our operations or mandates to provide products or services, impacts on our supply chains, the effect on customer demand, plant closures or changes to our operations. We cannot predict the impact that the novel coronavirus (COVID-19) pandemic will have on our customers, suppliers and other business partners, and any material effect on these parties could also adversely impact us. The effects on the health of our workforce, and our ability to meet staffing needs in our plants, distribution facilities, sale operations and other critical functions cannot be predicted. Further, the impacts of the expected worsening of global economic conditions and the continued disruptions to, and volatility in, the credit and financial markets, consumer and corporate spending as well as other unanticipated consequences remain unknown. The pandemic has resulted in, and may continue to result in, significant disruption of global financial markets, which may reduce our ability to access capital or our customers' ability to pay us for past or future purchases, which could negatively affect our liquidity.

While we are actively managing our response to potential impacts that are identified, we may not be able to respond to all impacts on a timely basis to prevent adverse effects on our business, financial condition and results of operations.

***The cyclical nature of the petrochemical industry may reduce our net revenue and gross margin.***

The petrochemical industry, including the global markets in which we compete, is cyclical and sensitive to changes in global supply and demand. This cyclicality may reduce our net revenue, increase our costs and decrease our gross margin, including as follows:

- downturns in general business and economic activity may cause demand for our products to decline;

- when global demand falls, we may face competitive pressures to lower our prices;

- increases in prices of the main raw materials we use, principally naphtha, ethane and propylene; and

- if we decide to expand our plants or construct new plants, we may do so based on an estimate of future demand that may never materialize or materializes at levels lower than we predicted.

Historically, the international petrochemical markets have experienced alternating periods of limited supply, which have caused prices and profit margins to increase, followed by expansion of production capacity, which has resulted in oversupply and reduced prices and profit margins. Prices in the petrochemical industry follow the global petrochemical industry, and we establish the prices for the products we sell in Brazil, other countries in Latin America, the United States and the world with reference to international market prices. Therefore, our net revenue, feedstock costs and gross margin are increasingly linked to global industry conditions that we cannot control, and which may adversely affect our results of operations and financial position.

4

***Adverse conditions in the petrochemical industry may adversely affect demand for our products.***

Sales of our petrochemical products are tied to global production levels and demand, which can be affected by macro-economic factors such as interest rates, oil prices, shifts to alternative products, consumer confidence, employment trends, regulatory and legislative oversight requirements, trade agreements, as well as regional disruptions, natural disasters, epidemics, pandemics, or other global events. For example, the persistence of the recent novel coronavirus (COVID-19) pandemic could negatively impact supply chains worldwide and demand for our products. The extent to which the novel coronavirus (COVID-19) pandemic impacts our results will depend on future developments, which are highly uncertain and cannot be predicted, including the severity of the novel coronavirus (COVID-19) pandemic, actions to contain it or treat its impact, among others.

***Our revenue from certain of our customers is significant, and the credit risks associated with these customers could adversely affect our results of operations.***

We engage in a number of transactions where counterparty credit risk is a relevant factor, including transactions with certain of our customers and those businesses we work with to provide services, among others. These risks are dependent upon market conditions and also the real and perceived viability of the counterparty. The failure or perceived weakness of any of our counterparties has the potential to expose us to risk of loss in certain situations. Our revenue from certain of our customers is significant, and the credit risks associated with these customers could adversely affect our results of operations. Certain contracts and arrangements that we enter into with counterparties may provide us with indemnification clauses to protect us from financial loss. To the extent the credit quality of these customers deteriorates or these customers seek bankruptcy protection, our ability to collect our receivables, and ultimately our results of operations, may be adversely affected. In addition, delays in payment cycles by significant customers may adversely affect our liquidity and working capital.

***Our results may be adversely affected by increases in expected credit losses.***

We have a large balance of accounts receivable and have established a reserve for the portion of such accounts receivable that we estimate will not be collected because of our customers' non-payment.

If the viability of the business of certain of our customers deteriorates or our credit policies are ineffective in reducing our exposure to credit risk relating to such customers, additional increases in expected credit losses accounts may be necessary, which could have a material adverse effect on our cash flows and results of operations. We record expected credit losses in an amount we consider sufficient to cover estimated losses on the realization of our trade accounts receivable, taking into account our loss experience and the aging of our accounts receivable, but we cannot assure you that these amounts will be sufficient to cover eventual losses. In addition, delays in payment cycles by significant customers may adversely affect our liquidity and working capital.

As of December 31, 2019, our total trade accounts receivable, net of expected credit losses (R$229.3 million) was R$2,306.7 million.

***Global macroeconomic factors have had, and may continue to have, adverse effects on the margins that we realize on our products.***

Our results of operations may be materially affected by adverse conditions in the financial markets and depressed economic conditions generally. Economic downturns in geographic areas or jurisdictions in which we sell our products may substantially reduce demand for our products and result in decreased sales volumes. Recessionary environments adversely affect our business because demand for our products is reduced.

According to the IMF, the world's GDP grew by 2.9% in 2019, a decrease of 0.7 percentage points as compared to the world's GDP growth during 2018. In 2019, Brazil's GDP grew by 1.1%, compared to growth of 1.3% in 2018, growth of 1.0% in 2017, and a contraction of 3.5% in 2016.

According to the IMF, the U.S. GDP grew by 2.3% in 2019 as compared to growth of 2.9%, 2.3% and 1.5% in 2018, 2017 and 2016, respectively. In addition, according to the IMF, European GDP grew by 1.2% in 2019 and the Mexican GDP stagnated in 2019.

According to the IMF, because of the adverse effects of the novel coronavirus (COVID-19) pandemic on the economy of several countries, the world's GDP and the GDP of Brazil, the United States, Europe and Mexico is expected to shrink significantly in 2020, leading to an economic contraction and a recession in these countries or regions.

Our ability to export to other countries depends on the level of economic growth in those countries and other economic conditions, including prevailing inflation and interest rates. In addition, disruptions in the global balance between supply and demand may impair our ability to export our products in response to a decline in domestic demand for these products. Prolonged volatility in economic activity in our key export markets, such as South America, Europe and Asia, could continue to reduce demand for some of our products and lead to increased margin pressure by importers into Brazil, which would adversely affect our results of operations.

### We face competition from producers of polyethylene, polypropylene, PVC and other petrochemical products.

We face strong competition across all of our petrochemical products. Our U.S. operations face competition in the United States from other U.S. producers of polypropylene and the other foreign producers of polypropylene that serve the United States. Our German operations face competition in Europe and the other export markets that it serves from European and other foreign producers of polypropylene. Our Mexico operations face competition from Mexican and U.S. producers of polyethylene producers. Competitors from South America are able to export to Brazil with reduced or no import duties. In addition, producers of almost all continents have regular or spot sales to trading companies and direct customers in Brazil for petrochemicals and resins.

We generally set the prices for our second generation products sold in Brazil with reference to the prices charged for these products by foreign producers in international markets. We generally set the prices for our second generation products exported from Brazil based on international spot market prices. We set the prices for polypropylene sold in the United States and Europe based on regional market pricing. The price for polyethylene in Mexico is based on prices for the polymer in the U.S. Gulf Coast region.

As a result of the recently commissioned gas-based ethylene capacity, coupled with the competitive pricing of the ethane as feedstock for petrochemicals production, we anticipate that we may experience increased competition from producers of thermoplastic resins, especially from North American, Middle East and Chinese producers, in the markets in which we sell these products.

In addition, the appreciation of the *real* against the U.S. dollar may increase the competitiveness of prices of imported products in *reais,* which may increase the competition in Brazil from other producers of second generation products. Some of our foreign competitors are substantially larger and have greater financial, manufacturing, technological and/or marketing resources than us. Also, the appreciation of the Euro against the U.S dollar may increase the competitiveness of prices of imported products denominated in Euro and, as a consequence, increase competition from imports.

### We may face competition from producers of substitutes for our products as a result of evolving technology, consumer and industry trends and preferences, and regulatory changes.

We compete in a market that relies on technological innovation and the ability to adapt to evolving consumer and industry trends and preferences. Petrochemical products and other products produced with our petrochemical products, such as consumer plastic items, are subject to changing consumer and industry trends, demands and preferences, as well as stringent regulatory and environmental requirements. Therefore, products once favored may, over time, become disfavored by consumers or industries or no longer be perceived as the best option, which may, as a consequence, adversely affect our results of operations and financial position.

In addition, plastic waste management, disposal and recycling have become a growing global environmental concern and have been receiving as much attention as other environmental topics, such as global warming, from the population at large, national and local governments, private companies, trend setters, and consumers worldwide. There has been a growing trend to attempt to move away from the usage of plastic products, which has been backed by governmental and lawmaking initiatives, as well as investments in plastic recycling systems by private companies, public entities and national and local governments. In November 2018, we issued a statement in support of the development of certain initiatives to foster a "circular economy" (reusing and repurposing resources within the economy), including: (i) partnerships to develop new products and applications to improve efficiency and promote recycling and reuse (circular design); (ii) investing in the development of new renewable products to support the circular economy at the beginning of the value chain; (iii) supporting and developing new technologies, business models and systems for recycling and improving recycling chains and recovery of materials; (iv) engaging consumers in recycling and recovery programs, especially through educational programs in connection with responsible consumerism to further knowledge on the value of plastic waste to the economy; (v) supporting and using life cycle assessment tools to select the most sustainable option, considering the economic, social and environmental impacts of plastic; (vi) supporting the measurement and communication of recycling and recovery indicators for plastic packaging materials; (vii) engaging in partnerships to understand, prevent and solve issues associated with mismanagement of plastic residues, especially debris in oceans; and (viii) supporting public policies to improve solid waste management and recycling chains, especially of plastic waste.

6

Despite these initiatives and other initiatives carried out within our industry, we may be unable to increase post-consumer plastic waste recycling rates, which may lead to decreased interest in our products by our customers and consumers, and impact our results of operations and financial condition.

In 2018, the European Union adopted a strategy for disposal of plastic products in a circular economy that aims to significantly increase recycling and targets the plastic products most often found on beaches and in seas. In addition, state and local governments, for example, in China and Brazil, have increasingly proposed or implemented bans on plastic products such as disposable plastic bags and straws, as well as other plastic food packaging. Additionally, the use of single-use plastic products has recently faced increased public scrutiny. Increased regulation or prohibition of the use of plastic products could increase the costs incurred by our customers to use such products or otherwise limit the use of these products, and could lead to a decrease in demand for PE, PP and other products we make. Such a decrease in demand could adversely affect our business, results of operations and financial condition.

Our continued success depends on our ability to continue to differentiate ourselves and our products and also to react to changes in these trends. Factors that may affect consumer perception of our products, or of consumer goods produced with our products, may include health trends and attention to substitute products perceived as more environmentally friendly. For example, in recent years, we have witnessed a shift in consumer preference moving away from plastic straws and in favor of straws made from other materials, such as paper or other compounds. A failure to react to similar trends in the future could enable our competitors to grow or secure their market share before we have a chance to respond.

In addition, regulations may be amended or enacted in the future that would make it more difficult to appeal to our customers, end consumers, or to leverage the products that we produce. For example, failure to comply with applicable policies, which could lead to lower demand for our products, banning of plastic products without allowing the search for alternatives by means of efficient solutions, including resins produced by Braskem, could have a material adverse effect on our business, results of operations and financial condition. Also, even if we are able to continue to distinguish our products, there can be no assurance that our competitors (including producers of substitutes) will not be successful in persuading consumers of our products to switch to their products. Some of our competitors may have greater access to resources than we do, which may better position them to react and adapt to evolving trends, preferences, and regulatory changes. Any loss of interest in our products, or consumer products produced with our products, may have a material adverse effect on our business, results of operations and financial condition.

***Higher raw materials costs would increase our cost of products sold and may reduce our gross margin and negatively affect our overall financial performance.***

Naphtha, a crude oil derivative, is the principal raw material used by our Chemicals Unit (formerly our Basic Petrochemicals Unit) and, indirectly, in our other business units in Brazil. Naphtha accounted, directly and indirectly, for 40.7% of our consolidated cost of products sold in 2019 and 41.8% in 2018, respectively.

Ethane and propane are the principal raw materials that we use to produce our basic petrochemical products in our petrochemical complex located in Duque de Caxias, in the State of Rio de Janeiro, or the Rio de Janeiro Complex, and represent the principal production and operating cost of such Complex. Ethane and propane accounted, directly and indirectly, for 0.5% and 1.0%, respectively, of our consolidated cost of products sold in 2019 and for 0.6% and 1.2%, respectively, of our consolidated cost of products sold in 2018.

Propylene is the principal raw material that we use to produce polypropylene in the United States and Europe and represents the principal production and operating cost of our USA and Europe Unit. We also purchase propylene in the Brazilian market for certain of our Brazilian polypropylene plants. Propylene accounted, directly and indirectly, for 20.1% and 21.7% of our consolidated costs of products sold in 2019 and 2018, respectively.

Ethane is the principal raw material that we use to produce ethylene in the Mexico Complex and represents the principal production and operating cost of the Mexico Complex. Ethane accounted, directly and indirectly, for 1.3% and 1.0% of our consolidated costs of products sold in 2019 and 2018, respectively.

7

In Brazil, we purchase the naphtha used by our Chemicals Unit at prices based on the Amsterdam-Rotterdam-Antwerp naphtha price, or the ARA price, and the ethane and propane at Mont Belvieu market prices. We purchase ethane used by our Mexico Unit at prices based on the Mont Belvieu purity ethane. We purchase the propylene used in Brazil and USA plants at prices based on U.S. Gulf reference price, or the USG price. We purchase the propylene used in our Europe plants as reported by ICIS-LOR based on monthly contract price for propylene for Europe. We purchase refinery off gas at a price related to imported natural gas price.

The ARA price of naphtha fluctuates primarily based on changes in the U.S. dollar-based price of Brent crude oil on the Intercontinental Exchange based in London. In 2019, the ARA price of naphtha decreased 16.0%, from US$601.30 per ton in 2018 to US$505.30 per ton in 2019, which was the result of lower oil prices and the use of more competitive feedstocks to produce ethylene at flexible petrochemical crackers, mainly in the United States.

In 2019, the Mont Belvieu prices of ethane averaged 21.6 cents per gallon, or US$160.5 per ton, decreasing 34.0% from 2018, driven by higher supply associated with the: (i) startup of new gas fractionators and pipelines for transportation; and (ii) delays in the startup of new petrochemical crackers.

In 2019, the USG price for propylene averaged US$820.30 per ton, 31.0% lower than 2018, due to increased availability of the monomer, which was the result of the higher utilization rates of PDH plants and the higher use of natural gas liquids in petrochemical crackers.

The European price reference for propylene averaged US$1,024.70 per ton in 2019, or 12.4% lower than in 2018, which was the result of the normalization of logistics constraints on propylene in Europe, which affected the region in the previous year due to low river levels.

The price of naphtha, ethane, propane and propylene in U.S. dollars has been, and may continue to be, volatile. In addition, fluctuations of the U.S. dollar in the future may effectively increase our naphtha, ethane, propane and propylene costs in *reais*. Any increase in naphtha, ethane, propane or propylene costs would reduce our gross margin and negatively affect our overall financial performance to the extent we are unable to pass on these increased costs to our customers and could result in reduced sales volumes of our products.

***We do not hedge against changes in the price of our principal raw materials, so we are exposed to fluctuations in the price of these primary raw materials.***

Currently, we do not hedge our feedstock's price exposure. We believe the petrochemical industry has a natural hedge, mainly due to the historical correlation between naphtha, which is the main feedstock used by a marginal producer, and its final products (polyethylene, polypropylene, PVC and others). Historically, fluctuations in the price of naphtha were followed by corresponding variations in first and second generation petrochemical products. Any hedge solely in naphtha's price would break this natural protection, most likely making our results more volatile. However, in light of our ongoing process of feedstock diversification, and with ethane and propane representing a more significant portion of our variable costs, the natural hedge described above has weakened. This occurs because ethane and propane have a significantly lower correlation to the prices of our final products, when compared to naphtha and propylene. As result, and more so than in the past, when the price of ethane and propane fluctuate we may not be able to pass on to our end-consumers all of the corresponding increases in our feedstocks costs.

***We depend on Petrobras to supply us with a substantial portion of our naphtha, ethane, propane and propylene needs.***

Petróleo Brasileiro S.A. - Petrobras, or Petrobras, is the only Brazilian supplier of naphtha and has historically supplied up to 70% of the naphtha consumed by our Chemicals Unit. In 2019, Petrobras supplied 36.5% of the naphtha consumed by our Chemicals Unit. Currently, Petrobras is also our primary supplier of ethane, propane and refinery off gas and has historically supplied the ethane, propane and refinery off gas consumed at our petrochemical complex located in the Rio de Janeiro Complex and our chemical complex located in Capuava, in the State of São Paulo, or the São Paulo Complex.

We are party to several propylene contracts with Petrobras refineries, which have historically supplied 40% of our propylene need to produce polypropylene in Brazil. As a result of limited infrastructure in Brazil to allow the importation of propylene in large quantities and substantial costs associated with the storage and transportation of the product, we are highly dependent on the propylene supplied by Petrobras.

8

Our Petrobras ethane and propane supply agreements expire in January 2021, and our Petrobras naphtha purchase agreement expires in December 2020. Certain of our propylene agreements with Petrobras expire in 2021, and others expire between 2028 and 2029. As of the date of this annual report, we cannot assure you that these agreements will be renewed and, if renewed, whether we will be able to keep the same terms and conditions currently in force, including with respect to pricing, volume, pipeline and other infrastructure access. In June 2020, we entered into new agreements with Petrobras for the supply of petrochemical naphtha to our industrial units in Bahia and Rio Grande do Sul. The agreements will become effective for five years following the expiration of the current agreement with Petrobras in December 2020. See "Item 5-Operating and Financial Review and Prospects-Recent Developments-Naphtha Agreements with Petrobras."

Petrobras controls a substantial portion of the pipeline infrastructure used to transport naphtha across Brazil and is our primary supplier of naphtha, ethane, propane and propylene. A failure to renew or extend our existing agreements for the supply of raw materials or pipeline infrastructure use, or a termination of such agreements with Petrobras could lead to difficulties in accessing Petrobras' pipeline infrastructure. The alternative would be to access pipeline infrastructure through the National Petroleum Agency, or the ANP, which would grant access to the pipeline infrastructure at a cost defined by the ANP.

Therefore, our production volumes and net revenue would likely decrease, while our costs would likely increase, and adversely affect our overall financial performance in the event of the occurrence of one or more of the following:

- significant damage to Petrobras' supply infrastructure through which Petrobras and Braskem import naphtha, or to any of the pipelines connecting our plants to Petrobras' facilities, whether as a result of an accident, natural disaster, fire or otherwise;

- termination by Petrobras of the naphtha, ethane, propane or propylene supply contracts with us, which provide that Petrobras may terminate the contracts for certain reasons described in "Item 4. Information on the Company";

- considering that Petrobras (and/or its subsidiaries) controls a substantial portion of the logistics infrastructure of our raw material across Brazil and our existing agreements for using its assets and their operation over certain Braskem's assets, we could also assume that we would face difficulties to import and ensure access of raw material to our crackers in a scenario that these agreements are terminated by Petrobras (and/or its subsidiaries) and therefore with a substantial impact on the infrastructure that we currently access; or

- failure to renew or extend our existing agreements for the supply of raw materials or pipeline infrastructure use considering that Petrobras is conducting a divestment plan of its assets that also includes certain refineries that supply naphtha to us and some logistic infrastructure assets.

In addition, although regulatory changes have ended Petrobras' monopoly in the Brazilian naphtha market and have allowed us to import naphtha, any restrictions imposed on the importation of naphtha into Brazil could increase our production costs. For a discussion of additional risks related to sole-source suppliers, see "-We rely on limited or sole-source suppliers for our raw materials."

***We depend on propylene supplied by third parties in the United States and Europe.***

Our reliance on third party suppliers poses significant risks to our results of operations, business and prospects. We rely upon third parties to supply our plants with propylene. We acquire propylene for our polypropylene plants in the United States under several long-term supply agreements and through the spot market. As of December 31, 2019, we had fifteen long-term supply agreements with multiple suppliers. The pricing formulas for propylene under these supply agreements are generally based on market prices. As of the date of this annual report, we cannot assure you that these agreements will be renewed and, if renewed, whether we will be able to keep the same terms and conditions currently in force, including with respect to pricing, volume, pipeline and other infrastructure access.

We acquire propylene for our polypropylene plants in Germany under long-term supply agreements that provide for the supply of 84% of the propylene requirements of these plants. We have two main supply agreements in Germany. One will expire in September 2021 and is automatically renewable for consecutive one-year terms, unless terminated by one of the parties, and the other expires in December 2023. We have entered into a third contract that will expire at the end of 2020, increasing the supply of our plants to 87% of the propylene required. The pricing formula for propylene under these supply agreements is based on market prices. As of the date of this annual report, we cannot assure you that these agreements will be renewed and, if renewed, whether we will be able to keep the same terms and conditions currently in force, including with respect to pricing, volume, pipeline and other infrastructure access.

9

Delays in the availability of propylene of acceptable quality, or our inability to obtain such acceptable propylene in the quantities we need over what has been contracted, or at all, may adversely affect our revenue and results of operations.

***We depend on ethane supplied by Pemex TRI in Mexico.***

We currently source most of our supply of ethane, which is the primary feedstock used in our polyethylene production process, from Pemex Transformación Industrial, or Pemex TRI, a state-owned Mexican entity, which is a subsidiary of Petróleos Mexicanos, or Pemex, the state-owned Mexican oil and gas company, pursuant to an ethane supply agreement, or the ethane supply agreement, entered into by Braskem Idesa S.A.P.I., or Braskem Idesa, which is our joint venture with Grupo Idesa, S.A. de C.V., or Idesa, with Pemex TRI under competitive commercial conditions at prices that reference: (i) the Mont Belvieu purity ethane price; and (ii) the Henry Hub price, which are both U.S. dollar-based international reference prices. As a result, our production volumes, net revenue and profit margins would likely decrease and materially adversely affect our overall financial performance in case one or more of the following events occur:

- significant damage to Pemex TRI's gas processing centers or to any of the pipelines connecting our complex to Pemex TRI's facilities, whether as a consequence of an accident, natural disaster, fire or otherwise;

- any further decrease in the amount of ethane currently being delivered by Pemex TRI to our petrochemical complex;

- any dispute with Pemex TRI related to the ethane supply agreement, including the non-recognition or non-payment of liquidated damages;

- any material default by us or by Pemex TRI to supply ethane in the contractually agreed volumes or qualities under the ethane supply agreement;

- any repudiation or termination by Pemex TRI or by us of the ethane supply agreement; or

- delays in the availability of ethane of acceptable quality, or our inability to obtain acceptable ethane in the quantities and quality that we need, or at all, or at reasonable prices.

Regarding liquidated damages due under the ethane supply agreement, during the fourth quarter of 2019 and the first quarter of 2020, Pemex should have delivered to us credit notes relative to: (i) the first quarter of 2019, in an amount of around US$26 million, after the second quarter of 2019 and third quarter of 2019 contractual cure period for providing catch-up volumes has lapsed; and (ii) the second quarter of 2019, in an amount of around US$13 million, after the third quarter of 2019 and fourth quarter of 2019 contractual cure period for providing catch-up volumes has lapsed. As of the date of this annual report, Pemex has yet to provide such credit notes and has therefore not fulfilled its contractual obligation on a timely basis.

We are currently engaged in ongoing discussions with Pemex TRI to try and address the issues related to the fact that Pemex's supply of ethane is below the contracted volumes and that Pemex has not paid certain liquidated damages due under the ethane supply agreement. We can give no assurances as to the outcome of such discussions and, at any time, we could initiate legal actions against Pemex for its defaults under the ethane supply agreement, such as arbitration proceedings against Pemex following the default and notifications triggered as a result thereof.

Furthermore, the ethane supply agreement could be modified through regulatory means, terminated or jeopardized by Pemex TRI as a result of political pressure to not comply with the agreement, change the terms of the agreement, initiate expropriation measures or a change in laws or regulations by the Mexican government.

A termination by Pemex TRI of the ethane supply agreement or a modification to the ethane supply agreement as a result of political pressure could have a material adverse effect on our business, results of operations and financial condition. The provisions for early termination by Pemex TRI include: (i) our failure to pay that continues for more than six months after notice; or (ii) an emergency stoppage in operations or force majeure event due to which our insurers consider the complex to be a total loss, or after which we cannot or do not resume operations for 48 months.

10

If Pemex TRI (i) delivers less than an average of 70% of the 66,000 barrels of ethane per day over a six-month period, (ii) reaches the annual limit in respect of liquidated damages owed by Pemex TRI to us and such limit is not waived by Pemex TRI, or (iii) materially breaches any of its obligations related to the supply of ethane thereunder, and such breach continues for more than six months after notice, Braskem Idesa has the right to terminate the ethane supply agreement and require Pemex TRI to repay certain outstanding debt and compensate Braskem and Idesa according to an agreed valuation formula including the repayment of certain of our debt.

Any termination, cancelation or modification of the ethane supply agreement or reduction in the amount of liquidated damages owed to us by Pemex TRI for any other reason, could have an adverse effect on our results of operations and financial position.See "Item 4. Information on the Company-Mexico Unit-Supply Contracts of the Mexico Unit-Ethane" and "Item 5. Operating and Financial Review and Prospects-Capital Expenditures-Joint Venture-Mexico Complex."

For a discussion of additional risks related to sole-source suppliers, see "-We rely on limited or sole-source suppliers for our raw materials."

***We have no control over the corporate actions or decisions of Pemex TRI, which is our main supplier of ethane and a Mexican state-owned enterprise.***

The Mexican government has exercised, and continues to exercise, significant influence over the Mexican economy. Accordingly, Mexican governmental actions concerning the Mexican economy and state-owned enterprises could have a significant impact on Mexican private sector entities in general and on our operations in particular. We cannot predict the impact that political conditions will have on the Mexican economy. We can give no assurances that changes in Mexican federal government policies will not adversely affect our business, financial condition, results of operations and prospects. We currently do not have and do not intend to obtain political risk insurance.

Our main supplier of ethane, Pemex TRI, is a subsidiary of Pemex, a state-owned entity of the Mexican government, and, therefore, the Mexican government controls Pemex, as well as its annual budget, which is approved by the Mexican Congress. The Mexican government may cut spending in the future. These cuts could adversely affect Pemex's annual budget and its ability to provide us with our contracted supply of ethane.

We are subject to the U.S. Foreign Corrupt Practices Act, or FCPA, U.S. domestic bribery laws, and other anti-corruption and anti-money laundering laws in the countries in which we conduct activities, including Mexico. We may have direct or indirect interactions with officials and employees of government agencies or state-owned or affiliated entities in Mexico, such as Pemex TRI. We could be held liable for the corrupt or other illegal activities of our employees, representatives, contractors, partners and agents, even if we do not explicitly authorize such activities. Detecting, investigating, and resolving actual or alleged violations of anti-corruption laws can require a significant diversion of time, resources, and attention from senior management. In addition, noncompliance with anti-corruption, anti-bribery, or anti-money laundering laws could subject us to whistleblower complaints, investigations, prosecution, enforcement actions, sanctions, settlements, fines, damages, other civil or criminal penalties or injunctions, suspension or prohibition from contracting with certain persons, reputational harm, adverse media coverage, and other collateral consequences. If any subpoenas or investigations are launched, or governmental or other sanctions are imposed, or if we do not prevail in any civil or criminal proceeding that may be filed against us, our business, financial condition and results of operations could be harmed.

In addition, there have been allegations released in the media in Brazil and Mexico regarding corruption at Pemex involving their procurement processes as a general matter. We can make no assurances that those allegations will not extend to the procurement process with regard to the ethane supply agreement.

Pemex's production, over which we have no control, nor over any other corporate action or decision, have decreased over the last years according to public disclosure by Pemex. As a result, it has led to a significant decrease in oil production and associated production of natural gas, which, in turn, is the feedstock used by Pemex in the production of ethane. Any further decrease in the amount of ethane currently being delivered by Pemex TRI to our petrochemical facility pursuant to the terms of the ethane supply agreement or any reduction in, or outright failure by, Pemex TRI to pay us the liquidated damages due under the ethane supply agreement, could have an adverse effect on our financial condition and results of operation.

11

*We rely on limited or sole-source suppliers for our raw materials, inputs and energy.*

We rely on Petrobras for most or all of our supply of ethane, propane, refinery off gas and propylene in Brazil, a few companies for a large portion of our supply of propylene in our USA and Europe Unit, and Pemex TRI for most of our supply of ethane in Mexico. For naphtha supply to Brazil we rely in several international suppliers for most of the purchases to the crackers in the states of Bahia and Rio Grande do Sul, and we rely on Petrobras for the major part of the supply only to the cracker located in the state of São Paulo. Also, we are subject to substantial risks because of our reliance on these and other limited or sole-source suppliers of raw materials, inputs and energy, including the following risks:

- if a supplier does not provide naphtha, ethane, propane, refinery off gas, propylene, input or energy, as the case may be, that meet our or their specifications in sufficient quantities and with acceptable performance or quality on time or deliver when required, then sales, production, delivery of our products to our customers on a timely manner and revenue from our plants could be adversely affected;

- if our relationship with a key supplier changes or is adversely affected, for example, due to competitive pressures (or conflicting interests), we may be unable to obtain naphtha, ethane, propane or propylene, as the case may be, on satisfactory financial terms;

- if an interruption of supply of naphtha, ethane, propane, refinery off gas, propylene, other inputs or energy, as the case may be, occurs because a supplier changes its technology roadmap, suffers damage to its manufacturing facilities, decides to no longer provide those products or services, increases the price of those products or services significantly or imposes reduced delivery allocations on its customers, it could take us a considerable period of time to identify and qualify alternative suppliers;

- some of our key suppliers are small companies with limited financial and other resources, and as a result, they may be more likely to experience financial and operational difficulties than larger, well-established companies, which increases the risk that they will be unable to deliver products as needed; and

- if a key supplier is acquired or has a significant change in business, the production and sales of our systems and services may be delayed or adversely affected, or our development programs may be delayed or may be impossible to complete.

Delays in the availability of naphtha, ethane, propane, refinery off gas or propylene of acceptable quality, or our inability to obtain such acceptable naphtha, ethane, propane or propylene in the quantities we need or at all, may adversely affect our revenue and results of operations.

*Our Polyolefins Unit and Vinyls Unit depend on our Chemicals Unit to supply them with their ethylene and propylene requirements. In addition, our plants located at the Camaçari Complex in the Brazilian state of Bahia depend on certain providers of environmental services for the treatment of effluents, industrial waste and water supply for industrial use.*

Our Chemicals Unit is the only supplier of ethylene to our Vinyls Unit, the only supplier of ethylene to the polyethylene plants and the principal supplier of propylene to the polypropylene plants of our Polyolefins Unit. Because the cost of storing and transporting ethylene is substantial and there is inadequate infrastructure in Brazil to permit the importing of large quantities of ethylene and propylene, our Polyolefins Unit in Brazil and our Vinyls Unit are highly dependent on the supply of these products by our Chemicals Unit. Consequently, our production volumes of, and net revenue from, Polyolefins and Vinyls products would decrease, and our overall financial performance would be negatively affected, in the event of the following:

- any significant damage to the facilities of our Chemicals Unit through which ethylene or propylene is produced, or to the pipeline or other facilities that connect our polyolefins plants or vinyls plants to our Chemicals Unit, whether as a consequence of an accident, natural disaster, fire or otherwise;

- any significant reduction in the supply of naphtha to our Chemicals Unit, as naphtha is the principal raw material used by our Chemicals Unit in the production of ethylene and propylene; or

12

- any significant reduction in the supply of ethane or propane to our basic petrochemical plant in Rio de Janeiro, as ethane and propane are the principal raw materials used in the production of ethylene and propylene.

Also, our production volumes of, and net revenue from, our Chemicals Unit products could decrease, and our overall financial performance would be negatively affected in the event of any significant damage to the facilities of our Vinyls and Polyolefins Units through which ethylene is consumed.

Our plants located at the Camaçari Complex in the Brazilian state of Bahia depend on our subsidiaries Cetrel S.A. ("Cetrel"), Água de Camaçari ("DAC") and Distribuidora de Água Triunfo ("DAT") for the: (i) treatment of effluents and industrial waste; (ii) supply of reuse water; (iii) supply of demineralized, clarified and potable water; and (iv) management of water reservoirs. An interruption in the operations of Cetrel, DAC or DAT may result in the shutdown of all of our plants at the Camaçari Complex and the Rio Grande do Sul Complex, in addition to increased environmental risks, which could lead to the shutdown of our entire petrochemical complex. If such a shutdown were to happen, our production volumes and net revenue from sales from our plants at the Camaçari Complex and the Rio Grande do Sul Complex would decrease, and our financial performance and results of operations would be adversely affected.

See also "-Our business is inherently subject to environmental, health and safety hazards. As a result, our business is also subject to stringent environmental and other regulations." below.

***We may be materially adversely affected if our transportation, storage and distribution operations are interrupted or are more costly than anticipated.***

Our operations are dependent upon uninterrupted transportation, storage and distribution of our products. Transportation, storage or distribution of our products could be partially or completely, temporarily or permanently shut down as the result of any number of circumstances that are not within our control, such as:

- catastrophic events;

- strikes or other labor difficulties; and

- other disruptions in means of transportation.

For example, in May 2018, Brazil experienced a national truck drivers' strike that severely impacted the logistics operations of many companies throughout Brazil, including the delivery of our raw materials, our products, and other goods. In response to such strike, we gradually reduced the utilization rate of our petrochemical complexes in Brazil, which operated at 50% of their nominal capacity in May 2018. Following the strike, Brazil introduced a national freight cost schedule that set forth minimum prices for freight services provided by truck drivers and freight companies countrywide, which may have a lasting impact on freight prices in Brazil and lead to sustained increased transportation costs in the future in connection with our operations.

Any significant interruption at our distribution facilities, an inability to transport our products to or from these facilities, or to or from our domestic or foreign customers or suppliers, or an increase in transportation costs, for any reason, would materially adversely affect us.

In addition, the International Maritime Organization (IMO) has set a limit for sulphur in fuel oil used onboard ships of 0.50% m/m (mass by mass), which is applicable from January 2020, aimed at significantly reducing the amount of sulphur oxide emissions by ships, down from the previous 3.50% m/m (mass by mass), which could increase our shipping costs and, as a consequence, decrease our gross margin.

***We rely on access to third-party licensed technology and related intellectual property, particularly in the context of the manufacturing process of certain of our products. If the licensed third-party technology and intellectual property that we use cease to be available to us on commercially reasonable terms, or at all, or if any such third party ceases to provide us with technical support under license or technical services agreements that we have entered into with them to allow us to satisfactorily operate, certain of our production facilities, our operating results and financial condition could be adversely affected.***
We use technology and intellectual property licensed from third parties in the regular operation of our business, partirularly in the operation of certain machinery and equipment required for the production of certain of our products such as our first and second generation products, and we may continue to rely on access to third-party technology and intellectual property in the future.

There can be no assurance that we will be able to continue to obtain or renew any such necessary technology and licenses on acceptable terms, or at all. Failure to obtain or renew the right to use third-party technology or intellectual property on commercially reasonable terms, or to maintain access to satisfactory technical support, could ultimately lead to stoppages in our production processes and preclude us from selling certain products, which could have a material adverse impact on our operating results and financing condition.

Additionally, our inability to maintain existing access to third-party technology, licenses and technical support on commercially reasonable terms, or at all, or to obtain additional technology, licenses or technical support necessary to manufacture current products or develop new ones, could require us to obtain substitute technology or licenses at a greater cost or of lower quality or performance standards, or require us to carry out unscheduled interruptions of our production facilities. Any of these circumstances could harm our business, financial condition and results of operations. There can be no assurance that we will be able to replace any such third-party technology, intellectual property or technical support service for any adequate substitute technology, intellectual property or technical support in a timely manner to avoid any unscheduled interruption of our production processes or facilities, or in a cost-efficient manner.

***Capital projects can take many years to complete, and market conditions could deteriorate significantly between the project approval date and the project startup date, negatively impacting project returns. If we are unable to complete capital projects at their expected cost and in a timely manner, or if the market conditions assumed as a basis for our project economics deteriorate, our business, financial condition, results of operations and cash flows could be materially and adversely affected.***

Delays or cost increases related to capital spending programs involving engineering, procurement and construction of facilities could materially adversely affect our ability to achieve forecasted internal rates of return and results of operations. Delays in making required changes or upgrades to our facilities could subject us to fines or penalties as well as affect our ability to contract with our customers and supply certain products we produce.

Such delays or cost increases may arise as a result of unpredictable factors, many of which are beyond our control, including, but not limited to:

- denial of or delay in receiving requisite regulatory approvals or permits;

- unplanned increases in the cost of construction materials or labor;

- disruptions in transportation of components or construction materials;

- change in the market conditions assumed as a basis for our project economics;

- adverse weather conditions, natural disasters, epidemics, pandemics or other events (such as equipment malfunctions, explosions, fires or spills) affecting our facilities, or those of vendors or suppliers;

- shortages of sufficiently skilled labor, or labor disagreements resulting in unplanned work stoppages; and

- nonperformance by, or disputes with, vendors, suppliers, contractors or subcontractors. Any one or more of these factors could have a significant impact on our ongoing capital projects.

If we are unable to make up the delays associated with such factors or to recover the related costs, or if market conditions change, it could materially and adversely affect our business, financial condition, results of operations and cash flows.

***Our level of indebtedness could adversely affect our ability to raise additional capital to fund our operations, limit the ability to react to changes in the economy or our industry and prevent us from meeting our obligations under our financing agreements.***

Our level of indebtedness and our leverage, together with changes to our ratings and those of our debt securities by the main credit rating agencies, could have certain material consequences to us, including the following:

14

- limit our ability to obtain additional financing for working capital, additions to fixed assets, product development, debt service requirements, acquisitions and general corporate or other purposes;

- limit our ability to pay dividends;

- a portion of our cash flows from operations must be set aside for the payment of interest on existing indebtedness and is therefore not available for other purposes, including operations, additions to fixed assets and future business opportunities;

- limit our ability to adjust to changing market conditions and place us at a competitive disadvantage compared to our competitors that have less debt;

- we may become vulnerable in a downturn in general economic conditions; and

- we may be required to adjust the level of funds available for additions to fixed assets.

As a result of the factors listed above, our financial condition and results of operations may be adversely affected.

***Any downgrade in the ratings of Brazil, our Company or our debt securities would likely result in increased interest and other financial expenses related to our borrowings and debt securities and could reduce our liquidity.***

Currently, Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., or Standard & Poor's, and Fitch Ratings Ltd., or Fitch, maintain our ratings on a global and national basis. Moody's Investors Service, Inc., or Moody's, only maintains our ratings on a global basis. On a global basis, we maintain an investment grade rating at: (i) Standard & Poor's of BBB with a negative outlook and (ii) Fitch Ratings of BBB with a negative outlook. At Moody's, our rating is Ba1 with a stable outlook. Our ratings are higher than the Brazilian sovereign rating by all these three main rating agencies. On a national basis, we maintain investment grade rating at: (i) Standard & Poor's of brAAA with a negative outlook and (ii) Fitch Ratings of AAA with a negative outlook.

Our credit rating is sensitive to any change in the Brazilian sovereign credit rating. The credit rating of the Brazilian federal government was downgraded in January 2018 and has not been investment grade by all the main rating agencies for several years. Any decision by these agencies to downgrade the ratings of the Brazilian federal government, our ratings or those of our debt securities in the future would likely result in increased interest and other financial expenses relating to our borrowings and debt securities and the inclusion of financial covenants in the instruments governing new indebtedness, and could significantly reduce our ability to obtain such financing, on satisfactory terms or in amounts required by us, and our liquidity and would require us to post cash collateral pursuant to our obligations or to contract letters of credit to backstop guarantees provided by us in the context of the Mexican Complex.

In 2020, the novel coronavirus (COVID-19) pandemic has significantly impacted economic activity and markets around the world, and its severity, magnitude and duration are highly uncertain, rapidly changing and difficult to predict. Actual and potential impacts of the novel coronavirus (COVID-19) on the global economy, the economies of certain countries and certain companies has led ratings agencies to review and downgrade the credit ratings of sovereigns and issuers of securities around the world. Recently, Fitch Ratings has revised the outlook of the Brazilian sovereign credit rating to negative from stable. A potential further downgrade of the ratings of Brazil, our ratings, or those of our debt securities could result in increased interest and other financial expenses related to our borrowings and debt securities and could reduce our liquidity and ability to obtain additional financing under desired terms and conditions.

***We may be subject to attempts to acquire our control, which may lead to significant changes in management, the strategies that we are currently pursuing, or in our current corporate governance practices.***

We may be subject to attempts to acquire our control. In the event there is a change in our corporate control, there might be significant changes in management, the strategies that we are currently pursuing, or in our current corporate governance practices.

For example, in June 2018, we were informed by Odebrecht S.A., or Odebrecht, about discussions that were being held between Odebrecht and LyondellBasell Industries N.V., or, LyondellBasell, regarding a potential transaction involving the transfer to LyondellBasell of all of Odebrecht's interest in us. In June 2019, we were informed by Odebrecht that such discussions for a change-of-control transaction with LyondellBasell had been terminated. We cannot assure you that such negotiations will not be resumed, or that Odebrecht will not initiate discussions with other parties regarding a change-of-control transaction in the future.

15

In addition, although we are not currently a party to any pending bankruptcy or other judicial restructuring proceedings in Brazil or elsewhere, we are exposed to certain risks related to the Odebrecht Judicial Restructuring Proceedings (as defined below), including risks related to the change of our corporate control resulting from decisions taken or agreed under such proceedings and the consequences derived therefrom. We have no control over the Odebrecht Judicial Restructuring Proceedings, and no assurance can be given on the outcome of the Odebrecht Judicial Restructuring Proceedings or their effect on us.

***Some of our shareholders may have the ability to determine the outcome of corporate actions or decisions, which could affect the holders of our class A preferred shares and the ADSs.***

Odebrecht, directly or through its wholly-owned subsidiary OSP Investimentos S.A., or OSP Inv., owns 38.3% of our outstanding share capital, including 50.1% of our voting share capital, and Petrobras holds 36.1% of our outstanding share capital, including 47.0% of our voting share capital. Nominees of Odebrecht constitute a majority of the members of our board of directors. Under a shareholders' agreement to which Odebrecht and Petrobras are parties, which we refer to as the Braskem S.A. Shareholders' Agreement, we may only undertake certain actions after Odebrecht and Petrobras have reached a consensus with respect to those actions. However, Odebrecht will have the sole power to approve our business plan, through the board of directors, as described under "Item 7. Major Shareholders and Related Party Transactions-Major Shareholders-Shareholders' Agreements." As a result, Odebrecht has the ability to determine the outcome of most corporate actions or decisions requiring the approval of our shareholders or our board of directors-in certain instances, with the consent of Petrobras-which could affect the holders of our class A preferred shares and of our American Depositary Shares, or ADSs.

Furthermore, on June 17, 2019, Odebrecht, together with certain of its controlling and controlled entities, filed a petition for judicial restructuring before the First Judicial Bankruptcy Court of the State of São Paulo, Brazil, seeking a voluntary judicial restructuring and emergency relief staying certain foreclosure actions by their creditors (the "Odebrecht Judicial Restructuring Proceedings"). The Odebrecht Judicial Restructuring Proceedings does not include us.

Although we are not currently a party to any pending bankruptcy or other judicial restructuring proceedings in Brazil or elsewhere, we are exposed to certain risks related to the Odebrecht Judicial Restructuring Proceedings, such as risks related to the change of our corporate control resulting from decisions taken and/or agreed under such proceedings and the consequences derived thereto, including but not limited to significant changes in our management and our strategy that may be undertaken by any new controlling shareholders that may arise from the conclusion of these proceedings. We have no control over the Odebrecht Judicial Restructuring Proceedings, and no assurance can be given on the outcome of the Odebrecht Judicial Restructuring Proceedings or their effect on us.

***We may face conflicts of interest in transactions with related parties.***

We maintain trade accounts receivable and current and long-term payables with some of our affiliates and other related parties, including Petrobras, which is our domestic supplier of naphtha and other raw materials such as propylene, ethane, propane and refinery off gas. These trade accounts receivable and trade accounts payable balances result mainly from purchases and sales of goods, which are at prices and on terms equivalent to the average terms and prices of transactions that we enter into with third parties. These and other transactions between us and our affiliates could result in conflicting interests between us and our shareholders.

***We may pursue strategic acquisitions or investments. The failure of an acquisition or investment to produce the anticipated results, or the inability to integrate an acquired company fully, could adversely affect our business.***

We may from time to time acquire or invest in complementary companies or businesses. The success of an acquisition or investment will depend on our ability to make accurate assumptions regarding the valuation, operations, growth potential, integration and other factors related to that business. We cannot assure you that our acquisitions or investments will produce the results that we expect at the time we enter into or complete a given transaction. Furthermore, acquisitions may result in difficulties integrating the acquired companies, and may result in the diversion of our capital and our management's attention from other business issues and opportunities. We may not be able to integrate successfully the operations that we acquire, including their personnel, financial systems, distribution or operating procedures. If we fail to integrate acquisitions successfully, our business could suffer. In addition, the expense of integrating any acquired business and their results of operations may adversely affect our operating results.

16

Certain acquisitions, partnerships and joint ventures we make may prevent us from competing for certain clients or in certain lines of business, and may lead to a loss of clients. We may spend time and money on projects that do not increase our revenue. To the extent we pay the purchase price of any acquisition in cash, it would reduce our cash reserves, and to the extent the purchase price is paid with any of our shares, it could be dilutive to our shareholders. To the extent, we pay the purchase price with proceeds from the incurrence of debt, it would increase our level of indebtedness and could negatively affect our liquidity and restrict our operations. Our competitors may be willing or able to pay more than us for acquisitions, which may cause us to lose certain acquisitions that we would otherwise desire to complete. We cannot ensure that any acquisition, partnership or joint venture we make will not have a material adverse effect on our business, financial condition and results of operations.

***We may face unforeseen challenges in the operation of our Mexico Complex, which could result in this business unit failing to provide expected benefits to us.***

During the first half of 2016, we concluded the construction phase of an olefins complex, or the Mexico Complex, located in the Mexican state of Veracruz. For more information about this, which we refer to as the Mexico Complex, see "Item 5. Operating and Financial Review and Prospects-Capital Expenditures-Joint Venture-Mexico Complex."

To develop our Mexico Complex, Braskem Idesa required significant capital expenditure and incurred significant debt. Our ability to achieve the strategic objectives of this business unit will depend largely on its successful operation. Factors that could affect the operation of this business unit include:

- general economic, political and business conditions in Mexico and global demand for polyethylene;

- the occurrence of unforeseen technical and mechanical difficulties that may interrupt production or lead to unexpected downtime of the Mexico Complex's plants;

- any material default by Pemex TRI under the ethane supply agreement;

- the ability of Braskem Idesa to service the debt under its project finance facility;

- the ability of Braskem Idesa's shareholders to comply with the obligation to make certain contingent equity contributions to cover additional amounts necessary to complete the project, as agreed in the equity support agreement in connection with the project finance facility. For additional information, see "Item 5. Operating and Financial Review and Prospects-Capital Expenditures-Joint Venture-Mexico Complex-Equity Support Agreement Relating to the Mexico Complex."

- an unstable and non-continuous supply of ethane and natural gas in the long term; and

- increased competition from domestic or foreign competitors and/or the emergence of new domestic or foreign competitors.

We cannot assure you that the Mexico Complex will provide the expected benefits to us, even after having completed three full calendar year of operations. Any significant interruption could hinder or prevent the implementation of our business plan as originally conceived, and result in revenue and net income below what is expected. Further, any material adverse effect on the financial condition or results of operations of the Mexican complex may adversely impact our own financial condition and results of operations. See also "-We depend on ethane supplied by Pemex TRI in Mexico."

17

***Adjustments in tariffs on imports that compete with our products could cause us to lower our prices.***

We and our second and third generation clients currently benefit from imports tariffs imposed by Mercosur countries members that allow us to charge prices for our polyolefin and vinyl products in the domestic market that include a factor based on the tariffs levied on comparable imports of those products. However, the Brazilian government has in the past used import and export tariffs to implement economic policies, resulting in varying tariff levels. For example, in September 2012, the Brazilian government increased import duties on 100 products related to various industries, including an increase in the import tariff on polyethylene. In October 2012, it increased the import tariff on polyethylene from 14% to 20%, and in October 2013, it reduced the import tariff on polyethylene to the previous level of 14%. Currently, the tariff remains at 14%. Adjustments of tariffs could lead to increased competition from imports and cause us to lower our domestic prices and impact the demand for our products, which would likely result in lower net revenue and could negatively affect our overall financial performance. Additionally, the products we export to the United States and Europe are subject to tariffs in the amount of 6.5% in each jurisdiction, subject to certain preferences. These tariffs generally favor our products produced locally and any future adjustments to these tariff structures could negatively impact our sales in these jurisdictions. Future trade agreements entered into by Brazil, the Mercosur, the United States or the European Union could also lead to increased competition from imports and lower domestic prices. Recently, the Trump administration imposed 25% tariffs on a variety of imports from China and subsequently implemented tariffs on additional goods from China.

***Changes in U.S. and global trade policies and other factors beyond our control may adversely impact our business, financial condition and results of operations.***

The international environment in which we operate is affected from inter-country trade agreements and tariffs. As a result of recent revisions in the U.S. administrative policy, there are, and there may be additional changes to existing trade agreements, greater restrictions on free trade and significant increases in tariffs on goods imported into the United States, particularly those manufactured in China, Mexico and Canada. Future actions of the U.S. administration and that of foreign governments, including China, with respect to tariffs or international trade agreements and policies remains currently unclear.

The escalation of a trade war, tariffs, retaliatory tariffs or other trade restrictions on products and materials either exported by us to China or raw materials imported by us from China, or other countries, may significantly hinder our ability to provide our products to customers in China or other affected locations. Such developments may result in a decrease in demand for our products as well as delays in payments from our customers. Furthermore, other governmental action related to tariffs or international trade agreements, changes in U.S. social, political, regulatory and economic conditions, or in laws and policies governing foreign trade, manufacturing, development and investment in the territories and countries where our customers are located, could lead to a rebalancing of global export flows and an increase in global competition, which in turn could adversely affect our business, financial condition, results of operations and cash flows.

***We may be affected by instability in the global economy and by financial turmoil.***

Instability in the global markets and in the geopolitical environment in many parts of the world as well as other disruptions may continue to put pressure on global economic conditions. In the event global economic and market conditions, or economic conditions in key markets, remain uncertain or deteriorate, we may experience material impacts on our business, results of operations and financial condition.

***We may not be able to specify in details technical specifications required by our customers' or updated mechanisms to promptly attend regulatory requirements, and we could be subject to damages based on claims brought against us or our customers as a result of the failure of our products specification.***

Our products specification may not meet certain technical or regulatory requirements, specifications or standards. In addition, our customers may impose stricter requirements on our products or governments may enact stricter regulations for the distribution, sale or use of our products. Failure to meet such standards could materially adversely affect our business, financial condition and results of operations if we are unable to sell our products in one or more markets or to important customers in such markets.

As with all quality control systems, any failure or deterioration of our quality control systems could result in defects in our products, which in turn may subject us to contractual, regulatory, product liability and other claims, which could have a material adverse effect on our reputation, business, financial condition and results of operations.

***Our business and operations are inherently subject to environmental, health and safety hazards. As a result, our business is also subject to stringent environmental and other regulations.***

As a company operating in the petrochemical industry, our operations involve the generation, use, handling, storage, transportation (mainly by pipeline, road, train, fluvial and maritime), treatment, discharge and disposal of hazardous substances and waste into the environment. Notwithstanding our environmental, health and safety standards, policies and controls, our operations remain subject to incidents or accidents that could adversely affect our business or reputation. Our industry is generally subject to significant risks and hazards, including fire, explosions, toxic gas leaks, spilling of polluting substances or other hazardous materials, failure of operational structures and incidents involving mobile equipment, vehicles or machinery, associated or not with the manufacture of petrochemicals and the storage and transportation of feedstock and petrochemical products. These events may occur due to technical failures, human errors or natural events, among other factors, and could result in significant environmental and social impacts, damage to or destruction of production facilities and communities, personal injury, illness or death of employees, contractors or community members close to our operations or close to our logistic routes and pipelines, environmental damage, delays in production, and, in certain circumstances, liability in civil, labor, criminal and administrative lawsuits.

Changes to applicable laws may impose changes on standards we have already implemented, which can take time to review and update. For example, we are carrying out studies related to dams at certain of our industrial sites as a result of a change in Brazilian law that now requires that all water and waste dams have a safety plan for these structures. We have already classified all of our dams in terms of associated risks and potential damage. At this time, we are preparing dam safety plans, with completion scheduled for the first half of 2020, which were communicated to public authorities. All of our dams are small in volume, and our preliminary assessments did not point to significant risks in their structures. Some environmental studies that we have commissioned have indicated instances of environmental contamination at certain of our plants. If the laws and regulations applicable to risks and safety plans change, we may be required to revise the studies that we have carried out, or take further action to rectify potential issues that would not need to be addressed under current laws and regulations. In addition, we and certain of our executive officers have received certain notices related to minor environmental violations and are or have been subject to investigations or legal proceedings with respect to certain alleged environmental violations. These environmental issues, and any future environmental issues that may arise, could subject us to fines or other civil or criminal penalties imposed by Brazilian authorities.

Also, under Brazilian federal and state environmental laws and regulations, we are required to obtain operating licenses and permits for our manufacturing facilities. If any of our environmental licenses or permits lapse or are not renewed or if we fail to obtain any required environmental licenses or permits, we may be subject to fines ranging from R$500 to R$50.0 million, and the Brazilian government may partially or totally suspend our activities and impose other civil and criminal sanctions on us.

In addition, our production and logistics processes are subject to inherent safety risks, which may lead to death or disability of our employees or individuals participating in such processes. Such risks cannot be entirely eliminated or mitigated despite full compliance with all safety measures applicable to us or required by laws or regulations. Despite all monitoring efforts, we may have a negative impact on our image and reputation, and on our business, financial condition and results of operations.

19

A sufficiently large accident at one of our plants, storage facilities, logistic equipment or pipelines could force us to suspend our operations temporarily and result in significant remediation costs and lost net revenue. Although we maintain insurance coverage for losses due to fire damage and for losses of income resulting from shutdowns due to fire, explosion or electrical damage, insurance proceeds from such insurance policies may not be available on a timely basis and may be insufficient to cover all losses, which could have a material adverse effect on our financial performance.

The operation of our salt mining activities in the state of Alagoas, Brazil, which is a raw material necessary for production of certain products in our Vinyls Unit, was subject to similar risks and hazards. For instance, in certain neighborhoods of the city of Maceió that are located near the geological area of our salt mines, there have been allegations that the ground gave way as a result of the activities carried out by us at these mines, which allegedly may have affected certain nearby private and public properties. Certain lawsuits have been filed in the state of Alagoas in connection with this incident.

Mining operations at our salt mine in Alagoas were halted in May 2019. Even though the risk of a sinkhole formation is unlikely, it cannot be fully disregarded. A safety area covering 15 of the 35 wells at the site of our salt mine was designated, and the entirety of the mining area has been monitored. In October 2019, a conceptual project was launched to start backfilling some wells that have lost their salt, which is a condition for sinkhole formation. We expect that these wells will be stabilized as soon as possible, starting in 2020. However, these actions are part of a large operation that, following reasonable engineering efforts, may take a few years to be completed. Other caverns that are comparatively more stable will be closely monitored. Based on the results of monitoring routines and additional studies relating to numerical simulations, which provide data to monitor the stability of the caverns, there could arise the need for further stabilization and backfilling.

On January 3, 2020, we entered into an agreement with the Alagoas State Public Defender's Office (*Defensoria Pública do Estado de Alagoas*), the Federal Prosecutor's Office (*Ministério Público Federal*), the State of Alagoas Prosecutor's Office (*Ministério Público do Estado de Alagoas*) and the Federal Public Defender's Office (*Defensoria Pública da União*) to support the relocation of, and indemnification to, residents in the areas at risk located in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in the city of Maceió, in the state of Alagoas, as set forth in the agreement, which was ratified by the Federal Judge of the 3rd District Court in the state of Alagoas. We estimate that the support for relocation set forth in the agreement and in surrounding areas will involve approximately 4,500 buildings and 17,000 people during the next two years.

On December 31, 2019, based on its assessment and on that of its external legal advisors, and considering the existing information that was available, discussions held with authorities and estimates of expenses with the various safety measures to benefit residents, the Company recorded a provision of R$3,383.1 million, of which R$1,450.5 million is under current liabilities and R$1,932.6 million is under non-current liabilities. Due to the inherent change in the assumptions related to the provisions arising from new facts and circumstances, execution time and extent of the action plans, the findings of future studies conducted by experts and the outcome of pending lawsuits, the provision may be adjusted over time to reflect new developments.

On February 17, 2020, we entered into a settlement agreement with the Labor Prosecutor's Office (*Ministério Público do Trabalho*) in the amount of R$40.0 million pursuant to which we agreed to implement a program for business recovery and promotion of educational activities, or the Business Recovery and Promotion of Educational Activities Program, for the benefit of residents and workers in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in the city of Maceió, in the state of Alagoas, Brazil. The program consists of constructing day care centers and schools, implementing vocational training programs and providing support to civil defense authorities with regard to hiring qualified personnel for continuing the process of monitoring the areas at risk in these districts. Pursuant to the settlement agreement, the Labor Prosecutor's Office agreed to withdraw the lawsuit it had filed against us, including the request to freeze our funds made in connection with such lawsuit, as per the notices to the market disclosed by us on July 25, 2019 and October 10, 2019. For additional information, see "Item 8. Financial Information-Legal Proceedings-Alagoas - Mining Activities."

Further, we may face difficulties in obtaining or maintaining operating licenses and may suffer damage to our reputation following the occurrence of any such event. Petrochemical producers are sometimes subject to unfavorable market perceptions as a result of the environmental impact of their business, which can have an adverse effect on their results of operations.

In addition, we and other petrochemical producers are subject to stringent federal, state and local environmental laws and regulations concerning human health, the handling, storage, transportation, treatment, discharge and disposal of hazardous substances and waste into the environment. Our operations in Brazil, including those of our subsidiaries Cetrel and DAC, which are responsible for providing environmental services, waste water treatment and water supply to the Camaçari Complex in the state of Bahia, for example, are subject to extensive federal, state and local laws, regulations, rules and ordinances relating to pollution, protection of the environment and the generation, storage, handling, transportation, treatment and disposal of hazardous substances and waste materials. The Brazilian government enacted the Environmental Crimes Law in 1998 that imposes criminal penalties on corporations and individuals that cause environmental damage. Corporations found to be guilty of polluting the environment may be fined up to R$50.0 million, have their operations suspended, be prohibited from contracting with the government, be required to repair damage that they caused and lose certain tax benefits and incentives. Executive officers, directors and other individuals may also be imprisoned for up to five years for environmental violations.

Our operations in the United States, Germany and Mexico are subject to extensive U.S., German, European and Mexican federal, state and local laws, regulations, rules and ordinances relating to pollution, protection of the environment and the generation, storage, handling, transportation, treatment, disposal and remediation of hazardous substances and waste materials. U.S. environmental laws and regulations may impose liability on us for the conduct of third parties, or for actions that complied with applicable requirements when taken, regardless of negligence or fault. Of particular significance to us are (1) regulatory programs to be established to implement air quality standards under the National Ambient Air Quality Standards for ozone and fine particles promulgated by the U.S. Environmental Protection Agency, or the EPA, and (2) various legislative and regulatory measures in the United States that are under review, discussion or implementation to address greenhouse gas emissions. In Mexico, we adhere to the comprehensive responsibility program promoted by the Mexican National Chemical Industry Association (*Asociación Nacional de la Industria Química de Mexico - ANIQ*), which is based on the responsible care standard adopted in the United States and Canada. We are also signatories of the Responsible Care program in the United States and Brazil that was launched by certain entities of the chemical industry sector worldwide.

Such existing stringent environmental and other regulations require significant capital expenditures. Our consolidated annual expenditures on environmental control were R$369.8 million in 2019, R$329.3 million in 2018 and R$330.1 million in 2017, including investments, waste and wastewater treatment, emissions management, environment licenses, environmental liabilities and other environmental expenditures. In addition, evolving regulatory requirements could require significant additional capital expenditures depending on the timing of the adoption and enforcement of specific standards imposing such requirements. In addition, changes in environmental regulations could inhibit or interrupt our operations, or require modifications to our facilities. Accordingly, environmental, health or safety regulatory matters may result in significant unanticipated costs or liabilities.

We may also, from time to time, be involved in certain claims, disputes or litigation proceedings concerning environmental risks and liabilities, health and safety hazards, among others. For more information, please see "Item 8. Financial Information--Legal Proceedings."

***We could be materially adversely affected by the impacts of the Global Settlement.***

In the context of allegations of improper payments in connection with the so-called Operation Car Wash (*Operação Lava Jato*) in Brazil, we engaged independent expert firms to conduct an investigation into such allegations (the "Investigation") and report their findings. We have cooperated with governmental authorities in several jurisdictions, including the U.S. Department of Justice, or the DoJ, the U.S. Securities and Exchange Commission, or the SEC, Brazil's Federal Prosecutor's Office (*Ministério Público Federal*), or the MPF, and Switzerland's Office of the Attorney General, or the OAG. On December 14, 2016, we entered into a leniency agreement with the MPF, or the Leniency Agreement, which was ratified by the competent Brazilian court on June 6, 2017. On December, 21, 2016, we filed a plea agreement in the United States District Court for the Eastern District of New York under which we agreed to plead guilty to a one-count criminal information charging us with conspiracy to violate the anti-bribery provisions of the U.S. Foreign Corrupt Practices Act, or the FCPA. On the same date, we consented to the entry of a final judgment in a civil action brought by the SEC based on civil violations of the anti-bribery, books and records and internal accounting controls provisions of the FCPA. The competent federal courts in the United States approved the DoJ and SEC resolutions on January 26, 2017 and February 28, 2017, respectively. In addition, on December 21, 2016, the OAG closed its investigation of these matters. We refer to these actions as the Global Settlement. Under the Global Settlement, we agreed to pay to the governmental authorities in these jurisdictions an aggregate amount of US$957 million (equivalent to R$3.1 billion), based on the exchange rate of R$3.27 per U.S. Dollar, applicable at the time of the negotiation.

21

The MPF will distribute the majority of the amount it receives as restitution to third parties for damages caused by the misconduct. Pursuant to the Global Settlement, the MPF agreed to communicate with other public authorities or entities, as well as stated-owned companies and mixed-capital companies with which Braskem enters into discussions to address the facts under the Global Settlement and avoid making duplicate restitution payments. In this context, as announced to the market on July 10, 2018, and disclosed in a material fact on May 27, 2019, we have cooperated and engaged in negotiations with the Ministry of Transparency and Controllership (CGU) and the Office of the Attorney General (AGU) in Brazil, and our Board of Directors approved the signing of a leniency agreement with the CGU and the AGU (the "CGU/AGU Agreement").

The CGU/AGU Agreement, in the amount of R$2.9 billion, to be adjusted by the SELIC rate, addresses the same facts that are the object of the Global Settlement executed in December 2016 with the Brazilian Federal Prosecution Office (MPF), the U.S. Department of Justice (DoJ), the U.S. Securities and Exchange Commission (SEC) and the Swiss Office of the Attorney General ("Global Settlement"). Of this amount, R$2.5 billion will be offset by the amount that Company already had undertaken to pay under the scope of the Global Settlement, resulting in an additional disbursement of R$410 million.

As of the date of this annual report, we have paid R$2.3 billion of the total fine established in the Global Settlement, in the following manner:

- US$94.9 million (R$296.6 million) to the DoJ on February 8, 2017;

- US$65.0 million (R$206.5 million) to the SEC on April 27, 2017;

- CHF30.2 million (R$104.3 million) to the OAG on June 27, 2017;

- R$736.4 million to the MPF on July 6, 2017;

- R$267.9 million to the MPF on January, 30 2018;

- CHF16.1 million (R$62 million) to the OAG on June 28, 2018;

- R$278 million to the MPF on January 30, 2019 ; and

- CHF16.1 million (R$58 million) to the OAG on June 27, 2019.

The outstanding amount of R$1.5 billion related to the Global Settelement and also the CGU/AGU Agreement will be paid in the following manner:

- CHF32.1 million to the OAG related to two remaining annual installments of CHF16.1 million due on June 30 of each year as from 2020;

- R$900 million to the MPF in four remaining annual installments due on January 30 of each year as from 2021. To guarantee payment of future installments, Braskem pledged collateral assets from its property, plant and equipment sufficient to cover one annual installment; and

- R$409.9 million in connection with the CGU/AGU Agreement in two annual installments due on January 30, 2024 and 2025.

The Global Settlement does not prevent Braskem from responding to any legitimate third party, which may seek indemnification against us from damages for the facts subject to the Global Settlement. As a result, we cannot assure you that the aggregate amount disbursed as a requirement pursuant to the agreement will be sufficient to cover indemnification claims of all of the victims. We may be required to make additional disbursements to cover such claims.

Other authorities with jurisdiction over us may seek to impose monetary sanctions or fines on, or to initiate investigative proceedings against, us. As a result of entering into the Global Settlement, Braskem may be prevented from entering into certain agreements with government entities and may be subject to increased operating costs for being under the obligation to improve its governance and anti-corruption practices and procedures, including the cost of external monitorships.

22

Under the terms of the Global Settlement, we were required to cooperate with these governmental authorities and improve our governance and anti-corruption compliance practices. We were also subject to external monitorship for a period of three years from 2017, which ended in March 2020, during which time the monitor assessed compliance with the Global Settlement, including the effectiveness of our internal controls, policies and procedures to reduce the risk of any anti-corruption violations.

On May 13, 2020, the MPF, the DoJ and the SEC confirmed the conclusion of the independent compliance monitorship at Braskem, which had been established in the settlement agreements entered into by Braskem, the DoJ and the SEC on December 21, 2016. The decision of the DoJ and the SEC was based on a final report from the independent monitors, who certified that the Company implemented all of the recommendations regarding the structure and execution of its compliance program and concluded that the Company meets the standards set out in the settlement agreements entered into with the DoJ and the SEC. Following the end of the independent monitorship period and the certification by the MPF, the DoJ and the SEC, the Company has complied with its obligations established in the settlement agreements entered into with these authorities and has successfully concluded the three-year monitorship.

We believe we are fully in compliance with our obligations under the Global Settlement.

***Unfavorable outcomes in pending or future litigation may reduce our liquidity and negatively affect our financial performance and financial condition.***

We are, and in the future may be, involved in numerous tax, civil and labor disputes, among others, involving monetary claims. If unfavorable decisions are rendered in one or more of these lawsuits, we could be required to pay substantial amounts. For certain of these lawsuits, we have not established any provision on our balance sheet or have established provisions only for a portion of the amounts in controversy, based on our judgments as to the risk of loss for these lawsuits.

In July 2015, two putative class action lawsuits were filed against us and certain of our then-current and former officers and directors, or the Defendants, in the United States District Court for the Southern District of New York, or the U.S. Court. In those lawsuits that were subsequently consolidated under the caption In re Braskem, S.A. Securities Litigation, No. 15-cv-5132, the Lead Plaintiff, Boilermaker-Blacksmith National Pension Trust, alleged that the Defendants made misrepresentations or omissions that inflated the price of Braskem S.A.'s stock in violation of U.S. securities laws.

After the decision on the motion to dismiss filed by us, partially granting its arguments, we and the Lead Plaintiff signed the proposed settlement agreement ("Proposed Settlement"), which was ratified by the applicable Court, which issued a final decision ending all claims from all members of the class of Investors. We have made no admission of any wrongdoing or liability as part of the settlement.

Under the terms of the Proposed Settlement, Braskem paid US$10.0 million (R$31.7 million) to resolve all claims arising out of or relating to the subject matter of the class action of a settlement class consisting of all persons who purchased or otherwise acquired a legal or beneficial ownership interest in Braskem American Depositary Receipts between July 15, 2010 and March 11, 2015, inclusive. The amount of the agreement was deposited by Braskem in the account designated by the judge ("Escrow Account") on October 2, 2017.

On February 21, 2018, a hearing was held in which a decision was handed down for the final approval of the agreement regarding the entire class of investors and the dismissal of the case. Said decision became final and unappealable. The individual distribution of the amount of the agreement is the responsibility of the manager of the Escrow Account, as determined by the Court and in accordance with the ratified allocation plan. The Proposed Settlement was signed solely to avoid the risk, uncertainty, and expense of further litigation and does not represent the admission of any wrongdoing or liability by Braskem.

In April 2019, the Alagoas State Attorney's Office (*Ministério Público do Estado de Alagoas*) and the State Public Defender's Office (*Defensoria Pública do Estado de Alagoas*) filed a lawsuit seeking to freeze our assets in an amount of up to R$6.7 billion to secure funds allegedly required to ensure remediation and compensation for environmental, property and personal damages potentially resulting from a geological incident related to our mining actitivies in the city of Maceió. A preliminary decision ordered the freezing of R$100 million in our banks accounts.

23

In addition, the Alagoas state court of appeals (Tribunal de Justiça do Estado de Alagoas) ordered the suspension of the distribution of dividends for the fiscal year 2018 that had been proposed in the amount of R$2.7 billion, or, alternatively, the freezing of assets in the same amount of the proposed dividend distribution.This decision was subsequently reversed by a decision of the Superior Court of Justice (*Superior Tribunal de Justiça*, or STJ), which authorized the distribution of dividends upon posting of a judicial bond in the same amount. The Alagoas State Attorney's Office and the Alagoas State Public Defender's Office amended their claim to exclude the request for indemnification for the alleged environmental damages and reduce the amount of assets to be frozen to R$3.7 billion, which according to their allegations would be equivalent to the actual damages caused to the residents of the districts affected by the geological event. On June 26, 2019, the presiding judge of the Alagoas state court of appeals (*Tribunal de Justiça do Estado de Alagoas*) issued a decision ordering an amount of R$3.7 billion to be frozen. This decision was also subsequently reversed by the Superior Court of Justice (STJ), which ordered the frozen amount of R$3.7 billion to be returned to our bank accounts after posting another judicial bond in an equivalent amount.

On July 25, 2019, we were informed of another civil lawsuit filed against us by the Labor Prosecutor's Office of the State of Alagoas, or MPT-AL, requesting injunctive relief to freeze the amount of R$2.5 billion to guarantee payment of any actual damages that workers affected by the geological event may suffer. In that lawsuit, MPT-AL further requested the payment of compensation to workers for pain and suffering. On October 10, 2019, the trial court denied the injunctive relief request.

On August 19, 2019, we became aware of the filing of another civil lawsuit by the Federal Prosecutor's Office (*Ministério Público Federal*) against us and other parties, requesting the following injunctive reliefs: (i) the set-up of a fund of R$3.1 billion for the benefit of social and environmental programs and emergency measures to be carried out, and the maintenance in said fund of working capital in the amount of at least R$2.0 billion or, after a financial schedule is approved for such fund, an amount equivalent to 100% of the expenses projected for the subsequent 12 months; (ii) the posting of bonds in the amount of R$20.5 billion; (iii) prohibition on us to encumber or dispose of any of our fixed assets and to distribute profits, in the form of dividends, interest on shareholders' equity or any other form; (iv) freezing of any profits not yet distributed; and (v) suspension of receipt of government financings and government incentives, as well as acceleration of existing indebtedness with BNDES (a federal development bank).

On January 3, 2020, the plaintiffs agreed to: (i) release the amount of R$3.7 billion that had been frozen, of which R$1.7 billion was to be transferred to a bank account of Braskem specifically for funding the Financial Compensation and Support for Relocation Program, which must maintain at minimum balance of R$100 million, subject to audit by an external auditor; and (ii) substitute the surety bonds that had been presented by Braskem in the approximate aggregate amount of R$6.4 billion for two new surety bonds in the approximate aggregate amount of R$3.0 billion to guarantee the public interest civil lawsuit filed by the Alagoas State Attorney's Office (*Ministério Público do Estado de Alagoas*) and the State Public Defender's Office (*Defensoria Pública do Estado de Alagoas*) and the public interest civil lawsuit filed by the Federal Prosecutor's Office (*Ministério Público Federal*).

For more information about our legal proceedings, see "Item 8. Financial Information-Legal Proceedings."

***Labor unrest may materially and adversely affect our operations.***

Labor unrest in our plants and facilities may have a material adverse effect on our financial condition or results of operations. For example, in August 2010, the unionized employees at our Neal, West Virginia plant went on strike. During the strike, the plant operated under the supervision of management until May 2011, when Braskem America entered into a new collective bargaining agreement. Although we believe that we maintain good relations with our employees, future labor actions, including strikes, could have a material adverse effect on our financial performance.

***Natural disasters, severe weather and climate conditions, or health epidemics could have a material adverse effect on our overall business.***

Some of our facilities are located in places that could be affected by natural disasters, such as floods, earthquakes, hurricanes, tornados and other natural disasters, which could disrupt our operations or the operations of our customers and could damage or destroy infrastructure necessary to transport our products as part of the supply chain. Additionally, other unanticipated problems such as health epidemics or pandemics, including the novel coronavirus (COVID-19) outbreak that began in China and spread to the rest of the world, could also cause operational disruptions of varied duration. Such events could require maintenance shutdowns, delay shipments of existing inventory or result in costly repairs, replacements or other costs, all of which could have a material adverse effect on our financial performance.

24

While our energy risk policy dictates that we purchase energy in advance at fixed prices through long-term contracts, the majority of Brazilian power generation capacity is provided by hydroelectric generation facilities. If the amount of water available to energy producers becomes scarce due to drought or diversion for other uses, the cost of energy may increase. In addition, if the amount of water available to industrial facilities becomes scarce, there may be a need to reduce production at the affected sites. Such conditions could have a material adverse effect on our sales and margins.

***We could be materially affected by violations of the U.S. Foreign Corrupt Practices Act, the Brazilian Anti-Corruption Law and similar anti-corruption laws.***

We, our subsidiaries and our joint venture partners are subject to a number of anti-corruption laws, including Law No. 12,846/2013, or the Brazilian Anti-Corruption Law, which entered into effect on January 28, 2014, the FCPA and various other anti-corruption and anti-bribery laws of other jurisdictions.

The FCPA, the Brazilian Anti-Corruption Law and similar anti-bribery laws in other jurisdictions generally prohibit companies and their intermediaries from making improper payments to government officials or other persons for the purpose of obtaining or retaining business. Violations of these laws may result in criminal or civil sanctions, inability to do business with existing or future business partners, injunctions against future conduct, profit disgorgements, disqualifications from directly or indirectly engaging in certain types of businesses, the loss of business permits or other restrictions which could have a material adverse effect on our business, financial condition, results of operations or liquidity. For instance, see "-We could be materially adversely affected by the impacts of the Global Settlement" for the impact on us of allegations of improper payments in connection with the Operation Car Wash.

***We are exposed to behaviors of our employees and non-employees that may be incompatible with our ethics and compliance standards, and failure to timely prevent, detect or remedy any such behavior and/or process vulnerabilities may have a material adverse effect on our results of operations and financial condition.***

Our business, including our relationships with third parties, is guided by ethical principles. We have adopted a Code of Conduct, a Global Compliance System Policy, an Anti-Corruption Policy, and several other internal policies designed to guide our management, employees and counterparties and reinforce our principles and rules for ethical behavior and professional conduct. We maintain an independent whistleblower channel (denominated "Ethics Line") managed by a third party available for employees and non-employees (including third parties). Every whistleblower complaint is investigated and submitted for evaluation to our Ethics Committee.

We are subject to the risk that our employees, counterparties or any person doing business with us may engage in fraudulent activity, corruption or bribery, circumvent or override our internal controls and procedures or misappropriate or manipulate our assets for their personal or business advantage. In the event that we believe or have reason to believe that our employees or agents have or may have violated applicable anti-corruption laws, including the FCPA, we may be required to investigate or have outside counsel investigate the relevant facts and circumstances, which can be expensive and require significant time and attention from senior management. We have in place a robust Compliance and Anti-Corruption Program implemented through every area of our Company, including several processes for identifying, monitoring and mitigating these risks, but such program may not be completely effective.

Our management is responsible for establishing and maintaining adequate internal control over financial reporting as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act of 1934. During our assessment of internal control over financial reporting as of December 31, 2019 (see "Item 15. Controls and Procedures"), we identified certain material weaknesses. We also identified material weaknesses in internal control over financial reporting as of December 31, 2018, certain of which still existed as of December 31, 2019. A material weakness is defined as a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim consolidated financial statements will not be prevented or detected on a timely basis.

25

As we were required to conduct additional procedures and analyses with respect to our internal processes and controls for the year ended December 31, 2017, we were unable to timely conclude our audited financial statements for such year and, therefore, were unable to timely file our annual report on Form 20-F for the year ended December 31, 2017. We obtained extensions from the SEC to file our annual report on Form 20-F for the year ended December 31, 2017 until May 16, 2019. Since we were not able to file our Form 20-F until the date granted by SEC and no further extensions were granted pursuant to Section 802.01E of the NYSE Listed Company Manual, on May 13, 2019, we were notified by the NYSE that it had suspended the trading of our ADSs and had initiated delisting procedures. Trading of our ADSs resumed after we filed our annual reports on Form 20-F for the years ended December 31, 2017 and December 31, 2018 on October 8, 2019 and October 17, 2019, respectively.

In the future, we may be required to conduct additional procedures and analyses with respect to our internal processes and controls that may lead to a delay in the conclusion of our audited financial statements and, as a result, prevent us from filing future annual reports in a timely manner. Any failure to timely file our annual reports in the future may have an adverse effect on our business.

***If we are unable to comply with the restrictions and covenants in the agreements governing our indebtedness, there could be a default under the terms of these agreements, which could result in an acceleration of payment of funds that we have borrowed and could affect our ability to make principal and interest payments on our debt obligations.***

Any default under the agreements governing our indebtedness that is not cured or waived by the required lenders or noteholders could result in the holders of any such indebtedness accelerating the payment of amounts outstanding, which could make us unable to pay principal and interest on those and other debt obligations. If we are unable to generate sufficient cash flow and are otherwise unable to obtain funds necessary to meet required payments of principal and interest on our indebtedness, or if we otherwise fail to comply with the various covenants in the agreements governing our indebtedness, we could be in default under the terms of such agreements. In the event of such default:

- the holders of such indebtedness could elect to declare all the funds borrowed thereunder to be due and payable, together with accrued and unpaid interest;

- the lenders or noteholders under such agreements could elect to terminate their commitments thereunder and cease making further loans;

- the acceleration under such indebtedness may trigger cross-acceleration provisions under other financing arrangements entered into by us; and

- we could be forced into bankruptcy or liquidation.

In addition, certain of our contractual arrangements, including debt obligations, contain change of control provisions that provide our counterparties with a termination right or the ability to accelerate the maturity of our indebtedness with them in the event of a change of our control without their consent. These provisions would be triggered in the event Odebrecht ceases to own, directly or indirectly, capital stock representing more than 50% of the voting power of our capital stock outstanding. As a result, if Odebrecht ceases to control, or in some cases, own a certain percentage of our common shares, whether as a result of the Odebrecht Judicial Restructuring Proceedings, an alternative sale, foreclosure by creditors, reorganization, restructuring or other similar circumstance in connection with the Odebrecht Judicial Restructuring Proceedings or otherwise, if appropriate consents or waivers are not obtained, such counterparties could terminate such contracts or accelerate the maturity of such financing arrangements. The termination of any of our contractual arrangements or the acceleration of the maturity of any of our financing arrangements could have a material adverse effect on our business, financial condition, results of operations and cash flows, and ultimately result in the cross-accelation of all of our indebtedness.

Furthermore, pursuant to the indentures governing our 5.375% Notes due 2022, 3.50% Notes due 2023, 6.45% Notes due 2024, 4.50% Notes due 2028, 4.500% Notes due 2030, 7.125% Notes due 2041, 5.875% Notes due 2050 and 7.375% Perpetual Bonds, a change of control with a ratings decline would require a repurchase of any such outstanding notes, plus accrued and unpaid interest, if any, to the repurchase date. See "Item 5. Operating and Financial Review and Prospects-Recent Developments-Odebrecht Judicial Restructuring Proceedings" and other disclosures in this Annual Report on Form 20-F for additional information relating to the Odebrecht Judicial Restructuring Proceedings.

26

We may in the future need to obtain waivers under our other indebtedness to avoid being in default. If we breach any covenants under any of our debt instruments and seek a waiver, we may not be able to obtain a waiver from the required lenders. If this occurs, we would be in default under such agreements, the lenders could exercise their rights or remedies, as described above, and we could be forced into bankruptcy or liquidation.

***Unauthorized disclosure, or loss of intellectual property, trade secrets, other sensitive business or personal information, or disruption in information technology by cyber-attacks, as well as our failure to comply with existing and future laws and regulations relating to data privacy and data security can subject us to significant penalties or liability and can adversely impact our operations, reputation and financial results.***

We collect, store, process, and use certain confidential information and other user data in connection with our business operations. We must ensure that any processing, collection, use, storage, dissemination, transfer and disposal of data for which we are responsible complies with relevant data protection and privacy laws. The protection of our customer, employee and company data is critical to us. We rely on commercially available systems, software, tools and monitoring to provide secure processing, transmission and storage of confidential information, such as customer, employee, company and other personal information.

Data protection and privacy laws are developing to take into account the changes in cultural and consumer attitudes towards the protection of personal data. For example, on August 14, 2018, Brazil enacted Law No. 13,709/2018 (Lei Geral de Proteção de Dados, or the LGPD), a comprehensive data protection law establishing general principles and obligations that apply across multiple economic sectors and contractual relationships. The LGPD establishes detailed rules for the collection, use, processing and storage of personal data and will affect all economic sectors, including the relationship between customers and suppliers of goods and services, employers and employees, and other relationships in which personal data is collected, whether in a digital or physical manner. The LGPD was initially expected to come into effect in August 2020, but its effective date has been postponed to at least 2021. By then, all entities subject to it, including us, will be required to adapt their data processing activities to the new rules. Any additional privacy laws or regulations enacted or approved in Brazil or in other jurisdictions in which we operate could seriously harm our business, financial condition or results of operations. On May 25, 2018, the Regulation No. 2016/279 of the European Parliament and of the Council of April 27, 2016 on the protection of personal data (the General Data Protection Regulation, or the GDPR) became directly applicable in all member states of the European Union. The GDPR has introduced new obligations relating to data privacy, control and retention, including, among others: (i) accountability and transparency requirements; (ii) enhanced data consent requirements; (iii) obligations to consider data privacy as any new products or services are developed and limit the amount of information collected, processed, stored and its accessibility; (iv) constraints on using data to profile data subjects; (v) providing data subjects with personal data in a useable format upon request and erasing personal data in certain circumstances; and (vi) reporting breaches without undue delay.

As we seek to expand our business and operations, we expect that we will be increasingly subject to laws and regulations relating to the collection, use, retention, security, and transfer of information, including the personally identifiable information of our employees and customers. These laws and regulations may be interpreted and applied differently over time and from jurisdiction to jurisdiction, and it is possible that they will be interpreted and applied in ways that will materially and adversely affect our business. Any failure, real or perceived, by us to comply with any regulatory requirements or orders or other local, state, federal, or international privacy or consumer protection-related laws and regulations could cause our customers to reduce their use of our products and services and could materially and adversely affect our business. The implementation of the GDPR and the LGPD, and of any other existing or future laws and regulations relating to data privacy is expected to require revisions of our procedures and policies and significant implementation resources. There can be no guarantee that we will have sufficient financial resources to comply with any new regulations or successfully compete in the context of a shifting regulatory environment. Further, there is a risk that the measures may not be implemented correctly or that there may be non-compliance with the new procedures. If there are breaches of the GDPR or the LGPD obligations, or of other data privacy laws and regulations, as the case may be, we could face significant administrative and monetary sanctions as well as reputational damage, which could have a material adverse effect on our operations, financial condition and prospects.

In addition, despite the security measures that we have in place, our facilities and systems, and those of our third-party service providers, may be vulnerable to security breaches, cyber-attacks, acts of vandalism, computer viruses, misplaced or lost data, programming or human errors, or other similar events. Any security incident, or any perceived failure involving the misappropriation, loss or other unauthorized disclosure of confidential information, as well as any failure or perceived failure to comply with laws, policies, legal obligations or industry standards regarding data privacy and protection, whether by us or our vendors, could damage our reputation, expose us to litigation risk and liability, subject us to negative publicity, disrupt our operations and harm our business.

27

For instance, in the second half of 2018, one of our information technology service providers experienced a cybersecurity incident Brazil, in which specified credentials for access to certain cloud storage accounts maintained by such service provider were disclosed to unauthorized third parties online. We were not affected by this security incident because we were not among the customers of such service provider whose credentials were disclosed. However, we cannot assure you that our security measures, or those put in place by our service providers, will be sufficient to prevent future security breaches, which may directly or indirectly affect us, or that our failure to prevent them will not have a material adverse effect on our business, results of operations or financial condition.

Cyber-attacks or security breaches could compromise confidential, business and other critical information, cause a disruption in our operations or harm our reputation, as our operations are heavily dependent on information technology and telecommunication systems and services. Information assets, including intellectual property, trade secrets, personal data and other business-sensitive critical information are an attractive asset to cyber criminals, cyberterrorism or other external agents. While we have a comprehensive cyber security program in place, which is continuously reviewed, maintained and upgraded, a significant cyber-attack, a human error, including from our employees and partners, or obsolescence of technology could result in the loss of critical business information and/or negatively impact our operations, which could have a negative impact on our financial results.

### Risks Relating to Brazil

***Brazilian political, economic and business conditions, and the Brazilian government's economic and other policies, may negatively affect demand for our products as well as our net revenue and overall financial performance.***

The Brazilian economy has been characterized by frequent and occasionally extensive intervention by the Brazilian government and unstable economic cycles. The Brazilian government has often changed monetary, taxation, credit, tariff and other policies to influence the course of Brazil's economy. The Brazilian government's actions to control inflation and implement other policies have at times involved wage and price controls, blocking access to bank accounts, imposing capital controls and limiting imports into Brazil.

Our results of operations and financial condition may be adversely affected by factors such as:

- expansion or contraction of the Brazilian economy, as measured by rates of growth in GDP, which is expected to significantly contract in 2020;

- fluctuations in exchange rates;

- exchange control policies;

- interest rates;

- inflation;

- tax policies;

- liquidity of domestic capital and lending markets; and

- other political, diplomatic, social, economic and business developments in or affecting Brazil.

Brazilian markets have been experiencing heightened volatility due to the uncertainties derived from the ongoing corruption investigations by the Federal Prosecutor's Office under Operations Car Wash, Zelotes, Greenfield, Efficiency and others, and their impact on the Brazilian economy and political environment. Certain current and former members of the Brazilian government and of the legislative branch, as well as former senior officers of the state-owned oil company and our shareholder Petrobras are being prosecuted for political corruption. These government officials and former senior officers allegedly accepted bribes by means of kickbacks on contracts granted by Petrobras to several infrastructure, oil and gas and construction companies, including Odebrecht, our controlling shareholder. We cannot currently predict how the Operation Car Wash investigation, related investigations and any future decisions and actions by authorities or developments in relation to our shareholders, may impact us. The profits of these kickbacks allegedly financed the political campaigns of political parties of federal, state and city governments that were unaccounted for or not publicly disclosed, as well as served to personally enrich the recipients of the bribery scheme. As a result of the ongoing Operation Car Wash investigation, a number of current and former senior politicians, including congressman and officers of the major state-owned companies in Brazil resigned or have been arrested. Senior elected officials and other public officials in Brazil are being investigated for allegations of unethical and illegal conduct identified during the Operation Car Wash investigation.

28

The potential outcome of these investigations is uncertain, but they have adversely affected and we expect that they will continue to adversely affect the Brazilian markets and trading prices of securities issued by Brazilian issuers. We cannot predict whether the allegations will lead to further political and economic instability or whether new allegations against government officials or other companies in Brazil will arise in the future. In addition, we can neither predict the outcome of any such allegations nor their effect on the Brazilian economy. The development of those unethical conduct cases could have a material adverse effect.

In addition, Brazilian politics have been characterized by considerable instability in recent years. The conviction of Former President Luiz Inácio Lula da Silva and potential ongoing judicial appeals may further increase political and economic instability. In addition, following a divisive presidential race, former Congressman Jair Bolsonaro became Brazil's president on January 1, 2019. It is unclear if and for how long the political divisions in Brazil that arose prior to the elections will continue under Mr. Bolsonaro's presidency and the effects that any such divisions will have on Mr. Bolsonaro's ability to govern Brazil and implement reforms. Any continuation of such divisions could result in congressional deadlock, political unrest and massive demonstrations and/or strikes that could materially adversely affect our operations. Uncertainties in relation to the implementation by the new government of changes relating to monetary, tax and pension funds policies as well as to the relevant legislation may contribute to economic instability. These uncertainties and measures adopted by the new administration may increase market volatility of Brazilian securities issued abroad.

Also, imports of suspension PVC from the United States and Mexico have been subject to anti-dumping duties of 16.0% and 18.0%, respectively, that were imposed by the Brazilian Foreign Trade Chamber (*Câmara de Comércio Exterior*), or CAMEX. Since 2008, imports of suspension PVC from China have also been subject to a duty of 21.6%, and imports of suspension PVC from South Korea have been subject to duties ranging between 0% and 18.9%, depending on the producer, as a result of the imposition of anti-dumping duties by CAMEX. The duties imposed on imports from the United States and Mexico are scheduled to expire in 2021, and, although the duties imposed on imports from China and South Korea expired in 2019, they are currently under review and therefore will remain in effect until the end of the review process, which is expected to occur in August 2020.

Additionally, in December 2010, CAMEX imposed an anti-dumping duty of 10.6% on polypropylene imports from the United States, which was extended in November 2016. In August 2014, the Brazilian government imposed anti-dumping duties on polypropylene imports from South Africa, India and South Korea of 16.0%, 6.4% to 9.9%, and 2.4% to 6.3%, respectively. The duties imposed on imports of polypropylene from the United States are scheduled to expire in 2021, and although the duties imposed on imports from South Africa, India and South Korea expired in 2019, they are currently under review and therefore will remain in effect until the end of the review process, which is expected to occur in August 2020.

In 2019, 31% of Brazilian polyethylene, polypropylene and PVC resins were imported products, which reflected an 8.5% annual increase in the volume of resins imported.

In 2018, 25% of Brazilian polyethylene, polypropylene and PVC resins were imported products, which reflected a 12.3% annual increase in the volume of resins imported, due to higher availability of products from plants that recently started to operate.

***Changes in industrial policy and related actions undertaken by the Brazilian government may negatively affect demand for our products as well as our net revenue and overall financial performance.***

We currently benefit from certain industrial policies and related actions undertaken by the Brazilian government intended to strengthen the domestic economy and certain local industries. Some of these policies and actions have recently included reductions in payroll taxes for plastic manufacturers, a program to improve the competitiveness of Brazilian producers in the export markets by refunding the federal taxes levied on their export sale, intervention of the federal government to reduce incentives to imports at local ports, increases in import duties on certain products, including polyethylene, and the reduction in the rates of the Social Integration Program (*Programa de Integração Social*), or PIS, a federal value-added tax, and Contribution for Social Security Financing (*Contribuição para Financiamento da Seguridade Social*), or COFINS, taxes on feedstock purchases by first- and second-generation petrochemical producers.

29

These taxes on feedstock purchases were set at a rate of 5.6% for naphtha and 9.25% for other feedstocks prior to June 2013. After September 2013, naphtha and also other feedstocks tax rates were lowered to 1% in 2015, increased to 3% in 2016, 5% in 2017 and further increased to 5.6% in 2018. On May 30, 2018, the Brazilian government issued Provisional Measure No. 836/18, which revoked the tax rebates for social contribution taxes, PIS and COFINS, beginning on September 1, 2018. Further, in early October 2018, the petrochemical industry special regime (REIQ) was not passed into law, which kept the PIS/COFINS taxes levied on the acquisition of domestic and imported feedstocks unchanged at 5.6%.

We cannot predict or control which policies will be renewed or discontinued and whether future changes to Brazilian industrial policy will be proposed and enacted in the future. If industrial policies that benefit us expire, or policies detrimental to us are implemented, our business, results of operations and financial condition may be adversely affected.

***Fluctuations in the real/U.S. dollar exchange rate could increase inflation in Brazil, raise the cost of servicing our foreign currency-denominated debt and negatively affect our overall financial performance.***

The exchange rate between the *real* and the U.S. dollar and the relative rates of depreciation and appreciation of the *real* have affected our results of operations and may continue to do so.

The Brazilian *real* has been devalued on several occasions. Throughout the last several decades, the Brazilian government has implemented various economic plans and various exchange rate policies, including sudden devaluations, periodic mini-devaluations (during which the frequency of adjustments has ranged from daily to monthly), exchange controls, dual exchange rate markets and a floating exchange rate system. From time to time, there have been significant fluctuations in the exchange rate between the Brazilian currency and the U.S. dollar and other currencies. On average, the *real* depreciated by 47.0% against the U.S. dollar during 2015, appreciated by 16.5% during 2016 and appreciated by 8.5% during 2017, depreciated by 14.5% during 2018 and depreciated by 7.9% during 2019.

Depreciation of the *real* relative to the U.S. dollar also could result in inflationary pressures in Brazil by generally increasing the price of imported products and services. On the other hand, the appreciation of the *real* against the U.S. dollar may lead to a deterioration of the country's current account and the balance of payments and may dampen export-driven growth.

We had total foreign currency-denominated debt obligations, all of which were denominated in U.S. dollars, in an aggregate amount of R$37,633.2 million (US$9,336.6 million) as of December 31, 2019 (inclusive of an aggregate amount of R$9,981.7 million (US$2,476.4 million) outstanding as of December 31, 2019 in connection with our secured debt related to our Mexico Complex), representing 96.0% of our consolidated indebtedness, net of transaction costs. As of December 31, 2019, we had R$6,803.9 million (US$1,688.0 million) in foreign currency-denominated cash and cash equivalents, including the aggregate amount of R$1,017.2 million (US$252.4 million) of Braskem Idesa's cash and cash equivalents.

A significant depreciation of the *real* in relation to the U.S. dollar or other currencies could increase our financial expenses as a result of foreign exchange losses that we must record and could reduce our ability to meet debt service requirements of our foreign currency-denominated obligations. To enable us to more efficiently manage the effects of exchange rate fluctuations on our results, in 2013 we decided to designate part of our U.S. dollar-denominated liabilities as a hedge for our future exports.

The prices of naphtha, our most important raw material, and of some of our other raw materials, are denominated in or linked to the U.S. dollar. Naphtha accounted, directly and indirectly, for 40.7% of our consolidated cost of products sold in 2019. When the *real* depreciates against the U.S. dollar, the cost in *reais* of our U.S. dollar-denominated and U.S. dollar-linked raw materials increases, and our operating income in *reais* may decrease to the extent that we are unable to pass on these cost increases to our customers.

30

Therefore, with the goal of partially mitigating the long-term exchange risk, in September 2016, the Company started to contract financial derivatives to establish a long-term foreign exchange hedge program. The program aims to mitigate dollar call and put option contracts by hedging expected cash flows over a 24-month period.

***The Brazilian government's actions to combat inflation may contribute significantly to economic uncertainty in Brazil and reduce demand for our products.***

Historically, Brazil has experienced high rates of inflation. Inflation, as well as government efforts to combat inflation, had significant negative effects on the Brazilian economy, particularly prior to 1995. The inflation rate, as measured by the General Price Index-Internal Availability (*Índice Geral de Preços-Disponibilidade Interna*), or the IGP-DI, reached 2,708% in 1993. Although inflation rates have been substantially lower since 1995 than in previous years, inflationary pressures persist. Inflation rates, as measured by the IGP-DI, were 10.7% in 2015, 7.2% in 2016, negative 0.4% in 2017, 7.1% in 2018 and 7.3% in 2019. The Brazilian government's measures to control inflation have often included maintaining a tight monetary policy with high interest rates, thereby restricting availability of credit and reducing economic growth. Inflation, actions to combat inflation and public speculation about possible additional actions also may contribute to economic uncertainty in Brazil and to heightened volatility in the Brazilian securities markets.

Brazil may experience high levels of inflation. Increasing prices for petroleum, the depreciation of the *real* and future governmental measures seeking to maintain the value of the *real* in relation to the U.S. dollar may trigger increases in inflation in Brazil. Periods of higher inflation may slow the rate of growth of the Brazilian economy, which would lead to reduced demand for our products in Brazil and decreased net revenue. Inflation is also likely to increase some of our costs and expenses, which we may not be able to pass on to our customers and, as a result, may reduce our profit margins and net income. In addition, high inflation generally leads to higher domestic interest rates, and, as a result, the costs of servicing our *real*-denominated debt may increase, causing our net income to be reduced. Inflation and its effect on domestic interest rates can in addition, lead to reduced liquidity in the domestic capital and lending markets, which could adversely affect our ability to refinance our indebtedness in those markets. Any decline in our net revenue or net income and any deterioration in our financial condition would also likely lead to a decline in the market price of our securities, including class A preferred shares and the ADSs.

***Fluctuations or changes in, or the replacement of, interest rates could raise the cost of servicing our debt or reduce our financial revenue, negatively affecting our overall financial performance.***

Our financial expenses are affected by changes in the interest rates that apply to our floating rate debt. As of December 31, 2019, we had, among other debt obligations:

- R$0.3 million of loans and financing that were subject to the Long-Term Interest Rate (*Taxa de Juros de Longo Prazo*), or TLP (which was formerly referred to as TJLP in connection with agreements entered into prior to January 1, 2019);

- R$1,031.5 million of loans and financing that were subject to the Interbank Deposit Certificate (*Certificado de Depósito Interbancário*), or CDI, rate;

- R$479.1 million of loans and financing that were subject to the Extended National Consumer Price Index (*Índice de Preços ao Consumidor Amplo*), or IPCA; and

- R$7,794.9 million of loans and financing that were subject to the London Interbank Offered Rate, or LIBOR.

The TLP includes an inflation factor and is determined quarterly by the Central Bank. In particular, the TLP, the CDI and the SELIC rates have fluctuated significantly in the past in response to the expansion or contraction of the Brazilian economy, inflation, Brazilian government policies and other factors. See "Item 11. Quantitative and Qualitative Disclosures about Market Risk." A significant increase in any of these interest rates could adversely affect our financial expenses and negatively affect our overall financial performance.

In addition, as a result of concerns about the accuracy of the calculation of LIBOR, a number of British Bankers' Association, or BBA, member banks entered into settlements with certain regulators and law enforcement agencies with respect to the alleged manipulation or under-reporting of LIBOR. Actions by the BBA, regulators or law enforcement agencies, as a result of these or future events, may result in changes to the manner in which LIBOR is determined. Potential changes, or uncertainty related to such potential changes, may adversely affect the market for LIBOR-based indebtedness and/or investments. In addition, changes or reforms to the determination or supervision of LIBOR may result in a sudden or prolonged increase or decrease in reported LIBOR, which could have an adverse impact on the market for LIBOR-based indebtedness and/or investments.

In July 2017, the head of the United Kingdom Financial Conduct Authority announced the desire to phase out the use of LIBOR by the end of 2021, and it is unclear if LIBOR will cease to exist or if new methods of calculating LIBOR will evolve. If LIBOR ceases to exist or if the methods of calculating LIBOR change from their current form, interest rates on future indebtedness may be adversely affected or we may need to renegotiate the terms of our existing facilities to replace LIBOR with the new standard that is established, if any, or to otherwise agree with lenders, trustees or agents, as applicable, on a new means of calculating interest. At this time, it is not possible to predict the effect of any such changes, any establishment of alternative reference rates or any other reforms to LIBOR that may be enacted in the United Kingdom or elsewhere. The elimination of LIBOR or any other changes or reforms to the determination or supervision of LIBOR could have a material adverse effect on our financial expenses and/or financial revenue and materially adversely affect our overall financial performance.

***Brazilian government exchange control policies could increase the cost of servicing our foreign currency-denominated debt, adversely affect our ability to make payments under our foreign currency-denominated debt obligations and impair our liquidity.***

The purchase and sale of foreign currency in Brazil is subject to governmental control. The current laws and regulations governing the Brazilian foreign exchange system allow the purchase and sale of foreign currency and the international transfer of *reais* by any person or legal entity, regardless of the amount, subject to certain regulatory procedures. Many factors could cause the Brazilian government to institute more restrictive exchange control policies, including the extent of Brazil's foreign currency reserves, the availability of sufficient foreign exchange on the date a payment is due, the size of Brazil's debt service burden relative to the economy as a whole, Brazil's policy towards the IMF and political constraints to which Brazil may be subject. A more restrictive policy could increase the cost of servicing, and thereby reduce our ability to pay, our foreign currency-denominated debt obligations and other liabilities.

Our foreign-currency debt denominated in U.S. dollars represented an aggregate of 96.0% of our indebtedness on a consolidated basis as of December 31, 2019, including transaction costs and Braskem Idesa Financing. If we fail to make payments under any of these obligations, we will be in default under those obligations, which could reduce our liquidity as well as the market price of our securities, including our class A preferred shares and ADSs.

***Changes in tax laws may result in increases in certain direct and indirect taxes, which could reduce our gross margin and negatively affect our overall financial performance.***

The Brazilian government implements from time to time changes to tax regimes that may increase our and our customers' tax burdens. These changes include modifications in the rate of assessments and, on occasion, enactment of temporary taxes, the proceeds of which are earmarked for designated governmental purposes. We cannot predict the changes to Brazilian tax law that may be proposed and enacted in the future, in particular in view of the novel coronavirus (COVID-19) pandemic. However, future changes in Brazilian tax law may result in increases in our overall tax burden, which could reduce our gross margin and negatively affect our overall financial performance.

*Risks Relating to Mexico*

*Mexico has experienced adverse economic conditions, which may adversely affect our business.*

Mexico has historically experienced uneven periods of economic growth. In 2017, Mexico's GDP only increased by 2.1%, while inflation increased to 6.8%. At the end of 2017, Mexico's inflation rate reached a 17-year high, primarily due to a weaker *Peso* compared to the U.S. dollar and the termination of government controls on gasoline and other fuels.In 2018, Mexico's economy rebounded slightly from the prior high inflation rate, decreasing to 4.8%. Inflation remained above the consumer price index target of 3%, and Mexico's GDP growth for 2018 decreased slightly to 2.0%, from 2.1% in 2017. In 2019, Mexico's GDP stagnated in relation to 2018. According to the IMF, because of the adverse effects of the novel coronavirus (COVID-19) pandemic, the GDP of Mexico is expected to shrink significantly in 2020, leading to an economic contraction and a recession in the country.

Decreases in the growth rate of the Mexican economy, periods of negative growth or reductions in disposable income may result in lower demand for our products. The Mexican government recently cut spending in response to an austerity policy and a downward trend in international crude oil prices, and it may further cut spending in the future. These cuts could adversely affect the Mexican economy and, consequently, our business, financial condition, operating results and prospects. In addition, there can be no assurance that the recent Mexican sovereign debt rating downgrades will not adversely affect our business, financial condition or results of operations.

Our revenues are subject to the risk of loss from unfavorable political and diplomatic developments, social instability, and changes in governmental policies, including expropriation, nationalization, international ownership legislation, interest-rate caps and tax policies. As a result, the actions of the Mexican government concerning the economy and regulating certain industries could have a significant effect on Mexican private sector entities, including us, and on market conditions, prices and returns on Mexican securities, including our securities.

*A renegotiation of commercial treaties or changes in foreign policy among Mexico, Canada and the United States may negatively affect our business, financial condition, results of operations and prospects.*

In recent years, economic conditions in Mexico have become increasingly correlated with economic conditions in the United States as a result of the North American Free Trade Agreement, or NAFTA, and increased economic activity between the two countries. Adverse economic conditions in the United States or other related events could have a significant adverse effect on the Mexican economy, which could adversely affect our business. As a result of talks to renegotiate NAFTA, on November 30, 2018, the United States, Canada, and Mexico signed the United States-Mexico-Canada Agreement, or USMCA. Although the USMCA is intended to replace NAFTA, the USMCA is not yet in effect and may fail to be approved and implemented. If such events occurred, they could adversely impact our business and operations. Since 2003, exports of petrochemical products from Mexico to the United States have enjoyed a zero-tariff rate under NAFTA. Any action taken by the current U.S. or Mexico administrations, including changes to NAFTA or the USMCA that would increase the tariff rate between the countries, could have a negative impact on the Mexican economy, such as reductions in the levels of remittances, reduced commercial activity or bilateral trade, or declining foreign direct investment in Mexico. In addition, increased or perceptions of increased economic protectionism in the United States and other countries could potentially lead to lower levels of trade and investment and economic growth, which could have a similarly negative impact on the Mexican economy. These economic and political consequences could adversely affect our business, results of operations and financial condition.

The 2016 U.S. presidential election and the change in the U.S. administration have had an impact on the worldwide economy and in Mexico. The current U.S. governmental policies towards Mexico have created instability, uncertainty and may adversely affect the Mexican economy. For example, President Donald Trump has instituted import tariffs on a limited amount of products imported from Mexico and enforced measures intended to control illegal immigration from Mexico, which have created friction between the U.S. and Mexican governments and may reduce economic activity between these countries. In addition, in June 2019, the Trump administration announced plans to impose an escalating series of tariffs on Mexico unless the Mexican government enacted certain policy changes. While the Mexican and U.S. governments were able to reach an understanding, we cannot assure you that the U.S. government will not impose escalating or other tariffs on Mexico and that we will not be materially adversely affected by tariffs in the future.

33

Our profitability is affected by numerous factors including demand for the products we provide. The demand for our products in Mexico, Central and South America, the Caribbean, Europe the U.S. and in the other countries in which we operate may be adversely affected by the tightening of credit markets and economic downturns. As a global company, we depend on the demand from customers in Mexico, the U.S. and the other countries in which we operate, and reduced consumer spending that falls short of our projections could adversely affect our business, results of operations and financial condition.

***Political events in Mexico could affect Mexican economic policy and our business, financial condition and results of operations.***

The last Mexican presidential and congressional elections took place in July 2018. Andrés Manuel López Obrador, presidential candidate for the National Regeneration Movement Party (*Movimiento de Regeneración Nacional*), or Morena, was elected President of Mexico and took office on December 1, 2018. Additionally, Mexican congressional elections took place in July 2018, resulting in Morena effectively controlling the Mexican House of Representatives (*Cámara de Diputados*) and having a significant influence in the Mexican Senate (*Senado de la República*), obtaining a historical absolute majority and reducing the rest of the political forces to a level of marginal influence. Mexico's next federal legislative election will be in July 2021.

During the presidential campaign, the candidates for the presidency and the federal legislatures presented diverse proposals to, among other things, modify or terminate certain structural reforms introduced in the previous administration, with the purpose of reducing the participation of private investment in sectors such as energy. Accordingly, as has happened historically in any change of administration or congress, the Mexican government could implement significant changes in laws, policies and regulations, and could reduce or eliminate the independence of organizations or of semi-autonomous or decentralized dependencies, which could affect the economic and political situation in Mexico. We cannot predict if the current administration will implement substantial changes in law, policy and regulations in Mexico, which could affect our business, results of operations or financial condition.

Morena's control over the Mexican Congress, as described above, could result in further reforms and secondary legislation of key sectors of the Mexican economy. The ruling political coalition led by Morena has been strengthened by fragmented support from the Green Ecologist Party of Mexico (*Partido Verde Ecologísta*), the Institutional Revolutionary Party (PRI) and a deficient organization of dissident political groups. As a result, in the state elections of 2019, Morena expanded its influence in the entities acquiring control of 21 of 32 local congresses. We cannot ascertain whether, and to what extent, such policies may affect our business, results of operations and financial condition or the legal framework in which we operate.

In addition, the new administration canceled the New Mexico City Airport (*Nuevo Aeropuerto Internacional de la Ciudad de México*) project, and has announced the kickoff of the main infrastructure projects that were promised during campaign (including a new refinery at Dos Bocas, the "Mayan train," and the construction of a new airport in Santa Lucía). Several investors and credit rating agencies are still cautious about the new administration's policies, which could contribute to a decrease in the Mexican economy's resilience in the event of a global economic downturn. Morena's led coalition control in the Congress and in various local Congresses are enough to implement significant reforms without the approval of the rest of the other Mexican political parties, including amendments to the Mexican Constitution. Such concentration of power and any instability in Mexican politics or the Mexican economy as a result of the above can have a negative impact on our business, financial position or operating results. The extent of such impact cannot be accurately predicted.

***Political and economic conditions and government policies in Mexico and elsewhere may have a material impact on our operations.***

Deterioration in Mexico's economic condition, social instability, political unrest or other adverse social developments in Mexico could adversely affect our business and financial condition. These events could also lead to increased volatility in the financial markets, thereby affecting our ability to maintain financial liquidity and service our debt. Additionally, spending cuts related to Pemex or other government expenditures, or lack of investments in natural gas and ethane recovery, could adversely affect Pemex, Pemex's ability to produce and recover ethane, the Mexican economy and, consequently, our business, financial condition, operating results and prospects.

34

In the past, Mexico has experienced several periods of slow or negative economic growth, high inflation, high interest rates, currency devaluation and other economic problems. These problems may worsen or reemerge, as applicable, in the future and could adversely affect our business and ability to service our debt. A worsening of international financial or economic conditions, such as a slowdown in growth or recessionary conditions in Mexico's trading partners, including the United States, or the emergence of a new financial crisis, could have adverse effects on the Mexican economy, our financial condition and our ability to service our debt.

Furthermore, our long-term supply agreement to purchase ethane from Pemex TRI, a state-owned Mexican entity, could be modified through regulatory means, terminated or jeopardized by them as a result of political pressure to not comply with the agreement, to change the terms of the agreement, expropriation measures, or change in laws regulations by the Mexican government. Any non-compliance, modification, termination or interruption of this supply agreement could have a material adverse effect on the results of our operations or our financial condition.

***Developments in other countries could adversely affect the Mexican economy, our financial performance and the price of our shares.***

The Mexican economy and the market value of Mexican companies may be affected to varying degrees by global economic and market conditions, and the economic and market conditions in other emerging market countries and major trading partners, in particular the United States. In recent years, economic conditions in Mexico have become increasingly correlated with economic conditions in the United States as a result of the North American Free Trade Agreement, or NAFTA, increased economic activity between the two countries, and the remittance of funds from Mexican immigrants working in the United States to Mexican residents. Therefore, adverse economic conditions in the United States, the termination of, or modifications to, NAFTA or its successor agreement, USMCA, or other related events, including global trade disputes and instability, could have a significant adverse effect on the Mexican economy. We cannot assure you that events in other emerging market countries, in the United States or elsewhere will not adversely affect our financial performance.

***Mexico has experienced a period of increased criminal activity, including violence associated with drug trafficking and organized crime, and such activities could adversely affect our financing costs and exposure to our customers and counterparties.***

During recent years, Mexico has experienced a period of increased criminal activity and violence, primarily due to organized crime. This violence has taken place throughout Mexico, including the State of Veracruz, where our Mexico Complex is located. Despite the efforts of the Mexican government to increase security measures by strengthening its military and police forces, drug-related violence and crime continues to threaten the Mexican economy and the peace and security of certain regions, resulting in economic and political instability and uncertainty in Mexico. Systematic criminal activity and isolated criminal events could interrupt our operations, affect our ability to generate revenue and increase the cost of our operations. Continued violence could result in the Mexican government adopting additional security measures, such as transport restrictions, prohibiting the transit of goods and people at certain times, and cross-border trade. We cannot assure you that these activities, their escalation and the violence associated with them, over which we have no control, could have a negative impact on the business environment in which we operate, and therefore on our results of operations and financial condition.

***We may interpret certain provisions of our ethane supply agreement differently than our counterparty Pemex TRI.***

As of the date of this annual report, we source substantially all of the ethane for the production of polyethylene at our Mexico Complex from Pemex TRI pursuant to the take-or-pay long-term ethane supply agreement with Pemex TRI. The ethane supply agreement is a complex agreement, and we may interpret certain of its provisions differently than Pemex TRI does. For instance, if Pemex TRI fails to supply a determined percentage of the ethane contractually specified under the ethane supply agreement for six consecutive months, we will have the right to terminate the ethane supply agreement and require Pemex TRI to pay to the other parties involved in the project an amount equal to the termination value of this project (the value of which is determined pursuant to the contract and takes into consideration, among other factors, the outstanding debt of the project and the amount invested in the project at such time). A difference of interpretation between us and Pemex TRI of certain provisions of the ethane supply agreement, including the provisions relating to calculation of the termination value, could have an adverse effect on our results of operations and financial position. See "-We have no control over the corporate actions or decisions of Pemex TRI, which is our main supplier of ethane and a Mexican state-owned enterprise."

***If we fail to develop an alternative source of ethane, it may have a negative impact on our business because we cannot operate our Mexico Complex at full capacity.***

In order to increase the operating rate of our Mexico Complex, we need to obtain additional quantities of ethane to offset the shortfall in the amount of ethane supplied by Pemex TRI under the ethane supply agreement. As of the date of this annual report, our Mexico Complex is importing additional supplies of ethane through a private terminal in Coatzacoalcos and transporting it to our complex via a logistical solution, or the Fast-Track Solution. In the future, we may consider the development and construction of a new terminal, or the Ethane Import Terminal. However, we cannot guarantee that the potential construction of the Ethane Import Terminal will be completed or that the Fast-Track Solution will be able to increase our production to our expected level of output. In addition, we cannot guarantee that we will be able to import ethane at current market prices, which could also adversely affect our business, results of operations and financial condition.

The development and construction of the Ethane Import Terminal and the establishment of the Fast-Track Solution for the importation of ethane may involve significant risks and uncertainties, such as:

- failure to obtain or maintain requisite approvals from the applicable regulators and governmental entities;

- negotiation of satisfactory engineering, procurement and construction agreements;

- negotiation of satisfactory operations and maintenance agreements;

- failure to achieve expected results;

- failure to obtain rights of way required for the construction of the Ethane Import Terminal;

- negotiation with local communities and minority groups;

- delays in the construction and start of operations of the Ethane Import Terminal;

- unanticipated liabilities;

- obtaining the required financing for the construction of the Ethane Import Terminal; or

- contractor's or subcontractor's failure to comply with construction contracts.

The spread of the novel coronavirus (COVID-19) has caused us to modify certain of our business practices, and we may take further actions as required by government authorities, including closure of ports, or that we determine are in the best interests of our employees, customers, partners and suppliers. These actions could impact the development and construction of the Ethane Import Terminal and the establishment of the Fast-Track Solution for the importation of ethane. We currently expect Pemex TRI's undersupply of ethane to continue.

***Risks Relating to Our Equity and Debt Securities***

***The totality of the shares issued by Braskem and owned by OSP Investimentos S.A. were given as collateral in financing agreements entered into by the Odebrecht Group.***

Pursuant to a shares fiduciary assignment agreement (*alienação fiduciária em garantia*) entered into by the Odebrecht Group on November 27, 2013, as amended on May 13, 2016, July 19, 2016, April 24, 2017 and May 23, 2018, all shares issued by Braskem and held by OSP Investimentos S.A. have been given as collateral in connection with certain financing agreements entered into by Odebrecht S.A. and certain of its subsidiaries. In the event that Odebrecht Group defaults on such financing agreements, or if such financing agreements are accelerated and, as a result, such collateral is seized by a creditor (assuming that Petróleo Brasileiro S.A. - Petrobras does not exercise its preemptive rights to acquire such shares) we may be subject to a change of control following statutory and procedural formalities required pursuant to our shareholders's agreement. A change of control under these circumstances may adversely affect us.

A foreclosure on or sale of our shares held by OSP Investimentos S.A. - whether within or outside the Odebrecht Judicial Restructuring Proceedings - may result in a change of control. As we do not have the ability to consent to or otherwise influence or control the Odebrecht Judicial Restructuring Proceedings or otherwise the acquirer of the shares from any such foreclosure, we may have a change in our corporate control in the foreseeable future.

***Shareholders of our class A preferred shares or the ADSs may not receive any dividends or interest on shareholders' equity.***

As permitted by the Brazilian Corporations Law, our by-laws specify that 25% of our adjusted net profit for each fiscal year must be distributed to shareholders as mandatory dividends, or the Mandatory Distribution of Dividends. Under our by-laws, our class A and class B preferred shareholders are entitled to an annual non-cumulative preferential dividend, or the Minimum Preferred Dividend, equal to 6% of their *pro rata* share of our capital before dividends may be paid to our common shareholders. The Brazilian Corporations Law allows a publicly traded company like ours to suspend the Mandatory Distribution of Dividends in any particular year if our board of directors informs our shareholders that such distributions would be inadvisable in view of our financial condition or cash availability, provided that such suspension does not affect the Minimum Preferred Dividend, which is still payable to the holders of preferred shares. However, the shareholders, including the holders of our class A preferred shares or the ADSs, may not receive any dividends or interest on shareholders' equity in any given year if we do not record a profit.

***Our class A preferred shares and the ADSs have limited voting rights and are not entitled to vote to approve corporate transactions, including mergers or consolidations of our Company with other companies, or the declaration of dividends.***

Under the Brazilian Corporations Law and our by-laws, holders of our class A preferred shares and, consequently, the ADSs underlying these shares are not entitled to vote at meetings of our shareholders, except in very limited circumstances. These limited circumstances directly relate to key rights of the holders of class A preferred shares, such as modifying basic terms of our class A preferred shares or creating a new class of preferred shares with superior rights. Holders of preferred shares without voting rights are entitled to elect one member and his or her respective alternate to our board of directors and our fiscal council, depending on specific requirements provided in the Brazilian Corporations Law. Holders of our class A preferred shares and the ADSs are not entitled to vote to approve corporate transactions, including mergers or consolidations of our Company with other companies, or the declaration of dividends. However, if we do not pay dividends for three consecutive years, holders of our class A preferred shares and the ADSs will be granted voting rights. See "Item 10. Additional Information-Description of Our By-laws-Voting Rights."

37

***Holders of the ADSs may find it difficult to exercise even their limited voting rights at our shareholders' meetings.***

Under Brazilian law, only shareholders registered as such in our corporate books may attend our shareholders' meetings. All class A preferred shares underlying the ADSs are registered in the name of the depositary. ADS holders may exercise the limited voting rights with respect to our class A preferred shares represented by the ADSs only in accordance with the deposit agreement relating to the ADSs, which provides that voting rights are only available to ADS holders at our discretion.There are practical limitations upon the ability of ADS holders to exercise their voting rights due to the additional steps involved in communicating with ADS holders. For example, we are required to publish a notice of our shareholders' meetings in certain newspapers in Brazil. To the extent that holders of our class A preferred shares are entitled to vote at a shareholders' meeting, they will be able to exercise their voting rights by attending the meeting in person, voting by proxy or by remote voting, if applicable. By contrast, holders of the ADSs will receive notice of a shareholders' meeting by mail from the depositary following our notice to the ADS depositary requesting the ADS depository to do so. To exercise their voting rights, ADS holders must instruct the depositary on a timely basis. This noticed voting process will take longer for ADS holders than for holders of class A preferred shares. If it fails to receive timely voting instructions for all or part of the ADSs, the depositary will assume that the holders of those ADSs are instructing it to give a discretionary proxy to a person designated by us to vote their ADSs, except in limited circumstances.

In the limited circumstances in which holders of the ADSs have voting rights, they may not receive the voting materials in time to instruct the depositary to vote the class A preferred shares underlying their ADSs. In addition, the depositary and its agents are not responsible for failing to carry out the voting instructions of the holders of the ADSs or for the manner of carrying out those voting instructions. Accordingly, holders of the ADSs may not be able to exercise their voting rights, and they will have no recourse if the class A preferred shares underlying their ADSs are not voted as requested.

***If holders of the ADSs exchange them for class A preferred shares, they may risk temporarily losing, or being limited in, the ability to remit foreign currency abroad and certain Brazilian tax advantages.***

The Brazilian custodian for the preferred shares underlying the ADSs must obtain an electronic registration number with the Central Bank to allow the depositary to remit U.S. dollars abroad. ADS holders benefit from the electronic certificate of foreign capital registration from the Central Bank obtained by the custodian for the depositary, which permits it to convert dividends and other distributions with respect to the class A preferred shares into U.S. dollars and remit the proceeds of such conversion abroad. If holders of the ADSs decide to exchange them for the underlying preferred shares, they will only be entitled to rely on the custodian's certificate of registration with the Central Bank for five business days after the date of the exchange. Thereafter, they will be unable to remit U.S. dollars abroad unless they obtain a new electronic certificate of foreign capital registration in connection with the preferred shares, which may result in expenses and may cause delays in receiving distributions. See "Item 10. Additional Information-Exchange Controls."

Also, if holders of the ADSs that exchange the ADSs for our Class A preferred shares do not qualify under the foreign investment regulations, they will generally be subject to less favorable tax treatment of dividends and distribution on, and the proceeds from any sale of, our preferred shares. See "Item 10. Additional information-Exchange Controls" and "Item 10. Additional Information-Taxation-Brazilian Tax Considerations."

***Restrictions on the movement of capital out of Brazil may impair the ability of holders of our shares, ADSs and debt securities to receive payments on their respective obligations or guarantees and may restrict our ability to make payments in U.S. dollars.***

In the past, the Brazilian economy has experienced balance of payment deficits and shortages in foreign exchange reserves, and the government has responded by restricting the ability of Brazilian or foreign persons or entities to convert *reais* into foreign currencies. The government may institute a restrictive exchange control policy in the future. Any restrictive exchange control policy could prevent or restrict our access to U.S. dollars, and consequently our ability to meet our U.S. dollar obligations under our shares, ADSs and the guarantees we granted pursuant to our outstanding notes, and could also have a material adverse effect on our business, financial condition and results of operations. We cannot predict the impact of any such measures on the Brazilian economy.

38

***The foreign exchange policy of Brazil may affect the ability of Braskem to make money remittances outside Brazil in respect of our equity securities or debt securities.***

Under current Brazilian regulations, Brazilian companies are not required to obtain authorization from the Central Bank in order to make payments under guarantees in favor of foreign persons, such as the holders of our shares, ADSs or our outstanding notes. We cannot assure you that these regulations will continue to be in force in the event that Braskem is required to perform its payment obligations under its shares, ADSs or the guarantees under our outstanding notes. If these regulations or their interpretation are modified and an authorization from the Central Bank is required, Braskem would need to seek an authorization from the Central Bank to transfer the amounts under such obligations out of Brazil or, alternatively, make such payments with funds held by Braskem outside Brazil. We cannot assure you that such an authorization will be obtained or that such funds will be available. If such authorization is not obtained, we may be unable to make payments to holders of our shares, ADSs or the applicable notes in U.S. dollars. If we are unable to obtain the required approvals, if needed for the payment of amounts owed by Braskem through remittances from Brazil, we may have to seek other lawful mechanisms to effect payment of amounts due under the shares, ADSs or the notes. However, we cannot assure you that other remittance mechanisms will be available in the future, and even if they are available in the future, we cannot assure you that payment on the outstanding notes would be possible through such mechanism.

***Holders of the ADSs may face difficulties in protecting their interests because we are subject to different corporate rules and regulations as a Brazilian company and our shareholders may have fewer and less well-defined rights than under the laws of other jurisdictions, including in a jurisdiction in the Unites States.***

Holders of the ADSs are not our direct shareholders and are unable to enforce the rights of shareholders under our by-laws and the Brazilian Corporations Law.

Our corporate affairs are governed by our by-laws and the Brazilian Corporations Law, which differ from the legal principles that would apply if we were incorporated in a jurisdiction in the United States, such as the State of Delaware or New York, or elsewhere outside Brazil. Even if a holder of ADSs surrenders its ADSs and becomes a direct shareholder, its rights as a holder of the class A preferred shares underlying the ADSs under the Brazilian Corporations Law to protect its interests relative to actions by our board of directors may be fewer and less well-defined than under the laws of those other jurisdictions.

Although insider trading and price manipulation are crimes under Brazilian law and are the subject of continuously evolving regulations promulgated by the Brazilian Securities and Exchange Commission, or the CVM, the Brazilian securities markets are not as highly regulated and supervised as the U.S. securities markets or the markets in some other jurisdictions. In addition, rules and policies against self-dealing or for preserving shareholder interests may be less well-defined and enforced in Brazil than in the United States and certain other countries, which may put holders of our class A preferred shares and the ADSs at a potential disadvantage when compared to holders of shares of companies incorporated in other jurisdictions. Corporate disclosures also may be less complete or informative than for a public company in the United States or in certain other countries.

***Holders of the ADSs may face difficulties in serving process on or enforcing judgments against us and other persons.***

We are a corporation (*sociedade por ações*) organized under the laws of Brazil, and all of our directors and executive officers and our independent public accountants reside or are based in Brazil. Most of our assets and those of these other persons are located in Brazil. As a result, it may not be possible for holders of the ADSs to effect service of process upon us or these other persons within the United States or other jurisdictions outside Brazil or to enforce against us or these other persons judgments obtained in the United States or other jurisdictions outside Brazil. In addition, because a substantial portion of our assets and all of our directors and officers reside outside the United States, any judgment obtained in the United States against us or any of our directors or officers may not be collectible within the United States. Because judgments of U.S. courts for civil liabilities based upon the U.S. federal securities laws may only be enforced in Brazil if certain conditions are met, holders may face greater difficulties in protecting their interests in the case of actions by us or our directors or executive officers than would shareholders of a U.S. corporation.

***Judgments of Brazilian courts enforcing Braskem's obligations under our equity securities or the guarantees would be payable only in*** reais***.***

If proceedings are brought in the courts of Brazil seeking to enforce our obligations under our shares, ADSs, the guarantees under our outstanding notes or our other indebtedness, we would not be required to discharge our obligations in a currency other than *reais*. Any judgment obtained against us in Brazilian courts in respect of any payment obligations under such shares, ADSs, guarantees or other indebtedness would be expressed in *reais*. We cannot assure you that this amount in *reais* will afford the holders of the shares, ADSs, notes or our other indebtedness full compensation of the amount sought in any such litigation.

***Actual or anticipated sales of a substantial number of class A preferred shares could decrease the market prices of our class A preferred shares and the ADSs.***

Sales of a substantial number of our class A preferred shares could negatively affect the market prices of our class A preferred shares and the ADSs. If substantial sales of shares are made through the securities markets by our controlling shareholders or other class A preferred shares, the market price of our class A preferred shares and, by extension, the ADSs may decrease significantly. As a result, holders of the ADSs may not be able to sell the ADSs at or above the price they paid for them.

***Holders of the ADSs or class A preferred shares in the United States may not be entitled to the same preemptive rights as Brazilian shareholders have, pursuant to Brazilian legislation, in the subscription of shares resulting from capital increases made by us.***

Under Brazilian law, if we issue new shares in exchange for cash or assets as part of a capital increase, subject to certain exceptions, we must grant our shareholders preemptive rights at the time of the subscription of shares, corresponding to their respective interest in our share capital, allowing them to maintain their existing shareholding percentage. We may not legally be permitted to allow holders of ADSs or class A preferred shares in the United States to exercise any preemptive rights in any future capital increase unless (1) we file a registration statement for an offering of shares resulting from the capital increase with the U.S. Securities and Exchange Commission, or the SEC, or (2) the offering of shares resulting from the capital increase qualifies for an exemption from the registration requirements of the Securities Act. At the time of any future capital increase, we will evaluate the costs and potential liabilities associated with filing a registration statement for an offering of shares with the SEC and any other factors that we consider important in determining whether to file such a registration statement. We cannot assure the holders of the ADSs or class A preferred shares in the United States that we will file a registration statement with the SEC to allow them to participate in any of our capital increases. As a result, the equity interest of such holders into us may be diluted.

***Brazilian tax laws may have an adverse impact on the taxes applicable to the disposition of our ADSs and preferred shares.***

According to Law No. 10,833, of December 29, 2003, if a nonresident of Brazil disposes of assets located in Brazil, the transaction will be subject to taxation in Brazil, even if such disposition occurs outside Brazil or if such disposition is made to another nonresident. Dispositions of our ADSs between nonresidents, however, are currently not subject to taxation in Brazil. Nevertheless, in the event that the concept of "disposition of assets" is interpreted to include the disposition between nonresidents of assets located outside Brazil, this tax law could result in the imposition of withholding taxes in the event of a disposition of our ADSs made between nonresidents of Brazil. Due to the fact that, as of the date of this annual report, there is no judicial guidance on the application of Law No. 10,833/2003, we are unable to predict whether an interpretation applying such tax laws to dispositions of our ADSs between nonresidents could ultimately prevail in Brazilian courts. See "Item 10. Additional Information-Taxation-Brazilian Tax Considerations."

***The relative volatility and liquidity of the Brazilian securities markets may adversely affect holders of our class A preferred shares and ADSs.***

The Brazilian securities markets are substantially smaller, less liquid and more volatile than major securities markets in the United States and other jurisdictions, and may be regulated differently from the manner in which U.S. investors are accustomed. Factors that may specifically affect the Brazilian equity markets may limit the ability of holders of the ADSs to sell class A preferred shares underlying ADSs at a price and at a time when they wish to do so and, as a result, could negatively impact the market price of the ADSs themselves.

40

***Economic developments and investor perceptions of risk in other countries, including both in developed or emerging market economies, may adversely affect the trading price of Brazilian securities, including our common shares and ADSs, as well as any outstanding debt securities.***

The market value of securities of Brazilian issuers is affected in varying degrees by economic and market conditions in other countries, including in developed countries, such as the United States and certain European countries, and in emerging market countries. Although economic conditions in such countries may differ significantly from economic conditions in Brazil, the reaction of investors to developments in these other countries may have an adverse effect on the market value of securities of Brazilian issuers. The price of shares traded in the Brazilian capital markets, for instance, has been historically subject to fluctuation of interest rates in the United States and the variation in the main U.S. stock exchanges. In addition, crises in other emerging countries may diminish investor interest in securities of Brazilian issuers, including our common shares and ADSs and our debt securities. This could adversely affect the market price of our common shares, ADSs and outstanding debt securities and could also make it more difficult for us to access capital markets, affecting our ability to finance our operations on acceptable terms.

Recently, heightened volatility in the Brazilian market was due to, among other factors, uncertainties regarding adjustments to the implications of the policies of the current U.S. administration, U.S. monetary policy, the United Kingdom's vote to leave the European Union (popularly known as Brexit) and their consequences on international financial markets, increased aversion to risk in emerging countries, and uncertainties regarding macroeconomic and political conditions. We have no control over and cannot predict the effects of Donald Trump's administration, policies or actions. Furthermore, we have no control over and cannot fully predict the effects of the United Kingdom's leaving the European Union (Brexit). In addition, we are exposed to disruption and volatility of global financial markets due to their effects on the economic and financial environment, particularly in Brazil, such as economic downturn, increased unemployment rate, decreased purchasing power of consumers and unavailability of credit.

These disruptions or volatility in global financial markets may increase even further the negative effects on the Brazilian economic and financial environment, adversely affecting us.

***Because Braskem Finance Limited and Braskem Netherlands Finance B.V. have no operations of their own, holders of our outstanding notes issued by Braskem Finance Limited or Braskem Netherlands Finance B.V. depend on Braskem to provide Braskem Finance Limited or Braskem Netherlands Finance B.V., respectively, with sufficient funds to make payments on these notes when they become due.***

Braskem Finance Limited, a wholly-owned subsidiary of Braskem incorporated in the Cayman Islands, and Braskem Netherlands Finance B.V., or Braskem Netherlands Finance, an indirect wholly-owned subsidiary of Braskem incorporated under the laws of The Netherlands, have no operations of their own other than the issuing and making of payments on their respective notes and other indebtedness, and using the proceeds therefrom as permitted by the agreements governing these issuances, including lending the net proceeds of the notes and other indebtedness incurred by Braskem Finance Limited and Braskem Netherlands Finance to Braskem and subsidiaries of Braskem. Accordingly, the ability of either Braskem Finance Limited or Braskem Netherlands Finance to pay principal, interest and other amounts due on the outstanding notes issued by it and other indebtedness will depend upon our financial condition and results of operations and our subsidiaries that are creditors of Braskem Finance Limited or Braskem Netherlands Finance, respectively. In the event of an adverse change in our financial condition or results of operations and our subsidiaries that are creditors of Braskem Finance Limited or Braskem Netherlands Finance, these entities may be unable to service their indebtedness to Braskem Finance Limited or Braskem Netherlands Finance, as the case may be, which would result in the failure of Braskem Finance Limited or Braskem Netherlands Finance, as the case may be, to have sufficient funds to repay all amounts due on or with respect to the respective outstanding notes.

***Payments on Braskem's guarantees will be junior to Braskem's secured debt obligations and effectively junior to debt obligations of Braskem's subsidiaries and jointly controlled companies.***

The outstanding notes are fully guaranteed by Braskem on an unsecured basis. The Braskem guarantees will constitute senior unsecured obligations of Braskem. The guarantees will rank equal in right of payment with all of Braskem's other existing and future senior unsecured indebtedness. Although the guarantees will provide the holders of the notes with a direct, but unsecured claim on Braskem's assets and property, payment on the guarantees will be subordinated to secured debt of Braskem to the extent of the assets and property securing such debt.

41

Upon any liquidation or reorganization of Braskem, any right of the holders of the notes, through enforcement of Braskem's guarantees (i) to participate in the assets of Braskem, including the capital stock of its subsidiaries and jointly controlled entities, will be subject to the prior claims of Braskem's secured creditors, and (ii) to participate in the assets of Braskem's subsidiaries and jointly controlled entities, and will be subject to the prior claims of the creditors of such subsidiaries and jointly controlled entities. The indentures relating to the outstanding notes include a covenant limiting the ability of Braskem and its subsidiaries to create or suffer to exist liens, although this limitation is subject to significant exceptions.

Our Mexico Complex was financed under a project finance structure, in which the construction loan must be repaid using exclusively the cash generated by us with shareholders pledging limited guarantees. Accordingly, this financing structure includes guarantees typical to transactions of this kind, such as assets, receivables, cash generation and other rights of Braskem Idesa.

As of December 31, 2019, Braskem had (1) consolidated corporate debt, net of transaction costs, of R$29,291.5 million (US$7,267.1 million), and (2) consolidated Braskem Idesa debt related to our Mexico Complex of R$9,981.7 million (US$2,476.4 million). Of the consolidated corporate debt, R$1,992.4 million (US$494.3 million) was unsecured debt of Braskem S.A., R$36.0 million (US$8.9 million) was secured debt of Braskem S.A., R$27,262.7 million (US$6,763.8 million) was unsecured debt of Braskem's subsidiaries and special purpose entities (other than Braskem Idesa S.A.P.I.), and R$0.6 million (US$0.1 million) was secured debt of Braskem's subsidiaries and special purpose entities (other than Braskem Idesa S.A.P.I.).

Braskem conducts a portion of its business operations through subsidiaries and jointly controlled companies. In servicing payments to be made on its guarantees of the outstanding notes, Braskem may rely, in part, on cash flows from its subsidiaries and jointly controlled companies, mainly in the form of dividend payments and interest on shareholders' equity. The ability of these subsidiaries and jointly controlled entities to make dividend payments to Braskem will be affected by, among other factors, the obligations of these entities to their creditors, requirements of Brazilian corporate and other law, and restrictions contained in agreements entered into by or relating to these entities. In the event that these subsidiaries and jointly controlled entities are unable to make dividend payments to Braskem due to insufficient cash flows, Braskem may be required to utilize its own cash flows to service payments. Further, if these subsidiaries and jointly controlled entities are unable to pay their debt, they may become subject to bankruptcy or insolvency proceedings. Any bankruptcy or insolvency proceedings of these subsidiaries and jointly controlled entities may have an adverse effect on our financial condition and results of operations.

***Braskem's obligations under the guarantees under the outstanding notes are subordinated to certain statutory preferences.***

Under Brazilian law, Braskem's obligations under the guarantees under the outstanding notes are subordinated to certain statutory preferences. In the event of a liquidation, bankruptcy or judicial restructuring of Braskem, such statutory preferences, including post-petition claims, claims for salaries, wages, social security, taxes and court fees and expenses and claims secured by collateral, among others, will have preference over any other claims, including claims by any investor in respect of the guarantees. In such event, enforcement of the guarantees may be unsuccessful, and holders of the outstanding notes may be unable to collect amounts that they are due under the outstanding notes.

***Brazilian bankruptcy laws may be less favorable to holders of our shares, ADSs and outstanding notes than bankruptcy and insolvency laws in other jurisdictions.***

If we are unable to pay our indebtedness, including our obligations under the shares, ADSs and guarantees under the outstanding notes, then we may become subject to bankruptcy proceedings in Brazil. The bankruptcy laws of Brazil currently in effect are significantly different from, and may be less favorable to creditors than, those of certain other jurisdictions. For example, holders of our outstanding debt securities may have limited voting rights at creditors' meetings in the context of a court reorganization proceeding. In addition, any judgment obtained against us in Brazilian courts in respect of any payment obligations under the guarantees normally would be expressed in the *real* equivalent of the U.S. dollar amount of such sum at the exchange rate in effect (1) on the date of actual payment, (2) on the date on which such judgment is rendered, or (3) on the date on which collection or enforcement proceedings are started against us. Consequently, in the event of our bankruptcy, all of our debt obligations that are denominated in foreign currency, including the guarantees, will be converted into *reais* at the prevailing exchange rate on the date of declaration of our bankruptcy by the court. We cannot assure you that such rate of exchange will afford full compensation of the amount invested in our outstanding debt securities plus accrued interest.

42

**ITEM 4. INFORMATION ON THE COMPANY**

According to IHS, we are the largest producer of thermoplastic resins in the Americas, based on the annual production capacity of our 29 plants in Brazil, six plants in the United States, two plants in Germany and four plants in Mexico as of December 31, 2019. We are the only producer of ethylene, polyethylene and polypropylene in Brazil. We produce a diversified portfolio of petrochemical and thermoplastic products and have a strategic focus on thermoplastic resins, including polyethylene, polypropylene and PVC.

As of December 31, 2019, our business operations were organized into five business units, which corresponded to our principal production processes, products and services. Our segments were as follows:

- our Chemicals Unit (formerly our Basic Petrochemicals Unit), which includes our production and sale of chemicals at the chemical complex located in Camaçari, in the State of Bahia, or the Northeastern Complex, the chemical complex located in Triunfo, in the State of Rio Grande do Sul, or the Southern Complex, the chemical complex located in Capuava, in the State of São Paulo, or the São Paulo Complex and the chemical complex located in Duque de Caxias, in the State of Rio de Janeiro, or the Rio de Janeiro Complex, and our supply of electricity produced at these complexes to second generation producers, including producers owned or controlled by us. This segment accounted for net revenue of R$27,172.3 million, or 42.3% of our consolidated net revenue of all reportable segments, including net revenue to our other business units;

- our Polyolefins Unit, which includes the production and sale of polyethylene, including the production of "green polyethylene" from renewable resources, and polypropylene produced by us in Brazil. This segment accounted for net revenue of R$21,191.9 million, or 33.0% of our consolidated net revenue of all reportable segments, including net revenue to our other business units;

- our USA and Europe Unit, which includes our production, operations and sale of polypropylene in the United States and Germany. This segment accounted for net revenue of R$10,044.3 million, or 15.7% of our consolidated net revenue of all reportable segments, including net revenue to our other business units;

- our Mexico Unit, which includes our production, operations and sale of ethylene, HDPE (high-density polyethylene) and LDPE (low-density polyethylene) in Mexico. This segment accounted for net revenue of R$3,051.4 million, or 4.8% of our consolidated net revenue of all reportable segments, including net revenue to our other business units; and

- our Vinyls Unit, which includes our production and sale of PVC and caustic soda. This segment accounted for net revenue of R$2,692.8 million, or 4.2% of our consolidated net revenue of all reportable segments, including net revenue to our other business units.

In 2017, 2018 and 2019, 53.1%, 54.8% and 54.5% of our net revenue, respectively, related to sales performed in Brazil, and 46.9%, 45.2% and 45.5% of our net revenue in 2017, 2018 and 2019 was derived from our international operations.

**Our Strategy**

Our strategic objective is to satisfy clients in the chemicals and plastics value chain in a sustainable way and maximize return on the capital invested by shareholders, with a focus on:

- polyethylene, or PE, resins, polypropylene, or PP, polyvinyl chloride, or PVC, chemicals and renewable chemistry; and

- Brazil and in the Americas, including Europe as an export platform.

The key pillars of our strategy include:

- *Productivity and Competitiveness*

    The petrochemical industry is constantly evolving through investments in the current asset base, advances in innovation and technology, and addition of new capacities with enhanced productivity and competitiveness. Therefore, in order to maintain our leadership position in the industry a key element of our strategy is to pursue improvements in productivity and competitiveness of our current operations, focused on operational efficiency and excellence, commercial and logistics effectiveness, and cost leadership and differentiation through our relationships with clients.

43

Innovation and technology remains an important path to increase productivity and competitiveness and we are currently focusing efforts on development and innovation to constantly improve our operations. Focus on innovation extends not only to operations and our product portfolio but also to new management models and business practices. We seek to position ourselves to adopt and implement new digital technologies and solutions that bring greater efficiency to our industrial processes and business management.

This strategy will allow us to ensure optimal operational performance, considering reliability, production optimization, cost reductions, investment discipline and improvements of our industrial processes.

- *Feedstock Diversification*

Feedstock is a key element of competitiveness in the petrochemical industry, driving a large part of production costs. Petrochemical feedstocks follow the volatile nature of commodity markets with the competitive gap between different feedstocks fluctuating over time and presenting different opportunities in specific regions.

We are constantly seeking to diversify our feedstock profile in order to reduce the volatility of our results, reduce risks related to feedstock availability, and position ourselves to capture opportunities. We are currently working to increase our exposure to gas, diversifying away from naphtha while investing in the flexibility of our assets to consume different feedstocks.

In 2017, we started a project that enables us to produce up to 15% of ethylene from ethane in the Northeastern complex of Brazil with a long-term ethane supply agreement with an U.S. based supplier with pricing based on the Mont Belvieu reference, and during 2018 we were able to successfully operate the assets taking advantage of the increasing flexibility it provided to the complex. In 2019, 1.5% of the ethylene production of our Northeastern Complex was ethane-based. We are also focused on capturing available feedstock opportunities in our current asset base by operating our US PP assets and Mexico cracker at full capacity, capturing propylene and ethane competitive advantage in the North American market and securing competitive feedstock contracts with a long-term view.

Additionally we are constantly monitoring opportunities to grow our asset base in feedstock advantaged regions and position our assets to capture local feedstock opportunities further diversifying our feedstock matrix, enhancing competitiveness and reducing exposure to feedstock related risks.

- *Geographic Diversification*

Regional markets are influenced by the local supply and demand balance, macro-economic factors and the political environment. Having a local presence in a given market not only provides easier access to regional customers, feedstock opportunities and industrial policies, but also exposes the player to a number of risks related to government decisions, feedstock availability and demand growth. Having a diversified footprint is important to have access to regional opportunities but also to hedging our operations against local risks.

An important pillar of our strategy is to diversify geographically, growing our global footprint outside Brazil and increasing our competitive scale in PE and PP, enhancing our leadership in the Americas.

44

We started diversifying geographically in 2010 with the acquisition of Sunoco assets in the United States, continuing in the following year with the acquisition of Dow PP assets in the United States and Europe and later in 2016 with the start-up of our greenfield ethane cracker in Mexico, which is integrated with three polyethylene plants. In 2017, we commenced operations of a new Ultra High Molecular Weight Polyethylene - UHMWPE (UTEC®) plant in the United States, which strengthened our position as one of the largest producers in the world, and approved the construction of a new PP facility in the United States (the largest PP production line in the Americas), which reached, during 2019, important construction milestones, keeping us on track for commencing operations in 2020.

Braskem intends to continue its strategy to diversify geographically while continuing to strengthen our position in the Americas in PE and PP.

- *People, Governance and Reputation*

We are committed to strengthening our image and reputation among key stakeholders - team members, society and investors, through advances in our compliance system, sustainability, innovation and people management, while strengthening our culture and financial health.

We are committed to strengthening our compliance system, guaranteeing the involvement and responsibility of all leaders and implementing all policies and actions defined by our compliance committee, guided by transparency, integrity and ethics.

Sustainability will continue to be an important aspect of our strategy and we will continue to drive improvements to our health, environment, safety, and eco-indicators, and strengthen our influence in local and international agendas of sustainable development.

In people management, we intend to develop a work environment that reinforces diversity and stimulates the attraction and integration of talented young people, preparing our team for our increasing globalization and preparing us for the new paradigms of managing people.

By these means, we intend to continue strengthening our image and reputation together with our stakeholders, positioning ourselves as a human-oriented, forward-thinking global company that cultivates strong relationships and generates value to all, offering sustainable solutions in chemicals and plastics.

**Our History and Development**

Our business began when the Odebrecht Group (comprised of Odebrecht S.A. and its subsidiaries) and Mariani Group acquired control of Copene, a raw materials petrochemical complex in Camaçari, in July 2001, and then subsequently integrated their assets in the petrochemical sector with Copene. From 2001 to 2004, we underwent a corporate reorganization and merged many companies that had been acquired. In addition, we acquired Polialden in 2005 and Politeno in 2006.

Through a partnership with Petrobras, we began consolidating the Southern Complex in Brazil in March 2007 with the acquired petrochemical assets from the Ipiranga group. In November 2007, we signed an agreement with Petrobras and Odebrecht, which required them to contribute part of their assets in the petrochemical sector to Braskem. In September 2008, Ipiranga Petroquímica, Petroquímica Paulínia and the spun-off portion of Ipiranga Química were merged into us. In May 2009, our merger with Triunfo was approved.

In January 2010, we announced the acquisition of Quattor in order to strengthen the Brazilian petrochemical sector and establish ourselves among the five largest and most competitive petrochemical companies in the world. In February 2010, we announced the acquisition of the polypropylene assets of Sunoco Chemicals, the fourth largest producer of this resin in the United States. This acquisition represented an important step towards strengthening our internationalization strategy, which combines our growth in the U.S. market with alternative access to competitive raw materials and main consumer markets. As a result of this acquisition, we became a leader of thermoplastic resins in the Americas, consolidating our position as a major player in the international petrochemical market and the third largest global player in the polypropylene industry. In 2010, Braskem inaugurated its green ethylene plant in Triunfo, Rio Grande do Sul, becoming the world leader in biopolymers and launched the brand I'm green™, which identifies Braskem's products made from renewable sources.

45

In July 2011, we announced the acquisition of Dow Chemical's polypropylene business, including four plants (two plants in the United States and two plants in Germany). The U.S. assets, located in Freeport and Seadrift, Texas, have a combined annual production capacity of 545,000 tons, which represented a 50% increase in annual capacity polypropylene production in the United States. The German assets, located in the cities of Wesseling and Schkopau, have a combined annual production capacity of 545,000 tons. This acquisition represented an important step in the consolidation of our international strategy, positioning us as the largest producer of polypropylene in the United States.

### Beginning of Operations of Our Mexico Unit

In April, 2016 Braskem Idesa, our joint venture with the Mexican Idesa group, reached an important milestone with the production of the first batch of polyethylene in the Mexico Petrochemical Complex following a gradual start-up process initiated in December 2015 with the beginning of utilities area operations, followed by the start-up of the cracker in March 2016.

Located in the state of Veracruz, the Mexico Complex includes an ethane cracker integrated with three polyethylene plants, as well as utilities plants (electric power, water and steam). Ethane supply is assured through a 20-year contract with Pemex TRI at a price pegged to the U.S. gas price.

46

**Our Corporate Structure**

The following chart presents our simplified ownership structure and the corporate structure of our principal subsidiaries as of the date of this annual report. The percentages in bold italics represent the direct and indirect percentage of the voting share capital owned by each entity, and the percentages not in bold italics represent the direct and indirect percentage of the total share capital owned by each entity.



In November 2017, Braskem Petroquímica Ltda., or Braskem Petro, merged with and into Braskem S.A., with Braskem S.A. as the surviving entity. This merger simplified our corporate structure by consolidating our activities to reduce financial and operating costs.

In January 2019, Odebrecht informed us of the Odebrecht Reorganization, which was effective as of December 31, 2018. For additional information on the Odebrecht Reorganization, see "Item 5. Operating and Financial Review and Prospects-Recent Developments-Odebrecht Reorganization."

The SEC maintains an internet website at www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file or funish documents electronically to the SEC, including us. Our internet website is www.braskem.com.br, and the internet website of our investors relations' department is www.braskem-ri.com.br. The information included on our internet website, the internet website of our investor relations' deparment, or the information that might be accessed through such websites is not included in this annual report and is not incorporated into this annual report by reference.

We are a corporation (*sociedade por ações*) organized under the laws of Brazil. Our registered office is at Rua Eteno, 1561, Pólo Petroquímico, Camaçari, Bahia, CEP 42810-000, Brazil, and our telephone number at this address is +55 71 3413-2102. Our principal executive office is at Rua Lemos Monteiro, 120 - 24° andar, Butantã, São Paulo, SP, CEP 05501-050, Brazil, and our telephone number at this address is +55 11 3576-9000.

47

**Vinyls Unit**

We were the leading producer of PVC in Brazil, based on sales volumes and installed capacity in 2019. As of December 31, 2019, our PVC production facilities had the second largest annual production capacity in Latin America. Our Vinyls Unit generated net revenue of R$2,692.8 million in 2019, or 4.2% of our net revenue of all reportable segments, including inter-segment sales.

Our PVC production is integrated through our production of chlorine, ethylene and other raw materials. The main use of PVC is for pipes and fittings and other products related to the civil construction market. Our Vinyls Unit also manufactures caustic soda, which is mainly used by producers of alumina, pulp and paper, and in the soap industry.

In 2019, we had an approximate 48% share of the Brazilian PVC market and a 16% share of the Brazilian caustic soda market (excluding consumption of alumina by companies located in the North and Northeast of Brazil), based on sales volumes of our Vinyls Unit.

**Products of Our Vinyls Unit**

The following table sets forth a breakdown of the sales volume of our Vinyls Unit by product line for the years indicated.

|  | For the Year Ended December 31, | | |
| --- | --- | --- | --- |
|  | **2019** | **2018** | **2017** |
|  | *(in thousands of tons)* | | |
| PVC | 491.3 | 490.1 | 525.7 |
| Caustic soda | 243.2 | 344.2 | 407.5 |
| Other[1] | 72.1 | 85.9 | 103.7 |
| Total domestic sales | 806.7 | 920.5 | 1,036.9 |
| Total export sales | 22.2 | 49.4 | 89.6 |
| Total Vinyls Unit sales | 828.8 | 969.9 | 1,126.5 |

(1) Includes chlorine, hydrogen, caustic soda flake and sodium hypochlorite.

**Production Facilities of Our Vinyls Unit**

We own five vinyls production facilities. Two of our facilities are located in the Northeastern Complex, and three others are located in the State of Alagoas.

The table below sets forth for each of our primary vinyls products, our annual production capacity as of December 31, 2019 and annual production for the years presented.

|  |  | Production For the Year Ended December 31, | | |
| --- | --- | --- | --- | --- |
| **Primary Products** | **Annual Production Capacity** | **2019** | **2018** | **2017** |
|  |  | *(in tons)* | | |
| PVC | 710.0 | 461.1 | 533.2 | 611.2 |
| Caustic Soda | 539.0 | 123.2 | 317.8 | 409.0 |

**Raw Materials of Our Vinyls Unit**

*Ethylene*

The most significant direct cost associated with the production of PVC is the cost of ethylene, which accounted for 21% of our Vinyls Unit's total cost of products sold in 2019. Our Chemicals Unit supplies all of the ethylene required by our Vinyls Unit.

*Electricity*

Electric power is a significant cost component in our production of chlorine and caustic soda. Electric power accounted for 10% of our Vinyls Unit's total cost of products sold in 2019. Our Vinyls Unit obtains its electric power requirements from various generators under long-term power purchase agreements (see "Chemicals Unit-Supply Contracts and Pricing of the Chemicals Unit-Electricity").

*Salt*

We used 212,000 tons of salt during 2019. Salt accounted for 1% of our Vinyls Unit's total cost of products sold in 2019.

However, salt mining operations at our mine were halted in May 2019, as described in "Item 3. Key Information-Risk Factors-Risks Relating to Us and the Petrochemical Industry-Our business and operations are inherently subject to environmental, health and safety hazards. As a result, our business is also subject to stringent environmental and other regulations" and "Item 8. Financial Information-Legal Proceedings-Alagoas - Mining Activities." Production of caustic soda and ethylene dichloride at our chlor-alkali facility located in the state of Alagoas was also interrupted due to the lack of salt. Ethylene dichloride, or EDC, is consumed in PVC production. Because of the interruption, we needed to import 139,000 tons of caustic soda to supply our customers and 295,000 tons of EDC to supply our PVC facilities located in the state of Alagoas and in the Northeastern Complex.

Seeking to resume our chlor-alkali operations, we launched a project to modify the feedstock base of our chlor-alkali plants by acquiring sea salt from third parties in Brazil or abroad. The product will be stocked, dissolved in water to make brine and then treated and sent for processing. The estimated cost of the project is R$59.3 million, of which R$21.2 million was already disbursed in 2019. See "Item 5. Operating and financial review and prospects-Other Investments-Technology change at our chlor-alkali facility in Alagoas."

### Sales and Marketing of Our Vinyls Unit

There is a structural link between the PVC and caustic soda markets because caustic soda is a co-product of the production of chlorine required to produce PVC. Most of the time, when demand for PVC is high, greater amounts of caustic soda are produced, leading to an increase in supply and generally lower prices for caustic soda. Conversely, when demand for PVC is low, prices for caustic soda tend to rise.

We make most of our sales of PVC and caustic soda directly to Brazilian customers, but we use third-party distributors to serve smaller caustic soda customers. However, our Vinyls Unit maintains contractual relationships through five distribution centers that provide logistical support, located in Paulínia and Barueri, both in the State of São Paulo, Joinville, in the State of Santa Catarina, Extrema, in the State of Minas Gerais, and Araucaria, in the State of Paraná. In addition, we operate twelve warehouse facilities for PVC, on a non-exclusive basis, and five terminal tank facilities for caustic soda strategically located along the Brazilian coast to enable us to deliver our products to our customers on a "just-in-time" basis. Our Vinyls Unit develops its business through close collaboration with its customers, working together to improve existing products as well as to develop new applications for PVC. Our marketing and technical assistance groups also advise customers and potential customers that are considering the installation of manufacturing equipment for PVC end products.

In addition, our Vinyls Unit supplies the Brazilian market with emulsion PVC and other copolymers with higher value by imports from Colombia under a contract with Mexichem. Our primary customers operate in the laminated, shoe and automobile sectors. These products represented 1.7% of our consolidated sales volume in 2019.

*Prices and Sales Terms*

We determine the domestic prices for our PVC resins with reference principally to the prices paid by third generation producers in Brazil for imports of PVC, which generally reflect the Northeast Asian spot market price. Delivery time, quality and technical service also affect the levels of sales of PVC resins. We establish our domestic price for caustic soda based on North American spot market prices.

*Competition*

*PVC*

Unipar Indupa (formerly Carbocloro and Solvay), or Unipar, and Braskem are the only two producers of PVC in Brazil. Unipar's total Brazilian installed annual production capacity is 300,000 tons, compared to our annual production capacity of 710,000 tons. Unipar's Brazilian production facilities are located in São Paulo, which is closer to the primary PVC market in Brazil than our facilities. However, we believe that our vertically integrated production capabilities, our strong relationship with our customers and our technical assistance programs enable us to make up for any competitive disadvantage due to distance and compete effectively with Unipar.

Braskem also competes with Unipar's Argentina production facilities and other importers of PVC. Unipar has a PVC plant in Argentina in addition to its plants in Brazil. Imports from all regions accounted for 34% of Brazilian PVC consumption in 2019. Domestically produced PVC is currently competitively priced with imported PVC, considering that our price is based on international market.

In addition, Braskem competes with other producers of thermoplastics that manufacture the same PVC products or substitutes for products in our PVC product line. Thermoplastic resins, principally polyethylene and polypropylene, are used in certain applications as substitutes for PVC. Wood, glass and metals also are used in some cases as substitutes for PVC.

*Caustic Soda*

According to IHS and Abiclor (*Associação Brasileira da Indústria de Álcalis, Cloro e Derivados*), the three largest Brazilian producers of caustic soda, including Braskem, accounted for 89% of capacity in Brazil in 2019. Most domestic producers operate on a local or regional basis, with the exception of Braskem and another producer located in the Northeast region of Brazil that operate in the whole country through terminal tanks located on the Brazilian coast. Imports accounted for 42% of Brazil's total caustic soda consumption in 2019, excluding Braskem imports.

Our principal competitors in the caustic soda market elsewhere in South America are other international petrochemical companies operating in Brazil and producers located on the U.S. Gulf Coast.

**Technology, Research and Development**

*Technology Licenses*

We rely on technology from third parties for the production processes at several of our facilities, including our crackers and our PE and PP manufacturing units. Our operations could be adversely affected if such third party licensors choose not to renew or continue to provide sufficient technical support under the license or technical services agreements that we have entered into with them.

Most of the original license agreements with regard to our Chemicals units in Brazil have already expired. However, new Technical Services Agreements have been entered into to optimize plant performance. No new license agreements for the construction of plants were signed since 2016. In Mexico, we also have a License Agreement in place with regard to our cracker unit.

We operate Vinyls units only in Brazil. The most recent license agreement with regard to our Vinyls units was signed in 2008 and terminated in 2013. The effects of such license agreement with regard to the interim period after its termination continued until the year ended December 31, 2018, and there is currenlty no technical services agreement in place. No new license agreements for the construction of plants were signed since 2016.

With respect to our Polyolefin units, Braskem uses various process technologies licensed from leading licensor companies under non-exclusive agreements in Brazil, Mexico, the United States and Germany. For some of these licenses, Braskem pays royalty fees based on production volume using the licensed technology on a quarterly basis and also participates in technical exchange meetings to share and receive information regarding improvements pursuant to the respective license agreement or technical service agreement. For some specific projects, Braskem has entered into joint development agreements, or JDA, with the original licensors and/or other technology partners under exclusive terms and cost-sharing conditions. No new license Agreements for the construction of plants were signed since 2016.

*Research and Development*

Our ability to compete in the markets that we serve depends on our ability to integrate new technologies developed by us and third parties in order to lower our costs and offer new products. In addition, our relationships with our customers are enhanced by our ability to develop new products and customize existing products to meet their needs.

We develop technology at our research and development centers: (1) Innovation and Technology Center in Triunfo, Rio Grande do Sul, Brazil; (2) Innovation and Technology Center in Pittsburgh, Pennsylvania, United States; (3) Renewable Chemicals Research Center in Campinas, São Paulo, Brazil; (4) Process Technology Development Center in Mauá, São Paulo, Brazil; (5) European Technical Center in Wesseling, North Rhein Westphalia, Germany; and (6) Mexican Technical Center in Nanchital, Vera Cruz, Mexico, where we develop new processes, products and applications for many market segments and which, as of December 31, 2019, collectively had 297 employees. Through these centers, we coordinate and conduct our research and development programs, which include the operation of (1) pilot plants, (2) catalysis, polymerization and polymer sciences laboratories, and (3) process engineering and research for renewable sources.

Braskem continues its efforts to develop solutions for products from renewable raw materials through internal projects and collaborations and partnerships with various third parties.

In November 2017, Braskem and Danish-based Haldor Topsoe, a world leader in catalysts and surface science, have signed a technological cooperation agreement to develop a pioneering route to produce monoethylene glycol (MEG) from sugar. With the agreement, Braskem seeks to expand its portfolio of renewable products to offer new solutions that complement its bio-based polyethylene marketed with the I'm green$^{TM}$ seal.

In 2019, to accelerate our efforts toward circular economy solutions, we created an innovation platform for recycling to strengthen our reputation as a sustainability leader. The platform coordinates all efforts relating to chemical and mechanical recycling of plastic waste and aims to convert post-consumer plastic into recycled resins. Our focus is to expand certified recycled resins in our portfolio.

**Maintenance**

Most of our maintenance is performed by third-party service providers. For example, we have contracts with Construtora Norberto Odebrecht, or CNO, a subsidiary of our controlling shareholder Odebrecht, Asea Brown Boveri Ltd., Rip Serviços Industriais S.A., Sulzer Ltda. and other service providers to perform maintenance for our basic petrochemical plants in the Northeastern Complex and in the Southern Complex. We also perform some of our ordinary course maintenance with our small team of maintenance technicians, which also coordinate the planning and execution of maintenance services performed by third parties.

*Chemicals Plants*

Regular chemicals plant maintenance requires complete plant shutdowns from time to time, and these shutdowns usually take 30 to 45 days to complete. We occasionally undertake brief shutdowns of the chemical operations at our basic petrochemical plants that do not materially affect our production output, primarily for maintenance purposes, catalyst regeneration and equipment cleaning. In addition, because we have two independent olefins units and two independent aromatics units at the Northeastern Complex and two independent olefins units at the Southern Complex, we may continue production of chemicals at these complexes without interruption, even while we perform certain maintenance services.

The next scheduled general maintenance shutdown of:

- the São Paulo Complex's olefins and aromatics units is scheduled to take place in 2020;

- the Southern Complex's olefins 1 and aromatics 1 units is scheduled to take place in 2021;

- the Northeastern Complex's olefins 2 and aromatics 2 units is scheduled to take place in 2023; and

- the Rio de Janeiro Complex's olefins unit is scheduled to take place in 2024.

*Plants of Our Polyolefins, Vinyls and USA and Europe Unit*

We have a regular maintenance program for each of our polyolefins plants. Production at each of our polyolefins plants generally is shut down for 7 to 20 days every 2 to 3 years to allow for regular inspection and maintenance. In addition, we undertake other brief shutdowns for maintenance purposes that do not materially affect our production of polyolefins. We coordinate the maintenance cycles of our polyolefins plants with those of our basic petrochemicals plants. While our chemicals facilities must be shut down for up to 30 days for maintenance, our polyolefins facilities may be shut down for shorter periods because these facilities are less complex to operate and maintain than our chemicals plants. Similarly, plants of our USA and Europe Unit attempt to coordinate their maintenance cycles with the routines of their largest suppliers.

We have a regular maintenance program for each of our vinyls plants. Our Camaçari and Alagoas PVC plants are generally shut down for 15 to 20 days every two years to allow for regular inspection and maintenance. Our caustic soda and chlorine plant in Alagoas shuts down once a year for three days of maintenance in different parts of the plant. Our caustic soda and chlorine plant in Camaçari does not require prolonged maintenance shutdowns and is shut down for two or three days each year.

*Environmental Regulation*

We, like other petrochemical producers, are subject to stringent federal, state and local environmental laws and regulations concerning human health, the handling and disposal of solid and hazardous wastes and discharges of pollutants into the air, water and soil. Petrochemical producers are sometimes subject to unfavorable market perceptions as a result of the environmental impact of their business, which can have an adverse effect on their results of operations.

Our consolidated annual expenditures on environmental control were R$369.8 million in 2019, R$329.3 million in 2018 and R$330.1 million in 2017, which included investments, waste and wastewater treatment, emissions management, environment licenses, environmental liabilities and other environmental expenditures.

Costs and capital expenditures relating to environmental, health or safety matters are subject to evolving regulatory requirements and will depend on the timing of the promulgation and enforcement of specific standards which impose the requirements.

*Compliance with Environmental Laws in Brazil*

The Brazilian government enacted an Environmental Crimes Law in 1998 that imposes criminal penalties on corporations and individuals causing environmental damage. Corporations found to be polluting can be fined up to R$50.0 million, have their operations suspended, be prohibited from government contracting, be required to repair damage that they cause and lose certain tax benefits and incentives. Executive officers, directors and other individuals may be imprisoned for up to five years for environmental violations.

We make all reasonable efforts to ensure that our operations are in compliance in all material respects with applicable Brazilian environmental laws and regulations currently in effect. Our internal audit processes and our management system in place aim to ensure that the permits that will expire be renewed in a timely manner. However, changes to applicable laws and regulations may require us to revise our standards, which may take time to implement. Some environmental studies that we have commissioned have indicated instances of environmental contamination at certain of our plants. In addition, we and certain of our executive officers have received notices from time to time related to minor environmental violations and are or have been subject to investigations or legal proceedings with respect to certain alleged environmental violations. These environmental issues, and any future environmental issues that may arise, could subject us to fines or other civil or criminal penalties imposed by Brazilian authorities.

*Operating Permits*

Under Brazilian federal and state environmental laws and regulations, we are required to obtain operating permits for our manufacturing facilities. If any of our environmental licenses and permits lapse or are not renewed or if we fail to obtain any required environmental licenses and permits, we may be subject to fines ranging from R$500 to R$50.0 million, and the Brazilian government may partially or totally suspend our activities and impose civil and criminal sanctions on us.

68

Each State in which we operate has its own environmental standards and state authorities in each state have issued operating permits that must be renewed periodically. Additionally, all projects for the installation and operation of industrial facilities in the Northeastern Complex, Southern Complex, São Paulo Complex and Rio de Janeiro Complex are subject to approval by various environmental protection agencies, which must approve installed projects prior to their commencement of operations and must renew such approval periodically thereafter. State authorities have issued operating permits for all of our plants, as follows: the Northeastern Complex (State of Bahia); Southern Complex (State of Rio Grande do Sul), São Paulo Complex and Cubatão, Santo André, Mauá and Paulínia plants (State of São Paulo), Rio de Janeiro Complex (State of Rio de Janeiro) and our Alagoas plants (State of Alagoas). We make all reasonable efforts to ensure that our operations in Brazil are in compliance in all material respects with applicable Brazilian federal, state and local environmental laws and regulations currently in effect, and we have an internal audit process and a management system in place assuring that the permits that will expire be renewed in a timely manner.

*Industrial Waste*

Companhia Riograndense de Saneamento, or Corsan, a state-owned sanitation company, operates an integrated system for liquid effluents treatment, or Sitel, in the Southern Complex. Sitel treats wastewater generated by us and the other petrochemical producers at the Southern Complex at a liquid effluents treatment station located in the Southern Complex. This treatment station also includes a system for the collection of contaminated wastewater and disposal after treatment. We treat wastewater generated by us at the Rio de Janeiro Complex at a liquid effluents treatment station located in the Rio de Janeiro Complex. This treatment station also includes a system for the collection and disposal of contaminated wastewater. Hazardous solid waste is co-processed in cement kilns or incinerated and other kinds of solid waste are disposed of in landfills at facilities approved by us.

We treat wastewater generated by us at the São Paulo Complex at a liquid effluents treatment station located in the São Paulo Complex. This treatment station also includes a system for the collection and disposal of contaminated wastewater. Hazardous waste generated at the São Paulo Complex is incinerated in cement kilns and other kinds of solid waste are disposed of in landfills.

In our Bahia facilities, all wastewater is transported to our wastewater treatment facility at Cetrel. Hazardous liquid and solid waste are incinerated at high temperatures and non-hazardous solid waste is coprocessed and sent to cement customers to be used as energy in cement kilns.

In our Alagoas Complex, organochlorines waste is incinerated, producing steam and wastewater. All wastewater is treated at a treatment station located in the complex. Solid waste is separated and disposed of in landfills.

Additionally, we have a series of recycling programs that include recycling of solid waste and wastewater. We recycle or reuse 42.9 % of the solid waste generated by our facilities and 25.3 % of the water used in our production processes.

*Mercury*

As of December 31, 2019, Braskem had a chlor-alkali plant in Bahia based on mercury cell technology. On April 20, 2020, our chlor-alkali plant in Bahia shut down following the end of the facility's useful life, and it will be decommissioned. The preferred decommissioning strategy involves structure decontamination and demolition, and we are currenlty planning the most appropriate strategies for waste destination and remediation of contaminated areas, which are expected to be implemented soon after the plant shutdown.

**Compliance with Environmental Laws in the United States**

Our operations in the United States are subject to U.S. federal, state and local laws and regulations governing the discharge of effluents and emissions into the environment; the generation, storage, handling, management, transportation and disposal of hazardous waste, industrial waste and other types of waste; the use, storage, and handling of various types of products and materials; and the protection of human health, safety and the environment. In many instances, specific permits must be obtained for particular types of operations, emissions or discharges. For example, our facilities in Texas, Pennsylvania and West Virginia are required to maintain various permits relating to air quality and treatment of industrial wastewater, and to comply with regulatory requirements relating to waste management. We are in possession of necessary permits to operate our facilities. We make all reasonable efforts to ensure that our operations in the United States are in compliance in all material respects with applicable U.S. federal, state and local environmental laws and regulations currently in effect.

69

As with the U.S. petrochemical industry generally, compliance with existing and anticipated laws and regulations increases the overall cost of operating our U.S. plants, including operating costs and capital costs to construct, maintain and upgrade equipment and facilities. These laws and regulations have required, and are expected to continue to require us to make, expenditures of both a capital and an expense nature.

The Clean Air Act, which was last amended in 1990, requires the United States Environmental Protection Agency, or the EPA, to set National Ambient Air Quality Standards, or the NAAQS, for pollutants considered harmful to public health and the environment. The Clean Air Act requires periodic review of the science upon which the standards are based and the standards themselves. NAAQS for ozone and fine particulate matter (referred to as PM2.5), promulgated by the EPA have resulted in identification of nonattainment areas throughout the country, including certain areas within Texas, Pennsylvania and West Virginia, where Braskem America operates facilities. As a result of these nonattainment designations by the EPA, state or local air pollution control agencies are required to apply permitting and/or control requirements intended to reduce emissions of ozone precursors (nitrogen oxides and volatile organic compounds), and fine particles (including PM2.5 precursors), in order to demonstrate attainment with the applicable NAAQS. Such requirements may include imposition of offset requirements, and could result in enhanced emission control standards. In addition, on August 24, 2016, the EPA finalized requirements for state and local agencies charged with the current PM2.5 NAAQS. These requirements could in turn translate into additional state-specific requirements to further reduce allowable emission rates for PM2.5 or its precursor pollutants. In October 2015, the EPA lowered the primary and secondary NAAQS for ozone from 0.075 ppm to 0.070 ppm. Such state-specific requirements would become applicable, if at all, following a multi-year process. Regulations implementing this change will likely not be promulgated for several years.

In addition to permitting and/or control requirements that may result from the implementation of the NAAQS at the state or local level, the EPA may promulgate new or revised federal New Source Performance Standards or National Emission Standards for Hazardous Air Pollutants that would apply directly to certain facility operations and may require the installation or upgrade of control equipment in order to satisfy applicable emission limits and/or operating standards under these regulatory programs. The EPA's currently-proposed regulations in this area would not specifically apply to Braskem America's operations.

Additionally, there are various legislative and regulatory measures to address greenhouse gas emissions which are in various stages of review, discussion or implementation by Congress and the EPA. In October 2015, the EPA finalized new regulations (known as the Clean Power Plan) aimed at lowering greenhouse gas emissions from existing, new and reconstructed electric generating units. In February 2016, the Supreme Court stayed implementation of the Clean Power Plan pending judicial review. On October 16, 2017, the EPA proposed repealing the Clean Power Plan, but this proposal has not been finalized. On August 21, 2018, the EPA proposed a replacement to the Clean Power Plan, the Affordable Clean Energy Rule. While it is currently not possible to predict the final impact, if any, that these regulations may have on Braskem America or the U.S. petrochemical industry in general, they could result in increased utility costs to operate our facilities in the United States. In addition, future regulations limiting greenhouse gas emissions of carbon content of products, which target specific industries such as petrochemical manufacturing could adversely affect our ability to conduct Braskem America's business and also may reduce demand for its products. The EPA's currently-proposed regulations in this area would not specifically apply to Braskem America's operations.

### Compliance with Environmental Laws in Mexico

Braskem IDESA in Mexico is subject to federal, state and local laws and regulations that govern the discharge of effluents and emissions to the environment; the generation, storage, handling, management, transportation and disposal of hazardous waste, industrial waste and other types of waste; the use, storage and handling of various types of products and materials; and the protection of human health, safety and the environment. Specific permits may be required for certain types of operations.

Ethylene and Aromatic Hydrocarbons Mixture production require permission of the Secretary of Energy and Federal Commission for Sanitary Risks (COFEPRIS) related to risk management and public health, The Mexican legislation regulates the emission of particles, ozone, fixed sources and everything related to GHGs. There are regulations on water, effluent treatments and specific conditions for discharge of the effluent. We make all reasonable efforts to ensure that our operations in Mexico are in compliance in all material respects with applicable Mexican federal, state and local environmental laws and regulations currently in effect.

70

In Mexico, the Federal Attorney´s Office for Federal Environmental Protection (PROFEPA) verifies compliance with the Mexican Regulation and Permits through audits.

Failure to comply with Mexican regulations may lead to economic and administrative penalties, including Operations shutdown in certain cases.

### *Compliance with Environmental Laws in Germany and the European Union*

Our operations in Germany are subject to German federal, state and local laws and regulations governing the discharge of effluents and emissions into the environment and the handling and disposal of industrial waste and otherwise relating to the protection of the environment and waste management. Our operations in Germany are in compliance in all material respects with applicable German federal, state and local environmental laws and regulations currently in effect.

As with the petrochemical industry in the European Union generally, compliance with existing and anticipated German laws and regulations increases the overall cost of operating our European business, including operating costs and capital costs to construct, maintain and upgrade equipment and facilities. These laws and regulations have required, and are expected to continue to require us to make expenditures of both a capital and an expense nature.

At our Schkopau and Wesseling facilities in Germany, we are required to maintain air, radiation, waste water and waste management permits. We are in possession of all necessary permits.

Furthermore, our Wesseling and Schkopau facilities in Germany are subject to existing European GHG regulations and a cap and trade program relating to emissions. We have purchased sufficient carbon dioxide emissions permits for its operations until 2019/2020, provided it operates under normal business conditions. We will purchase any additional permits that may be required on the emission trade market. We are not aware of any new environmental regulations that would materially affect our European operations. Accordingly, we cannot estimate the potential financial impact of any future European Union or German environmental regulations.

### Sustainability

In April 2018, our board of directors approved our policy on global sustainable development. Its objective is to encourage economic growth, environmental preservation and social justice by developing sustainable solutions related to chemical and plastic production. In connection with these goals, we have developed a three-pronged approach: (1) seek and develop sustainable sources and operations, (2) develop and deliver a portfolio of sustainable products and services, and (3) work with our clients to offer sustainable solutions that benefit society as a whole.

#### *Circular Economy*

Consistent with our purpose of contributing to the transition from a linear economy into a circular economy, effectively demonstrating our commitment to sustainable development, we announced our global positioning statement titled "Braskem's Positioning in the Circular Economy."

Through this positioning statement, we assumed a voluntary commitment to adopt best practices at all of our industrial units to further reduce the loss of pellets (i.e., granulated raw material used to make plastic products, a form in which most of our products are sold) in our industrial processes by 2020, and undertook industry commitments to work towards having all plastic packaging reused, recycled or recovered by 2040.

In the statement, we also announced eight key global initiatives to achieve these targets, which are: (i) partnerships with clients and value chain to develop new products that increase efficiency, recycling and reuse; (ii) more investments in renewable products; (iii) development and support of new technologies and the recycling chain; (iv) programs to engage consumers in conscientious consumerism, proper disposal and recycling; (v) use of science tools to select the most sustainable options; (vi) adoption of recycling indicators for plastic packaging; (vii) partnerships to understand, prevent and solve the problem of marine debris; and (viii) incentives for policies to improve solid waste management.

### Property, Plant and Equipment

Our properties consist primarily of petrochemical production facilities in:

- • Camaçari, in the State of Bahia;

71

- Triunfo, in the State of Rio Grande do Sul;

- Duque de Caxias, in the State of Rio de Janeiro;

- São Paulo, Paulínia, Cubatão, Santo André and Mauá, in the State of São Paulo;

- Maceió and Marechal Deodoro, in the State of Alagoas;

- the United States, in La Porte, Freeport and Seadrift, Texas; Marcus Hook, in Pennsylvania; Neal and West Virginia;

- Germany, in Schkopau and Wesseling; and

- Coatzacoalcos, in Mexico.

For more information, see note 12 to our audited consolidated financial statements included elsewhere in this annual report.

Our principal executive offices are located in São Paulo, in the State of São Paulo, and we have an administrative support office in the City of Salvador, in the State of Bahia. We also have equity interests in investments located in other parts of the country. We own all our production facilities, but we generally rent our administrative offices.

The following table sets forth our properties as of December 31, 2019 by location of facilities, products produced and size of plant.

| Type of Product or Service | Location of Facilities | Size of Plant |
|---|---|---|
| | | *(in hectares)*[1] |
| Chemicals | Triunfo | 152.8 |
| Chemicals | Santo André | 74.1 |
| Chemicals | Camaçari | 65.5 |
| Chemicals | Duque de Caxias | 53.0 |
| Chemicals | Mexico | 23.6 |
| Polypropylene | Paulínia | 39.7 |
| Polyethylene | Triunfo | 30.5 |
| Polyethylene | Camaçari | 24.5 |
| Polyethylene | Cubatão | 17.6 |
| Polyethylene | Santo André | 15.8 |
| Polyethylene | Duque de Caxias | 15.0 |
| Polyethylene | Mexico | 14.9 |
| Polypropylene | La Porte, Texas | 87.0 |
| Polypropylene | Neal, West Virginia | 27.1 |
| Polypropylene | Mauá | 15.8 |
| Polypropylene | Duque de Caxias | 15.0 |
| Polypropylene | Camaçari | 13.2 |
| Polypropylene | Triunfo | 10.0 |
| Polypropylene | Marcus Hook, Pennsylvania | 6.9 |
| Polypropylene | Freeport, Texas | 8.9 |
| Polypropylene | Seadrift, Texas | 2.5 |
| Polypropylene | Schkopau, Germany | 3.7 |
| Polypropylene | Wesseling, Germany | 26.0 |
| Caustic soda/chlorine | Maceió | 15.0 |
| PVC/caustic soda/chlorine | Camaçari | 12.6 |
| PVC | Marechal Deodoro | 186.7 |
| Distribution Center | Vila Prudente/Capuava | 3.2 |

(1) One hectare equals 10,000 square meters.

We believe that all of our production facilities are in good operating condition. As of December 31, 2019, the consolidated net book value of our property, plant and equipment was R$32,315.2 million.

The following properties are mortgaged or pledged to secure certain of our financial transactions: (1) our chemicals plant and our polyethylene plant located in the Southern Complex; (2) our chlor-alkali plant and PVC plant located in the Northeastern Complex; (3) our chemicals plant and our polyethylene plant located in São Paulo Complex; (4) our chlor-alkali plant and PVC plant located in the State of Alagoas; (5) our chemicals plant, our polyethylene plant and our polypropylene plant located in the Rio de Janeiro Complex; and (6) our chemical plant and our polyethylene plants located in Mexico.

**Insurance**

In addition to the policies described below for our Brazilian and international operations, we maintain other insurance policies for specific risks, including general and product liability, directors and officers liability coverage, workers' compensation, marine cargo and charterer's liability insurance, among others.

We believe that our insurance coverage is reasonable in amount and consistent with industry standards applicable to chemical companies operating globally.

***Operations in Brazil, Mexico, the United States and Germany***

We carry insurance for all our plants against material damage and consequent business interruption through comprehensive "all risk" insurance policies.

The "all risks" insurance program for our plants provides for a total replacement value of US$34.5 billion for property damage. This insurance program is underwritten through separate policies in Brazil, Mexico, the United States and Germany by large insurance companies. The leading insurers are Mapfre (rating S&P BBB+), Inbursa (rating S&P AAA) and FM Global (rating S&P A+). These policies are valid until April 2020.

Set forth is a table with additional information related to our all risk insurance policies.

| Policy / Region US$ bn | Value at risk - Property Damage | Combined Property Damage and Business Interruption Limit | Comments |
|---|---|---|---|
| Brazil | 26.4 | 3.4 | - |
| Mexico[1] | 6.1 | 2.9 | - |
| USA and Germany | 2.0 | 0.5 | Limit increased from US$330 million to US$500 million |

(1) Includes coverage for acts of terrorism.

Our policies provide coverage for losses that arise from accidents caused by or resulting from fire, explosion and machinery breakdown, among others, and consequential business interruption, with maximum indemnity periods ranging from 12 to 33 months, depending on the plant and/or coverage.

As part of our program, we also have general and products liability insurances for our operations, which cover losses for damages to third parties caused by our operations and products. Braskem has coverage for environmental liabilities and remediation activities such as clean-up costs. These policies are capped at US$50 million for Mexico, US$50 million for Brazil and US$25 million for the United States and Germany (coverage is included in the general and umbrella liability policies).

New projects can be covered for Construction/Erection All Risks under the existing Property policies or through a standalone project-specific policy.

We have relevant exposure to operational risks, and our insurance policy requires our insurance coverage to be contracted through a complex insurance program involving multiple insurers and reinsurers in the commercial market, which have limited and variable capacity to offer insurance policies over time. In order to seek alternatives for the composition of hedges, the possibility of transferring operational risks through the mutual insurer "OIL" was identified. OIL is the global leader in the energy sector, including oil and gas, refining, chemical and petrochemicals, electric power and mining, and holds a total of US$3 trillion in insured assets and has a portfolio of selected participants. In addition to providing a stable capacity to Braskem, OIL has a structure in which there is reciprocal cooperation among the insured companies participating in a known risk environment, in addition to a lower administrative cost compared to the commercial insurance market, providing less volatile and potentially more competitive premiums.

**Compliance**

We have adopted a Policy on Compliance in Acting Ethically with Integrity and Transparency, and several internal policies designed to guide our management, employees and counterparties and reinforce our principles and rules for ethical behavior and professional conduct. We maintain an Ethics Line managed by a third party available for employees and non-employees. Every whistleblower complaint is investigated and submitted for evaluation by our Ethics Committee.

As of December 31, 2019, we identified a material weakness in our control environment as we had insufficient resources with an appropriate level of knowledge, training, expertise and skills commensurate with our financial reporting requirements. This resulted in a material weakness in our risk assessment as we did not effectively design and perform our processes and controls over risk assessment. Additionally, as described below we had a number of ineffective controls that also indicated that we had material weaknesses in our information and communication and monitoring components of internal control over financial reporting. These material weaknesses resulted in the following control deficiencies that were material weaknesses or aggregated to material weaknesses: (i) ineffective design and operation of general information technology controls (GITCs) related to user access and program change-management over certain ancillary IT operating systems, databases and applications that support our financial reporting processes, which resulted in business process controls that are dependent on the affected IT systems, in particular the completeness and accuracy of information from such systems, also being considered ineffective because they could have been adversely impacted. In addition, there were ineffective controls over reports from our ERP system and lack of controls over spreadsheets used in the operation of certain controls; (ii) ineffective design and operation of controls within the financial reporting process including consolidation, analysis of complex and unusual transactions , review of manual journal entries, and the preparation and review of the financial statements, including the technical application of generally accepted accounting principles and applicability of required disclosures; (iii) Ineffective operation of controls over legal contingencies related primarily to completeness of the legal contingences assessment; (iv) ineffective operation of controls over the purchase of and payment for certain legal services; (v) ineffective controls over the quantity of product shipped for sales transactions. See "Item 15. Controls and Procedures". Our management is actively engaged on the development and implementation of remediation efforts to address the material weaknesses described above.

In addition, we have implemented and improved procedures and control activities, which allowed us to resolve a material weaknesses described in our 2018 annual report on Form 20-F: in 2019, the Feedstock department implemented new controls related to oversight of purchases and payment of raw materials. This controls were able to ensure the raw material received from suppliers were adequate, in terms of quantity and quality. These efforts were able to ensure the remediation of the material weakness related to Ineffective design of controls over the purchase of raw materials. We have implemented these remedial steps and successfully tested the related controls. Therefore, as of December 31, 2019, we have concluded this material weaknesses described in our annual report on Form 20-F for the year ended December 31, 2018 has been remediated. See "Item 15. Controls and Procedures."

**ITEM 4A. UNRESOLVED STAFF COMMENTS**

Not Applicable.

**ITEM 5. OPERATING AND FINANCIAL REVIEW AND PROSPECTS**

*The following discussion of our financial condition and results of operations should be read in conjunction with our audited consolidated financial statements as of December 31, 2019 and 2018 and for the three years ended December 31, 2019, included in this annual report, as well as with the information presented under "Presentation of Financial and Other Information" and "Item 3. Key Information-Selected Financial and Other Information."*

*The following discussion contains forward-looking statements that involve risks and uncertainties, in particular with respect to the recent novel coronavirus (COVID-19) pandemic and related impacts on our historical and future results of operations and financial condition. Our actual results may differ materially from those discussed in the forward-looking statements as a result of various factors, including those set forth in "Cautionary Statement with Respect to Forward-Looking Statements" and "Item 3. Key Information-Risk Factors."*

**Overview**

Our results of operations for the years ended December 31, 2019, 2018 and 2017 have been influenced, and our results of operations will continue to be influenced, by a variety of factors, including:

- GDP growth in the regions where we operate, including as follows:

  o Brazil's GDP, which expanded 1.1% in 2019, as compared to 1.1% in 2018 and 1.0% in 2017, which affected the demand for our products and, consequently, our sales volume;

  o the U.S. GDP, which expanded 2.3% in 2019, as compared to 2.9% in 2018 and 2.5% in 2017, which affected the demand for our products and, consequently, our sales volume;

  o Europe's GDP, which expanded 1.2% in 2019, as compared to 2.2% in 2018 and 2.5% in 2017, which affected the demand for our products and, consequently, our sales volume;

  o Mexico's GDP, which contracted 0.1% in 2019, as compared to a 2.1% expansion in 2018 and a 2.0% expansion in 2017, which affected the demand for our products and, consequently, our sales volume; and

  o according to the IMF, because of the adverse effects of the novel coronavirus (COVID-19) pandemic on the economy of several countries, the world's GDP and the GDP of Brazil, the United States, Europe and Mexico is expected to shrink significantly in 2020, leading to an economic contraction and a recession in these countries or regions;

- the expansion of global production capacity for the products that we sell and the growth rate of the global economy;

- the international market price of naphtha, our principal raw material, expressed in U.S. dollars, which has a significant impact on the cost of producing our products and which has experienced volatility during the three years ended December 31, 2019, fluctuating in a range between US$447 and US$563 per ton during 2019, US$463 and US$676 per ton during 2018, and US$400 and US$571 per ton during 2017;

75

- the average domestic prices of our principal products expressed in U.S. dollars, which fluctuate to a significant extent based on international prices for these products and which also have a high correlation to our raw material costs;

- our crackers' capacity utilization rates, which decreased in 2019 as a result of the: (i) lower utilization rate of the cracker in Bahia resulting from the shutdown of the chlor-alkali and dichloroethane plants in Alagoas; (ii) scheduled turnaround of one of our production lines at the Bahia cracker in the fourth quarter of 2019; (iii) lower utilization rate at the crackers in Rio Grande do Sul, due to logistics problems; and (iv) drop in the marginal profitability of our export of resins;

- government industrial policy;

- changes in the *real*/U.S. dollar exchange rate, including the depreciation of the *real* against the U.S. dollar by 4.0% in 2019 and 14.5% in 2018, as compared to an appreciation of 8.3% in 2017;

- the level of our outstanding indebtedness, fluctuations in benchmark interest rates in Brazil, which affect our interest expenses on our *real*-denominated floating rate debt and financial income on our cash and cash equivalents, and fluctuations in the LIBOR rate, which affect our interest expenses on our U.S. dollar-denominated floating rate debt;

- the inflation rate in Brazil, which was 7.7% in 2019, 7.1% in 2018, and negative 0.4% in 2017, in each case, as measured by the IGP-DI, and the effects of inflation on our operating expenses denominated in *reais* and our *real*-denominated debt that is indexed to take into account the effects of inflation or bears interest at rates that are partially adjusted for inflation; and

- the tax policies and tax obligations.

Our financial condition and liquidity is influenced by various factors, including:

- our ability to generate cash flows from our operations and our liquidity;

- prevailing Brazilian and international interest rates and movements in exchange rates, which affect our debt service requirements;

- our ability to continue to be able to borrow funds from international and Brazilian financial institutions and to sell our debt securities in the international and Brazilian securities markets, which is influenced by a number of factors discussed below, including the adverse effect of the novel coronavirus (COVID-19) on the world economy and our business, financial condition and results of operations;

- our capital expenditure requirements, which consist primarily of maintenance of our operating facilities, expansion of our production capacity and research and development activities; and

- the requirement under Brazilian Corporations law and our by-laws that we pay dividends on an annual basis in an amount equal to at least 25% of our adjusted net income, unless our board of directors deems it inconsistent with our financial position and the decision of our board of directors is ratified by our shareholders.

**Recent Developments**

*Impact of the Novel Coronavirus (COVID-19)*

The rapid, worldwide spread of the novel coronavirus (COVID-19) has created global economic disruption and uncertainty, including in our business.

In March 2020, in view of the progression of the novel coronavirus (COVID-19) outbreak, we formed a crisis committee with the aim of establishing global procedures focusing on the health of our team members and the continuity of our operations. We have taken the following measures: (i) recommended that all team members and contractorswork remotely; (ii) established a minimum team in industrial areas to ensure safety and operational continuity matters; (iii) prohibited all national and international business travel, apart from exceptional cases; (iv) determined the self-quarantine of any team member or contractor returning from international travel or high risk areas, whether for business travel or personal reasons; (v) recommended that internal and face-to-face meetings with over 20 people be avoided, and prohibited participation in corporate events with 50 people or more; (vi) recommended that non-routine contractors and suppliers do not visit our facilities, and also prohibited access by visitors or third parties coming from high risk areas to our facilities; (vii) created joint schedules with customers and local communities to optimize the distribution of our products in a way that helps fight the pandemic.

**ITEM 8. FINANCIAL INFORMATION**

**Consolidated Statements and Other Financial Information**

Reference is made to Item 19 for a list of all financial statements filed as part of this annual report.

**Legal Proceedings**

We are, and may be in the future, involved in numerous tax, civil and labor disputes, among others, involving monetary claims. If any of these legal proceedings were decided adversely to us, we do not believe that our results of operations or financial condition would be materially and adversely affected.

For some of these lawsuits, we have not established any provision on our balance sheet nor have we established provisions only for part of the amounts claimed, based on our judgments as to the outcomes of these lawsuits.

*Tax Proceedings*

We are engaged in several legal proceedings with Brazilian tax authorities for which we have established provisions in an aggregate amount of R$672.1 million as of December 31, 2019. In addition, there are currently certain legal proceedings pending in which we are involved for which we have not established provisions, since there is no trigger in accordance to IAS 37 to record such provisions. If any of these legal proceedings were decided adversely to us, we do not believe that our results of operations, cash flows or financial condition would be materially and adversely affected.

*IR/CSLL Tax Assessment Notices*

In 2013, 2014 and 2017, we received tax assessment notices from the Federal Brazilian Revenue Service claiming that the amortization of the goodwill recorded in 2001 and 2002 in connection with the purchase of shares of certain companies related to the formation of Braskem was not deductible for purposes of calculating our income tax and social contribution. The amount claimed is R$1 billion, including interest and fines. We challenged these assessment notices because we believe that these claims are based on a misinterpretation of both the applicable law and facts by the tax authorities and that the statute of limitations has expired. In May 2018 and November 2019, two of the claims regarding the tax assessment notices were decided partially in our favor by the Administrative Court, thereby reducing our liabilities by R$403 million. We believe that a loss of these claims is possible and our external legal counsel expect that the administrative discussions will end in 2022. As of December 31, 2019, we had made no provision with respect to these claims and there is no deposit or guarantee related to them.

In 2009, 2013 and 2017, we received deficiency notices from the Brazilian federal tax authority claiming that the tax losses offset in the taxable year were in excess of the limitation of 30% of the taxable profits of a given year, as imposed by Brazilian tax law. The amount under discussion is R$348 million, including interest and fines. We challenged these assessment notices because we believe that the 30% limitation is not applicable in the event of the merger of the taxpayer and that the statute of limitations for one of these claims has expired. In April 2019, one of the claims regarding the tax assessment notices was decided in our favor by the Administrative Court, thereby reducing our liabilities by R$407 million. Despite this favorable decision, the risk of loss is possible and our external legal counsel expect that the administrative discussions will end in 2020, and the judicial discussion will end in 2027. As of December 31, 2019, we had made no provision with respect to these claims and there is no deposit or guarantee related to the processes that are in administrative discussion phase. Collection is suspended during the discussions due to an injunction later confirmed by a judicial award that we obtained in our favor.

We received a tax assessment notice from the Federal Brazilian Revenue Service claiming income tax and social contribution debts due to the following: (i) commissions paid by Braskem in 2011 were not considered deductible for purposes of calculating income tax and social contribution; (ii) commissions paid by Braskem INC in 2013 and 2014 were also not considered deductible for purposes of calculating income tax and social contribution; (iii) we did not withhold the income tax over the payments of the aforementioned commissions; and (iv) marketing expenses were not considered deductible for purposes of calculating income tax and social contribution. We challenged this assessment notice in Administrative Court due to the following reasons: (i) the statute of limitations has expired for the year of 2011, and tax authorities are claiming the payment of income tax and social contribution without taking into consideration that the right to deduct some expenses for purposes of calculating income tax and social contribution is still under discussion in other tax proceedings; (ii) Braskem INC has already recalculated its income tax which only resulted in the decrease of its tax losses; (iii) the net interest paying company is non-resident in Brazil; and (iv) marketing expenses are related to our activities. The amount under discussion is R$133 million, including interest and fines. We believe that a loss of this claim is possible and our external legal counsel expect that the administrative discussion will end in 2022. As of December 31, 2019, we had made no provision with respect to this claim and there is no deposit or guarantee related to it.

152

In December 2017, we received a tax assessment notice from the Federal Brazilian Revenue Service claiming unpaid income tax and social contribution in connection with exchange variation losses recorded by Braskem in the elapsed time between the due date of naphtha import invoices and their payments. The Federal Brazilian Revenue Service considered that these losses, recorded in 2012, were not deductible for purposes of calculating income tax and social contribution which resulted in the recalculation of our tax losses and social contribution negative tax base. The amount claimed is R$103 million. We believe that a loss of this claim is possible and our external legal counsel expect that the administrative discussion will end by 2022. As of December 31, 2019, we had made no provision with respect to this claim and there is no deposit or guarantee related to it.

We are discussing, at the administrative level, the rejection by the Federal Brazilian Revenue Service of Clearing Statements that aimed at the discharge of federal taxes with credits arising from negative balance of income tax and social contribution. The amount under discussion, corresponding to taxes whose compensation was not ratified, is R$196 million, including interest and fines. We believe that a loss of this claim is possible and our external legal counsel expect the administrative discussion to end by 2024. As of December 31, 2019, we had made no provision with respect to this claim and there is no deposit or guarantee related to it.

In November 2018, we received a tax assessment notice from the Federal Brazilian Revenue Service demanding the payment of income tax on exports made by Braskem Qpar S.A. to Braskem Incorporated Limited, due to resale of goods abroad. According to the Federal Brazilian Revenue Service, Braskem Incorporated Limited omitted revenue when making resales abroad for an amount greater than that recorded. This supposedly omitted revenue was attributed directly to Braskem, as successor of Braskem Qpar. Based on this premise, the inspection department issued a second tax assessment notice to impose a fine. As of December 31, 2019, the aggregate amount of these tax assessment notices was approximately R$75.0 million. We believe that a loss of this claim is possible and our external legal counsel expect that the case will be resolved by 2023. There are no deposits or guarantees related to these assessments.

*IOF*

We are involved in judicial and administrative proceedings due to tax assessment notices issued by the Federal Brazilian Revenue Service claiming that the following operations are subject to Financial Operations Tax (IOF): (i) the transfers of financial resources under cash pooling and current account agreements made between Quattor Participações S/A, Quattor Química S/A and Braskem and between Braskem and CPN Incorporated and (ii) the advances for future capital increases made by Quattor Participações S/A and Quattor Química S/A. The amount claimed is R$167 million. We believe that these operations do not constitute loans under Brazilian legislation and, as such, are not subject to IOF. We believe that a loss in this claim is possible and our external legal counsel expect that the judicial discussion will end in 2024. We presented a guarantee for the debt under judicial litigation in the amount of R$59 million.

*ICMS Tax Assessment Notice*

From 1999 to 2019, the internal revenue department of the States of Bahia, Alagoas, Pernambuco, São Paulo, Rio Grande do Sul and Rio de Janeiro issued tax assessment notices against Braskem claiming unpaid ICMS taxes in the amount of R$740 million, retrospectively revised by inflation and the benchmark rate, in connection with several alleged violations of certain provisions of the ICMS tax legislation, including, among others: (1) inappropriately claiming ICMS credits for the acquisition of goods that the internal revenue department considers for use and consumption; (2) inappropriately claiming ICMS credits for the acquisition of assets not related to production; (3) transfer of goods below the cost of production; (4) differences in stock of final products; (5) lack of evidence that we exported goods; (6) failure to pay taxes on the sale of products subject to tax substitution and inappropriately claiming ICMS tax credits on the purchase of products subject to tax substitution; (7) failure to register invoices; (8) unpaid ICMS taxes on charges for electricity transmission; and (9) for the use of a calculation basis relating to ICMS tax lower than that required by law, in connection with internal transfers of the product crude dichlorethane to another unit in the State of Alagoas, from January 2013 to May 2016, which were not subject to deferral. We challenged these assessment notices in the administrative court because we believe that there are reasonable grounds on which we can successfully defend against these assessments. The administrative cases are expected to be resolved by 2025 and the judicial cases by 2030. If an unfavorable decision is rendered against us, it is expected that the debts would be paid at 50% of the current value, based on the favorable precedents at judicial and administrative levels. A guarantee was offered in the amount of R$148 million for the debts under discussion in the judiciary. We believe that a loss of these claims is possible and, as of December 31, 2019, we had not recognized any provision with respect thereto.

153

In 2009, tax assessment notices were issued by the internal revenue department of the State of São Paulo against Braskem Qpar claiming unpaid ICMS taxes and related fines in connection with several alleged violations of certain provisions of the ICMS tax legislation, including:

(1) Inappropriately claiming ICMS credits: (i) in the amount of R$53.5 million from February 2004 to August 2005, November 2005 to February 2006, and September 2006 to January 2008, related to the acquisition of "acrylonitrile" sold by Acrinor Acrilonitrila do Nordeste S.A.; (ii) in the amount of R$1.6 million from December 2004 to August 2005, related to credits informed in invoices issued by Proquigel Química S.A.; and (iii) in the amount of R$3.1 million from August 2004 to November 2005, related to credits informed in invoices issued by Proquigel Química S.A. for export, not subject to ICMS;

(2) A fine of 100% of the taxes assessed was imposed in all cases above;

(3) Error in the issuance of invoices under CFOP code 6.905 without the circulation of goods - a fine of 30% of the amount of the invoices (R$480.4 million) was assessed; and

(4) Fine assessed due to the default in answering to notification of tax authorities to present documents to a tax audit.

The administrative proceedings were closed in the administrative court in 2015, and the remaining debt is under discussion in the judiciary. Due to favorable decisions, the State Treasury of São Paulo has rectified the amount of the debt to apply default interest and monetary restatement limited to the SELIC rate, which reduced the debt in 20%. Regarding this amount, the chances of loss are remote, and for the remaining debt we believe the loss is possible. As of December 31, 2019, we had established related provisions in the amount of R$297.5 million. We offered a guarantee to the debts and our external legal counsel expect the cases to be resolved by 2025.

*PIS and COFINS Non-Cumulative Tax Assessment Notice*

We received assessment notices from the federal internal revenue department alleging that we had inappropriately claimed certain PIS and COFINS credits in relation to: (1) wastewater treatment; (2) charges for electricity transmission; (3) freight related to the storage of finished goods; (4) credits claimed at inappropriate times, relating to various acquisitions; and (5) fixed assets. As of December 31, 2019, the amount in dispute in connection with these claims was R$1.2 billion. We challenged these assessment notices because we believe that there are reasonable grounds on which we can successfully defend against these assessments. We believe that a loss of these claims is possible and our external legal counsel expect that the administrative discussions will end in 2024 and the judicial discussion will end in 2030. We presented a guarantee for the debt under judicial discussion in the amount of R$30 million.

The Federal Brazilian Revenue Service did not recognize the compensation of PIS and COFINS credits for the following reasons:

- the amount of the credits informed in the compensation files were greater than the amount informed in the PIS and COFINS declaration (DACON);

- freight expenses not linked to sales operations or without a proven connection, link to the national territory, but related to imported products;

- credits relating to the acquisition of fixed assets from incorporated companies whose documentation was not found; and

- taxation of taxable revenues erroneously classified as exempt, at zero rate or not taxed.

154

A loss of this claim is likely and our external legal counsel expects that the administrative discussion will end in 2022. As of December 31, 2019, we had established related provisions in the amount of R$193.1 million. There are no deposits or guarantees related to these claims.

*PIS and COFINS Tax Assessment Notice*

Braskem is involved in several judicial and administrative proceedings related to the payment of PIS and COFINS, including (1) unpaid COFINS from March 1999 to December 2000, February 2001 to March 2002, May 2002 to July 2002 and during September 2002, (2) inappropriately claimed credits due to the additional 1% in the COFINS rate and PIS Decree-Law Nos. 2,445 and 2,449; (3) undue compensation of PIS and COFINS debts with PIS credits (Decree-Law Nos. 2,445 and 2,449) which were considered to have expired by the tax authorities; and (4) an omission in the base revenue resulting from exchange gains earned due to successive reductions of our associated capital. We challenged these assessment notices because we believe that there are reasonable grounds on which we can successfully defend against these assessments. We believe that a loss of these claims is possible and our external legal counsel expect the cases to be resolved by 2023. As of December 31, 2019, we had established related provisions in the amount of R$63.3 million. We offered guarantee in the amount of the judicial litigations.

In 2014, we received a tax assessment notice from the Federal Brazilian Revenue Service claiming that the tax losses and social contribution negative tax base used to pay debts under the MP No. 470/2009 installments program, as well as interest, and fines exoneration afforded in installments of the MP No.470/09 are taxable. We challenged this assessment notice because we believe that these claims are based on a misinterpretation of both the applicable law and facts by the tax authorities. In November 2018 and August 2019, two of the claims regarding the tax assessment notices were decided in our favor by the Administrative Court. As of December 31, 2019, the amount of PIS and COFINS claimed was R$883 million. We believe that a loss of this claim is possible and our external legal counsel expect that the administrative discussion will end in 2020. There are no provision with respect to this claim.

We and our affiliates are involved in several other judicial and administrative proceedings related to the alleged undue compensation of PIS and COFINS debts with the following credits: (1) Corporate Income tax; (2) FINSOCIAL; (3) tax on net profits; (4) PIS (Decree-Law Nos. 2,445 and 2,449); and (5) COFINS. The proceedings are also related to debts of COFINS levied on interest calculated on equity. As of December 31, 2019, the amount in material disputes relating to PIS and COFINS was R$148 million. We offered guarantee in the amount of the judicial litigation. We believe that a loss of this claim is possible and our external legal counsel expect that the judicial discussion will end in 2024. As of December 31, 2019, we had not recognized any provision with respect to these proceedings.

We are involved in lawsuits related to the payment of PIS and COFINS offsetting with Cide-Combustíveis credits, as authorized by Law No. 10,336/2001. As of December 31, 2019, the aggregate amount of these cases was R$144 million. We believe that a loss of this claim is possible and our external legal counsel expect that the discussion will end in 2030. We constituted a guarantee in the amount under discussion.

*Isolated Fine Tax Assessment Notices*

From 2016 to 2019, we received tax assessment notices from the federal internal revenue department imposing isolated fines due to the use of credits of: (i) non-cumulative PIS/COFINS; (ii) negative Balance of IRPJ/CSLL; (iii) REINTEGRA and (iv) other credits, offset and not homologated. As of December 31, 2019, the amount claimed was R$289 million. We believe that a loss of these claims is possible and our external legal counsel believe that the administrative proceedings will end in 2024. There are no deposits or guarantees related to these claims.

*IPI and Import Duty Tax Assessment Notice*

In 2002, the merged company Ipiranga Petroquímica received a tax assessment notice from the Federal Brazilian Revenue Service due to the contracting of two separate companies, one to supply the parts and technology and the other to supply the specialized labor to provide technical assistance in the construction of an industrial plant in the State of Rio Grande do Sul, claiming that it would have been done only to reduce the price of the parts and technology used and, as a consequence, reduce the value of IPI and import duty to be paid. The administrative proceeding was closed in 2019 and currently the debt is under discussion in the judiciary. As of December 31, 2019, the amount claimed was R$82 million. We believe that a loss of this claim is possible and our external legal counsel expect the case to be resolved by 2030. We offered a guarantee in the amount of the judicial litigation.

155

*SUDENE - Income Tax Reduction*

Since 2015, we have obtained favorable decisions in administrative proceedings and lawsuits claiming the reduction of 75% of IR on income from the following industrial units: (i) PVC and chlor-alkali (*cloro soda*) units, established in the state of Alagoas; and (ii) Chemicals, PE, PVC and chlor-alkali units, established in the city of Camaçari (BA). The realization period is 10 years. In 2019, the operations in Brazil recorded tax losses, therefore it was not possible to claim any deductions as tax incentives.

*PRODESIN - ICMS Tax Incentive*

Braskem has ICMS tax incentives by the state of Alagoas, through the state of Alagoas Integrated Development Program, or PRODESIN, which aimed at implementing and expanding a plant in that state. This incentive is considered an offsetting entry to sales taxes. In 2019, the amount was R$67.8 million (R$81.9 million in 2018). As PRODESIN is considered an investment subsidy, it was allocated to our tax incentive reserve, pursuant to the Brazilian Corporations Law.

*REIQ - PIS/COFINS Tax Incentive*

The Brazilian chemical and petrochemical sector enjoyed an important achievement in 2013. The government, in response to one of the proposals elaborated by the Chemical Industry Competitiveness Council, approved the PIS and COFINS tax rates relief on raw material purchases by first and second generation producers, which serve various sectors of the economy. The measure aimed to restore some of the industry's competitiveness, which was weakened by factors related to infrastructure, productivity, feedstock and energy costs and the exchange rate that pressured the chemical industry's trade deficit, according to ABIQUIM, which ended 2019 at US$31.5 billion. By 2019, we had a tax rebate of 3.65% (PIS and COFINS) on the acquisition of petrochemical raw materials.

On May 30, 2018, the Brazilian government issued Provisional Measure No. 836/18, which revoked the tax rebate of 3.65%, beginning on September 1, 2018. However, in early October, 2018, the Provisional Measure failed to be converted into law, which kept the rebate of PIS and COFINS on the acquisition of petrochemical raw materials unchanged at 3.65%.

**Social Security Contributions - Withholding of 11%**

We received a tax assessment from the Brazilian Federal Revenue Service for allegedly withholding social security at the rate of 11% on the gross amount of invoices, bills or trade notes related to services executed through assigned labor, in the period from February 1999 to June 2002, amounting to R$53 million as of December 31, 2019.

Our external legal counsel, in view of prior decisions by the Administrative Council of Tax Appeals (CARF) and the evidence provided by us, consider the chances of loss at the administrative level as possible. Our external legal counsel expect that the administrative proceeding will be resolved in 2020. There are no deposits or any other type of guarantee for such procedures, since they are still being discussed at the administrative level.

**Social Security Contributions - Harmful Agents**

We are involved in several judicial and administrative proceedings related to the payment of social security contributions in which the following issues are discussed: (i) the collection through tax assessments of the additional Workplace Accident Risk ("RAT") for the costing of special retirement, due to the alleged exposure of workers to harmful agents, in addition to a fine for non-disclosure of this information in GFIP (in the period from April 1999 to February 2006); and (ii) the requirement, in terms of tax enforcement, of additional RAT (in the period from November 2000 to January 2001, and from November 2001 to June 2002). The aggregate amount of these claims, as of December 31, 2019, was approximately R$47 million. Our external legal counsel expect that the discussions at the administrative level will be concluded in 2021 and in 2027 at the judicial level. There is no deposit or other type of guarantee for the proceedings that are still under administrative discussion and the only one that is under judicial discussion is guaranteed by bond in the amount of R$3.7 million.

156

*Class Action Proceedings*

In July 2015, two putative class action lawsuits were filed against us and certain of our then-current and former officers and directors, or the Defendants, in the United States District Court for the Southern District of New York. The lawsuits were subsequently consolidated under the caption In re Braskem, S.A. Securities Litigation, No. 15-cv-5132. In November 2015, Boilermaker-Blacksmith National Pension Trust, or the Lead Plaintiff, filed a consolidated class action complaint, which asserted claims under Section 10(b) and Section 20(a) of the Exchange Act, on behalf of a putative class of purchasers of our ADSs, from June 1, 2010 to March 11, 2015. In the operative complaint, the Lead Plaintiff alleges that the Defendants made misrepresentations or omissions that inflated the price of our stock in violation of U.S. securities laws. We filed a motion to dismiss on July 6, 2016. On March 31, 2017, the court ruled on the motion to dismiss, granting it in part and denying it in part. The parties have signed a proposed settlement agreement on September 14, 2017 and the U.S. court granted final approval to the settlement and entered a judgment to dismiss the action and discharge the claims of the class members on February 21, 2018. Under the terms of the settlement, we paid US$10 million to resolve all claims of the settlement class consisting of purchasers of our ADSs during the period from July 15, 2010 through March 11, 2015, that arise out of or relate to the subject matter of the class action. We paid the settlement amount into an Escrow Account (which is subject to the jurisdiction of the Court) on October 2, 2017 and the Claims Administrator shall arrange its distribution after the entry by the court of a class distribution order. We have made no admission of any wrongdoing or liability as part of the settlement.

*Global Settlement*

In the context of allegations of improper payments in connection with the so-called Operation Car Wash (*Operação Lava Jato*) in Brazil, we engaged independent expert firms to conduct an investigation into such allegations (the "Investigation") and report their findings. We have cooperated with governmental authorities in several jurisdictions, including the U.S. Department of Justice, or the DoJ, the U.S. Securities and Exchange Commission, or the SEC, Brazil's Federal Prosecutor's Office (*Ministério Público Federal*), or the MPF, and Switzerland's Office of the Attorney General, or the OAG. On December 14, 2016, we entered into a leniency agreement with the MPF, or the Leniency Agreement, which was ratified by the competent Brazilian court on June 6, 2017. On December, 21, 2016, we filed a plea agreement in the United States District Court for the Eastern District of New York under which we agreed to plead guilty to a one-count criminal information charging us with conspiracy to violate the anti-bribery provisions of the U.S. Foreign Corrupt Practices Act, or the FCPA. On the same date, we consented to the entry of a final judgment in a civil action brought by the SEC based on civil violations of the anti-bribery, books and records and internal accounting controls provisions of the FCPA. The competent federal courts in the United States approved the DoJ and SEC resolutions on January 26, 2017 and February 28, 2017, respectively. In addition, on December 21, 2016, the OAG closed its investigation of these matters. We refer to these actions as the Global Settlement. Under the Global Settlement, we agreed to pay to the governmental authorities in these jurisdictions an aggregate amount of US$957 million (equivalent to R$3.1 billion), based on the exchange rate of R$3.27 per U.S. Dollar, applicable at the time of the negotiation.

The MPF will distribute the majority of the amount it receives as restitution to third parties for damages caused by the misconduct. Pursuant to the Global Settlement, the MPF agreed to communicate with other public authorities or entities, as well as stated-owned companies and mixed-capital companies with which Braskem enters into discussions to address the facts under the Global Settlement and avoid making duplicate restitution payments. In this context, as announced to the market on July 10, 2018 and disclosed in a material fact on May 27, 2019, we have cooperated and engaged in negotiations with the Ministry of Transparency and Controllership (CGU) and the Office of the Attorney General (AGU) in Brazil, and our Board of Directors approved the signing of a leniency agreement with the CGU and the AGU (the "CGU/AGU Agreement").

The CGU/AGU Agreement, in the amount of R$2.9 billion, to be adjusted by the SELIC rate, addresses the same facts that are the object of the Global Settlement executed in December 2016 with the Brazilian Federal Prosecution Office (MPF), the U.S. Department of Justice (DoJ), the U.S. Securities and Exchange Commission (SEC) and the Swiss Office of the Attorney General ("Global Settlement"). Of this amount, R$2.5 billion will be offset by the amount that Company already had undertaken to pay under the scope of the Global Settlement, resulting in an additional disbursement of R$410 million.

As of the date of this annual report, we have paid R$2.3 billion of the total fine established in the Global Settlement in the following manner:

- US$94.9 million (R$296.6 million) to the DoJ, on February 8, 2017;

157

- US$65.0 million (R$206.5 million) to the SEC, on April 27, 2017;

- CHF30.2 million (R$104.3 million) to the OAG, on June 27, 2017;

- R$736.4 million to the MPF, on July 6, 2017;

- R$267.9 million to the MPF, on January, 30 2018;

- CHF16.1 million (R$62.0 million) to the OAG, on June 28, 2018;

- R$278.0 million to the MPF, on January 30, 2019;

- CHF16.1 million (R$58 million) to the OAG, on June 27, 2019; and

- R$278 million on January 30, 2020 with respect to the leniency agreements with MPF and CGU/AGU.

The outstanding amount of R$1.5 billion related to the Global Settelement and also the CGU/AGU Agreement will be paid in the following manner:

- CHF32.1 million to the OAG, related to two remaining annual installments of CHF16.1 million due on June 30 of each year as from 2020; and

- R$900 million to the MPF in four remaining annual installments due on January 30 of each year as from 2020. To guarantee payment of future installments, Braskem pledged collateral assets from its property, plant and equipment sufficient to cover one annual installment; and

- R$409.9 million in connection with the CGU/AGU Agreement in two annual installments due on January 30, 2024 and 2025.

The Global Settlement does not prevent Braskem from responding to any legitimate third party, which may seek indemnification against us from damages for the facts subject to the Global Settlement. As a result, we cannot assure you that the aggregate amount disbursed as a requirement pursuant to the agreement will be sufficient to cover indemnification claims of all of the victims. We may be required to make additional disbursements to cover such claims.

Other authorities with jurisdiction over us may seek to impose monetary sanctions or fines on, or to initiate investigative proceedings against, Braskem. As a result of entering into the Global Settlement, Braskem may be prevented from entering into certain agreements with government entities and may be subject to increased operating costs for being under the obligation to improve its governance and anti-corruption practices and procedures, including the cost of external monitorships.

Under the terms of the Global Settlement, we were required to cooperate with these governmental authorities and improve our governance and anti-corruption compliance practices. We were also subject to external monitorship for a period of three years from 2017, which ended in March 2020, during which time the monitor assessed compliance with the Global Settlement, including the effectiveness of our internal controls, policies and procedures to reduce the risk of any anti-corruption violations. The monitorship period could be terminated early or extended for up to one year at the authorities' discretion depending on our compliance with the Global Settlement.

On May 13, 2020, the MPF, the DoJ and the SEC confirmed the conclusion of the independent compliance monitorship at Braskem, which had been established in the settlement agreements entered into by Braskem, the DoJ and the SEC on December 21, 2016. The decision of the DoJ and the SEC was based on a final report from the independent monitors, who certified that the Company implemented all of the recommendations regarding the structure and execution of its compliance program and concluded that the Company meets the standards set out in the settlement agreements entered into with the DoJ and the SEC. Following the end of the independent monitorship period and the certification by the MPF, the DoJ and the SEC, the Company has complied with its obligations established in the settlement agreements entered into with these authorities and has successfully concluded the three-year monitorship.

We believe we are fully in compliance with our obligations under the Global Settlement.

158

In connection with the execution of the CGU/AGU Agreement, Braskem originally took a tax deduction in its 2019 quarterly financial statements for the full amount of the payments to be paid under the CGU/AGU Agreement, as under Brazilian tax law the execution of such agreement provides a right to take a tax deduction on the compensation amount that is due to be paid in Brazil under this type of agreement. The plea agreement entered into with the DoJ as part of the Global Settlement prohibits Braskem from seeking tax deduction in connection with the payment of any part of the aggregate amount of the total criminal penalty contained in the plea agreement, which includes a credit for a portion of the payments to be made in Brazil. After further consideration, in light of the language in the plea agreement, Braskem voluntarily decided to reverse such tax deduction so that no part of the prior tax deduction would be inconsistent with the plea agreement entered into with DoJ. Under the Plea Agreement, it is the DoJ´s sole discretion to determine whether Braskem S.A. has breached the Plea Agreement and to determine the consequences of such breach. Currently, based on the advice of our counsel, we believe that it is unlikely that it will incur in losses as a result of this matter.

### Labor Proceedings

### Employment and Occupational Health and Safety Proceedings

We have provisioned R$315.4 million, as of December 31, 2019, with respect to employment and occupational health and safety proceedings, relating to 604 labor proceedings, including cases of occupational health and safety (in 2018, there were 477 proceedings). Our external legal counsel estimate that the time for completion of each of such proceedings in Brazil is more than five years. Estimates related to the completion of the proceedings and the possibility of future disbursement may change as result of new decisions of higher courts.

### Social Security

As of December 31, 2019, we were involved in several social security proceedings in connection with which the aggregate amount claimed was R$941.2 million. We believe that our chance of loss is possible and therefore have not established a provision for these claims.

### Civil Proceedings

### Caustic soda transportation

We are the defendant in civil lawsuits filed by the owner of a former distributor of caustic soda and by the shipping company that provided services to this former distributor, which, as of December 31, 2019, totaled R$65.8 million. The claimants seek indemnity for damages related to the alleged non-performance of the distribution agreement. Our management's evaluation, supported by the opinion of external legal counsel, is that the lawsuits will possibly be dismissed within an eight-year period as of December 2019. No judicial deposit or other form of guarantee was constituted for these lawsuits. No provision has been made by us for this proceeding.

### Excess weight

A civil class action was filed by the Federal Prosecutor's Office in Brasilia seeking to hold us liable for damages caused to federal roads by trucks carrying excess weight. The action claims damages to the federal government arising from material damages and collective pain and suffering, in the amount of R$61.2 million, as of December 31, 2019. The lawsuit was dismissed in the lower court, and the decision dismissing it was confirmed by a higher court. A special appeal has been filed by the Federal Prosecutor's Office and is currently pending before the Superior Court of Justice (STJ).

### Resale of solvents

In January 2017, we became the defendant in a civil lawsuit filed by a former reseller of solvents, claiming alleged breach of a distribution agreement. As of December 31, 2019, the damages claimed in the lawsuit amounted to R$204.6 million. Based on the opinion of external legal counsel, our management believes that the lawsuit has a possible risk of loss. As a result, no provision has been made by us. No judicial deposit or other form of guarantee was constituted for this lawsuit.

### Redress proceeding

159

A compensatory lawsuit was filed by the insurer of one of our customers. The insurer seeks the reimbursement of the amount paid to a customer pursuant to an insurance agreement entered into with the customer. As of December 31, 2019, the amount involved in this proceeding was R$75.6 million. According to the insurer, the losses incurred by the customer, for which it was reimbursed, were caused by the supply of non-conforming products by Braskem. Our management, based on the opinion of external legal counsel, considers that the lawsuit may be dismissed in a period of up to eight years. No judicial deposit or other form of guarantee was constituted for this lawsuit.

### Civil Claim for Recovery of Overpaid Amounts Related to CIDE Contributions

A lawsuit was filed by a customer of ours claiming (i) the repayment of the amount allegedly withheld by Braskem for the payment of CIDE's share due for fuel supply and (ii) compensation for damages arising from the misuse of said amount. The lawsuit was dismissed at a lower court and the decision was confirmed by a higher court. Currently, there is a special appeal that was filed by the customer pending before the Superior Court of Justice (STJ). As of December 31, 2019, the amount in dispute was R$144 million. Our management, based on the opinion of external legal counsel, considers that the lawsuit will possibly be dismissed in a period of up to three years. No judicial deposit or other form of guarantee was constituted for this lawsuit.

### Corporate Related Proceedings

As of December 31, 2019, one of our most significant corporate claims is related to an ordinary collection claim combined with a request for damages for losses, requesting the payment of dividends and a share bonus arising from the class "A" preferred shares of the dissolved company Salgema Indústrias Químicas S.A. Dividends and bonus related to fiscal years prior to 1987 were considered to have become time-barred by lower courts and therefore not owed by Braskem. However, the Alagoas state Court of Appeals reviewed the decision and considered that amounts prior to such period are also owed. Braskem filed an appeal against the decision with the Superior Court of Justice (STJ), which was partially granted. It is possible that the statute of limitations could be applied to part of the claim once the request for liquidation is reviewed by the Superior Court of Justice (STJ). During fiscal year 2019, Braskem established a provision of R$64.3 million for this lawsuit and there is no guarantee related to this claim.

We are also currently subject to the liquidation of an award related to a lawsuit filed in 1988, which ordered Polialden Petroquímica S.A., which merged into Braskem on May 31, 2006, to pay to its non-controlling preferred shareholders certain remaining profits. The purpose of the liquidation proceeding is to determine the value of the award calculated in accordance with the judicial order issued on April 15, 2016, which will occur through an arbitration procedure, as determined by the court, and was appealed. The procedure is awaiting the beginning of the expert analysis.

Based on the opinion of our external legal counsel, as of December 31, 2019, On December 31, 2019, we constituted a provision of R$64.3 million.

### Reverse Logistic System

Braskem is directly or indirectly (through industry associations) involved in public civil actions and proceedings currently pending before the municipality of São Paulo, the municipality of Porto Alegre, and 27 municipalities in the state of Mato Grosso do Sul and the state of Paraná related to the execution of a National Sectorial Agreement for the reverse logistic system of general packages, seeking amendments to the terms of such agreement or the implementation of reverse logistics, as well as payment of damages to municipalities and indemnification for environmental damage. Several companies and associations that have entered into the National Sectorial Agreement are involved in such claims, which are all in their early stages. The total net value involved in these claims is R14.5 million, considering all defendant companies and associations (if the amount is divided among all companies and associations involved as defendants, Braskem would be responsible for R$0.52 million). According to the opinion of our external legal counsel, these lawsuits have a possible chance of loss and, as a result, no provision has been made by Braskem.

### Hashimoto Civil Action

A civil class action was filed in June 2018 by the Public Prosecutor's Office of the State of São Paulo against us and other companies that operate in the Capuava Petrochemical Complex, seeking the reparation and/or remediation of environmental damages supposedly arising from the emission of air pollutants, as well as a joint judgement against companies that comprise such complex, seeking environmental moral damages in the amount of R$107.6 million. Based on the opinion of external legal counsel, our management believes that the lawsuit will possibly be dismissed within a period of eight years. No judicial deposit or other form of guarantee was constituted for this lawsuit.

*Alagoas - Mining Activities*

In April 2019, the Alagoas State Attorney's Office (*Ministério Público do Estado de Alagoas*) and the State Public Defender's Office (*Defensoria Pública do Estado de Alagoas*) filed a lawsuit seeking to freeze our assets in an amount of up to R$6.7 billion to secure funds allegedly required to ensure remediation and compensation for environmental, property and personal damages potentially resulting from a geological incident related to our mining actitivies in the city of Maceió. A preliminary decision ordered the freezing of R$100 million in our banks accounts.

In addition, the Alagoas state court of appeals (*Tribunal de Justiça do Estado de Alagoas*) ordered the suspension of the distribution of dividends for the fiscal year 2018 that had been proposed in the amount of R$2.7 billion, or, alternatively, the freezing of assets in the same amount of the proposed dividend distribution.This decision was subsequently reversed by a decision of the Superior Court of Justice (*Superior Tribunal de Justiça*, or STJ), which authorized the distribution of dividends upon posting of a judicial bond in the same amount. The Alagoas State Attorney's Office and the Alagoas State Public Defender's Office amended their claim to exclude the request for indemnification for the alleged environmental damages and reduce the amount of assets to be frozen to R$3.7 billion, which according to their allegations would be equivalent to the actual damages caused to the residents of the districts affected by the geological event. On June 26, 2019, the presiding judge of the Alagoas state court of appeals (*Tribunal de Justiça do Estado de Alagoas*) issued a decision ordering an amount of R$3.7 billion to be frozen. This decision was also subsequently reversed by the Superior Court of Justice (STJ), which ordered the frozen amount of R$3.7 billion to be returned to our bank accounts after posting another judicial bond in an equivalent amount.

On May 8, 2019, we became aware of the Report No. 1, prepared by the Mineral Resources Research Company (Companhia de Pesquisa de Recursos Minerais), or CPRM, an entity of the Brazilian Energy and Mining Ministry (*Ministério de Minas e Energia*), on the geological events that occurred in the city of Maceió. Such report indicated the occurrence of (i) destabilization of caverns resulting from sodium chloride, or salt, extraction, which created a dynamic situation that reactivated pre-existing geological structures and deformations in the districts of Pinheiro, Mutange and Bebedouro; and (ii) instability in the Pinheiro district, which was aggravated by the erosive effects caused by an increase in the infiltration of stormwater runoff in pre-existing fractures in extremely erodible soil and accelerated due to the lack of an effective stormwater runoff drainage network and of adequate basic sanitation, among other factors. In this context, due to the developments from the publication of Report No. 1 by CPRM, in accordance with applicable safety standards, on May 9, 2019, we suspended all salt extraction and, consequently, the operations of the chlor-alkali and dichloroethane plants located in the district of Pontal da Barra in Maceió, state of Alagoas and also reducing production in the Camaçari Petrochemical Complex in the state of Bahia, since they are integrated into the production chain. Given that, Braskem put in place a non-integrated business model according to which the Company will import: (i) caustic soda to supply the Brazilian market using its logistics structure and terminals along the Brazilian coast; (ii) EDC to continue to operate its PVC plants in the states of Alagoas and Bahia, in Brazil; and (iii) sea salt to supply the Chlorine Soda plant in the state of Bahia.We have continuously cooperated with relevant authorities and the local community.

On July 25, 2019, we were informed of another civil lawsuit filed against us by the Labor Prosecutor's Office of the State of Alagoas, or MPT-AL, requesting injunctive relief to freeze the amount of R$2.5 billion to guarantee payment of any actual damages that workers affected by the geological event may suffer. In that lawsuit, MPT-AL further requested the payment of compensation to workers for pain and suffering. On October 10, 2019, the trial court denied the injunctive relief request.

On August 19, 2019, we became aware of the filing of another civil lawsuit by the Federal Prosecutor's Office (Ministério Público Federal) against us and other parties, requesting the following injunctive reliefs: (i) the set-up of a fund of R$3.1 billion for the benefit of social and environmental programs and emergency measures to be carried out, and the maintenance in said fund of working capital in the amount of at least R$2.0 billion or, after a financial schedule is approved for such fund, an amount equivalent to 100% of the expenses projected for the subsequent 12 months; (ii) the posting of bonds in the amount of R$20.5 billion; (iii) prohibition on us to encumber or dispose of any of our fixed assets and to distribute profits, in the form of dividends, interest on  shareholders' equity or any other form; (iv) freezing of any profits not yet distributed; and (v) suspension of receipt of government financings and government incentives, as well as acceleration of existing indebtedness with BNDES (a federal development bank). On January 15, 2020, the trial court denied the injunctive relief requests.

161

On November 14, 2019 we issued a material fact in which we informed the market that we submitted to the Brazilian National Mining Agency (*Agência Nacional de Mineração*, or ANM) a plan with measures to permanently end salt extraction activities in Maceió and close all of its wells. We proposed to the ANM the creation of a protection area around certain wells, which will involve resettling people, vacating properties and taking certain additional monitoring measures. These measures are based on a study conducted by the Institute of Geomechanics of Leipzig (IFG), Germany, which is a global reference in geomechanics of salt wells, and is expected to be implemented in coordination with Brazilian civil defense and other authorities. Our preliminary estimates, which still need to be confirmed with relevant authorities, indicate that the protection area will cover an area of approximately 400 properties and 1,500 people. For certain other wells, the recommendation is that additional monitoring measures be taken, without the need to vacate properties and resettle residents. The proposed measures are related to the permanent termination of salt extraction activities at our salt mine in Alagoas and the closure of its wells. With regard to the geological incident that occurred in Maceió, Braskem will continue to cooperate with authorities, and count on the support of independent experts, to identify the causes of the incident and to implement all other necessary actions.

On January 3, 2020, we entered into an agreement with the Alagoas State Public Defender's Office (*Defensoria Pública do Estado de Alagoas*), the Federal Prosecutor's Office (*Ministério Público Federal*), the State of Alagoas Prosecutor's Office (*Ministério Público do Estado de Alagoas*) and the Federal Public Defender's Office (*Defensoria Pública da União*) to support the relocation of, and indemnification to, residents in the areas at risk located in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in the city of Maceió, in the state of Alagoas, as set forth in the agreement, which was ratified by the Federal Judge of the 3rd District Court in the state of Alagoas. We estimate that the support for relocation set forth in the agreement and in surrounding areas will involve approximately 17,000 people. We also estimate that the following amounts will be provisioned in connection with the agreement: (i) R$1.7 billion for the implementation of the Financial Compensation and Support for Relocation Program; and (ii) R$1.0 billion for the actions required to close certain salt wells previously operated by us. The provisions will be disbursed in the coming years and may be changed based on new developments.

Based on such agreeement, the plaintiffs agreed to: (i) release the amount of R$3.7 billion that had been frozen, of which R$1.7 billion is to be transferred to a bank account of Braskem specifically for funding a financial compensation and relocation program, which must maintain at minimum balance of R$100 million, subject to audit by an external auditor; and (ii) substitute the surety bonds that had been presented by Braskem in the approximate aggregate amount of R$6.4 billion for two new surety bonds in the approximate aggregate amount of R$3.0 billion to guarantee the public interest civil lawsuit filed by the Alagoas State Attorney's Office (*Ministério Público do Estado de Alagoas*) and the State Public Defender's Office (*Defensoria Pública do Estado de Alagoas*) and the public interest civil lawsuit filed by the Federal Prosecutor's Office (*Ministério Público Federal*). Of the amount of R$3.7 billion, which has been fully reimbursed to the Company, R$1.7 billion was transferred to a bank account controlled by Braskem specifically for funding the financial compensation and relocation program, as set forth in the agreement described below.

On February 14, 2020, we entered into an agreement with the Labor Prosecutors' Office in the state of Alagoas (*Ministério Público do Trabalho do Estado de Alagoas*) to end the civil lawsuit filed against the Company in July 2019, with the commitment to invest R$40.0 million to implement a Business Recovery and Promotion of Educational Activities Program for residents and workers in the districts of Mutange, Bom Parto, Pinheiro and Bebedouro in Maceió, in the state of Alagoas. Such program consists in constructing day care centers and schools, implementing vocational training programs and providing support to the Civil Defense authorities in hiring qualified personnel for continuing the process of monitoring the areas at risk in these districts. As per the settlement, the Labor Prosecution Office agreed to withdraw the public-interest civil action and the request to freeze funds made in said action, as per the notices to the market disclosed by the Company on July 25 and October 10, 2019.

Braskem is still cooperating with authorities to identify the causes of the geological event in Maceió and necessary measures to deal with the problem with the support of independent experts. The Company is also committed to fulfilling all of its obligations under the agreements it has signed and to a continuous dialogue with the authorities and the community in order to support measures that may guarantee the safety and well-being of those involved in the event.

**Dividends and Dividend Policy**

*Payment of Dividends*

Our dividend distribution policy has historically included the distribution of periodic dividends, based on annual balance sheets approved by our board of directors. When we pay dividends on an annual basis, they are declared at our annual shareholders' meeting, which we are required by the Brazilian Corporations Law and our by-laws to hold by April 30 of each year. When we declare dividends, we are generally required to pay them within 60 days of declaring them unless the shareholders' resolution establishes another payment date. In any event, if we declare dividends, we must pay them by the end of the fiscal year for which they are declared. Any holder of record of shares at the time that a dividend is declared is entitled to receive dividends. Our payment of annual dividends is based on our audited financial statements prepared for our preceding fiscal year.

Our Finance and Investments Committee will review, prior to the review by our board of directors, any management proposal regarding the distribution of dividends or interest on capital stock.

Our board of directors may declare interim dividends based on the accrued profits recorded or the realized profits in our annual or semi-annual financial statements approved by our common shareholders. In addition, we may pay dividends from net income based on our unaudited quarterly financial statements. These quarterly interim dividends may not exceed the amounts included in our capital reserve accounts. We may set off any payment of interim dividends against the amount of the mandatory distributable amount for the year in which the interim dividends were paid.

The following table sets forth the dividends and/or interest attributable to shareholders' equity paid to holders of our common shares, class "A" preferred shares and "class B" preferred shares since January 1, 2017 in *reais* and in U.S. dollars translated from *reais* at the commercial market selling rate in effect as of their respective payment date.

| | | Nominal Brazilian Currency per | | | US$ equivalent per | | |
|---|---|---|---|---|---|---|---|
| Year | Payment Date | Common shares | Class A Preferred Shares | Class B Preferred Shares | Common shares | Class A Preferred Shares | Class B Preferred Shares |
| 2017 | December 12,2017 | 1.26 | 1.26 | 0.61 | 0.38 | 0.38 | 0.38 |
| 2017 | May 10, 2018 | 1.89 | 1.89 | - | 0.53 | 0.53 | - |
| 2018 | December 30,2019 | 0.84 | 0.84 | 0.61 | 0.21 | 0.21 | 0.15 |

The following discussion summarizes the principal provisions of the Brazilian Corporations Law and our by-laws relating to the distribution of dividends, including interest attributable to shareholders' equity.

*Calculation of Adjusted Net Profits*

At each annual shareholders' meeting, our board of directors is required to recommend how to allocate our net profits for the preceding fiscal year, which recommendation our board of executive officers initially submits to our board of directors for approval. This allocation is subject to approval by our common shareholders. The Brazilian Corporations Law defines "net profits" for any fiscal year as our net income after income taxes for that fiscal year, net of any accumulated losses from prior fiscal years and any amounts allocated to employees' participation in our net profits in that fiscal year. Under the Brazilian Corporations Law, our adjusted net profits available for distribution are equal to our net profits in any fiscal year, reduced by amounts allocated to our legal reserve and other applicable reserves, and increased by any reversals of reserves that we constituted in prior years.

*Reserve Accounts*

Under the Brazilian Corporations Law and our by-laws, we are required to maintain a legal reserve. In addition, we are permitted by the Brazilian Corporations Law to establish the following discretionary reserves:

- a contingency reserve for an anticipated loss that is deemed probable in future years. Any amount so allocated in a previous year must be reversed in the fiscal year in which the loss had been anticipated if the loss does not occur as projected or charged off in the event that the anticipated loss occurs;

163

**PART III**

**ITEM 17. FINANCIAL STATEMENTS**

We have responded to Item 18 in lieu of responding to this item.

**ITEM 18. FINANCIAL STATEMENTS**

Reference is made to Item 19 for a list of all financial statements filed as part of this annual report.

**ITEM 19. EXHIBITS**

(a) Financial Statements

| | |
|---|---|
| Independent Auditor's Reports on the Financial Statements | F-1 |
| Consolidated Statement of Financial Position as of December 31, 2019, 2018 and 2017 | F-7 |
| Consolidated Statement of Profit or Loss as of December 31, 2019, 2018 and 2017 | F-9 |
| Consolidated Statement of Comprehensive Income as of December 31, 2019, 2018 and 2017 | F-10 |
| Consolidated Statement of Changes in Equity as of December 31, 2019, 2018 and 2017 | F-11 |
| Consolidated Statement of Cash Flows as of December 31, 2019, 2018 and 2017 | F-13 |
| Notes to the Consolidated Financial Statements | F-14 |

(b) List of Exhibits

| Exhibit Number | Exhibit |
|---|---|
| 1.01 | Bylaws of Braskem S.A., as amended (English translation) (incorporated by reference to Exhibit 1 to Form 6-K of Braskem S.A. filed on October 22, 2018). |
| 2.01 | Amended and Restated Form of Deposit Agreement, dated as of January 4, 2017, among Braskem S.A., The Bank of New York Mellon, as Depositary, and Owners and Holders of American Depositary Shares issued thereunder (incorporated by reference to Exhibit 1 to Form F-6 of Braskem S.A. filed on December 22, 2016). |
| 2.02 | Description of Securities. |
| 3.01 | Shareholders' Agreement of BRK Investimentos Petroquímicos S.A. and Braskem S.A., dated as of February 8, 2010, among Odebrecht S.A., Odebrecht Serviços e Participações S.A., Petrobras Química S.A. - Petroquisa, Petróleo Brasileiro S.A. - Petrobras, and BRK Investimentos Petroquímicos S.A. and Braskem S.A., as intervening parties (English translation), as amended on September 24, 2018 and as adhered to by OSP Investimentos S.A. on December 31, 2018 (incorporated by reference to Exhibit 1 to Form 6-K of Braskem S.A. filed on February 28, 2019). |
| 4.03 | Restricted Share Award Plan of Braskem S.A. approved at the Extraordinary Shareholders' Meeting held on March 21, 2018 (English translation) (incorporated by reference to Exhibit 1 to Form 6-K of Braskem S.A. filed on March 22, 2018). |
| 4.04 | Naphtha Purchase Agreement, dated as of December 23, 2015, between Petróleo Brasileiro S.A. - Petrobras and Braskem S.A. (English translation). (*Confidential treatment has been requested for certain portions omitted from this exhibit pursuant to Rule 24b-2 under the Securities Exchange Act of 1934, as amended. Confidential portions of this Exhibit have been separately filed with the Securities and Exchange Commission) (incorporated by reference to Exhibit 4.04 to Form 20-F of Braskem S.A. filed on May 5, 2016). |
| 8.01 | List of subsidiaries (incorporated by reference to note 2.1.1 to our audited consolidated financial statements included elsewhere in this annual report). |
| 11.01 | Code of Conduct of Braskem S.A., as amended (English translation) (incorporated by reference to Exhibit 1 to Form 6-K of Braskem S.A. filed on December 17, 2018). |
| 12.01 | Certification of Principal Executive Officer dated June 12, 2020 pursuant to Exchange Act Rules 13a-15(e) and 15d-15(e). |
| 12.02 | Certification of Principal Financial Officer dated June 12, 2020 pursuant to Rules 13a-15(e) and 15d-15(e). |
| 13.01 | Certifications of Principal Executive Officer and Principal Financial Officer dated June 12, 2020 pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.01 | Disclosure of Mine Safety and Health Administration Safety Data. |

195

**SIGNATURES**

The registrant hereby certifies that it meets all of the requirements for filing on Form 20-F and that it has duly caused and authorized the undersigned to sign this annual report on its behalf.

Date: June 12, 2020

BRASKEM S.A.

By:  /s/ Roberto Lopes Pontes Simões
Name:  Roberto Lopes Pontes Simões
Title:   Chief Executive Officer

196

**INDEX TO FINANCIAL STATEMENTS**

Independent Auditors's Reports on the Financial Statements                          F-1
Consolidated Statement of Financial Position as of December 31, 2019, 2018 and 2017     F-7
Consolidated Statement of Profit or Loss as of December 31, 2019, 2018 and 2017        F-9
Consolidated Statement of Comprehensive Income as of December 31, 2019, 2018 and 2017   F-10
Consolidated Statement of Changes in Equity as of December 31, 2019, 2018 and 2017     F-11
Consolidated Statement of Cash Flows as of December 31, 2019, 2018 and 2017            F-13
Notes to the Consolidated Financial Statements                                        F-14

197

| Exhibit Number | Exhibit |
|---|---|
| 2.02 | Description of Securities. |
| 12.01 | Certification of Principal Executive Officer dated June 12, 2020 pursuant to Exchange Act Rules 13a-15(e) and 15d-15(e). |
| 12.02 | Certification of Principal Financial Officer dated June 12, 2020 pursuant to Rules 13a-15(e) and 15d-15(e). |
| 13.01 | Certifications of Principal Executive Officer and Principal Financial Officer dated June 12, 2020 pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. |
| 99.01 | Disclosure of Mine Safety and Health Administration Safety Data. |

198

# Braskem S.A.

**Consolidated financial statements**
**at December 31, 2019**
**and Independent Auditors' Report**

**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors
Braskem S.A.:

*Opinion on Internal Control Over Financial Reporting*

We have audited Braskem S.A. and subsidiaries' (the Company) internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission. In our opinion, because of the effect of the material weaknesses, described below, on the achievement of the objectives of the control criteria, the Company has not maintained effective internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the consolidated statement of financial position of the Company as of December 31, 2019 and 2018, the related consolidated statements of profit and loss, comprehensive income, changes in equity, and cash flows for each of the years in the two-year period ended December 31, 2019, and the related notes (collectively, the *consolidated* financial statements), and our report dated June 12, 2020 expressed an unqualified opinion on those consolidated financial statements.

A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. Material weaknesses have been identified and included in management's assessment related to the Company's control environment, risk assessment, information and communication, and monitoring activities resulting in material weaknesses related to the ineffective design, implementation, and operation of (i) general information technology controls (GITCs) in the areas of user access and program change-management over information technology systems that support the Company's financial reporting processes, as well as the completeness and accuracy of reports used by the Company, which resulted in business process controls that are dependent on the affected GITCs also being considered ineffective because they could have been adversely impacted; (ii) controls within the financial reporting process including consolidation, the analysis of complex and unusual transactions, review of manual journal entries and the preparation of and review financial statements, including the technical application of generally accepted accounting principles and applicability of required disclosures; (iii) controls over the provision for legal contingencies, (iv) controls over the purchase of and payment for legal services and (v) controls over the quantity of product shipped for sales transactions. These material weaknesses were considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2019 consolidated financial statements, and this report does not affect our report on those consolidated financial statements.

*Basis for Opinion*

The Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting, included in the accompanying Management's Annual Report on Internal Control over Financial Reporting appearing under Item 15 of the Company's Annual Report on Form 20-F. Our responsibility is to express an opinion on the Company's internal control over financial reporting based on our audit. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

F-1

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether effective internal control over financial reporting was maintained in all material respects. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audit also included performing such other procedures as we considered necessary in the circumstances. We believe that our audit provides a reasonable basis for our opinion.

*Definition and Limitations of Internal Control Over Financial Reporting*

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

KPMG Auditores Independentes

São Paulo, Brazil
June 12, 2020

F-2

## Report of Independent Registered Public Accounting Firm

To the Shareholders and Board of Directors
Braskem S.A.:

*Opinion on the Consolidated Financial Statements*

We have audited the accompanying consolidated statement of financial position of Braskem S.A. and subsidiaries (the Company) as of December 31, 2019 and 2018, the related consolidated statements of profit or loss, comprehensive income, changes in equity, and cash flows for each of the years in the two-year period ended December 31, 2019, and the related notes (collectively, the consolidated financial statements). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the two-year period ended December 31, 2019, in conformity with International Financial Reporting Standards (IFRS) as issued by the International Accounting Standards Board (IASB).

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States) (PCAOB), the Company's internal control over financial reporting as of December 31, 2019, based on criteria established in *Internal Control - Integrated Framework (2013)* issued by the Committee of Sponsoring Organizations of the Treadway Commission, and our report dated June 12, 2020, expressed an adverse opinion on the effectiveness of the Company's internal control over financial reporting.

*Changes in Accounting Principles*
As discussed in Note 2.3 to the consolidated financial statements, the Company has changed its method of accounting for lease arrangements as of January 1, 2019 due to the adoption of IFRS 16 "Leases".
*Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits. We are a public accounting firm registered with the PCAOB and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud. Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provides a reasonable basis for our opinion.

*Critical Audit Matters*

The critical audit matters communicated below are matters arising from the current period audit of the consolidated financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the consolidated financial statements and (2) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matters below, providing separate opinions on the critical audit matters or on the accounts or disclosures to which they relate.

*Evaluation of impairment of cash generating units that contain goodwill*

As discussed in notes 3.2.3 and 13 (a) to the consolidated financial statements, the balance of goodwill was R$ 2,058,873 thousand as of December 31, 2019. To evaluate the impairment of goodwill, the Company identifies its cash generating units ("CGU"), estimates the recoverable amount of each CGU, and compares this with its carrying value. The estimate of the recoverable value of the CGUs requires significant judgment on the part of the Company to make certain assumptions including those related to: the discount rate; the growth rates for the next 10 years; the inflation rate, which is used for cash flows to perpetuity; and, where the recoverable value is based on fair value less costs of disposal, future capital expenditure and its associated impact on costs.

We identified the evaluation of impairment of CGUs that contain goodwill as a critical audit matter. The assessment of certain assumptions used in the estimates of recoverable values, specifically the discount rate, the growth rates for the next 10 years, the inflation rate and future capital expenditure, including its associated impact on costs, was complex and involved a high degree of subjectivity which required the application of greater auditor judgment.

The primary procedures we performed to address this critical audit matter included the following:

- We tested certain internal controls over the Company's goodwill impairment assessment process, including the Company's review of the calculation of the recoverable value for each CGU and the underlying assumptions, such as the discount rate, the growth rate for the next 10 years and the inflation rate.

- We involved corporate finance professionals with specialized skills and knowledge, who assisted in:

- evaluating the discount rate used by the Company by comparing to a discount rate developed using an independent methodology;

- evaluating the growth rates for the next 10 years used by the Company by comparing to historic growth rates and market projections;

- evaluating the inflation rate used by the Company by comparing with market information;

- evaluating the future capital expenditure and its associated impact on costs by comparing to historic information; and

- performing sensitivity analyses on the interest rate and discount rate to assess their impact on the estimation of the recoverable value of each CGU.

We compared the projected cash flows for 2019 made by the Company in the prior year with the Company's actual cash flows for that year to assess the Company's ability to accurately forecast.

*Evaluation of the provision and disclosures related to the salt mining activities in Alagoas*

As discussed in notes 3.2.5, 24.2 and 26 to the consolidated financial statements the Company has recorded a provision related to the geological phenomenon in the vicinity of the Company's salt mining wells in the state of Alagoas of R$ 3,383,067 thousand as of December 31, 2019 and made disclosures in relation to civil lawsuits, related to the same geological phenomenon, to which it is a party. The provision is for the estimated future outflows of resources required to honor the Company's commitments under an agreement signed with the Brazilian government authorities following the occurrence of the geological phenomenon. These commitments include taking measures to close and stabilize the salt mines as well as relocating and compensating residents and businesses in the region. The Company has determined that it is possible, but not probable, that it will be required to make payments under the civil lawsuits and therefore made disclosures but recorded no provisions as of December 31, 2019.

We identified the evaluation of the provision and disclosures related to the salt mining activities in Alagoas as a critical audit matter. The evaluation of the estimates and assumptions used by the Company to determine the provision amount required challenging auditor judgment and the use of specialized skills and knowledge. Specifically, the key estimates and assumptions related to the extent and cost of the remediation actions required to stabilize and close the wells, the market value of the properties of residents and businesses in the region and the other costs to relocate and compensate the residents and business owners. In addition, subjective auditor judgment was required to assess the likelihood of an outflow of resources occurring as a result of the civil lawsuits.

The primary procedures we performed to address this critical audit matter included the following:

We tested certain internal controls over the Company's litigation process, including controls related to the evaluation of information from external and internal legal counsel, as well as controls over the financial statement disclosures.

We evaluated the expertise, objectivity and professional experience of the external legal counsel who assisted the Company in evaluating the likelihood of an outflow of economic resources as a result of the civil lawsuits and estimating the amounts involved.

In addition, we obtained legal confirmation, directly from the Company's legal counsel, that included an evaluation of the likelihood of loss and an estimation of the amounts involved, and compared these evaluations and estimates to those of the Company and with the disclosure made.

We involved fixed asset and infrastructure valuation professionals, with specialized skills and knowledge, who assisted in:

- evaluating the technical appraisal reports regarding the stability of the salt mining wells and the required remediation actions to stabilize and close the wells, the remediation plans established by the Company and the Company's estimate of the significant costs to implement these plans;

- evaluating the assumptions used by the Company to estimate the market value of properties and the significant components of the other costs to relocate and compensate the residents and business owners impacted by the geological phenomenon, by comparing them to internal and external information, as applicable, including publicly available information on real estate values in the region and property sizes, contracts with third party service providers and estimates received from external legal advisors; and

- performing a sensitivity analysis of certain of the assumptions used by the Company to estimate the market value of properties and the significant components of the other costs to relocate and compensate the residents and business owners impacted by the geological phenomenon.

KPMG Auditores Independentes

We have served as the Company's auditor since 2018.

São Paulo, Brazil
June 12, 2020

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Braskem S.A.

### *Opinion on the Financial Statements*

We have audited the consolidated statements of profit or loss, comprehensive income, changes in equity and cash flows of Braskem S.A. and its subsidiaries (the "Company") for the year ended December 31, 2017, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the results of operations and cash flows of the Company for the year ended December 31, 2017 in conformity with the International Financial Reporting Standards as issued by the International Accounting Standards Board.

### *Basis for Opinion*

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audit included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ PricewaterhouseCoopers Auditores Independentes

Salvador, Bahia, Brazil

October 07, 2019

We served as the Company's auditor from 2002 to 2019.

F-6