**SCHNADER HARRISON
SEGAL & LEWIS, LLP**
Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Telephone: (856) 482-5222
Facsimile: (856) 482-5754
Email:  lrodriguez@schnader.com
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MATSUKAWA CO., LLC, (n/k/a MATSUKAWA CO., LTD) individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>BRASKEM S.A., *et al.*<br><br>Defendants. | Case No. 2:20-cv-11366-CCC-ESK |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT**

1

## TABLE OF CONTENTS

**Page(s)**

TABLE OF AUTHORITIES ...................................................................................(ii)

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS .......................................................................................3

    A.   The Mine and the Earthquake ...............................................................3

    B.   The Class Period Begins .......................................................................4

    C.   The Class Period Ends ..........................................................................8

ARGUMENT ...........................................................................................................8

I.     THE APPLICABLE LEGAL STANDARDS..................................................8

II.    THE COMPLAINT PLEADS ACTIONABLE MISSTATEMENTS AND
OMISSIONS OF MATERIAL FACT...........................................................9

    A.   Defendants Did Not Disclose that the CPRM Presented Evidence
Showing Braskem's Role in Damage at the Mine ...............................10

    B.   Defendants' Truth on the Market Defense Fails...................................15

    C.   Defendants Misrepresented Their Purported Assistance to Authorities
in Discerning the Cause of Damage Near the Mine ............................19

    D.   Defendants Failed to Accurately Disclose Liabilities.........................22

    E.   Defendants Failed to Accurately Disclose Salt Reserve Estimates......26

III.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER.....................29

    A.   Braskem's Deceptive Conduct Supports a Strong Inference of
Scienter...............................................................................................30

    B.   The Individual Defendants' Scienter Can Be Imputed to Braskem
Under the "Corporate Scienter" Doctrine............................................34

    C.   Corporate Resignations Show Awareness of Wrongdoing ..................37

    D.   Defendants' Access to Information Showing Their Statements Were
Misleading Is Indicative of Scienter ..................................................38

    E.   A Holistic Review Supports a Strong Inference of Scienter ...............39

IV.   PLAINTIFF ADEQUATELY PLEADS 20(A) CLAIMS ...........................40

CONCLUSION.......................................................................................................40

i

# TABLE OF AUTHORITIES

**CASES**                                                                              **Page(s)**

*In re Acadia Pharms. Inc. Sec. Litig.,*
  2020 U.S. Dist. LEXIS 95464 (S.D. Cal. June 1, 2020)......................................18

*In re Advanta Corp. Sec. Litig.,*
  180 F.3d 525 (3d Cir. 1999)...............................................................................29

*Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP,*
  No. CV 20-200, 2021 WL 1264027 (E.D. Pa. Apr. 6, 2021) ...................10, 11, 16

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009).............................................................................................8

*Aviva Partners LLC v. Exide Techs.,*
  Civ. A. No. 05-3098 (MLC), 2007 WL 789083 (D.N.J. Mar. 13, 2007) .............28

*In re Banco Bradesco S.A. Sec. Litig.,*
  277 F. Supp. 3d 600 (S.D.N.Y. 2017) ................................................................19

*In re Bank of Am. AIG Disclosure Sec. Litig.,*
  980 F. Supp. 2d 564 (S.D.N.Y. 2013) ................................................................19

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544, 570 (2007)......................................................................................8

*Belmont v. MB Inv. Partners, Inc.,*
  708 F.3d 470 (3d Cir. 2013)................................................................................40

*BG Litig. Recovery I, LLC v. Barrick Gold Corp.,*
  180 F. Supp. 3d 316 (D.N.J. 2018) .....................................................................16

*In re Bristol-Myers Squibb,*
  CA 00-1990 (SRC), 2005 WL 2007004 (D.N.J. Aug. 17, 2005) ........................21

*In re Burlington Coat Factory Sec. Litig.,*
  114 F.3d 1410 (3d Cir. 1997)..........................................................................27, 30

ii

*In re Campbell Soup Co. Sec. Litig.*,
  145 F. Supp. 2d 574 (D.N.J. 2001) ..........................................................38

*In re Celgene Corp. Sec. Litig.*,
  No. CV 18-4772, 2020 WL 8870665 (D.N.J. Nov. 29, 2020) ...........................10

*In re Citigroup, Inc. Sec. Litig.*,
  330 F. Supp. 2d 367 (S.D.N.Y. 2004),
  *aff'd*, 165 F. App'x 928 (2d Cir. 2006)...................................................21

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
  442 F. App'x 672 (3d. Cir. 2011) ...........................................................37

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  No. 2:16-CV-06509 WHW-CLW,
  2018 WL 3772675 (D.N.J. Aug. 8, 2018) ...............................................10

*In re Cognizant Tech. Sols. Corp. Sec. Litig.*,
  No. CV 16-6509 (ES) (CLW), 2020 WL 3026564 (D.N.J. June 5, 2020),
  *motion to certify appeal denied*, No. CV 16-6509 (ES) (CLW),
  2021 WL 1016111 (D.N.J. Mar. 17, 2021)...............................................32, 34, 36

*Curran v. Freshpet*,
  No. Civ. A. 16-2263, 2018 WL 394878 (D.N.J. Jan. 1, 2018)..............................9

*De Vito v. Liquid Holdings Grp., Inc.*,
  No. CV156969KMJBC, 2018 WL 6891832 (D.N.J. Dec. 31, 2018)...................40

*Dingee v. Wayfair Inc.*,
  15-CV-6941(DLC), 2016 WL 3017401 (S.D.N.Y. May 24, 2016) ....................18

*In re Donald J. Trump Casino Sec. Litig.*,
  793 F. Supp. 543 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (2d Cir. 1993) .......................19

*In re Elecs. for Imaging, Inc. Sec. Litig.*,
  No. CV 17-5992, 2019 WL 397981 (D.N.J. Jan. 31, 2019),
  *appeal dismissed*, No. 19-1844,
  2019 WL 5152343 (3d Cir. Sept. 24, 2019) ...............................................38

*Emps. Ret. Sys. Of the P.R. Elec. Power Auth. v. Conduent Inc.*,
   CA No. 19-8237 (SDW) (SCM),
   2020 WL 3026536 (D.N.J. June 5, 2020) ............................................................ 15

*Emps. Ret. Sys. of the City of Providence v. Embraer S.A.*,
   16 Civ. 6277 (RMB), 2018 WL 1725574 (S.D.N.Y. Mar. 30, 2018) .................. 14

*In re Enzymotec Secs. Litig.*,
   CA No. 14-5556 (JLL) (MAH),
   2015 WL 8784065 (D.N.J. Dec. 14, 2015) ................................................... 16, 25

*In re Eros Int'l PLC Sec. Litig.*,
   No. CV 19-14125, 2021 WL 1560728 (D.N.J. Apr. 20, 2021) ........................... 38

*Fain v. USA Techs., Inc.*,
   707 F. App'x 91 (3d Cir. 2017) ......................................................................... 38

*Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009) ............................................................... 17

*Gaer v. Educ. Mgmt. Corp.*,
   No. CIV.A. 10-1061, 2011 WL 7277447 (W.D. Pa. Aug. 30, 2011) .................. 19

*In re Galena Biopharma, Inc. Sec. Litig.*,
   No. CV 17-929, 2019 WL 5957859 (D.N.J. Nov. 12, 2019) ............................... 14

*GSC Partners CDO Fund v. Washington*,
   368 F.3d 228 (3d Cir. 2004) ......................................................................... 24, 39

*Hall v. Johnson & Johnson*,
   CA No. 18-1833 (FLW), 2019 WL 7207491 (D.N.J. Dec. 27, 2019) ............ 11, 39

*Halperin v. eBanker USA.COM, Inc.*,
   295 F.3d 352 (2d Cir. 2002) .............................................................................. 28

*Heartland Payment Systems, LLC v. Carr*,
   No. 3:18-cv-09764-BRM-DEA, 2021 WL 302918 (D.N.J. Jan. 29, 2021) ......... 12

*In re Hertz Global Holdings, Inc. Sec. Litig.*,
   CA No. 13-7050, 2017 WL 1536223 (D.N.J. Apr. 27, 2017) ...................... 28, 38

*Hoey v. Insmed Inc.*,
  CA No. 16-4323 (FLW), 2018 WL 902266 (D.N.J. Feb. 15, 2018) ....................16

*Howard v. Arconic, Inc.*,
  395 F. Supp. 3d 516 (W.D. Pa. 2019)...........................................................14, 21

*Hull v. Glob. Digital Sols., Inc.*,
  No. CV 16-5153(FLW), 2017 WL 6493148 (D.N.J. Dec. 19, 2017)...................38

*In re Inv. Tech. Grp., Inc.*,
  251 F. Supp. 3d 596 (S.D.N.Y 2017) .................................................................15

*Institutional Investor Group v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009)..............................................................20, 29, 30, 38

*Jackson v. Abernathy*,
  960 F.3d 94 (2d Cir. 2020)..................................................................................37

*In re Keyspan Corp. Sec. Litig.*,
  383 F. Supp. 2d 358 (E.D.N.Y. 2003) .................................................................19

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..............................................................................23

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
  797 F.3d 160 (2d Cir. 2015)................................................................................35

*Lapin v. Goldman Sachs Grp, Inc.*,
  506 F. Supp. 2d 221 (S.D.N.Y. 2006) .................................................................35

*Lovallo v. Pacria Pharms., Inc.,*
  No. 14-cv-06172, 2015 WL 7300492 (D.N.J. Nov. 18, 2015)............................19

*In re Marsh & McLennan Cos, Inc. Sec. Litig.*,
  501 F. Supp. 2d 452 (2006) ................................................................................34

*Matrixx Initiatives Inc. v. Siracusano*,
  563 U.S. 27 (2011)..........................................................................................21, 39

v

*McMahan & Co. v. Wherehouse Entm't*,
  900 F.2d 576 (2d Cir. 1990)..................................................................................21

*In re Merrill Lynch & Co. Research Reports Sec. Litig.*,
  272 F. Supp. 2d 243 (S.D.N.Y. 2003) ...............................................................19

*Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
  874 F. Supp. 2d 341 (S.D.N.Y. 2012) ...............................................................35

*In re Prudential Fin., Inc. Sec. Litig.*,
  No. 2:19-cv-20839-SRC-CLW,
  2020 WL 7706860 (D.N.J. Dec. 29, 2020).........................................................26

*P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*,
  142 F. Supp. 2d 589 (D.N.J. 2001)....................................................................29

*In re Res. Am. Sec. Litig.*,
  No. CIV. 98-5446, 2000 WL 1053861 (E.D. Pa. July 26, 2000) ........................15

*Roofer's Pension Fund v. Papa*,
  No. 16-cv-2805, 2018 WL 3601229 (D.N.J. July 27, 2018) .........................36, 37

*Sailors v. N. States Power Co.*,
  4 F.3d 610 (8th Cir. 1993) .................................................................................19

*In re Sanofi Sec. Litig.*,
  155 F. Supp. 3d 386 (S.D.N.Y. 2016) ...........................................................34, 35

*Scott v. ZST Digital Networks, Inc.*,
  CV 11-03531 GAF (JCx), 2012 WL 538279 (C.D. Cal. Feb. 14, 2012) .............17

*SEC v. Desai*,
  145 F. Supp. 3d 329 (D.N.J. 2015),
  *aff'd*, 672 F. App'x 201 (3d Cir. 2016)..........................................................31, 32

*Se. Pa. Trans. Auth. v. Orrstown Fin. Servs., Inc.*,
  No. 12-cv-993, 2016 WL 7117455 (M.D. Pa. Dec. 7, 2016) .............................33

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
  499 F. Supp. 3d 49 (D. Del. 2020)....................................................................21

*Snellink v. Gulf Res., Inc.,*
　870 F. Supp. 2d 930 (C.D. Cal 2012) ...................................................................18

*Sun v. Han,*
　CA No. 15-703 (JLL), 2015 WL 9304542 (D.N.J. Dec. 21, 2015).......................34

*In re Synchronoss Techs., Inc. Sec. Litig.,*
　No. 17-cv-2978, 2019 WL 2849933 (D.N.J. July 2, 2019) ..................................38

*In re Suprema Specialties, Inc. Sec. Litig.,*
　438 F.3d 256 (3d Cir. 2006).................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
　551 U.S. 308 (2007).....................................................................................*passim*

*Thomas v. Shiloh Indus., Inc.,*
　No. 15 CV 7449 (KMW), 2017 WL 2937620 (S.D.N.Y. July 7, 2017) ..............36

*In re Unisys Corp. Sec. Litig.,*
　No. CIV. 00-1849, 2000 WL 1367951 (E.D. Pa. Sept. 21, 2000)........................17

*Underland v. Alter,*
　Civ. A. No. 10-3621, 2012 WL 2912330 (E.D. Pa. July 16, 2012) .....................26

*United States ex rel. Wilkins v. United Health Grp., Inc.,*
　659 F.3d 295 (3d Cir. 2011).................................................................................9

*In re Urban Outfitters, Inc. Sec. Litig.,*
　103 F. Supp. 3d 635 (E.D. Pa. 2015) ...................................................................19

*Utesch v. Lannett Co., Inc.,*
　385 F. Supp. 3d 408 (E.D. Pa. 2019) ...................................................................33

*Vanderhoef v. China Auto Logistics Inc.,*
　No. 2:18-CV-10174,
　2020 WL 5105243 (D.N.J. Aug. 31, 2020) (Cecchi, J.).....................31, 32, 34, 36

*Vanderhoef v. China Auto Logistics Inc.,*
　No. 18-cv-10174, 2021 WL 3260849 (D.N.J. July 31, 2021).................31, 32, 40

*In re VEON Ltd. Sec. Litig.*,
   No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) ..........36

*In re Veritas Software Corp. Sec. Litig.*,
   No. 04-831-SLR, 2006 WL 1431209 (D. Del. May 23, 2006) .....................25, 27

*Williams v. Globus Med., Inc.*,
   869 F.3d 235 (3d Cir. 2017)......................................................................10

*Winer Family Tr. v. Queen*,
   No. 03-4318, 2004 WL 2203709 (E.D. Pa. Sept. 27, 2004),
   *aff'd sub nom*, 503 F.3d 319 (3d Cir. 2007 ..........................................15

*In re Xerox Corp. Sec. Litig.*,
   935 F. Supp. 2d 448 (D. Conn. 2013)...................................................19

**STATUTES AND RULES**

Private Securities Litigation
Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a), *et seq.,* ................24, 25, 28
   15 U.S.C. § 78u-5(c)(1) ......................................................24, 25, 27

Securities Exchange Act of 1934
   15 U.S.C. § 78j(b) ("Section 10(b)")...........................................9, 40
   15 U.S.C. § 78t(a) ("Section 20(a)") ...............................................40

Federal Rules of Civil Procedure
   Rule 12(b)(6)...............................................................................8, 9

Brazil's National Environmental Policy Act ("NEPA")
   Article 14..............................................................................13, 32

Lead Plaintiff Matsukawa Co., Ltd. ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the Amended Complaint (the "Complaint").[1]

## PRELIMINARY STATEMENT

On the first day of the Class Period, the Brazilian government provided Braskem's high-level officers with detailed evidence showing that Braskem's salt mine caused the ground under the Pinheiro neighborhood of Maceió, Brazil to sink, damaging roads and compromising structures. Although Defendants knew Braskem was strictly liable for any damage caused by its salt mining operations in Pinheiro, Braskem repeatedly obfuscated its role in the damage (and corresponding liability) by pointing to natural causes such as rain. Defendants knew they were wrong to offer up these misleading explanations to investors. Brazilian authorities later confirmed that Braskem actively tried to mislead the investigators about the mine's role in the subsidence – even while Defendants advised investors that they were cooperating with the investigation. For these reasons, the Complaint adequately alleges material misrepresentations and omissions of material fact.

---

[1] "Defendants" are Braskem S.A. ("Braskem" or the "Company"), Roberto Lopes Pontes Simões ("Simões"), Fernando Musa ("Musa") and Pedro van Langendonck Teixeira de Freitas ("Freitas"). Messrs. Simões, Musa and Freitas are collectively referred to herein as the "Individual Defendants." References to "¶__" are to the Complaint. References to Defendants' motion to dismiss are to "Br. _".

1

The complaint also adequately alleges that Defendants made their misleading statements and omissions with scienter. Defendants displayed an unmistakable pattern of deception in connection with the investigation of the damage – leading to civil and criminal investigations – and had access to information showing Braskem's role in the damage. When the truth was revealed, Braskem investors lost tens of millions of dollars as Braskem ADS fell in value.

Defendants argue that U.S. investors knew of the detailed evidence showing that Braskem's salt mine caused the ground under Pinheiro to sink. But such a 'truth on the market' defense is premature at the motion to dismiss stage. Furthermore, he truth was never presented to U.S. investors because the detailed evidence showing that Braskem's salt mine caused the ground under Pinheiro to sink was only presented *in Portuguese*. It is well-settled that foreign-language publications do not enter the U.S. securities market or reveal the truth of a matter disputed by a defendant's SEC filings.

Separately, Defendants claim that the market also knew that Braskem's statements about its liabilities relating to the salt mine were lowball estimates. Defendants' theory flies in the face of both market and analyst reactions to the later revelations: investment professionals were surprised when the liabilities were later amended and Braskem's ADS price dropped in response.

For these reasons and those set forth below, Defendants' motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    The Mine and the Earthquake

Braskem is one of the largest petrochemical companies in the world, and uses vast quantities of salt to produce its products. Braskem's salt mining operation (the "Mine") was located beneath the Pinheiro neighborhood in the city of Maceió (which is the capital of the state of Alagoas in Brazil).  ¶3.

On February 15, 2018, after heavy rains, residents of Maceió noticed cracked structures and large fissures in streets, including a fissure of approximately 283 meters that appeared in the Pinheiro neighborhood. ¶46. On March 3, 2018, an earthquake measuring 2.4 on the Richter scale shook Maceió (the "Earthquake"). ¶8. The Federal Prosecution Office ("MPF") opened an inquiry into Braskem's role in the fissure, Earthquake and related damage around Maceió. ¶48-50.

On March 21, 2019, at a Federal Senate hearing concerning the widespread damage, the Geological Survey of Brazil ("CPRM") presented satellite data and studies showing that the area with the most ground movement correlated precisely with areas of Braskem's salt mining activity. ¶¶51-52. The CPRM also provided evidence at the meeting that from June 2016 to December 2018, the ground rapidly subsided at a rate of 100 times greater than normal. ¶45, 53.

B.      **The Class Period Begins**

The Class Period begins on March 21, 2019, when Braskem misleadingly represented that "[t]he company is providing support to public authorities [. . . .] and conducting studies to help in the determination of the causes of the event that affects the district of Pinheiro." ¶56. Braskem failed to disclose that the CPRM provided detailed evidence at the meeting showing that Braskem's operations caused the ground subsidence and damage around the Mine. ¶¶45, 51-56, 76-80.

On April 2, 2019, Alagoas state authorities sought injunctive relief to retain 6.7 billion Brazilian *reais* worth of Braskem assets to cover, *inter alia*, "social rent costs, indemnity repairs, environmental repairs, construction works, stabilization of affected areas [. . . .]" ¶57.[2] Although Braskem disclosed that it had been sued by local authorities on the same day, it once again failed to disclose that the CPRM presented the Company with detailed evidence showing that Braskem's operations caused the ground subsidence and damage around the Mine.  ¶¶58, 113.  Braskem's ADS price fell approximately 6% in response to the news. ¶59.[3]

On May 8, 2019, the CPRM released its final report concerning the ground subsidence in Maceió.  The report revealed that the area adjacent to the Mine had

---

[2] One Brazilian *real* ("R$") was approximately $0.25 USD at the time.

[3] An American depositary share ("ADS") is an equity share of a non-U.S. company that is held by a U.S. depositary bank and is available for purchase by U.S. investors.

4

subsided significantly *since at least 2016* and also concluded that the rapid subsidence triggered the cracks and fissures observed in the area. ¶64. As one analyst later summarized the report's conclusions: "Braskem's salt mining operation in Maceió was responsible" for the damage. *Id*.

On May 9, 2019, Braskem's Chief Executive Officer ("CEO"), Defendant Musa, addressed the CPRM Summary Report and represented that: (i) Braskem was sharing its own study results with the CPRM and; (ii) the CPRM report had concluded that "*there are connections between our operations and what's happening in the neighborhood nearby*." ¶67 (emphasis added). Defendant Musa failed to disclose that: (i) the CPRM provided detailed evidence at the meeting showing that Braskem's operations caused the ground subsidence and damage around the Mine; and (ii) Braskem was not just "sharing" results with the CPRM, but providing the agency with misleading information. ¶¶116, 121, 124.

On May 14, 2019, CPRM technicians revealed that Braskem sent inaccurate information relating to the Company's mining activity. ¶73. The President of the Special Commission of Inquiry of the City Council of Maceió ("CEI") stated that the City Council could seek to have the responsible parties arrested. ¶74.

On June 3, 2019, Braskem officials met representatives of the MPF and CPRM in Alagoas. In response to a subsequent inquiry from Braskem, CPRM officials noted that during the June 3, 2019 meeting, Braskem failed to provide

relevant data indicating faults in the salt mining area to the Federal Justice Ministry. ¶77. The CPRM also noted that one of the slides presented by Braskem in a May 2019 meeting with the MPF had "exaggerated the horizontal scale in relation to the vertical scale, generating a deformed geological model." ¶78. The CPRM concluded that Braskem bore responsibility for the ground subsidence by the Mine: "[T]he cause of the sinking phenomenon is related to Braskem's caverns." ¶79. The CPRM response also emphasized that dozens of professionals in four different groups agreed that Braskem had caused the ground subsidence. ¶80. Similarly, on September 24, 2019, a CEI report noted that Braskem had passed "imprecise" information and "did not pass on information about subsidence." *Id*. The CEI found compelling evidence of fraud on the part of Braskem executives that it held should be forwarded to state and federal police. ¶86.

The CEI implicated Alvaro Cesar Oliveira de Almeida ("Almeida"), Milton Pimentel Pradines Filho ("Pradines"), and Marcelo de Oliveira Cerqueira ("Cerqueira") and the Federal Ministry of Justice implicated Musa, Almeida, Pradines, and Cerqueira. *Id*.

On October 8, 2019, Braskem filed its 2017 annual report – over a year and a half late – and represented that the Mine reserves would allow production for approximately 35 to 45 years. But Braskem failed to disclose that such production

was unsustainable due to the unsafe situation caused by ground subsidence near the Mine. ¶¶118-20.  Braskem made a similar misstatement on October 17, 2019. ¶124.

In a November 7, 2019 hearing before the Chamber of Deputies (the lower house of Brazil's National Congress), the CPRM's Dr. Thales Sampaio ("Sampaio") described how Braskem's own study showed that the Company's activities at the Mine caused the ground subsidence: "we affirm, as the Brazil Geological Survey, that *subsidence is caused by the destabilization of mining pits*. We have no doubt about that." ¶89 (emphasis added).

On November 14, 2019, Braskem announced that it would permanently end salt extraction activities in Maceió. ¶90.  On November 22, 2019, Defendant Simões replaced Defendant Musa as CEO after his resignation the previous day.  ¶92. Musa's resignation was reportedly due to parent company Petrobras' displeasure with Musa's handling of the Mine disaster. ¶94.

On January 3, 2020, the Company agreed to set aside at least R$2.7 billion to fund a Financial Relocation and Compensation Support Program (the "Agreement," which was made with the MPF, the Federal Public Defender's Officer, the Alagoas State Prosecution Office, and Alagoas State Public Defender's Officer).  The Agreement was merely a starting point, not a final settlement figure to cover all potential liabilities. ¶95.  When announcing the Agreement, Braskem did not adequately disclose that the R$2.7 billion was only a minimum initial payment rather

7

than a complete estimate. ¶96. Thus, the market believed that Braskem's liabilities concerning the Mine were apparently only R$2.7 billion and the price of Braskem ADSs jumped from $15.67 to $16.29 on January 4, 2020. ¶97. Indeed, a J.P. Morgan analyst report dated January 3, 2020, expressed pleasant surprise at the purported settlement of the issue: "we did not expect a *solution* in the short-term." ¶98 (emphasis added).

### C. The Class Period Ends

On July 9, 2020, the Company disclosed that its liabilities were far greater than earlier disclosed. Among other things, nearly 2,000 additional properties would need to be evacuated and salt mining operations would have to be permanently closed. These additional liabilities were 60% greater than previously disclosed. ¶100. On this news, the price of Braskem ADSs price fell 6.20%. ¶101. Analysts were shocked by the newly disclosed liabilities. J.P. Morgan observed that "[t]he announcement was not expected by investors." ¶102.

### ARGUMENT

### I. THE APPLICABLE LEGAL STANDARDS

A complaint defeats a 12(b)(6) motion by alleging a facially plausible claim to relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable[.]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[P]lausibility…is not akin to… probability…[but] asks for more than

8

a sheer possibility that…defendant…acted unlawfully." *Id.* The Court's role on a 12(b)(6) motion is to determine whether plaintiff is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). "At the motion to dismiss stage, the Court is obliged to accept all factual allegations in the Complaint as true." *Curran v. Freshpet*, No. Civ. A. 16-2263, 2018 WL 394878, at *6 (D.N.J. Jan. 1, 2018).

The elements of a Section 10(b) claim are: (1) a material misrepresentation or omission; (2) scienter; (3) in connection with the purchase or sale of a security; (4) reliance (transaction causation); (5) economic loss; and (6) loss causation. *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 275 (3d Cir. 2006), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Defendants challenge only the first and second elements, and thus concede that the Complaint adequately pleads the remaining four elements.

## II. THE COMPLAINT PLEADS ACTIONABLE MISSTATEMENTS AND OMISSIONS OF MATERIAL FACT

As discussed below, Defendants made material misrepresentations and omissions of material fact about Braskem's role in damage near the Mine, the Company's financial future, and the extent of Braskem's liabilities.

### A. Defendants Did Not Disclose that the CPRM Presented  Evidence Showing Braskem's Role in Damage at the Mine

"To ensure that investors are not misled by statements that are deceptive although literally true, '[o]nce a defendant makes an affirmative statement or characterization about its business, it puts that subject 'in play' and assumes a duty, under the securities laws, to speak truthfully about that subject.'" *In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. 2:16-CV-06509 WHW-CLW, 2018 WL 3772675, at *15 (D.N.J. Aug. 8, 2018) (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 282 (3d Cir. 1992); *Williams v. Globus Med., Inc.*, 869 F.3d 235, 241 (3d Cir. 2017) ("[O]nce a company has chosen to speak on an issue…it cannot omit material facts related to that issue so as to make the disclosure misleading").[4]

On March 21, 2019, Braskem announced that it had attended a meeting in the Brazilian Senate and, thus, put "in play" the meeting and Braskem's role in causing the damage near the Mine:

> Executives of Braskem attended the public hearing [. . . .] with the objective of debating the situation of the district of Pinheiro, in Maceió.
>
> ***
>
> The company is providing support to public authorities [. . . .] and conducting studies to help in the determination of the causes of the event that affects the district of Pinheiro.  ¶108.

---

[4] *See also Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, No. CV 20-200, 2021 WL 1264027 (E.D. Pa. Apr. 6, 2021); *In re Celgene Corp. Sec. Litig.*, No. CV 18-4772, 2020 WL 8870665, at *10 (D.N.J. Nov. 29, 2020) (company liable for "half-truths").

These statements are classic examples of incomplete, actionable half-truths because Braskem failed to disclose that the CPRM provided detailed evidence at the meeting showing that Braskem's operations caused the ground subsidence and damage around the Mine – for which Braskem was strictly liable. *See* ¶¶45, 51-56, 76-80. It was misleading for Braskem to omit this vital information and simply state that it: (i) attended a meeting with the CPRM; (ii) provided information to the CPRM; and (iii) was working to help determine the causes of damage near the Mine.[5]

In *Hall v. Johnson & Johnson*, CA No. 18-1833 (FLW), 2019 WL 7207491, at *18 (D.N.J. Dec. 27, 2019), Judge Wolfson held that defendants had a duty to disclose where plaintiff "sufficiently alleged the existence of scientific evidence, of which defendants were aware, suggesting the falsity of Defendants' statements[.]" *Id.* at *18. Likewise, here the Complaint adequately alleges that CPRM presented "scientific evidence" to Braskem at the March 21, 2019 hearing – which Braskem failed to disclose to the market.

Defendants argue that the March 21, 2019 hearing transcript "belies Plaintiff's allegations" that the CPRM presented evidence showing that Braskem caused the ground subsidence. Br. at 23. This argument is without merit. First, Defendants raise "fact-sensitive" issues concerning the weight of various statements made at the

---

[5] In addition, "statements regarding safety [are] material in industries carrying high safety risks." *Energy Transfer LP*, 2021 WL 1284027, at *12.

11

hearing that cannot be decided at this stage. *See, e.g., Heartland Payment Systems, LLC v. Carr*, No. 3:18-cv-09764-BRM-DEA, 2021 WL 302918, at *6 (D.N.J. Jan. 29, 2021). Second, U.S. investors were not aware of the many statements at the hearing – only of Braskem's misleading public statement in English (¶108) – because the hearing was conducted in Portuguese. *See also infra* at II.B.

Third, Defendants' argument that the transcript shows that the causes of the subsidence "could not yet be determined" cherry-picks certain statements while ignoring the collective weight of the evidence presented. Br. at 22-23. For example, Defendants cite to Senator Cunha's statement at the hearing commencement – ***which was made before any evidence was presented***. Similarly, Defendants' reliance on statements from Antonio Carlos Bacelar and Dr. Sampaio of CPRM and Dr. Federico Bedran of the Ministry of Mines is misplaced because they merely noted that the investigation had not concluded – but offered nothing to diminish the compelling and "blunt" evidence presented that pointed to Braskem's role in causing the damage. *Compare* Br. 22-23 *with* Luttinger Decl. Ex. 1 20, 59.

In fact, Director Bicca (of the National Mining Agency) referenced the CPRM evidence when he classified the event as "neotectonics accelerated by human actions" and testified that the subsidence occurred "due to human actions" including "obviously the issue of mining." Luttinger Decl. Ex. 1 at 20, 24. Bicca also exclaimed that the "interferometry images" presented by the CPRM were "blunt!"

12

and represented "an unambiguous signaling that the process … is at considerable speed for a geological phenomenon." *Id*. at 59; ¶¶53-55. Similarly, Federal Representative Jó Pereira observed that "[a]t the very least, there is joint liability between these persons, whether individuals or legal entities." *Id.* (emphasis added).[6] In short, evidence showing ground subsidence of 100 times the normal rate indicated that "something [ . . .] unnatural is happening." *Id*. at 38; ¶¶41, 51-55.

Furthermore, contrary to Defendants' argument that the evidence presented at the meeting was simply a mixed bag, just two weeks later, the Alagoas state authorities filed a request for injunctive relief and froze R$6.7 billion in Braskem assets to cover damages "arising and related to the effects of mining in the neighborhood and surroundings." ¶57. Critically, the application was based on "sufficient evidence that ***there is a causal connection between the mining activity and the damage*** that is occurring." ¶59 (emphasis added). Indeed, the very same CPRM satellite data presented at the hearing formed the basis of the CPRM's May 8, 2019 report, which definitively determined that Braskem's salt mining operations were the primary cause of the ground subsidence and associated damages. ¶¶63-65.

---

[6] Representative Pereira's declaration was an allusion to Brazil's National Environmental Policy Act Article 14, which required Braskem to "repair or otherwise compensate for damage caused to the environment and to third parties by its activity regardless of fault[.]" ¶¶4, 42, 149.

Defendants also argue that there was no duty to disclose that the CPRM had presented detailed evidence showing Braskem's role in damage near the Mine.  Br. at 23-25.  This argument also fails.  Plaintiff does not allege a duty to disclose in a vacuum.  Rather, the duty to disclose arose when Defendants made affirmative misrepresentations about the hearing without also disclosing the evidence presented, which "bluntly" and "obviously" indicated to both experts and Brazilian elected officials alike that the Mine was linked to the ground subsidence and thus, Braskem was likely to be jointly liable for the damages under Brazilian law.  *See supra* at p. 10; ¶¶41, 51-55, 57, 59, 63-65, Luttinger Decl., Ex. 1 at 59.  For the same reason, Defendants' argument that they need not disclose "facts relating to ongoing government investigations" also fails – once Defendants spoke about the hearing they had to do so completely and accurately.  *See supra* at 10.[7]

---

[7] Defendants' cited case authorities only highlight the weakness of their arguments. For example, in *In re Galena Biopharma, Inc. Sec. Litig.*, No. CV 17-929, 2019 WL 5957859, at *11 (D.N.J. Nov. 12, 2019) (Br. at 25), Defendants selectively quote the opinion, and ignore the court's finding that "[t]he law required Galena to disclose the investigation ***and its potential legal ramifications.***" Similarly, in *Embraer S.A.*, the court found that the defendant adequately disclosed that it was under investigation and that it "might have to pay substantial fines and/or incur other sanctions." *Emps. Ret. Sys. of the City of Providence v. Embraer S.A.*, 16 Civ. 6277 (RMB), 2018 WL 1725574, at *5 (S.D.N.Y. Mar. 30, 2018).  But Defendants here did not disclose ***any*** potential liability or reference ***any*** of the evidence presented at the March 21, 2019 meeting that linked Braskem and the ground subsidence.  In *Howard v. Arconic, Inc.*, 395 F. Supp. 3d 516 (W.D. Pa. 2019), the court held that Item 503(c) does not require disclosure of "uncharged, unadjudicated wrongdoing." 395 F. Supp. 3d at 572.  But here, Plaintiff does not allege Defendants had to disclose "unadjudicated wrongdoing" but rather that Defendants chose to speak about the

Accordingly, the Complaint adequately alleges that Defendants omitted to disclose the evidence presented at the March 21, 2019 hearing.

## B.    Defendants' Truth on the Market Defense Fails

Defendants also argue that there was no duty to disclose the evidence linking Braskem's mining to the ground subsidence because the information was "a matter of public record." Br. at 18-22. This argument, commonly referred to as the "truth on the market" defense, "recognizes that a statement or omission is materially misleading only if the allegedly undisclosed facts have not already entered the market." *Winer Family Tr. v. Queen*, No. 03-4318, 2004 WL 2203709, at *4 (E.D. Pa. Sept. 27, 2004), *aff'd sub nom*, 503 F.3d 319 (3d Cir. 2007). "To prevail on a 'truth on the market' defense at th[e] [motion to dismiss] stage of the litigation . . . defendants must establish that defense ***as a matter of law*** on the basis of the allegations of the Amended Complaint[.]" *In re Res. Am. Sec. Litig.*, No. CIV. 98-5446, 2000 WL 1053861, at *5 (E.D. Pa. July 26, 2000) (emphasis added).

The truth on the market defense "is intensely fact-specific and is rarely an appropriate basis to dismiss a § 10b claim." *Emps. Ret. Sys. Of the P.R. Elec. Power Auth. v. Conduent Inc.*, CA No. 19-8237 (SDW) (SCM), 2020 WL 3026536, at *6

---

hearing and the causes of the subsidence and, thus, had a duty to tell the whole truth. Finally, in *In re Inv. Tech. Grp., Inc.*, 251 F. Supp. 3d 596 (S.D.N.Y 2017), the court found no duty to disclose where there was no "significant change" related to regulatory action. Here, the opposite is true: the CPRM's satellite evidence showed the rapid, severe and unnatural ground subsidence near the Mine.

n.8 (D.N.J. June 5, 2020). Indeed, "this defense requires a fact intensive analysis not suitable for consideration on a motion to dismiss but rather, should be resolved at a later juncture of litigation [….]" *Hoey v. Insmed Inc.*, CA No. 16-4323 (FLW), 2018 WL 902266, at *15 n.12 (D.N.J. Feb. 15, 2018). To the extent it may entertain such a defense at the motion to dismiss stage, a court is "guided by its duty to accept all factual allegations as true and construe the Amended Complaint in a light most favorable to Lead Plaintiffs." *In re Enzymotec Secs. Litig.*, CA No. 14-5556 (JLL) (MAH), 2015 WL 8784065, at *16 (D.N.J. Dec. 14, 2015).

Defendants have not met their heavy burden in asserting this defense because the allegedly corrective information was not "conveyed to the public 'with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by' the alleged misstatements." *Energy Transfer LP*, 2021 WL 1284027, at *31 (citing *In re Merck & Co., Sec., Derivative & "ERISA" Litig.*, No. 05-1151, 2011 WL 3444199, at *35 (D.N.J. Aug. 8, 2011)). First and foremost, the truth could not have been on the U.S. securities market when it was in Portuguese. Indeed, courts are particularly loath to countenance or even analyze truth on the market defenses when foreign languages are involved. *See, e.g., BG Litig. Recovery I, LLC v. Barrick Gold Corp.*, 180 F. Supp. 3d 316, 325 n.59 (D.N.J. 2018) ("[e]ven assuming that such information—which apparently was posted in Spanish—was available to plaintiffs and other investors, it is inappropriate to consider it at this

16

stage"). Tellingly, Defendants retained a translator to translate the hearing transcript, among other documents, from Portuguese to English. *See* Luttinger Decl. Ex. 1 at 172. At bottom, Defendants would have to show that as a matter of law the U.S. securities market fully understood the evidence presented at the hearing, which in addition to being an inappropriate fact question, is simply untenable.

Courts in this District routinely deny motions to dismiss based on the truth on the market defense. For example, in *In re Enzymotec*, Judge Linares denied a motion to dismiss where the defendant asserted that new Chinese regulations were publicly known as evinced through articles, government reports and even analyst reports, because "to prevail on this theory, Defendants would have to show that the market understood the regulations' implications, which is a fact question not properly addressed at this stage." 2015 WL 8784065, at *15.[8]

Courts outside of this district are in accord. In *In re Fuwei Films Sec. Litig.,* 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009), the court found "that the publication of three newspaper articles – in Chinese – does not transform the information contained

---

[8] *See also In re Unisys Corp. Sec. Litig*., No. CIV. 00-1849, 2000 WL 1367951, at *4 (E.D. Pa. Sep. 21, 2000) (truth on the market defense did not apply to a contract that was "not readily available on the [company] website, but rather an investor must pass through two other websites to see the contract"); *Scott v. ZST Digital Networks, Inc.,* CV 11-03531 GAF (JCx), 2012 WL 538279, at *12 (C.D. Cal. Feb. 14, 2012) (article published six months earlier revealing inconsistencies in SEC and Chinese public filings was not "transmitted with the requisite degree of 'intensity and credibility' necessary").

within the articles into 'matters of general public knowledge' that may properly be imputed to Fuwei's stockholders." *Id*. Thus, the court found that "these articles do not excuse Defendants, as a matter of law, from their respective duties to disclose the allegedly misleading information identified by Plaintiffs in this case." *Id*. *See also Snellink v. Gulf Res., Inc.,* 870 F. Supp. 2d 930, 942 (C.D. Cal 2012) (rejecting truth on the market defense when filings with a Chinese regulator were "not public" and "not readily accessible for U.S. investors"); *In re Acadia Pharms. Inc. Sec. Litig.,* 2020 U.S. Dist. LEXIS 95464, at \*17 (S.D. Cal. June 1, 2020) (truth on the market defense could not be established by pointing to an article published in *The Lancet* as "information must be transmitted to the public 'with a degree of intensity and credibility sufficient to effectively counter-balance any misleading impression created by the insiders' one-sided representations'") (citing *In re Iso Ray, Inc. Sec. Litig.,* 189 F. Supp. 3d 1057, 1073 (E.D. Wash. 2016)).

Defendants' authorities to the contrary fall flat. For example, in *Dingee v. Wayfair Inc.*, 15-CV-6941(DLC), 2016 WL 3017401, at \*4 (S.D.N.Y. May 24, 2016), the court found that the allegedly omitted information was disclosed in prior SEC filings and analyst reports in English. That is not the case here. Likewise, Defendants' claim that a "quick internet search" would have revealed the omitted information is without merit; the information was ***never*** disclosed in English and was part of a 100+ page transcript. Br. at 21 (citing *Park Yield LLC v. Brown*, No.

18

18-cv-1947, 2019 WL 6684127, at *8 (S.D.N.Y. Dec. 6, 2019) (where the "quick internet search" merely would have turned up a felony conviction). This is precisely why "the issue of causation is 'usually reserved for the trier of fact.'" *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 655 (E.D. Pa. 2015) (quoting *EP Medsystems Inc. v. Echocath, Inc.*, 235 F.3d 865, 885 (3d Cir. 2000)).[9]

Accordingly, Defendants' truth on the market defense should be rejected.

## C. Defendants Misrepresented Their Purported Assistance to Authorities in Discerning the Cause of Damage Near the Mine

In March of 2019, Defendants represented that Braskem was cooperating with and providing information to Brazilian authorities to discern the cause(s) of the Alagoas ground subsidence. ¶¶56, 66. These representations were misleading and

---

[9] Defendants' remaining authorities are also easily distinguishable. *See Gaer v. Educ. Mgmt. Corp.*, No. CIV.A. 10-1061, 2011 WL 7277447, at *4 (W.D. Pa. Aug. 30, 2011) (relevant public hearings were held before the Department of Education in English); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600 at 652 (S.D.N.Y. 2017) (disclosure in question was covered by U.S. news outlets); *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576-77 (S.D.N.Y. 2013) (disclosure in question was reported by *The New York Times*, *Houston Chronicle*, *Baltimore Sun*, *Dow Jones Business News*, among others); *In re Merrill Lynch & Co. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003) (disclosure was previously made in earlier SEC filings); *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 377 (E.D.N.Y. 2003) (same); *Lovallo v. Pacria Pharms., Inc.*, No. 14-cv-06172, 2015 WL 7300492, at *8 (D.N.J. Nov. 18, 2015) (same); *In re Donald J. Trump Casino Sec. Litig.*, 793 F. Supp. 543, 562 (D.N.J. 1992), *aff'd*, 7 F.3d 357 (2d Cir. 1993) (same). Both *In re Xerox Corp. Sec. Litig.,* 935 F. Supp. 2d 448, 488 (D. Conn. 2013) and *Sailors v. N. States Power Co.*, 4 F.3d 610 (8th Cir. 1993) (Br. at 20 and 21), are similarly inapposite because the Court considered the defense in the context of a summary judgment, not at the pleading stage.

incomplete as Braskem had actually provided the regulators with misleading information relating to its mining activity.  ¶¶15, 73-74. Authorities commenced a criminal investigation in response. *Id*. Defendants argue there was no duty to disclose the failure to provide accurate information to regulators (Br. at 25-27), but their assertions are without merit.

First, Defendants misstate the allegations.  Defendants first represented that they were "providing support to the public authorities" in March of 2019, and the first disclosure of any kind that those representations were false did not take place until May of 2019, when Defendant Musa conceded that the CPRM had completed its own report showing that Braskem was at fault.  But even in May of 2019, Defendants reiterated that the Company had shared its own studies with the agency but failed to disclose that these "studies" were deeply flawed.  ¶¶73, 108, 115.

Second, Defendants argue that the Complaint represents an "attempt to turn the securities laws into a 'rite of confession.'"  Br. at 26.  Not so.  Where Defendants chose to tout their support of the investigation, they had a duty to tell the ***whole*** truth. *See Institutional Investor Group v. Avaya, Inc.,* 564 F.3d 242, 251 (3d Cir. 2009). "[D]isclosure of [such an important] omitted fact would have been viewed by the

20

reasonable investor as having significantly altered the "total mix" of information made available.'" *Matrixx Initiatives Inc. v. Siracusano*, 563 U.S. 27, 38 (2011).[10]

Third, Defendants argue that the representations about providing study results to the authorities were not technically false or misleading because there was no representation as to the "accuracy or completeness of the results." Br. at 27. As set forth above, "even an objectively true statement, if it leaves out material information may be actionable." *In re Bristol-Myers Squibb*, CA 00-1990 (SRC), 2005 WL 2007004, at *22 (D.N.J. Aug. 17, 2005). That is precisely what happened here – Defendants claimed to be sharing information with the CPRM when they were actually sharing ***misleading*** information instead.[11] And here, whether Defendants' statements may have been literally true – providing information to authorities – the statements were still incomplete and misleading. Any reasonable investor would consider the total mix of information "significantly altered" if they knew Braskem

---

[10] In *In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006), although the Court observed that securities laws do not "require a company to accuse itself of wrongdoing" it is "sufficient to show that the challenged statements were actionably unsound when made." *SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 67 (D. Del. 2020) (citing *In re Citigroup*), *appeal filed* 20-3427 (3d Cir. Dec. 8, 2020). *See also Howard*, 395 F. Supp. 3d 472, *supra* at n.4.

[11] *See also McMahan & Co. v. Wherehouse Entm't*, 900 F.2d 576 (2d Cir. 1990) ("Some statements although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth but by the ability of the material to accurately inform rather than mislead [. . . .]").

21

provided inaccurate information to the CPRM and other investigators because it undermines Braskem's representation that it was cooperating with the investigation. Defendants' motion to dismiss on this basis should be denied.

### D.   Defendants Failed to Accurately Disclose Liabilities

Defendants also misled the market about its liabilities associated with the damage near the Mine.  On January 3, 2020, Braskem disclosed in a 6-K filing with the SEC, which was signed by Defendant Freitas, that it had executed an agreement subjecting the Company to further liabilities of over R$2.7 billion. ¶126. These statements were misleading because Defendants downplayed the true scope and severity of the Company's liability. Defendants knew the settlement figure was merely a minimum starting payment – not a final estimate, and knew that Brazilian laws held companies strictly liable. *See* ¶¶42-43, 95.

Defendants' argument that the announced settlement amounts – which were revised upwards time and again during and after the Class Period – are "inactionable forward looking statements" is without merit. Br. at 27. First, Defendants argue that there was never a representation that the provisions would be sufficient to resolve all liabilities the Company might face.  Br. at 28.  But that is *precisely* the conclusion that analysts and the market reached when Defendants announced that Braskem would pay R$2.7 billion to resolve liabilities associated with the ground subsidence in Alagoas – only 40% of the amount it had announced several months earlier.  ¶126.

Indeed, analysts were surprised and relieved: "The amount is lower than the R$3.8bn we had in our model, and we did not expect a **solution** in the short-term ... We see the announcement as positive as it ***mitigates one of investors' key concerns*** with the case." ¶ 98 (emphasis added). Tellingly, Braskem's ADS price rose 4.33% that day and another 7% over the next three days. ¶128.[12]

Subsequent events confirm that Defendants' January 3, 2020 statements were misleading. Specifically, two months later, when a *Reuters* article quoted Brazilian officials as stating that Braskem would likely need to pay significantly greater settlement figures than previously estimated, Braskem doubled down on its previous estimated liabilities. ¶99 (contrasting Defendants' confidence in the estimate and unlikeliness of upward revision with prosecutors' repeated warnings that the amount was a "floor, not a ceiling" and that it was "likely" that additional amounts would be incurred). On July 9, 2020, Braskem abruptly reversed course and announced an extra R$1.6 billion in liabilities due to the continuing fallout of the ground subsidence – namely, thousands of Alagoas residents needed to be relocated. ¶100.

---

[12] Defendants do not address the J.P. Morgan analyst report in their motion to dismiss. Instead, Defendants request judicial notice of an extraneous analyst report. *See* Br. at 3 n.1; 28 n.20. But as the Ninth Circuit recently warned, "the unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99 (9th Cir. 2018) (articulating standard for "plausible" claim at pleading stage).

The same day, analysts from J.P. Morgan expressed shock at the additional provisions, stating that the revision was "not expected by investors, in our view." ¶102.  In response, the price of Braskem's ADSs dropped 6%.  ¶101. In short, Defendants' arguments that the market was aware of the scope of liability is without merit and belied by both analyst and market reaction to the revelation of the truth.

Second, Defendants argue that the truth about Braskem's potential liabilities had already been disclosed to the market.  Br. at 29.  But for the reasons set forth above, the truth on the market defense is not appropriate at this stage.  *See supra* at II.B.  This argument is also belied by J.P. Morgan's reaction to the initial disclosure in January 2020 – "we did not expect a solution in the short-term" – and curative disclosure in July 2020 – "not expected by investors, in our view."  ¶¶98, 102.[13]

Third, Defendants' argument that the estimates were protected by the safe harbor provisions of the PSLRA, (*see* 15 U.S.C. § 78u-5(c)(1)) is also without merit. Br. at 29-31.  The boilerplate snippet disclosures that estimates "may be changed" and "adjusted" do not provide the requisite "meaningful cautionary statements identifying important factors that could cause the actual results to differ materially from those in the" statements at issue.  *See e.g. GSC Partners CDO Fund v.*

---

[13] The surprises continued after the Class Period ended.  On September 15, 2020, J.P. Morgan expressed dismay at the continuing fallout, stating that "[t]he magnitude of expected expenses is a negative surprise – as of 2Q20, BAK had provisions of R$4.6bn related to Alagoas…our understanding was that…any additional provisions would be marginal...***when will it end?***" (emphasis added).  ¶ 105.

24

*Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004) ("cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge") (quoting *Semerenko v. Cendant Corp.*, 223 F.3d 165, 182 (3d Cir. 2000)).  In fact, as set forth above, analysts did not view the settlement announcement as a "starting point" and were surprised when the results were altered.  ¶102.  And federal prosecutors also took pains to push back on Defendants' statements, which the Company then reiterated in rebuttal.  ¶99.  Moreover, "statements of present or historical fact … are not entitled to PSLRA's safe harbor at [the motion to dismiss] stage."  *In re Enzymotec*, 2015 WL 8784065, at *11.  And "the safe harbor provision does not afford corporations a free pass to lie to investors." *In re Veritas Software Corp. Sec. Litig.*, No. 04-831-SLR, 2006 WL 1431209, at *7 (D. Del. May 23, 2006).  And as set forth below, the Complaint also adequately alleges scienter.  Thus, Defendants knew their statements were "false or misleading" (15 U.S.C. § 78u-5(c)(1)) and they are thus ineligible for the second prong of the safe harbor provision of the PSLRA.  Indeed, Defendants repeatedly expressed their confidence in the estimate and unlikeliness of upward revision while, at the same time, prosecutors repeated warnings that the amount was a "floor, not a ceiling" and that it was "likely" that additional amounts would be incurred.  ¶99.

Fourth, Defendants' arguments concerning loan loss reserves do not bear scrutiny.  Br. at 31-32.  Opinions about reserves "may give rise to liability under the

25

securities laws if [they are] not believed by the speaker and contain[] an embedded assertion of incorrect facts… an opinion statement may be actionable if the speaker omits facts concerning the basis for the opinion and 'those facts conflict with what a reasonable investor would take from the statement itself.'" *In re Prudential Fin., Inc. Sec. Litig.*, No. 2:19-cv-20839-SRC-CLW, 2020 WL 7706860, at *8 (D.N.J. Dec. 29, 2020) (quoting *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86, 189 (2015)). In other words, opinions about loss reserves require good faith to be shielded from liability. Consequently, even if Defendants' settlement announcements represented a loan loss reserve under IAS 37 – and Plaintiff does not concede that they do – they did not represent the "best estimate" because Defendants' statements were belied by the prosecutors who negotiated the settlement.[14]

### E.    Defendants Failed to Accurately Disclose Salt Reserve Estimates

On May 9, 2019, Braskem announced the suspension of salt extraction at its plants in Alagoas. ¶ 67. Five months later, in two late-filed annual reports, Braskem nevertheless represented that the Alagoas salt mine would continue production "for

---

[14] Similarly, Defendants' argument that the settlement amounts represented a "subjective auditor judgment... to assess the likelihood of an outflow of resources occurring as a result of the civil lawsuits" is wrong. Br. at 31 n.22. In fact, "any techniques used for evaluating and setting loan loss reserves 'require quantitative and qualitative analyses of the past and present status of loans.'" *Underland v. Alter*, Civ. A. No. 10-3621, 2012 WL 2912330, at *5 n.47 (E.D. Pa. July 16, 2012) (citing *Shapiro*, 964 F.2d at 281).

26

approximately 35 to 45 years," and created the expectation that Braskem's operations would resume. ¶119-25. These statements were misleading because producing chlorine at these rates was unsustainable due to the inherently unsafe situation caused by ground subsidence at and near the Mine. ¶¶ 120, 126.[15]

Defendants argue that these salt reserve disclosures are inactionable for three reasons, but each one lacks merit. First, Defendants argue that the statements were made as of year-end periods that predated the Mine suspensions. Br. 33. But Defendants cite no authority for the proposition that the statements need not reflect facts and evidence that exist when the statements were made. Indeed, the late-filed annual reports included cautionary language concerning the regulatory actions and investigations of the ground subsidence at the Mine (which post-dated the years of the annual reports) but misrepresented the nature of the salt reserves. In fact, Defendants do not argue that the statements were true when made; they were not. A statement "about future events is actionable if it lacks a reasonable basis when made." *In re Veritas*, 2006 WL 1431209, at \*7 (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997)).

Defendants' second argument, that the estimates were protected by the PSLRA's statutory safe harbor, is also unavailing. *See* 15 U.S.C. § 78u-5(c)(1). Although the salt reserve estimates are forward-looking, Defendants' misstatements

---

[15] The mine was permanently closed in November 2019. ¶ 90.

27

do not qualify for the safe harbor because they were: (i) not "accompanied by meaningful cautionary statements" and (ii) made with actual knowledge "that statement was false or misleading." *Id.*

The 2017 and 2018 Forms 20-F do not disclose the risk of a likely (or even possible) permanent shutdown of operations, which must have been in discussion given that the Mine was formally shut just weeks after filing. *See* Luttinger Decl., Ex. 13 at 15; Ex. 14 at 14-15. Defendants failed to make this highly material risk known to investors. Accordingly, "the warning was not tailored to [the] harm" pled in the Complaint. *In re Hertz Global Holdings, Inc. Sec. Litig.*, CA No. 13-7050, 2017 WL 1536223, at *14 (D.N.J. Apr. 27, 2017); *Halperin v. eBanker USA.COM, Inc.,* 295 F.3d 352, 359 (2d Cir. 2002) (plaintiff may establish cautionary language is not meaningful "by showing, for example, that the cautionary language did not expressly warn of … the risk that brought about plaintiffs' loss"). As a result, the cautionary language was not meaningful and does not bring the forward-looking statements under the PSLRA safe harbor.

The safe harbor also does not apply here because the Complaint adequately alleges that Defendants knowingly made the false and misleading statements in the 2017 and 2018 Forms 20-F. *See Aviva Partners LLC v. Exide Techs.,* Civ. A. No. 05-3098 (MLC), 2007 WL 789083, at *20 (D.N.J. Mar. 13, 2007) (safe harbor does not apply when "defendants knew that such statements were false or misleading

28

when made") (citing *In re Advanta Corp., Sec. Litig.*, 180 F.3d 525 (3d Cir. 1999)). Defendants do not argue that the statements were true at the actual time they were made.  *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F. Supp. 2d 589, 611 (D.N.J. 2001) ("An 'estimate' is actionable securities fraud if… the estimate lacked any reasonable basis.")   Defendants had no basis to estimate 35 years of salt production when it was very likely that the Mine would be permanently shut down.

Finally, Defendants argue that no reasonable investor could "have interpreted the estimates as a guarantee that the mines would remain operational" because the Mine suspension had already been announced.  Br. at 34.  But this is, once again, a truth on the market defense that is not suitable to resolution at this stage of the litigation.  *See supra* at II.B.  In fact, a reasonable investor would have no reason to believe that the Mine would be shut permanently when reading the relevant disclosures because Braskem did ***nothing*** to warn for that specific risk.

The motion to dismiss the salt reserve disclosures should be denied.

## III.   THE COMPLAINT ADEQUATELY ALLEGES SCIENTER

A complaint adequately alleges scienter with facts giving rise to a strong inference of either reckless or conscious misbehavior.  *See Avaya*, 564 F.3d at 251; *In re Advanta Corp. Sec. Litig.*, 180 F.3d at 534-35.  "A reckless statement is one involving not merely simple, or even inexcusable negligence, but a danger of misleading buyers or sellers that is either known to the defendant or is so obvious

29

that the actor must have been aware of it." *Avaya*, 564 F.3d at 267 n.42. Thus, Courts in this Circuit do not require proof of intentional fraud. *See id*. at 269. Motive allegations are, likewise, not necessary to plead a strong inference of scienter but can strengthen the scienter calculus. *Tellabs*, 551 U.S. at 224. Significantly, scienter can be inferred from indirect "circumstantial evidence." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1418.

A "strong inference" of scienter is one that a reasonable person would deem "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. The inference need not be irrefutable or a "smoking gun," "or even the 'most plausible of competing inference[s],'" but only "*as likely* as any plausible opposing inference." 551 U.S. at 308, 324, 328. Thus, a tie goes to the plaintiff. *See also Avaya*, 564 F.3d at 269.

Scienter allegations must also be viewed collectively, rather than in isolation. *See Tellabs*, 551 U.S. at 310 ("The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard").

### A.    Braskem's Deceptive Conduct Supports a Strong Inference of Scienter

Braskem's unmistakable pattern of deception surrounding the Company's role in causing damage near the Mine is strong evidence of scienter: (i) Braskem provided authorities with inaccurate information relating to the Company's mining activity

30

(¶¶73, 137); (ii) slides presented to authorities "exaggerated the horizontal scale in relation to the vertical scale, generating a deformed geological model" (¶78); (iii) Braskem concealed data indicating faults in the salt mining area from the Federal Justice Ministry (¶¶77, 138); and (iv) Braskem passed "imprecise information" and failed to provide information that "showed Braskem that there were faults in the Pinheiro neighborhood and the region" (¶¶85, 140).

This Court recently held that similar allegations adequately allege scienter.  In *Vanderhoef v. China Auto Logistics Inc.*, No. 2:18-CV-10174, 2020 WL 5105243, at *3 (D.N.J. Aug. 31, 2020) (Cecchi, J.), the plaintiffs alleged that Defendant China Auto "took steps to impede the internal investigation into related party transactions".  This Court found that such "[a]ttempts to cover up fraud demonstrate a high degree of scienter." *Id.* (citing *SEC v. Desai*, 145 F. Supp. 3d 329, 337 (D.N.J. 2015), *aff'd*, 672 F. App'x 201 (3d Cir. 2016)).  And in *Vanderhoef v. China Auto Logistics Inc.*, No. 18-cv-10174, 2021 WL 3260849, at *4 (D.N.J. July 31, 2021), this Court made similar findings as to two individual defendants.  *See id*. at *4 ("Shiping and Xinwei actively impeded the Investigation to conceal their fraud").

Both *China Auto* decisions are on point.  Here: (i) Braskem concealed data indicating faults in the salt mining area from the Federal Justice Ministry (¶¶77, 138); (ii) sent CPRM technicians inaccurate information relating to the Company's mining activity (¶¶73, 137); (iii) obfuscated the ground subsidence problems at the

31

Mine (¶78); and (iv) failed to pass on information about subsidence (¶¶85, 140). These attempts at a cover-up, like in *China Auto*, support a strong inference of scienter. *See also In re Cognizant Tech. Sols. Corp. Sec. Litig.*, No. CV 16-6509 (ES) (CLW), 2020 WL 3026564, at *22 (D.N.J. June 5, 2020), *motion to certify appeal denied*, No. CV 16-6509 (ES) (CLW), 2021 WL 1016111 (D.N.J. Mar. 17, 2021) ("strong inference of scienter" where plaintiff alleged that defendant executive "approved and executed a plan to conceal the bribery scheme that necessarily entailed deliberately falsifying Cognizant's books, records, and accounts"); *Desai*, 145 F. Supp. 3d at 337 (plaintiff's "effort to mask his violations of federal securities law demonstrates a high degree of scienter").

Furthermore, Defendants had a particular motive to cover up any links between the environmental damage and Braskem's mining activity, as Brazilian law holds companies strictly liable for environmental damage. ¶149. Under NEPA, Article 14, a company "must repair or otherwise compensate for damage caused to the environment and to third parties by its activity regardless of fault," with the two required elements being only the harm itself and some causal link between the harm and the company's activities. ¶150. While motive is not necessary to plead a strong inference of scienter (*see Tellabs*, 551 U.S. 310), Defendants' motive to hide Braskem's role in damage by the Mine further strengthens the inference of scienter.

32

Finally, Braskem's interference with investigations was so serious that it warranted criminal and civil investigations – which further support an inference of scienter. *See Utesch v. Lannett Co., Inc.*, 385 F. Supp. 3d 408, 423 (E.D. Pa. 2019) ("ongoing investigations … may represent a 'piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter'") (citing *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013)).  Here, the CEI recommended that Almeida, Pradines, and Cerqueira be criminally indicted "for [] attempt[ing] to interfere in investigations, and [] use [] economic power to interfere in the case and coerce the State."  ¶¶86, 142.  Likewise, the Federal Justice Ministry of Alagoas recommended civil and criminal indictment for Musa, Almeida, Pradines, and Cerqueira for possible fraud relating to ground subsidence at the Mine.  ¶¶87, 143.  Two criminal inquiries were initiated after the CEI's recommendations.  ¶¶87, 144.[16]

---

[16] The fact that Brazilian authorities opened an investigation into Defendant Musa (along with other Braskem executives) is an important piece of circumstantial evidence showing that Musa had knowledge about the environmental damage Braskem caused in Maceió and made efforts to thwart the government's investigation of the matter. ¶¶86-87, 142-144. It was not offered, as Defendants imply (Br. at 37), as evidence of Musa's "wrongdoing" – but of his knowledge. Thus, *Se. Pa. Trans. Auth. v. Orrstown Fin. Servs., Inc.*, No. 12-cv-993, 2016 WL 7117455, at *11 (M.D. Pa. Dec. 7, 2016) is inapposite since that court held that "[a]n SEC investigation does not 'reveal to the market that a company's previous statements were false or fraudulent.'"

33

**B.    The Individual Defendants' Scienter Can Be Imputed to Braskem Under the "Corporate Scienter" Doctrine**

"The doctrine of corporate scienter allows a plaintiff to plead an inference of scienter against a corporate defendant without raising the same inferences required to attribute scienter to an individual defendant." *In re Cognizant*, 2021 WL 1016111, at *24 (quoting *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246 (3d Cir. 2013)). "Courts have found collective scienter to satisfy the pleading standard where 'the pleaded facts [ ] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'" *Sun v. Han*, CA No. 15-703 (JLL), 2015 WL 9304542, at *12 (D.N.J. Dec. 21, 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital*, 531 F.3d at 195 (2d Cir. 2008)). This Court has noted that "[t]o impute the fraud of an officer to a corporation, the alleged fraud must be committed in the officer's course of employment and for the benefit of the corporation. *China Auto*, 2020 WL 5105243, at *10 (citing *Official Comm. of Unsecured Creditors v. R.F. Lafferty & Co.*, 267 F.3d 340, 358 (3d Cir. 2001)). In sum, when a non-defendant senior official has knowledge about a fraud, that knowledge can be imputed to the corporate defendant.

A wide range of corporate officials have been found senior enough to impute scienter to a corporate defendant. *See, e.g., In re Marsh & McLennan Cos, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 482 (2006) (plaintiffs adequately pled corporate scienter based on bid manipulation by an executive director of marketing); *In re Sanofi Sec.*

34

*Litig.*, 155 F. Supp. 3d 386, 409 (S.D.N.Y. 2016) (Assistant VP of Special Projects and VP President of U.S. Diabetes Unit were considered "management-level employees" for purposes of corporate scienter); *Pa. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 371-72 (S.D.N.Y. 2012) (misdeeds of "vice president, assistant vice president, and senior managers" imputed to company); *Loreley*, *Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177-78 (2d Cir. 2015) (Second Circuit imputed scienter of managing director, whom they referred to as a "high-level employee," to Wachovia); *Lapin v. Goldman Sachs Grp, Inc.*, 506 F. Supp. 2d 221, 242 (S.D.N.Y. 2006) (imputing corporate scienter on behalf of "senior ... analysts and investment bankers").

This is a textbook case of corporate scienter where at least four high-level non-defendant Braskem officers knew of the fraud – including executives with titles similar to those in the cases discussed above: (i) Almeida was Industrial Director of Vinyls; (ii) Cerqueira was Executive Vice President, Brazil Manufacturing and Global Industrial Operations; (iii) Pradines was Braskem's Institutional Relations Manager; and (iv) Alexandre de Castro ("Castro") was Braskem's Business Director of Chlor Alkali and Vinyls until March 2020. ¶146.

Significantly, Almeida and Castro spoke on behalf of the Company at the March 2019 meeting when the CPRM presented detailed information showing

35

Braskem's role in the damage near the Mine.  ¶¶51-55, 147.  And Almeida and Cerqueira each held leadership positions at critical business segments.

Almeida, Cerqueira and Pradines were also recommended for civil and criminal indictment, further illustrating their relationship to and knowledge of the alleged misconduct.  *See* ¶86.  As in *China Auto*, "[w]hen the officer of a company commits fraud, the 'principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger…the rights of innocent investors should be protected. Therefore, the allegations adequately impute scienter to [China Auto].'"  *China Auto,* 2020 WL 5105243, at *3.  *See also In re Cognizant*, 2020 WL 3026564, at *28 (scienter sufficiently pled "notwithstanding that the plaintiff failed to allege scienter with respect to any individual defendant") (internal citation omitted); *Thomas v. Shiloh Indus., Inc.*, No. 15 CV 7449 (KMW), 2017 WL 2937620, at *2 (S.D.N.Y. July 7, 2017) ("a plaintiff can show corporate scienter by pleading…that someone whose intent could be imputed to the corporation acted with the requisite scienter") (citation omitted);  *In re VEON Ltd. Sec. Litig*., No. 15-CV-08672 (ALC), 2017 WL 4162342, at *10 (S.D.N.Y. Sept. 19, 2017) (person whose state of mind is imputed to the corporate defendant need not have a misstatement).

Unlike *Roofer's Pension Fund v. Papa*, No. 16-cv-2805, 2018 WL 3601229, at *19 (D.N.J. July 27, 2018), cited by Defendants (*see* Br. at 39), there is clear "connective tissue" between the knowledge possessed by Almeida, Cerqueira,

36

Pradines, and Castro and the alleged misstatements and omissions. Almeida and Castro were aware that the CPRM had provided evidence in March 2019 showing that Braskem's Mine caused the ground subsidence observed in Maceió, though this fact was not disclosed in Braskem's press release discussing the meeting. ¶¶51-55, 108, 147. Furthermore, by opening investigations into, among others, Cerqueira and Pradines, Brazilian authorities believed that they knew about the ground subsidence and the subsequent investigations, as well as Braskem's frustration of such investigations. ¶¶142-45.[17]

### C.   Corporate Resignations Show Awareness of Wrongdoing

The Third Circuit has noted that the departure of corporate executive defendants can strengthen the inference of scienter. *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 679 (3d Cir. 2011). *See also Papa*, 2018 WL 3601229, at *20 (this Court noted that "resignation of key executives…[can] bolster" scienter). These were no ordinary resignations simply following an alleged fraud – they were suspicious and linked to the allegations. A news report linked CEO Musa's November 21, 2019 resignation with his handling of the ground subsidence at the Mine. ¶¶94, 153. Likewise, in March 2020, Castro

---

[17] Defendants' reliance on *Jackson v. Abernathy*, 960 F.3d 94, 99 (2d Cir. 2020), is misplaced because the plaintiff there "failed to plead facts tending to show that senior executives must have known that the challenged statements were false." *See id.* at 96. Here, by their presence at the March 21, 2019 meeting, Almeida and Cerqueira knew Braskem's statements were misleading.

– who presented at the March 2019 meeting with the CPRM – left the Company.

¶155.   The timing of these resignations further supports an inference that Musa knowingly or recklessly made misstatements and that Castro knew of misconduct that can be imputed to Braskem through the corporate scienter doctrine.[18]

## D.   Defendants' Access to Information Showing Their Statements Were Misleading Is Indicative of Scienter

This Court has noted that a plaintiff alleges a "strong inference of scienter" by "sufficiently plead[ing] [d]efendants'… access to information contradicting their public statements .... [*i.e.*, that] Defendants knew or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" *In re Elecs. for Imaging, Inc. Sec. Litig.*, No. CV 17-5992, 2019 WL 397981, at *6 (D.N.J. Jan. 31, 2019), *appeal dismissed*, No. 19-1844, 2019 WL 5152343 (3d Cir. Sept. 24, 2019).   *See also Avaya*, 564 F.3d at 267 (Third Circuit permits plaintiffs to utilize circumstantial evidence for either conscious or reckless behavior).[19]

---

[18] Defendants' authorities concerning resignations are inapposite.   *See In re Synchronoss Techs., Inc. Sec. Litig.*, No. 17-cv-2978, 2019 WL 2849933, at *18 (D.N.J. July 2, 2019) (plaintiff failed to "allege any specific connection between [the] resignations and the alleged fraud")*; Fain v. USA Techs., Inc.*, 707 F. App'x 91, 97 (3d Cir. 2017) (one executive remained as a consultant and the other had only been in his role for a short period but managed to obtain considerable benefits after his departure); *In re Hertz Global*, 2017 WL 1536223, at *20-21 (the timing of the resignations did not indicate that they were linked to the alleged fraud).

[19] *See also Hull v. Glob. Digital Sols., Inc.*, 2017 WL 6493148, at *21 (D.N.J. Dec. 19, 2017) (defendants reckless where they "'knew facts or had access to information suggesting…statements were [in]accurate"); *In re Eros Int'l PLC Sec. Litig.*, No. CV

The Complaint alleges that the Individual Defendants had access to undisclosed information about the CPRM's findings. *See* ¶¶34, 51-55, 108, 147. These are far from the "conclusory allegations" at issue in *GSC Partners*, 368 F.3d at 239. *See also Hall*, 2019 WL 7207491, at *24 (executives' "access to information contradicting their public statements" pled scienter) (internal citation omitted).[20]

## E.   A Holistic Review Supports a Strong Inference of Scienter

Courts must review scienter holistically.  *Siracusano*, 563 U.S. at 48-49. The inference from the collective scienter allegations must only be as cogent or compelling as a plausible alternative inference. Plaintiff's allegations collectively demonstrate a strong – indeed, compelling – inference of scienter:

- Braskem concealed adverse data, repeatedly presented misleading data, and covered up its role in the ground subsidence (¶¶34, 51-55 108-09, 138);

- Almeida, Cerqueira, Pradines and Castro's knowledge can be imputed to Braskem (¶¶146-48);

- Defendants knew or recklessly disregarded that Brazil would hold Braskem strictly liable for damages at the Mine -- even if it was only a partial cause (¶¶149-51);

- Authorities opened numerous investigations into Braskem executives (¶¶142-43);

---

19-14125, 2021 WL 1560728, at *12 (D.N.J. Apr. 20, 2021); *In re Campbell Soup Co. Sec. Litig.*, 145 F. Supp. 2d 574, 599 (D.N.J. 2001).

[20] Defendants argue that the Complaint does not allege scienter as to Freitas and Simões.  But the Complaint alleges that each had access to the same damning information about Braskem's role in damage at the Mine.  *See* ¶34.

39

- CEO Musa and Business Director of Vinyls Castro resigned from Braskem (¶¶152, 154);

- The Individual Defendants had access to detailed information from the CPRM (¶¶51-55, 63-66).

These allegations collectively provide an inference that Defendants' statements were knowingly or recklessly misleading at least as strong as an inference of innocence.

## IV.   PLAINTIFF ADEQUATELY PLEADS 20(A) CLAIMS

To state a 20(a) claim, Plaintiff must demonstrate a 10(b) violation and that the Individual Defendants were controlling persons of the corporation. *China Auto*, 2021 WL 3260849, at *6.  Plaintiff adequately alleges a 10(b) violation and that the Individual Defendants controlled Braskem's disclosures.  *See* ¶¶192-97.[21]

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

---

[21] As this Court noted in *China Auto*, "the overwhelming trend in this circuit" is that plaintiffs do not have to plead culpable participation. *Id.*, 2021 WL 3260849, at *5. Defendants rely on *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470 (3d Cir. 2013), but although *Belmont* held that "to ***ultimately succeed*** under a Section 20(a) claim, a defendant 'must have been a culpable participant…district courts in the Third Circuit disagree as to 'whether culpable participation must be alleged to survive a motion to dismiss". *De Vito v. Liquid Holdings Grp., Inc.*, No. CV156969KMJBC, 2018 WL 6891832, at *44–45 (D.N.J. Dec. 31, 2018) (citing *Belmont*, 708 F.3d at 484 (3d Cir. 2013).  Regardless, because Plaintiff sufficiently pleads scienter, Plaintiff also satisfies the culpable participation requirement.

Dated: August 27, 2021

Respectfully submitted,

**SCHNADER HARRISON
SEGAL & LEWIS, LLP**
By: /s/ Lisa J. Rodriguez
Lisa J. Rodriguez
Woodland Falls Corporate Park
220 Lake Drive East, Suite 200
Telephone: (856) 482-5222
Facsimile: (856) 482-5754
lrodriguez@schnader.com

*Local Counsel for Plaintiffs and the
Proposed Class*

**BERNSTEIN LIEBHARD LLP**
Michael S. Bigin
Joseph R. Seidman, Jr.
Lisa Sriken
10 East 40th Street
New York, New York 10016
Tel.: (212) 779-1414
Fax: (212) 779-3218
bigin@bernlieb.com
seidman@bernlieb.com
lsriken@bernlieb.com

**WOLF HALDENSTEIN
ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney
Patrick Donovan
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
guiney@whafh.com
donovan@whafh.com

*Co-Lead Counsel for Plaintiffs
and the Proposed Class*

41